IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| JANE DOES 1-9,<br><br>          Plaintiffs,<br><br>v.<br><br>COLLINS     MURPHY,     LIMESTONE COLLEGE, MG FREESITES, LTD d/b/a PORNHUB.COM,  and  HAMMY  MEDIA, LTD. d/b/a XHAMSTER.COM,<br><br>          Defendants. | Civil Action Number: 7:20-cv-00947-TMC<br><br><br>**DEFENDANT MG FREESITES' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |

Defendant MG FREESITES, LTD ("MG Freesites"), pursuant to Rule 7.02, Local Civil Rules, supports its motion to dismiss filed contemporaneously with this memorandum, as follows.

## **INTRODUCTION**

This lawsuit is a legally impermissible attempt to hold a website operator liable for material posted by one of its millions of users around the world.

MG Freesites is the operator of the popular website Pornhub.com (the "Website"), a video-sharing platform that operates in a manner similar to YouTube. The Website enables members of the public to post adult-oriented content and to search for and view content posted by others. According to Plaintiffs, in 2012 or 2013, Defendant Collins Murphy ("Murphy"), illegally recorded videos of several women, including Plaintiffs. *Six years later*, Murphy allegedly posted the videos he made to a "countless" number of websites, including the Website and other websites that have absolutely no affiliation with MG Freesites. Plaintiffs' claims in

this action arise entirely from the allegation that Murphy's user-uploaded videos were among millions of videos hosted and made available on the Website.

If true, Murphy's alleged conduct certainly is disturbing. But well-settled law in this Circuit and others provides complete immunity for website operators from the claims that Plaintiffs have asserted in this lawsuit. Plaintiffs' claims, instead, must be brought against the person (or people) that created or developed the content at issue (such as ***Defendant Murphy***) – not against the Website that (unbeknownst to it) was used by Murphy to disseminate ***his*** content. Section 230 of the Communications Decency Act ("CDA") explicitly and unequivocally protects "computer service providers" from liability arising from content made available on their platforms by users acting as "information content providers." *See infra*. In light of the CDA and its immunity, Plaintiffs do not allege, and cannot ever credibly allege, that MG Freesites engaged in unlawful conduct.

Plaintiffs do not allege MG Freesites created or participated in the creation of the content, directed or instructed Murphy to create his unlawful content, or even was aware of the nature of the content that Murphy uploaded. Plaintiffs' theory would make website owners such as MG Freesites liable for any instance of unlawful conduct engaged in by any one of their millions of users – and thus place them in the untenable position of having to review tens of thousands of uploads every day and make subjective decisions about whether to allow any particular content to be made available. That is precisely what the CDA was designed to avoid. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("Congress carved out a sphere of immunity from state lawsuits for providers of interactive computer services to preserve the 'vibrant and competitive free market' of ideas on the Internet.")

Plaintiffs' effort to recast their allegations as "negligent monitoring" does not save their claims. Courts uniformly have held that where, as here, the defendant's alleged "negligence" is that it failed to screen third party content, that is a claim that arises from MG Freesites' status as an online publisher and thus is barred. Nor can Plaintiffs dodge CDA protection by claiming, in wholly conclusory terms, that MG Freesites somehow "conspired" with Murphy or that Murphy acted as MG Freesites' "agent." Plaintiffs do not allege a single *fact* that could support such a claim. It is wholly implausible that MG Freesites, a Cyprus company, "conspired" with Murphy to create videos in South Carolina six or seven years before the videos were posted to the Internet – not only on the Website, but also on MG Freesites' competitors' sites.

To the extent Plaintiffs can state a claim against Murphy or Defendant Limestone College (the "College"), that dispute is between those parties. But what Plaintiffs cannot do is hold the Internet liable for what Murphy did with his videos after he created them. Accordingly, and for the reasons set forth below, Plaintiffs' claims should be dismissed **with prejudice and without leave to amend**.

## RELEVANT ALLEGATIONS

Plaintiffs are nine women that allege to have been the victims of secret, unauthorized "spy cam" recordings by Murphy, who is a former employee of the College. Specifically, Plaintiffs allege that in 2012, while students at Bellarmine University and members of a field hockey team visiting the College, they were secretly videotaped by a hidden camera while showering and changing clothes in the locker room. Second Amended Complaint ¶¶ 30, 36. (Dkt. # 33; hereinafter, "Compl.")

Plaintiffs allege Murphy created and distributed the unlawful video recordings at issue. Compl. ¶ 1. In 2012, Murphy was employed by the College as its intramural/summer conference

director.  *Id.* ¶ 14.  In that capacity, Murphy had access to the locker room facilities at the
College; placed a hidden video camera in the locker room; and between September 2012 and
October 2013, "secretly recorded multiple women, including women who are not Plaintiffs in
this action, changing clothes and taking showers" (the "Videos").  *Id.* ¶¶ 32, 62.  Murphy then,
"at some point in 2019," "uploaded and disseminated [the Videos] to countless pornographic
websites."  *Id.* ¶ 34.  According to Plaintiffs, Murphy "continues to possess, upload, forward,
and/or disseminate [the Videos]" to the Internet.  *Id.* ¶ 37.

Among the "countless" websites that Murphy uploaded the Videos to were MG Freesites'
Website and others operated by its competitors.  The Website is an online platform like YouTube
and Vimeo that enables members of the public to upload and store audiovisual content, as well as
to view content previously uploaded and shared by others.  *Id.* ¶ 45.  Like YouTube and other
"tube sites," the Website is available to the public for free and receives revenue from advertising.
*See id.* ¶ 17.  Plaintiff alleges Murphy created and "for many years" maintained user accounts on
the Website and other adult tube sites; developed a large following of "thousands of viewers;"
and regularly added spy cam videos (including the Videos) to his accounts.  *Id.* ¶¶ 38-41.

Plaintiffs do ***not*** allege MG Freesites had any role in, or participated in any manner with,
the creation or production of the Videos.  By way of example, Plaintiffs do not allege MG
Freesites owned or operated any purported spy cam; knew or communicated with Murphy
(including in 2012 and 2013); edited or modified any of the Videos; or even purchased them
from Murphy.  Nor do Plaintiffs allege MG Freesites had any knowledge that the Videos were
created without Plaintiffs' authorization or by using locker room "spy cams."  To the contrary,
Plaintiffs specifically allege the Videos were posted to the Website at least six years ***after*** they
were created by Murphy, ***and*** that they were uploaded to "countless" websites – not just MG

Freesites' Website.  Plaintiffs also do not allege MG Freesites' purported relationship with Murphy was any different from its relationship with any other Website user, of which there are millions.  Finally, Plaintiffs do ***not*** allege MG Freesites received or failed to comply with any take-down notices issued by Plaintiffs – only that MG Freesites allegedly received takedown notices by ***other*** women ***in unrelated circumstances*** and thus purportedly was on "notice" that the Videos at issue here might, hypothetically (among the millions uploaded by users), have been made without consent.

Notwithstanding MG Freesites' lack of involvement with and lack of knowledge of the creation of the Videos, Plaintiffs have asserted five separate claims for relief against MG Freesites: (1) Invasion of Privacy, (2) Intentional Infliction of Emotional Distress, (3) "Negligent Monitoring," (4) False Light, and (5) Civil Conspiracy.  The first two claims (Invasion of Piracy and Intentional Infliction of Emotional Distress) are based upon Plaintiffs' allegations that Murphy intentionally secretly videotaped Plaintiffs in the College locker room.  Plaintiffs' claim for "negligent monitoring" and "false light" arise from allegations that MG Freesites failed to achieve or confirm the consent of every person that appears on any uploaded content to the Website.  Finally, Plaintiffs allege in vague and conclusory terms that "Defendants conspired for the purpose of creating sexually lewd content which directly invaded the Plaintiffs' rights to privacy guaranteed by the United States Constitution."  *Id.* ¶ 103.

## ARGUMENT

### *Standard*

A motion to dismiss for failure to state a claim challenges the legal sufficiency of the facts alleged on the face of the complaint.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  To survive a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs may not rely on "labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the complaint must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, while all factual allegations in the Complaint must be accepted as true and construed in the light most favorable to Plaintiffs, the Court is free to ignore "bare assertions devoid of further factual enhancements," as well as "unwarranted inferences, unreasonable conclusions, or arguments." *Nemet*, 591 F.3d at 255.

In other words, the complaint must plead "sufficient facts to allow a court, drawing on judicial experience and common sense, to infer 'more than the mere possibility of misconduct. Without such 'heft,' the plaintiff's claims cannot establish a valid entitlement to relief, as facts that are 'merely consistent with a defendant's liability' fail to nudge claims 'across the line from conceivable to plausible.'" *Nemet,* 591 F.3d at 256 (quoting *Twombly*, 550 U.S. at 570). In such cases, dismissal for failing to state a claim should be with prejudice, when the grounds for dismissal show that an amendment cannot cure the defect. *See generally Iodice v. United States*, 289 F.3d 270, 281 n. 8 (4th Cir. 2002); *see Domino Sugar Corp. v. Sugar Workers Local Union 392*, 10 F.3d 1064, 1067 (4th Cir. 1993) (dismissal without prejudice not appealable unless "no amendment … could cure the defects in the plaintiff's case.") (internal citation omitted).

Plaintiff's Complaint fails to allege any facts sufficient to state a claim for relief against MG Freesites, far less a plausible one.

## I. PLAINTIFFS' CLAIMS FOR 'INVASION OF PRIVACY' AND 'INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS' DO NOT ALLEGE ANY UNLAWFUL CONDUCT BY MG FREESITES.

Plaintiffs' First and Second Causes of Action for invasion of privacy and intentional infliction of emotional distress should be dismissed because they do not arise from any alleged conduct by MG Freesites.

Wrongful intrusion into private affairs and intentional infliction of emotional distress are intentional torts, requiring more than "unintended conduct amounting merely to lack of due care." *Snakenberg v. Hartford Cas. Ins. Co.*, 383 S.E.2d 2, 7 (S.C. Ct. App. 1989) (insurance company had no duty to defend claim for wrongful intrusion into private affairs because claim requires that defendant commit an intentional act, a naturally uncovered event); *Hansson v. Scalise Builders of S.C.*, 374 S.C. 352, 356 (S.C. 2007) (requiring plaintiff to prove each element of the claim of intentional infliction of emotional distress, including that an "*intentional ... act[] of defendant* caused plaintiff's emotional distress").

To the contrary, Plaintiffs' First Cause of Action is based on their allegations that:

> "Defendant *Murphy*, in his capacity as an employee and agent of Defendant *Limestone*, was given access to and/or control over the locker room facilities at Limestone" and "[u]tilizing that access, Defendant *Murphy* placed a hidden video camera in Defendant Limestone's locker room and captured video and images of the Plaintiffs[,] their teammates, and other student athletes from around the nation, all while they were fully nude, or in various stages of undress."

Compl. ¶¶ 61-62 (emphasis added).

Likewise, Plaintiffs' Second Cause of Action for intentional infliction of emotional distress alleges that "the conduct of Defendant *Murphy* in secretly videotaping the Plaintiffs and the other student athletes while totally nude, or in various stages of undress, was done intentionally to inflict severe emotional distress on the Plaintiffs and/or Defendants knew that such distress would likely result from such conduct." Compl. ¶ 69 (emphasis added).

Plaintiffs do not allege, and cannot allege, that MG Freesites had any involvement at all in Murphy's act of placing the hidden video camera or capturing images of Plaintiffs. *See Snakenberg*, 383 S.E.2d at 11 (defining the intrusion element of invasion of privacy as, *inter alia*: "watching, spying, prying, [and] besetting"). Plaintiffs also do not allege and cannot allege

(far less plausibly) that MG Freesites, a Cyprus corporation, had any involvement in providing Murphy with access to the College's locker rooms. Indeed, Plaintiffs allege that Murphy's conduct took place in 2012 and 2013, but the Videos were not uploaded to the Website until 2019. The First and Second Causes of Action should be dismissed against MG Freesites for that reason alone.

## II. PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT.

Irrespective of how Plaintiffs have purported to frame their claims against MG Freesites, *all* of these claims, including for invasion of privacy, intentional infliction of emotional distress, negligence, and civil conspiracy should be dismissed. These claims arise from MG Freesites' alleged publication of content posted by a third party on its online platform, and therefore are barred on their face by the immunity accorded to MG Freesites under Section 230(c)(1) of the Communications Decency Act of 1996 (codified at Title 47, Section 230, United States Code).

Section 230(c)(1) of the CDA states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 USC § 230(c)(1) (2020) ("Section 230"). The Fourth Circuit Court of Appeals examined the law and found, "[b]y its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third party user of the service." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). In other words:

> "[Section] 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content – *are banned*."

*Id*. (emphasis added).

In *Zeran*, the formerly ubiquitous online platform commonly known as 'AOL' was accused of defaming the plaintiff relative to content posted by website users. *Id.* at 328. The Court held that "Section 230 . . . ***plainly immunizes*** computer service providers like AOL from liability for information that originates with third parties" and upheld the District Court's order entering judgment for AOL filed under Rule 12. *Id*. (emphasis added).

The Fourth Circuit addressed Section 230 again in a lawsuit brought by a car dealership relative to negative reviews issued by users on website, 'Consumeraffairs.com.' *Nemet,* 591 F.3d at 252. The Court affirmed the District Court's order dismissing the complaint for failing to state a cause of action on the ground that Section 230 "bar[s] state law plaintiffs from holding interactive computer service providers legally responsible for information created and developed by third parties." *Id.* at 254; *accord Dongziao Yue v. Chun-Hui Miao,* No. 3:18-3467-MGL-PJG, 2019 WL 5872142, *3-4 (D.S.C. June 27, 2019); *Cox v. Twitter, Inc.,* No. 2:18-2573-DCN-BM, 2019 WL 2513963, *3 (Feb. 8, 2019) ("Where the violation alleged by a Plaintiff derives from the Defendant's status or conduct as a publisher, § 230(c)(1) of the CDA prohibits liability.")

"[T]o further the policies underlying the CDA, courts have generally accorded Section 230 immunity a broad scope." *Dongziao Yue*, 2019 WL 5872142 at *4. These policies include, most notably, "to avoid the 'obvious chilling effect' the 'specter of tort liability' would otherwise pose to interactive computer service providers given the 'prolific' nature of speech on the Internet." *Nemet,* 591 F.3d at 254 (quoting *Zeran*, 129 F.3d at 331). As a result, CDA immunity applies to all manner of claims, including claims for negligence, intentional infliction of emotional distress and invasion of privacy. *Zeran*, 129 F.3d 327 (negligence); *Jones v. Dirty World Entertainment Recordings LLC,* 755 F.3d 398 (6th Cir. 2014) (outrage), *Carafino v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) (privacy). In addition, courts should

resolve questions of Section 230 immunity "at the earliest possible stage of the case because the immunity protects websites not only from ultimate liability but also from 'having to fight costly and protracted legal battles.'"  *Id.* (quoting *Fair Housing Counsel of San Fernando Valley* v. *Roommates.com*, 521 F.3d 1157, 1175 (9th Cir. 2008)).

CDA immunity applies if three conditions are met.  "First, [the defendant] must be a 'provider of an interactive computer service.  Second, the offending communications must be provided by another information content provider.  Third, Plaintiff's claims must be premised on Facebook's role as 'publisher' of the third-party content." *Richard v. Facebook, Inc.*, No. 2018-CP-2606158, 2019 WL 8324749, *6 (Ct. of Common Pleas of S. Carolina, May 22, 2019).  All three of these conditions are met here.

A.     **The Website is an "interactive computer service."**

The CDA defines "interactive computer service" as "any information service, system, or access software provider that provides or enables access by multiple users to a computer server." 47 U.S.C. § 230(f)(2) (2020).  This definition "has been construed broadly to effectuate the statute's speech-protective purpose." *Ricci v. Teamsters Union Local* 456, 781 F.3d 25, 28 (2nd Cir. 2015).  "Courts generally conclude that a website falls within this definition." *Ascentive LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 474-75 (E.D.N.Y. 2011).

There can be little serious dispute that MG Freesites' Website – an Internet platform that enables members of the public to upload and view third party content stored on a computer server – is an interactive computer service.  Plaintiffs admit as much, characterizing the Website plainly as a "website" (Compl. ¶¶ 45, 52, 53, 89-93) and online "platform" (*Id.* ¶ 46).  Courts have found a variety of similar online services, including the video-sharing sites YouTube and Vimeo, to be "interactive computer services" and thus the beneficiary of CDA immunity.  *See, e.g., Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150 (N.D. Cal. 2017) (YouTube); *Domen v.*

*Vimeo, Inc.*, 433 F. Supp. 3d 592 (S.D.N.Y. Jan. 15, 2020) (Vimeo); *Richard*, 2019 WL 8324749 at *6 (Facebook); *Fields v. Twitter, Inc.,* 200 F. Supp. 3d 964, 969 (N.D. Cal. 2016) (Twitter).

   **B.    The Videos were provided to the Website by a third party information content provider.**

   An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3) (2020).  Plaintiffs readily admit the Videos were created and provided to the Website by **Murphy***,* and that it was Murphy, not the Website, that was responsible for the creation and/or development of the Videos.  *See* Compl. ¶ 39 (Murphy's viewers "would regularly subscribe and watch the content **he generated and posted**"); ¶ 42 ("Murphy gained an income from the content **he provided** on his accounts"); ¶ 45 (Defendants pay "**those who submit** such media to their website"); ¶ 47 (Defendants "**enlist others to create** [content]"); ¶ 53 (content was "posted on [Murphy's] accounts").  Notably, Plaintiffs never once allege, or even suggest, that MG Freesites had any involvement in creating or developing the Videos, whether by editing or altering them, helping Murphy to capture the images embodied within the Videos, or providing Murphy with any equipment used to create the Videos.  *See Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446, 452 (E.D. Va. 2012) ("There are no allegations that Defendants created the posts or altered them."); *Carafino v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003) (owner of Matchmaker website was not an "information content provider" with respect to the content at issue because it "did not play a significant role in creating, developing, or 'transforming' the relevant information.")

   Plaintiffs' suggestion that MG Freesites became an "information content provider" with respect to third party content because it "encouraged" the posting of explicit videos and created "an avenue for which [Murphy] could be compensated for the uploading of such media," is

without merit. Compl. ¶ 57. That very same argument has been rejected by numerous courts, all of which held that a website owner becomes a content provider only when it has participated in the ***creation*** of the ***specific content*** at issue.

In *Nemet Chevrolet* the plaintiff alleged that the operator of the Consumeraffairs.com website should be liable for defamatory posts on its website because it was "responsible, in whole or in part, for the creation or development" of the posts. *Nemet Chevrolet*, 591 F.3d at 254. The plaintiff argued that Consumeraffairs.com "solicited its customers' complaints, steered them into specific categor[ies] designed to attract attention by consumer class action lawyers, contact[ed] customers to ask questions about their complaints and to 'help" them 'draft or revise' their complaints, and 'promis[ed]' that customers would 'obtain some financial recovery by joining a class action lawsuit.'" *Id.* at 256-57. The Fourth Circuit found that "even accepting as true all of the facts Nemet pled as to Consumeraffairs.com's liability for the structure and design of its website, the amended complaint 'does not show, or even intimate,' that Consumeraffairs.com contributed to the allegedly fraudulent nature of the comments at issue." *Id*. at 257-258. As for the plaintiff's allegation that the defendant "helped" third parties to "draft or revise" their content, that allegation likewise was insufficient to transform the defendant into an information content provider because it was devoid of any facts "to show any alleged drafting or revision by [defendant] was something more than a website operator performs as part of its traditional editorial function." *Id.*

In *Jones* the Court of Appeals for the Sixth Circuit applied CDA immunity to a website that encouraged the posting of rumors and gossip targeting nonpublic figures. *Jones*, 755 F.3d 398. The defendant not only encouraged members of the public to post those rumors, but also reviewed each posting, inserted its own written commentary, and referred to contributors as the

"Dirty Army." *Id.* at 402. The Court held that none of this conduct made the website an information content provider, broadly holding that "an encouragement test would inflate the meaning of 'development' to the point of eclipsing the immunity from publisher-liability that Congress established." *Id.* at 414. To that point, the Sixth Circuit added:

> "Many websites not only allow but also actively invite and encourage users to post particular types of content. Some of this content will be unwelcome to others… Under an encouragement test of development, these websites would lose the immunity under the CDA and be subject to hecklers' suits aimed at the publisher…. Congress envisioned an uninhibited, robust, and wide-open internet, but the muddiness of an encouragement rule would cloud that vision."

Many courts have reached the same conclusion in analogous circumstances, uniformly holding that encouraging or inducing users to post certain categories of content does not transform a website operator into a content provider. *See, e.g., East Coast Test Prep LLC v. Allnurses.com*, -- F.3d --, No. 18-3197 (8th Cir. Aug. 19, 2020); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20-21 (1st Cir. 2016), *superseded by statute, see infra* p. 16-17 (allegations concerning the structure and operation of the website, including allegations that the defendant structured its website in a manner designed to encourage sex trafficking, were insufficient to make the website an information content provider); *Ascentive LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 474-75 (E.D.N.Y. 2011) ("The fact that the defendants invite postings and then in certain circumstances alter the way those postings are displayed is not the 'development' of information for Section 230 purposes."); *Shiamili v. Real Estate Group of New York, Inc.*, 17 N.Y. 3d 281, 290 (2011) ("We reject Shiamili's contention that defendants should be deemed content providers because they created and ran a Web site which implicitly encouraged users to post negative comments about the New York City real estate industry.").

The cursory allegation that MG Freesites purportedly "rewarded" Murphy for posting his content by "shar[ing] the revenues such content generated" does not affect this analysis. Plaintiffs admit that any revenue-sharing arrangement with Murphy was the same arrangement it offers to anyone "who submits [sexual content] to [its] website." Compl. ¶ 45. In fact, the **_very same_** revenue-sharing agreement alleged here is used by YouTube, and had no bearing on the result in *Gonzalez*. *Gonzalez*, 282 F. Supp. 3d at 1155 (alleging "Google has agreed to share with ISIS and ISIS-affiliated users a percentage of revenues generated by these ads."). Similarly, in *In re Bitconnect Securities Litigation*, 2019 WL 9104318, at *12-13 (S.D. Fla. Aug. 23, 2019), the plaintiffs alleged that they were victims of a Ponzi scheme that was promoted, in part, through YouTube videos touting fraudulent cryptocurrency investments. The court found that the claim was "thoroughly foreclosed" by Section 230, even though YouTube was alleged to have provided the fraudsters "with an extraordinary reach" and to have "profited significantly from the exposure of its users to videos advertising Defendants' purported Ponzi scheme." *Id.*

As in all of the cases above, Plaintiffs do **_not_** claim that MG Freesites participated in the creation or development of any of the Videos – far less that MG Freesites had any knowledge that the Videos were unlawfully obtained. *See Jones*, 755 F.3d at 411 (information content provider "means being responsible for what makes the displayed content allegedly unlawful.") All that Plaintiffs claim is that MG Freesites actively encouraged members of the public to post sexually explicit videos. But "Congress has made a… policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others." *Blumenthal v. Drudge*, 992 F. Supp. 44, 52 (D.D.C. 1998).

C.     **Plaintiffs' claims arise from MG Freesites' role as "publisher" of third party content.**

The third requirement for Section 230 immunity is met if a plaintiff "seek[s] to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content." *Zeran*, 129 F.3d at 330.  The manner in which the claim is pled, and the name given to the cause of action, is irrelevant; "[w]here the violation alleged by a Plaintiff derives from the Defendant's status or conduct as a publisher, § 230(c)(1) of the CDA prohibits liability."  *Cox v. Twitter, Inc.*, No. 2:18-2573-DCN-BM, 2019 WL 2513963, *3 (D.S.C. Feb. 8, 2019).

*All* of Plaintiffs' claims arise from MG Freesites' purported publication of the Videos on the Website.  *See, e.g.,* Compl. ¶ 58 (MG Freesites "painted the Plaintiffs in a false light by allowing them to be present on [its] website[].");  ¶ 93 (MG Freesites' conduct "resulted in the presence of illegally filmed pornographic content being present on [its] website.");  ¶ 97 ("Defendants' websites hosted videos of the Plaintiffs…");  *see also Sign-N-Ryde, LLC v. Preferred Auto. Grp., LLC*, No. 2011-UP-554, 2011 S.C. App. Unpub. LEXIS 690, at *2 (Ct. App. Dec. 9, 2011) (citing Restatement (Second) of Torts for the proposition that the tort of "false light" requires "publicity," but affirming dismissal because South Carolina does not recognize a claim for "false light"); *Snakenberg*, 383 S.E.2d at 6 ("Wrongful publicizing of private affairs involves a public disclosure of private facts . . . . The gravamen of the tort is publicity . . . .).  That is exactly the type of conduct that is protected by the CDA.

Plaintiffs cannot avoid the CDA by purporting to cast their claims as "negligent monitoring."  *See Gonazlez*, 282 F. Supp. 3d at 1164 ("Section 230 is implicated not only by claims that explicitly point to third party content but also by claims which, through artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability

or implicated a defendant's role, broadly defined, in publishing or excluding third party [c]ommunications."). Indeed, Plaintiffs' "negligent monitoring" claim – arising from allegations that MG Freesites purportedly failed to "mitigate the exposure of women" – has been consistently rejected by every court that has considered the issue, including appellate courts in the First, Third, and Fifth Circuits.

In *Doe v. MySpace, Inc.*, 528 F.3d 393 at 413 (5th Cir. 2008), a 14-year-old girl created a personal profile on the MySpace website and, after doing so, was contacted by a 19-year-old man and sexually assaulted. The victim and her mother brought a series of claims against MySpace (including for negligence and intentional infliction of emotional distress), alleging that the service was aware that minors were using the website but failed to implement "basic safety measures" to protect them. *Id.* at 416. The Court rejected the plaintiffs' argument, holding that the claims "are barred by the CDA, notwithstanding [plaintiffs'] assertion that they only seek to hold MySpace liable for its failure to implement measures that would have prevented [plaintiff] from communicating with [the attacker]." *Id.* at 420. As here, the allegations "are merely another way of claiming that MySpace was liable for publishing the communications and they speak to MySpace's role as a publisher of online third-party-generated content." *Id.*

*Doe v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), came to the exact same conclusion, even where the website (unlike the one operated by MG Freesites) was designed to encourage and profit from unlawful conduct. In that case, the defendant website took a variety of steps intended to allow members of the public to post advertisements for sexual services, including by offering an option to anonymize email addresses, stripping metadata from uploaded photographs, accepting anonymous payments, and applying a different set of standards for "escort" services. *Id.* at 16, *superseded by statute*, *Stokinger v. Armslist, LLC*, Nos. 144647,

1884CV03236-F, 2020 Mass. Super. LEXIS 69, at *12 (Mar. 13, 2020) ("The 2018 Amendment did not narrow the broad scope of the CDA's immunity—except in relation to sex trafficking. The court's holding in *Backpage.com, LLC* was superseded by the enactment of the 2018 Amendment, but the broad legal principles immunizing other website operators, like [Defendant], remain in effect.").  The Court found that while all of these procedures may have facilitated sex trafficking, they were all "within the purview of traditional publisher functions." *Id.* at 16.  "[C]ourts have rejected claims that attempt to hold website operators liable for failing to provide sufficient protections to users from harmful conduct created by others."  *Id.*  Thus, "even if we assume, for argument's sake, that Backpage's conduct amounts to 'participation in a [sex trafficking] venture'… [t]he strictures of section 230(c) foreclose such suits."  *Id.*

And in *Green v. America Online,* 318 F.3d 465, 471 (3d Cir. 2003), the plaintiff attempted to hold AOL liable for its failure to prevent users of its service from distributing malware designed to harm others' computers.  The court had little difficulty in concluding that these claims (including the plaintiff's claims for negligence) were barred:  "Green's fundamental tort claim is that AOL was negligent in promulgating harmful content and in failing to address certain harmful content on its network.  Green thus attempts to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network — actions quintessentially related to a publisher's role.  Section 230 "specifically proscribes liability' in such circumstances."  *Id.* at 471; *see also Noah v. AOL Time Warner, Inc.*, 261 F. Supp. 2d at 532 (rejecting discrimination claim arising from allegations that AOL failed to protect the plaintiff from harassment based on his religion); *Gonzalez,* 282 F. Supp. 3d at 1150 (rejecting claim that Google was liable for promoting terrorism because it "refused to actively identify ISIS

YouTube accounts" or to make "substantial and sustained efforts to ensure that ISIS would not re-establish the accounts using new identifiers.")

There are good policy reasons for applying CDA protection to these "failure to block" or "failure to screen" allegations.  As the *Zeran* Court explained:

> "Interactive computer services have millions of users.  The amount of information communicated via interactive computer services is therefore staggering.  The specter of tort liability in an area of such prolific speech would have an obvious chilling effect.  It would be impossible for service providers to screen all of their millions of postings for possible problems.  Faced with potential liability for each message republished by their services, interactive computer services might choose to severely restrict the number and type of messages posted.  Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect."

*Zeran*, 129 F.3d at 331 (internal citations omitted).

Likewise here, millions of videos are present on the Website, with many thousands of new videos uploaded each day.  To hold MG Freesites liable for the content of every video uploaded to its website would be manifestly unfair and unjust – especially since Plaintiffs admit that MG Freesites has no ability to determine whether any particular video was filmed without consent and Plaintiffs never even requested that the Videos be removed.

## III.     PLAINTIFFS' AGENCY AND CONSPIRACY ALLEGATIONS ARE PURELY CONCLUSORY AND WITHOUT FACTUAL BASIS.

In a final, misguided effort to avoid the CDA, Plaintiffs have attempted to tie Defendants MG Freesites and Murphy together by broadly alleging that Murphy is MG Freesites' "agent," or that Murphy and MG Freesites "conspired for the purpose of creating sexually lewd content." But these allegations are wholly conclusory and devoid of *any* factual basis.  Compl. ¶¶ 57, 103.

Plaintiffs completely fail to allege a single fact that could plausibly give rise to an inference that Murphy, an independent third party without any relationship to MG Freesites –

and that engaged in the alleged wrongdoing *six years* before the Videos were posted to the Website – is MG Freesites' "agent."

Under South Carolina law, "[t]he test to determine agency is whether or not the purported principal has the right to control the conduct of [its] alleged agent." *Allen v. Greenville Hotel Partners, Inc.*, 409 F. Supp. 2d 672 (D.S.C. 2006). Moreover, "[a] party asserting agency as a basis of liability must prove the existence of the agency, and the agency must be clearly established by the facts." *Frasier v. Palmetto Homes of Florence, Inc.,* 323 S.C. 240, 473 S.E.2d 865, 867 (1996). In contravention of *Frasier*, Plaintiffs do not even attempt to explain the basis for their agency theory, far less provide any facts to support a claim that MG Freesites "controlled" Murphy's conduct, or even was aware of it.

As for Plaintiffs' "civil conspiracy" claim, their entire claim is based upon the wholly conclusory allegation that:

> "During period [sic] alleged in this Complaint, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which resulted in the surreptitious and illegal filming of the Plaintiffs."

Compl. ¶ 104. This is precisely the type of "threadbare recital[]" of the elements of the cause of action" and "conclusory statement[]" that both the Supreme Court and the Fourth Circuit have held to be insufficient as a matter of law to demonstrate an entitlement to relief. *Nemet*, 591 F.3d at 260 (quoting *Iqbal*, 556 U.S at 677).

Ultimately, Plaintiffs' "agency" and "conspiracy" theories are premised on the exact same alleged facts that give rise to their other claims: namely, that Murphy posted the Videos to the Website; Murphy participated in the same content-neutral revenue-sharing agreement offered to all users of the site; and the Website failed to screen or block the Videos from being posted.

As set forth above, these facts are insufficient to state a cause of action because they arise from MG Freesites' status as a publisher of third party online content.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed in their entirety, with prejudice and without leave to amend.

Respectfully submitted,

DATED September 14, 2020                    TURNER, PADGET, GRAHAM AND LANEY, P.A.

Greenville, South Carolina      By:    */s/ R. Taylor Speer*
                                        R. Taylor Speer | Attorney ID: 12267
                                        email | tspeer@turnerpadget.com
                                        direct | 864-552-4618

                                        J. Kenneth Carter | Attorney ID: 05108
                                        email | kcarter@turnerpadget.com
                                        direct | 864-552-4611

                                        Post Office Box 1509
                                        Greenville, South Carolina 29602
                                        facsimile | 864-282-5993

TPGL 10589084V1 16881.00101             *Attorneys for Defendant MG Freesites Ltd*