# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### SPARTANBURG DIVISION

JANE DOES 1-9,

               Plaintiffs,

vs.

COLLINS MURPHY, LIMESTONE
COLLEGE, MG FREESITES, LTD., d/b/a
PORNHUB.COM, and HAMMY MEDIA,
LTD. d/b/a XHAMSTER.COM,

               Defendants.

Case No.: 7:20-cv-00947

---

## HAMMY MEDIA LTD.'S MEMORANDUM IN SUPPORT OF
## MOTION FOR JUDGMENT ON THE PLEADINGS

### INTRODUCTION

*"Although xHamster's website is both commercial and… such a website 'is arguably no more directed at Iowa than at Uzbekistan.'"*

--  *Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359, \*25 (N.D. Iowa Jan. 17, 2012)

In the present case, the Plaintiffs, residents of Indiana, Kentucky, and Texas seek to hold a Cyprus-based company, Hammy Media, Ltd. ("HML"), liable for the actions of another defendant who allegedly posted videos of the Plaintiffs (taken without their consent) to the xHamster website which HML manages out of Cyprus, utilizing servers located in the Netherlands, and which is accessible everywhere in the world that the internet is available. As the Court will see, HML – which removed the videos once it was notified of their existence – has no connections to South Carolina or the United States and is not subject to personal jurisdiction in this Court.

Moreover, even if this Court could exercise jurisdiction consistent with the Due Process requirements of the United States Constitution, the complaint could not survive inasmuch as HML

is entitled to immunity with respect to all of the claims brought by the Plaintiffs pursuant to Section 230 of the Communications Decency Act.

Accordingly, and pursuant to Fed. R. Civ. P. 12(c), HML respectively requests that this Court dismiss Plaintiffs' Fourth Amended Complaint with respect to HML. In further support of its motion, HML states as follows.

FACTS[1]

The Plaintiffs are residents of the states of Kentucky, Texas, and Indiana. Fourth Amended Complaint ("FAC"), ¶¶4-12. At some point in the Fall of 2012, Plaintiffs, who were then members of Indiana University's field hockey team, traveled to Limestone College ("Limestone") to participate in a game against the Limestone College team. FAC, ¶27. Unbeknownst to Plaintiffs, Collins Murphy ("Murphy"), then Limestone's intramural/summer conference director, had surreptitiously placed cameras in the locker room and recorded Plaintiffs and their teammates as they changed their clothes and showered. FAC, ¶¶26, 29-32.

Seven years later – in 2019 – the recordings of the Plaintiffs and their teammates were uploaded to "countless pornographic websites," including xHamster.com, which is owned and operated by HML. FAC, ¶¶19, 34. Plaintiffs believe the videos to have been uploaded to these websites by Murphy. FAC, ¶¶ 37-40.

HML is a Cypriot company headquartered in Cyprus. FAC, ¶19; Answer, ¶19; Declaration of Mardiros Haladjian, ¶3. HML does not now have an office in Texas, nor has it ever had an office in Texas. Answer, ¶19; Haladjian Decl., ¶4. HML does not now have an office in South

---

[1] The Facts stated are taken from the Fourth Amended Complaint; HML's Answer, or the Declaration of Mardiros Haladjian, as indicated. Where HML is without information as to the truth of certain of Plaintiffs' allegations (because those allegations concern parties other than HML), HML accepts those allegations as true for the purposes of the present motion.

Carolina, nor has it ever had an office in South Carolina. Haladjian Decl., ¶5. Indeed, HML does not have an office in the United States, nor has it ever had an office in the United States. Haladjian Decl., ¶6.

HML does not (and has not): have employees in South Carolina or the United States; maintain a bank account in South Carolina or the United States; or pay taxes in South Carolina or the United States. Haladjian Decl., ¶¶7-9.

The xHamster website is free for visitors to use. Haladjian Decl., ¶10. The website is supported entirely by third-party advertising. *Id.* HML does not itself sell advertising on the website, but rather advertising is placed through an ad broker company, which is also located in Cyprus. *Id.,* ¶11. The servers that store the content that is displayed on the xHamster website are located in the Netherlands. *Id.,* ¶12. HML utilizes three Content Delivery Network ("CDN") providers to speed the delivery of content to users, all of whom are located within Europe. *Id.,* ¶13.

The xHamster website is not aimed or directed at any state or any country, but rather it is universally accessible wherever the internet is available. *Id.,* ¶14.

The content that appears on the xHamster website is not created by HML, but rather it is what is known as user generated content ("UGC"). *Id.,* ¶15. This means that the users of the xHamster website themselves upload content to the website. *Id.* The xHamster website hosts more than 7,895,000 videos. *Id.*, ¶16. Users of the website upload approximately 1,000 videos a day. *Id.*

In November of 2019, HML was contacted by Brian Blanton, a Detective with the Gaffney Police Dept. Detective Blanton informed HML – for the first time – that surreptitiously-recorded videos had been uploaded by a user to the xHamster website. *Id.,* ¶17. Detective Blanton first

requested information about the uploader of the video and HML immediately provided him with all of the information that it possessed. *Id.,* ¶18. Detective Blanton then requested that he be provided access to the videos so that they could be downloaded for evidence and, following such downloading, that the videos be taken down. xHamster complied with each of these requests. *Id.,* ¶19. Prior to being contacted by Detective Blanton, xHamster was unaware of the existence of the videos or that they had been recorded without consent. *Id.*, ¶20.

The videos at question in this litigation were uploaded to the xHamster website by a user with the username "cwdistribution." *Id.,* ¶21. At the time the cwdistribution account was created, it was possible for users to upload videos without first going through an identity verification process. *Id.,* ¶22. xHamster does not know the identity of user "cdwdistribution." *Id.,* ¶23. HML has since changed its systems so that uploads are accepted only from accounts which have gone through an identity verification process, which includes providing a copy of a government-issued identification. *Id.,* ¶24. HML has never paid any compensation of any sort to the user "cwdistribution." *Id.,* ¶25. HML has never had any written or verbal communications with the user "cwdistribution." *Id.,* ¶26.

<u>ARGUMENT</u>

I.    <u>Legal Standards</u>

A motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is analyzed under the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Parks v. Rl Enter. & Assocs.*, 2021 U.S. Dist. LEXIS 153886, at *3-4 (D.S.C. Feb. 23, 2021). A rule 12(c) motion "scrutinizes the complaint in a manner similar to a motion to dismiss, except on a 12(c) motion, the court is to consider the answer as well as the complaint . . . . [as well as] documents attached to the pleadings." *Mead v. Gaston Cty.,* 2013 U.S. Dist. LEXIS 157687, at *4 (W.D.N.C.

Nov. 1, 2013). As with a motion brought under Rule 12(b)(6), the purpose of such a motion is to "test the sufficiency of the complaint." *Id.* "[T]he facts alleged 'must be enough to raise a right to relief above the speculative level' and must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Robinson v. American Honda Motor Co., Inc.,* 551 F.3d 218, 222 (4th Cir. 2009)(citations omitted). The complaint "must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Although the court must accept all of the complaint's factual allegations as true, this tenet 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements do not suffice.'" *Parks, supra,* at *4 (citations omitted). Similarly, "conclusory allegations are not entitled to an assumption of truth, and even those allegations pled with factual support need only be accepted to the extent that 'they plausibly give rise to an entitlement to relief.' …The court need not accept unsupported legal allegations… legal conclusions couched as factual allegations… or conclusory factual allegations devoid of any reference to specific acts, dates, or policies. …In sum, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact). *Harrison v. Owens,* 2013 U.S. Dist. LEXIS 113217, at *3-6 (D.S.C. Aug. 12, 2013).

II.    Plaintiffs' Complaint Must Be Dismissed For Lack of Personal Jurisdiction.

Once a defendant raises a challenge to the exercise of personal jurisdiction "the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). And, although a determination of personal jurisdiction under a state's long-arm statute is often viewed as a two-step process –

consideration of whether the state statute authorizes an exercise of jurisdiction, followed by a constitutional due process analysis – where, as here, the state's long-arm statute extends to the limits of the United States Constitution's Due Process Clause, the two inquiries merge into one. *See*, *e.g.*, *Wallace v. Yamaha Motors Corp., U.S.A.,* 2022 U.S. App. LEXIS 447, at \*4-5 (4th Cir. Jan. 6, 2022)("Because South Carolina has interpreted its long-arm statute to extend personal jurisdiction to the constitutional limits imposed by federal due process, our inquiry must focus on due process")(citations omitted); *Sonoco Prods. Co. v. Inteplast Corp.*, 867 F. Supp. 352, 354 (D.S.C. 1994) ("Under South Carolina law, the first requirement [of personal jurisdiction] collapses into the second."); *Goldowsky v. Gareri,* 2018 U.S. Dist. LEXIS 26212, at \*4-5 (D.S.C. Jan. 29, 2018)("The South Carolina Supreme Court has held that the State's long-arm statute, S.C. Code Ann. § 36-2-(803), is coextensive with the limits of the Due Process Clause.' …As a result, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'")(citations omitted).

And, under Fed. R. Civ. P. 4(k)(2), the Court conducts the same constitutional analysis, only applied to the entire country as opposed to a single state. *See*, *e.g.*, *Base Metal Trading v. Ojsc Novokuznetsky Aluminum Factory*, 283 F.3d 208, 215 (4th Cir. 2002) ("Rule 4(k)(2) allows a federal court to assert jurisdiction in cases 'arising under federal law' when the defendant is not subject to personal jurisdiction in any state court, but has contacts with the United States as a whole.").

"To satisfy the constitutional due process requirement, a defendant must have sufficient 'minimum contacts' with the forum state such that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) (quoting *Int'l Shoe Co. v. Wash*., 326 U.S. 310, 316 (1945)).

"The minimum contacts test requires the plaintiff to show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arise[s] out of' those activities." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "This test is designed to ensure that the defendant is not 'haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.' ... It protects a defendant from having to defend himself in a forum where he should not have anticipated being sued." *Id.* (citations omitted).

The United States Supreme Court has reaffirmed that the due process inquiry must focus "'on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). As the *Walden* court explained:

> For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State. Two related aspects of this necessary relationship are relevant in this case.
>
> First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State.... We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State....
>
> Second, our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.

*Id.* at 284-85.

In conducting its analysis, the Court must take extra care before exercising jurisdiction over foreign defendants. As the Supreme Court and the Fourth Circuit have cautioned, "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 115

(1987); *Ellicott Mach. Corp. v. John Holland Party, Ltd.,* 995 F.2d 474, 479 (4th Cir. 1993)(quoting *Asahi* and noting that the need for caution in exercising personal jurisdiction applies "with particular force in actions against foreign national defendants").

The Fourth Circuit has "synthesized the due process requirements for asserting specific personal jurisdiction in a three-part test in which 'we consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Consulting Eng'rs Corp.*, 561 F.3d at 277 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc*., 293 F.3d 707, 712 (4th Cir. 2002)).

### A.    Purposeful Availment

The Fourth Circuit has articulated a series of nonexclusive factors to be considered in determining whether a defendant has engaged in purposeful availment including: "whether the defendant maintains offices or agents in the forum state ... whether the defendant owns property in the forum state ... whether the defendant reached into the forum state to solicit or initiate business ... whether the defendant deliberately engaged in significant or long-term business activities in the forum state ... whether the parties contractually agreed that the law of the forum state would govern disputes ... whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship ... the nature, quality and extent of the parties' communications about the business being transacted ... and whether the performance of contractual duties was to occur within the forum." *Consulting Eng'rs Corp.*, 561 F.3d at 278 (multiple citations omitted).

In the present case, none of the articulated factors are met: HML has no offices or agents in South Carolina or the United States; has never solicited or initiated business in South Carolina or the United States; has no significant or long-term business activities in South Carolina or the United States; there is no contract between HML and Plaintiff selecting South Carolina or United States law (indeed, there is no contract at all between the parties); HML has made no in-person contact with residents of South Carolina or the United States regarding a business relationship; the parties have never communicated with one another; and there were no contractual duties to be performed within South Carolina or the United States. Quite to the contrary, any actions taken by HML were taken wholly and entirely within Cyprus, where HML is headquartered.

Plaintiffs' complaint reveals little about their assertion of personal jurisdiction over HML other than to: (a) erroneously claim that HML had an office in Texas;[2] and (b) state that HML has "made purposeful electronic contacts with the State of South Carolina which resulted in a cause of action recognized by South Carolina." Fourth Amended Complaint, ¶22. Presumably, Plaintiffs are referring to HML's operation of the xHamster website, which is equally accessible anywhere that the internet is available. The operation of a universally accessible website, however, is an insufficient basis for the exercise of personal jurisdiction.

This Court and the Fourth Circuit have soundly rejected the idea that Plaintiffs can meet their burden of proving express aiming simply by pointing to the accessibility of a website within

---

[2] It is unclear where Plaintiffs got the misimpression that HML had an office in Texas, but this misimpression is not entitled to be assumed as true in the face of HML's sworn statement to the contrary. *See, e.g., Maseng v. Lenox Corp.*, 483 F. Supp. 3d 360, 373 n.8 (D.S.C. 2020)("Plaintiff argues that in deciding the Rule 12(b)(2) motion, this court must accept as true her allegation that the Tea Kettle was 'designed, manufactured, tested, packaged, tested, imported, inspected, promoted, sold and/or distributed by Defendants.' …The court disagrees. 'To determine whether a plaintiff has satisfied her burden, the court may consider *both defendant's and plaintiff's* pleadings, *affidavits*, and other supporting documents presented to the court")(citations omitted).

the jurisdiction, even if the website is popular within the relevant jurisdiction. *See, e.g., Conrad v. Benson,* 2020 U.S. Dist. LEXIS 149427, at *6 (D.S.C. Aug. 13, 2020)(finding no personal jurisdiction over the owners of the popular vacation rental website, HomeAway: "the Court finds it lacks specific jurisdiction over HomeAway. HomeAway has shown, and Plaintiff does not substantively dispute, that HomeAway neither targets South Carolina in particular nor leases properties directly to South Carolina residents, acting instead 'as an online marketplace that enables third-party property owners and/or managers to list their properties and potential Travelers to search for and book those properties and engage in rental transactions directly with those property owners.' …HomeAway's website is "accessible to all but targeted at no one in particular'…"); *Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 142-43 (4th Cir. 2020)("Marriott obviously intends to engage in commercial transactions through the website. Nonetheless, the website is not directed at the residents of any particular forum. ... Plaintiffs focus much of their attention on the fact that the website includes South Carolina as an option in the drop-down menu used by customers to select their state of residence when making reservations. South Carolina's inclusion in a list of every other state in the country (and every other country in the world) shows that Marriott was willing to accept reservations from South Carolina residents, but it does not show that Marriott was targeting South Carolina residents through its website. To the contrary, the list of options confirms that the website was accessible to all but targeted at no one in particular"); *ESAB Group, Inc. v. Centricut, L.L.C.*, 34 F. Supp. 2d 323, 331 (D.S.C. 1999) ("While it is true that anyone, anywhere could access Centricut's home page, including someone in South Carolina, it cannot be inferred from this fact alone that Centricut deliberately directed its efforts toward South Carolina residents.").

Numerous other federal courts have similarly held that the maintenance of a website is

10

relevant to specific jurisdiction only where the site is expressly aimed at the forum, which requires the plaintiff to prove that such acts "are performed for the very purpose of having their consequences felt in the forum state." *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 1390-91 (8th Cir. 1991) (quoting *Brainerd v. Governors of Univ. of Alberta*, 873 F.2d 1257, 1260 (9th Cir. 1989)). *See also AMA Multimedia, Ltd. Liab. Co. v. Wanat*, 970 F.3d 1201, 1210 (9th Cir. 2020)(finding no jurisdiction despite the fact that popular adult website received 20 percent of its traffic was from the United States because "'the market for adult content is global,' evidenced by the fact that the other 80% of ePorner's viewers were outside the United States," concluding that "the United States was not 'the focal point' of the website 'and of the harm suffered.' …AMA therefore has not shown Wanat purposefully directed his activities at the United States. The district court correctly found that, on this record, it lacked specific jurisdiction over Wanat"); *Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359, *24-25 (N.D. Iowa Jan. 17, 2012) ("Although I accept as true Fraserside's allegations that xHamster intentionally infringed Fraserside's registered copyrights and trademarks, these allegations, alone, fail to demonstrate that xHamster 'uniquely or expressly aimed' its tortious acts at Iowa.... Although xHamster's website is both commercial and interactive, as an Iowa district court noted in a case presenting similar facts, such a website 'is arguably no more directed at Iowa than at Uzbekistan.'"); *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) ("If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution."); *Toys "R" Us, Inc. V. Step Two, S.A.*, 318 F.3d 446, 452-54 (3d Cir. 2003) ("[T]he mere operation of a commercially interactive web site should not subject the operator to jurisdiction.... Rather, there must be evidence that the defendant 'purposefully availed' itself of

conducting activity in the [jurisdiction]."); *Johnson v. Arden*, 614 F.3d 785, 797-98 (8th Cir. 2010) ("[T]he Johnsons have failed to prove that www.BoutiqueKittens.com is uniquely or expressly aimed at Missouri; thus *Calder* provides no support for their Lanham Act claim."); *Instabook Corp. v. Instapublisher.com*, 469 F. Supp. 2d 1120, 1127 (S.D. Fla. 2006) (finding insufficient contacts in a patent infringement case since, among other reasons, "Defendant could not reasonably anticipate being haled into court in Florida based on its operation of interactive websites accessible in Florida and its sales to two Florida residents" in the absence of "targeting or solicitation of Florida residents"); *Liberty Media Holdings, LLC v. Letyagin, et al.*, 2011 WL 13217328 at *4 (S.D. Fla. Dec. 14, 2011) ("Precedent, however, establishes that maintaining a website accessible to users in a jurisdiction does not subject a defendant to be sued there: those users must be directly targeted, such that the defendant can foresee having to defend a lawsuit...." (and cases cited therein)).

### B.     The Claims do not Arise Out of Activities Directed at the Forum

Given that HML has not aimed any of its activities at South Carolina or the United States, as discussed in detail above, Plaintiffs' claims cannot have arisen out of such actions.

### C.     The Exercise of Jurisdiction Would Not Be Reasonable

In determining if an exercise of personal jurisdiction is constitutionally reasonable, the Fourth Circuit has dictated the consideration of five factors: (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies. *Consulting Eng'rs Corp,* 561 F.3d at 277-79 (citations omitted).

1.      *Burden on the Defendant* – HML is a Cypriot company with no employees or offices in South Carolina or the United States and, as such, it would present a great burden for HML to be required to defend itself in this Court.

2.      *The Interest of the Forum State* – Certainly a state has an interest in protecting its citizens from harm, including the harm allegedly inflicted on the Plaintiff in this action.  The Plaintiffs, however, are not residents of South Carolina and HML is not alleged to have taken any actions within South Carolina or the United States, as such, the state has a diminished interest in the resolution of the present complaint, at least insofar as it sounds against HML.

3.      *Plaintiffs' Interests in Convenient and Effective Relief* – Plaintiffs would undoubtedly face their own burdens in having to litigate claims against HML in Cyprus and, yet, as discussed below, their claims against HML are, in any event, barred by United States law.  More to the point, Plaintiffs can obtain complete and effective relief from other defendants in this action who are undoubtably subject to the jurisdiction of this Court.

4.      *The Final Factors* – To the extent that the final factors are applicable, they weigh in favor of a denial of personal jurisdiction given the important sovereignty concerns at play.  *Ellicot Mach. Corp.*, 995 F.2d at 480 ("Continuing in the *World-Wide Volkswagen* analysis, we perceive that the issues here implicate fundamental substantive social policies affecting international trade, business, and sovereignty concerns.  The involvement of these policies weighs against the reasonableness of jurisdiction in Maryland....  In our view, the total picture implicates the concerns expressed in *Asahi* for constraint in the exercise of personal jurisdiction in an international context.").  *See also*, *Sinatra v. National Enquirer*, 854 F.2d 1191, 1199 (9th Cir.

1988) ("a higher jurisdictional barrier" exists where, as here, the defendants are aliens as opposed to simply citizens from different states "because important sovereignty concerns exist.").

Accordingly, an exercise of personal jurisdiction over HML would not be reasonable.

III.    Plaintiffs' Complaint Must Be Dismissed As It Is Barred In Its Entirety By Section 230 of the Communications Decency Act.

Even if this Court had jurisdiction over HML, it would still need to dismiss Plaintiffs' complaint inasmuch as their claims are precluded by the immunity afforded to HML under Section 230 the Communications Decency Act ("CDA").

Section 230(c)(1) of the CDA provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).  In explaining the import of this section, the Fourth Circuit – in one of the earliest cases interpreting Section 230 – held that "by its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role." *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997).  As the *Zeran* court noted, "the purpose of this statutory immunity is not difficult to discern. Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum."  *Id.*

Recognizing the importance of Section 230 as a *complete bar* to most civil suits, the Fourth Circuit and courts within this circuit have routinely held that the question of Section 230 immunity

should be determined at the "earliest possible stage" of a litigation because, "as we have often explained in the qualified immunity context, 'immunity is an *immunity from suit* rather than a mere defense to liability' and 'it is effectively lost if a case is erroneously permitted to go to trial.' … We thus aim to resolve the question of § 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 254-55 (4th Cir. 2009)(citations omitted)(italics in original). *See also Advanfort Co. v. Cartner,* 2015 U.S. Dist. LEXIS 199411, at *13-14 (E.D. Va. Oct. 30, 2015)("this Court is not persuaded by Plaintiffs insistence that this issue be decided on a motion for summary judgment after some discovery has been conducted, as opposed to at the motion to dismiss stage. Fourth Circuit precedent directs this Court 'to resolve the question of Section 230 immunity at the earliest possible stage of the case because that immunity protects websites not only from ultimate liability, but also from having to fight costly and protracted legal battles.' …As MarEx points out, the Eastern District of Virginia has not hesitated to grant motions to dismiss based on CDA immunity"); *Russell v. Implode-Explode Heavy Indus*., 2013 U.S. Dist. LEXIS 133358, at *14-15 (D. Md. Sep. 18, 2013)("Moreover, Section 230 immunity, like other forms of immunity, is generally accorded effect at the earliest point in the litigation because it is otherwise "effectively lost if a case is erroneously permitted to go to trial.").  Indeed, the *Zeran* case itself involved the Fourth Circuit affirming the District Court's dismissal of plaintiff's complaint pursuant to §230 on a motion for judgment on the pleadings.

And, as the Fourth Circuit has also noted, "to further the policies underlying the CDA, courts have generally accorded § 230 immunity a broad scope."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009)(citations omitted).  *See also Doe v.*

*Backpage.com, LLC,* 817 F.3d 12, 18-19 (1st Cir. 2016)("There has been near-universal agreement that section 230 should not be construed grudgingly. …This preference for broad construction recognizes that websites that display third-party content may have an infinite number of users generating an enormous amount of potentially harmful content, and holding website operators liable for that content "would have an obvious chilling effect" in light of the difficulty of screening posts for potential issues")(citations omitted); *Russell v. Implode-Explode Heavy Indus*., 2013 U.S. Dist. LEXIS 133358, at *14 (D. Md. Sep. 18, 2013)("Notably, the reasoning in Zeran is now accepted by courts across the country, and "[t]he broad reach of the CDA to bar a panoply of torts is supported by other courts that have considered the CDA's reach.").

As other federal courts have recognized, part of affording §230 a "broad scope" is recognizing that a plaintiff should not be allowed to impose civil liability on a provider through the use of creative pleading.  *See, e.g.*, *Barnes v. Yahoo!, Inc.,* 565 F.3d 560, 562 (9th Cir. 2009)("a plaintiff cannot sue someone for publishing third-party content simply by changing the name of the theory from defamation to negligence. Nor can he or she escape section 230(c) by labeling as a 'negligent undertaking' an action that is quintessentially that of a publisher. …It is because such conduct is publishing conduct that we have insisted that section 230 protects from liability 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online'")(citations omitted); *Doe v. MySpace Inc.,* 528 F.3d 413, 420 (5th Cir. 2008)("No matter how artfully Plaintiffs seek to plead their claims, the Court views Plaintiffs' claims as directed toward MySpace in its publishing, editorial, and/or screening capacities"); *M.A. v. Vill. Voice Media Holdings*, 809 F. Supp. 2d 1041, 1058 (E.D. Mo. 2011)("Plaintiff artfully and eloquently attempts to phrase her allegations to avoid the reach of § 230. Those allegations, however, do not distinguish the complained-of actions of Backpage from any other website that

16

posted content that led to an innocent person's injury. Congress has declared such websites to be immune from suits arising from such injuries. It is for Congress to change the policy that gave rise to such immunity.").

In their Fourth Amended Complaint, Plaintiffs allege eight causes of action against HML: four privacy torts (Count I – Wrongful Intrusion Upon Private Affairs; Count II - Wrongful Publicizing of Private Affairs; Count III - Wrongful Appropriation of Personality and Count VIII – False Light Invasion of Privacy); one count for Intentional Infliction of Emotional Distress (Count IV); one count for Negligent Monitoring (Count VII); one court for Civil Conspiracy (Count X); and one Count for RICO violations (Count XI).

Putting aside, for the moment, the fact that some of counts alleged by the Plaintiffs are not recognized under South Carolina law[3] and that, with respect to others, the Plaintiff has failed to allege facts upon which relief may be granted (as this Court held previously),[4] each of the counts articulated by the Plaintiff are barred by the immunity afforded to HML under Section 230 and must, therefore, be dismissed.

---

[3] A number of decisions have noted, for example, that no South Carolina Court has recognized the availability of a state law claim for false light invasion of privacy.  See, e.g., *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 482 (2006); *Brown v. Peterson*, 326 S.C. 409, 422 (1997); *Parker v. Evening Post Publishing Co.*, 317 S.C. 236, 246 1994).  Instead, South Carolina recognizes three (but only three) privacy torts: (1) wrongful appropriation of personality; (2) wrongful publicizing of private affairs; and (3) wrongful intrusion into private affairs.  *See, e.g., J.R. v. Walgreens Boots All., Inc.,* 2021 U.S. App. LEXIS 31389, at *6 (4th Cir. Oct. 19, 2021); *Land v. Barlow,* 2021 U.S. Dist. LEXIS 242859, at *33 (D.S.C. Nov. 17, 2021); *Erickson, supra* at 482.  Similarly, there appear to be no cases in which a court has recognized a claim for "negligent monitoring" under South Carolina law.  Accordingly, Counts VII and VIII should also be dismissed on this basis.

[4] Specifically, this Court previously dismissed Counts I-IV as to Defendant MG Freesites because "even when reviewing the Complaint in a light most favorable to Plaintiffs, this Court cannot draw a reasonable inference that Freesites had any control over Murphy when he recorded Plaintiffs." (D.E. #133).  The same holds true here and, for this reason as well, Counts I-IV of the Fourth Amended Complaint should be dismissed as to HML.

By its very terms, only three conditions are necessary for §230 immunity to apply: (1) the defendant must be a "provider of an interactive computer service" (such as a website); (2) the offending content must have been created by someone other than the defendant (i.e., an "information content provider"); and (3) the liability sought to be imposed must arise from the defendant's actions in "publishing" the offending content. *See, e.g., Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997)("The relevant portion of § 230 states: 'No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.' 47 U.S.C. § 230(c)(1). By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions -- such as deciding whether to publish, withdraw, postpone or alter content -- are barred.").

There can be no question, of course, but that HML, as the operator of the xHamster.com website, is a provider of an interactive computer service. Nor is there any question but that the content in question was created entirely by Defendant Murphy (indeed, the entire Fourth Amended Complaint is premised upon precisely that assertion). And, despite Plaintiffs' "artful pleading," the Fourth Amended Complaint makes clear that Plaintiff seeks to hold HML liable as a publisher of content (the videos at issue) that were created by Murphy and posted to the website by a third-party (whether that was Murphy or some other individual). As such, each of Plaintiffs' claims falls squarely within the protections of §230. Indeed, various federal courts have dismissed each of these causes of action under §230. As just a small sampling of such decisions:

18

**Privacy torts**: *Joude v. WordPress Foundation,* 2014 U.S. Dist. LEXIS 91345, *21 (N. D. Cal. 2014)("assuming without deciding that Plaintiffs have sufficiently pled misappropriation of likeness, their claim nevertheless fails as a matter of law because Section 230 of the Communications Decency Act of 1996 grants immunity to providers like Automattic for publishing content created by third parties"); *Perfect 10, Inc. v. Giganews, Inc.*, 2013 U.S. Dist. LEXIS 71349 (C.D. Cal. Mar. 8, 2013)(holding that §230 barred claims against service providers for violation of publicity rights under California law); *Morton v. Twitter*, 2021 U.S. Dist. LEXIS 66897 (C.D. Cal. Feb. 19, 2021); *Doe v. Mark Bates & Yahoo!, Inc*., 2006 U.S. Dist. LEXIS 93348 (E.D. Tex. Dec. 27, 2006).

**Negligent monitoring/Negligent operation of a website**: *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003) ("Green thus attempts to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network -- actions quintessentially related to a publisher's role. Section 230 'specifically proscribes liability' in such circumstances"); *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 323 (D.N.J. 2015)("The Third Circuit has recognized the CDA's immunity provision to protect internet service providers from allegations of negligently failing to monitor their websites"); *Dyroff v. Ultimate Software Grp., Inc*., 934 F.3d 1093, 1101 (9th Cir. 2019); *Doe v. MySpace Inc.,* 528 F.3d 413 (5th Cir. 2008); *Beckman v. Match.com*, 2013 U.S. Dist. LEXIS 78339, at *16-17 (D. Nev. May 29, 2013); *M.H. v. Omegle.com, LLC*, 2022 U.S. Dist. LEXIS 4543, at *14 (M.D. Fla. Jan. 10, 2022); *Doe v. Mark Bates & Yahoo!, Inc*., 2006 U.S. Dist. LEXIS 93348 (E.D. Tex. Dec. 27, 2006).

**Intention Infliction of Emotional Distress**: *Morton v. Twitter*, 2021 U.S. Dist. LEXIS 66897 (C.D. Cal. Feb. 19, 2021); Doe v. MySpace Inc., 528 F.3d 413, 420 (5th Cir. 2008);

*Beckman v. Match.com*, 2013 U.S. Dist. LEXIS 78339, at *16-17 (D. Nev. May 29, 2013); *M.H. v. Omegle.com, LLC*, 2022 U.S. Dist. LEXIS 4543, at *14 (M.D. Fla. Jan. 10, 2022).

**Civil Conspiracy:** *J.B. v. G6 Hosp., LLC*, 2020 U.S. Dist. LEXIS 151213 (N.D. Cal. Aug. 20, 2020); *Doe v. Mark Bates & Yahoo!, Inc*., 2006 U.S. Dist. LEXIS 93348 (E.D. Tex. Dec. 27, 2006).

**Civil RICO**: *Doe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015)(rejecting plaintiffs' arguments that §230 did not apply to Civil RICO claims); *Icon Health & Fitness, Inc. v. ConsumerAffairs.com*, 2017 U.S. Dist. LEXIS 97761, at *13 (D. Utah June 22, 2017)("The court rejects Plaintiff's argument that the CDA does not immunize RICO violations. Plaintiff first cites to a portion of the CDA that states the Act must not 'be construed to impair the enforcement of . . . any other Federal criminal statute.' 47 U.S.C. § 230(e)(1). Plaintiff appears to believe this language exempts its civil RICO claim from application of the CDA. Yet the explicit statutory language of this exception precludes application of the CDA to federal *criminal* cases. It has no effect on civil matters.").

Given the allegations of the Fourth Amended Complaint, Plaintiff (presumably) believes that two lines of argument strip HML of its immunity under §230: (1) that HML allegedly knew from other, unnamed women that users sometimes posted videos taken without the subjects' consent, and (2) that the xHamster website was structured in such a way as to enable those looking for nonconsensual content to find it more easily.  Even if the Court were to assume the truth of these allegations for the purposes of the present motion, however, neither would take HML outside of the protections of §230.

With respect to the "notice" argument, the Fourth Circuit soundly rejected this proposition in *Zeran:*

Liability upon notice would defeat the dual purposes advanced by § 230 of the CDA. …If computer service providers were subject to distributor liability, they would face potential liability each time they receive notice of a potentially defamatory statement -- from any party, concerning any message. Each notification would require a careful yet rapid investigation of the circumstances surrounding the posted information, a legal judgment concerning the information's defamatory character, and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information.

…In light of the vast amount of speech communicated through interactive computer services, these notices could produce an impossible burden for service providers, who would be faced with ceaseless choices of suppressing controversial speech or sustaining prohibitive liability. Because the probable effects of distributor liability on the vigor of Internet speech and on service provider self-regulation are directly contrary to § 230's statutory purposes, we will not assume that Congress intended to leave liability upon notice intact.

*Zeran, 129* F.3d at 333.

Court after court has held similarly.  *See, e.g., M.A. v. Vill. Voice Media Holdings*, 809 F. Supp. 2d 1041, 1049-51 (E.D. Mo. 2011)("The First Circuit noted in 2007 that '[i]t is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech.' …Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content.  Thus, even if a service provider knows that third parties are posting illegal content, 'the service provider's failure to intervene is immunized.'")(collecting cases*); Baldino's Lock & Key Serv. v. Google, Inc.,* 88 F. Supp. 3d 543, 546-50 (E.D. Va. 2015)("A publishing website is immune under the CDA even when given notice that it has published false information"); *Poole v. Tumblr, Inc.*, 404 F. Supp. 3d 637, 642-43 (D. Conn. 2019)("Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content"); *Universal Commun. Sys. v. Lycos, Inc.,* 478 F.3d 413, 420 (1st Cir. 2007)("It is, by now, well established that notice of the unlawful nature of the information provided

is not enough to make it the service provider's own speech. …We confirm that view and join the other courts that have held that Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content.").

Similarly doomed is Plaintiff's argument that HML is stripped of immunity by virtue of having (allegedly) structured its website in such a way that users could more easily find nonconsensual content. *See Doe v. Backpage.com, LLC,* 817 F.3d 12, 29 (1st Cir. 2016)("The appellants' core argument is that Backpage has tailored its website to make sex trafficking easier….But Congress did not sound an uncertain trumpet when it enacted the CDA, and it chose to grant broad protections to internet publishers. Showing that a website operates through a meretricious business model is not enough to strip away those protections. If the evils that the appellants have identified are deemed to outweigh the First Amendment values that drive the CDA, the remedy is through legislation, not through litigation"); *Universal Commun. Sys., supra* at 420 ("At best, UCS's allegations establish that Lycos's conduct may have made it marginally easier for others to develop and disseminate misinformation. That is not enough to overcome Section 230 immunity"); *M.A. v. Vill. Voice Media Holdings*, 809 F. Supp. 2d 1041, 1049-1050 (E.D. Mo. 2011)("to find Backpage to be not immune from suit based on M.A.'s allegations about how it structured its website in order to increase its profits would be to create a for-profit exception to § 230's broad grant of immunity. This the Court may not do"); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 258 (4th Cir. 2009)("Even accepting as true all of the facts Nemet pled as to Consumeraffairs.com's liability for the structure and design of its website, the amended complaint 'does not show, or even intimate,' that Consumeraffairs.com contributed to the allegedly fraudulent nature of the comments at issue. …Thus, as to these claimed facts in the Development Paragraph, Nemet's pleading not only fails to show it is plausible that

Consumeraffairs.com is an information content provider, but not that it is even a likely possibility.").

CONCLUSION

For the reasons stated hereinabove, Plaintiffs' Fourth Amended Complaint should be dismissed in its entirety with respect to Hammy Media, Ltd.

Respectfully Submitted,

**/s/ Hannah Rogers Metcalfe**
Hannah Rogers Metcalfe, Fed ID. 9943
Metcalfe & Atkinson, LLC
1395 South Church Street
Greenville, South Carolina 29605
(864) 214-2319

Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Valentin D. Gurvits (*pro hac vice*)
Frank Scardino (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com

*Attorneys for Defendant Hammy Media LTD*

March 29, 2022
Greenville, South Carolina