**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| Jane Does 1-9,<br>　　　　Plaintiffs,<br>vs.<br>Collins Murphy, Limestone College, MG Freesites, LTD., d/b/a Pornhub.com, and Hammy Media LTD. d/b/a Xhamster.com,<br>　　　　Defendants. | Case No.: 7:20-cv-00947<br><br>**HAMMY MEDIA LTD.'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** |

**INTRODUCTION**

Just as they did weeks ago in a related case, Plaintiffs' counsel presents this Court with a hodge-podge of random, unverified, and sometimes comically erroneous materials (that Plaintiffs assert must be true because they are on the internet), all of which fall well outside the scope of the pleadings and most of which have no relevance whatsoever to the actual question before this Court, namely whether the Court can exercise personal jurisdiction over Hammy Media Ltd. ("HML"), a Cyprus company, that lacks the requisite contacts with the United States to permit an exercise of personal jurisdiction consistent with the Due Process Clause of the Constitution.

Indeed, Plaintiffs spend a good deal of their memorandum to casting stones at Defendants *other than* HML, apparently believing not only in guilt-by-association, but jurisdiction-by-association as well. Even if *either* of these theories were legally sound (and they are not), Plaintiffs have failed to plead (and cannot plead) facts that reasonably associate HML with the other Defendants or the acts those Defendants allegedly undertook.

Indeed, Plaintiffs' memorandum is so misguided as to accomplish a rare feat: not only does it fail to support Plaintiffs' opposition to the *present* motion, it also further illustrates why this Court should not entertain Plaintiffs' (already-rejected) attempt to amend its complaint for a fifth

time. In further support of its Motion for Judgment on the Pleadings, HML states as follows.

## **BLIND ALLEYWAYS AND DEAD ENDS**

Oddly, Plaintiffs begin their opposition by (yet again) attempting to argue about this Court's denial of their motion to file a *Fifth* Amended Complaint, an amendment which would have **_quadrupled_** the number of defendants – including the *addition* of seven new foreign corporations located in Cyprus, Luxembourg, Ireland, and the British Virgin Islands – and added entirely new causes of action (while dropping others), presumably in recognition of the weakness of claims made in their first four complaints. To support this completely irrelevant line of argument, Plaintiffs cite to: (1) allegations made in a *New York Times* article **about Mindgeek, a completely different defendant** (allegations that do not even appear to involve the Plaintiffs); (2) perceived grievances that Plaintiffs have with motion practice engaged in by **Mindgeek** prior to HML having been served with the Complaint; (3) Plaintiffs' complaint that they were required to comply with the requirements of the Hague Convention in serving HML – a Cyprus company – with the Complaint in this action; and (4) their insistence that a host of *additional* foreign companies need to be added to the present litigation, based solely on Plaintiffs' vague suspicions that there must be some nefarious conspiracy out there somewhere that it might be able to discover if permitted to undertake "extensive discovery."

Clearly, none of this has any relevance to the *actual* motion before this Court, which seeks to dismiss Plaintiffs' Fourth Amended Complaint for lack of personal jurisdiction and immunity under Section 230 of the Communications Decency Act. Moreover, Plaintiffs' memorandum in opposition offers this glimpse of what one can expect if Plaintiffs are allowed to again amend their complaint: unfocused attempts to sling mud in every direction, hoping that something might stick to someone somewhere, coupled with continuing complaints about having to adhere to the procedures mandated by the law when attempting to sue foreign defendants. This way madness lies.

## FACTUAL MISREPRESENTATIONS AND MISDIRECTIONS

Rule 12(b)(6) motions test the sufficiency of the allegations within the four corners of the complaint, considering *only* the facts as alleged in the complaint, documents attached to the complaint, and documents that are referenced in, and central to, the complaint. *See, e.g., Sullivan v. City of Frederick,* 738 F. App'x 198, 199 (4th Cir. 2018); *In re Derivium Capital, LLC v. Cathcart*, 2008 U.S. Dist. LEXIS 138245, at *4 (D.S.C. June 17, 2008). In considering a motion under Rule 12(c), the court expands its inquiry only so far as to include also the answer and the documents attached to or referenced in the answer. *See, e.g., Clavon v. S.C. Dep't of Corr.,* 2021 U.S. Dist. LEXIS 34493, at *7 (D.S.C. Feb. 24, 2021)("The key difference between a Rule 12(b)(6) motion and a Rule 12(c) motion is that the court 'consider[s] the answer as well as the complaint' and 'documents incorporated by reference in the pleadings' on a Rule 12(c) motion"); *Rli Ins. Co. v. Innovative Emp'r Sols., LLC,* 2021 U.S. Dist. LEXIS 256438, at *1 (D.S.C. Apr. 20, 2021)("in addressing a Rule 12(c) motion, the Court may consider the Answer and attached exhibits in addition to the Complaint.")

Despite this rather black letter law proposition, Plaintiffs' memorandum in opposition to HML's motion is littered with factual allegations found nowhere in the pleadings, as well as "facts" that are only "facts" by virtue of the fact that they appear somewhere on the internet which, of course, makes them true. And, although it would be impossible to catalog every such instance, three "factual" assertions stand out as particularly egregious:

- "xHamster's secretive and convoluted business structure is discussed in an article published by a German magazine, Das Spiegel and references the mysterious 'Mr. H.'" Opposition, p.5, n.3. Even if the Court were to put aside the fact that this article is well outside of the scope of the pleadings in this case -- and that the footnote reads like a plot summary for an episode of Scooby Doo – there is no "mysterious Mr. H" even mentioned in the attached article. Rather, the article

3

suggests that a reporter surprised Mardiros Haladjian at home; found that he spoke only "broken English," and he declined to answer questions. Of course, none of this has any relevance past Plaintiffs' attempts to waive their hands in the air and say "spooky, spooky." Indeed, to the extent that Plaintiffs make any attempt at all to demonstrate some actual "relevance" to the Das Spiegal article it is to argue that HML is related to the advertising company, Traffic Stars. Opposition, pp. 6-7. Even if the Court could consider this outside-the-pleadings allegation contained in a chart in a translated Das Spiegal article, the chart suggests nothing more than an (unspecified) connection between two Cyprus-based companies, hardly the stuff upon which personal jurisdiction in the United States can be based.

- "By some independent accounts, xHamster brings in an estimated $236,175,120 in revenue annually." Opposition, p. 5, citing to a random website "worthofweb.com." Once again, this allegation is both wholly outside the pleadings and irrelevant but, perhaps more to the point, it is also laughably absurd. Indeed, the website itself admits that its calculations – which are little more than guesses based on other estimates – are far from reliable. *See* **Exhibit A** ("We are totally aware that it is practically impossible to be accurate with these estimations. After all, we are using public ranking systems which are not so accurate in the first place.") As some measure of how wildly inaccurate these guesses are: worthofweb.com estimates that the xHamster.com website is worth approximately $2.9 **billion**, *more than the same site estimates Walmart.com and McDonalds.com to be worth,* **combined**. *See* **Exhibit B**.

- "A cursory check of the internet shows that xHamster may indeed have servers (or contracts to provide servers) in the US. …The above screen shots were taken from the internet…. " Opposition, p. 6. There are only two possibilities here: either Plaintiffs lack even a basic understanding of how the internet operates, or they understand that what they're saying to the Court is wildly misleading and they simply do not care. Neither is particularly encouraging. Preliminarily,

Plaintiffs' supposition that xHamster *may* have servers in the United States is directly contradicted by the Haladjian Declaration. *See* Haladjian Decl., ¶12 ("The servers that store the content that is displayed on the xHamster website are located in the Netherlands.")

Moreover, despite Plaintiffs' representations to the contrary, Cloudflare does *not* host content or provide websites with servers. *See,* "What is Cloudflare," located at https://developers.cloudflare.com/fundamentals/get-started/concepts/what-is-cloudflare/, attached hereto as **Exhibit C** ("What Cloudflare is not: Cloudflare is not generally a hosting provider.") Instead, Cloudflare interposes itself between an internet user and the website's servers and, by doing so, protects the servers from malicious attacks and helps speed content delivery, no matter where in the world the user is located. *See* "How Cloudflare Works," located at https://developers.cloudflare.com/fundamentals/get-started/concepts/how-cloudflare-works/, attached hereto as **Exhibit D** ("All requests to and from your origin flow through Cloudflare and — as these requests pass through our network — we can apply various rules and optimizations to improve security, performance, and reliability. … Beyond hiding your origin's IP address from potential attackers, Cloudflare also stops malicious traffic before it reaches your origin web server.") What this means – as Plaintiffs could easily have ascertained had they bothered to check before making representations to this Court – is that "…all traffic to your origin server will *appear* to be coming from Cloudflare IP addresses."  *See* "Cloudflare IP addresses," located at https://developers.cloudflare.com/fundamentals/get-started/concepts/cloudflare-ip-addresses/, attached hereto as **Exhibit E** (emphasis added).

Cloudflare – an international company with data servers in "250 cities in 100+ countries" (including Nicosia, Cyprus, where HML is located), provides its services to "over 25 million Internet properties," representing "more than 10% of all websites… including 16% of the Fortune 1000." *See* **Exhibits F and G, respectively**. Ultimately, HML's utilization of Cloudflare is jurisdictionally

5

irrelevant and Plaintiffs' attempt to mislead the Court into believing that Cloudflare hosts the xHamster servers should give the Court pause.

## ARGUMENT

Plaintiffs next make a series of half-hearted legal arguments (more suggestions, really, than arguments), apparently believing that the Court should be tasked with doing the actual work of determining whether any of Plaintiffs' positions have merit. They do not. And, while HML will not retread ground covered in its Motion for Judgment on the Pleadings, it will respond to some of Plaintiffs' hinted-at arguments.

I. Revenues Alone Are Insufficient to Establish Personal Jurisdiction.

Plaintiffs first suggest that the question of specific personal jurisdiction is no more complicated than their saying: HML has lots of revenues worldwide; some of those revenues must come from the United States; therefore, personal jurisdiction is appropriate in the United States. Opposition, p. 5. This "argument," however confuses alleged contacts with the forum and *jurisdictionally relevant* contacts with the forum. Here, the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017) is particularly instructive. In *Bristol-Myers*, "more than 600 plaintiffs, most of whom are not California residents, filed [a] civil action in a California state court against Bristol-Myers Squibb Company (BMS), asserting a variety of state-law claims based on injuries allegedly caused by a BMS drug called Plavix." *Id.* at 1777.

Although *Bristol-Myers* "engages in business activities in California and sells Plavix there," the Supreme Court nonetheless found that the California courts could not exercise personal jurisdiction over the claims brought by non-California residents. The Court reached this conclusion despite the fact that "BMS does sell Plavix in California. Between 2006 and 2012, it **sold almost 187 million Plavix** pills in the State and **took in more than $900 million from those sales**." *Id.* at 1778 (emphasis added).

Nevertheless, the Supreme Court rejected the argument that these sales could be considered for specific jurisdiction purposes because the sales did not relate directly to the claims brought by the non-resident plaintiffs:

> Settled principles of specific jurisdiction control this case. For a court to exercise specific jurisdiction over a claim there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.... When no such connection exists, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.... The mere fact that other plaintiffs were prescribed, obtained, and ingested Plavix in California does not allow the State to assert specific jurisdiction over the nonresidents' claims. Nor is it sufficient (or relevant) that BMS conducted research in California on matters unrelated to Plavix. What is needed is a connection between the forum and the specific claims at issue.

*Id.* at 1776 (internal citations omitted). *See*, *also*, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 930, n.6 (2011)("[E]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales"); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 139 (4th Cir. 2020) ("Marriott's business activity in South Carolina is not insignificant, as it franchises, licenses, or manages ninety hotels in the state. Those activities, however, have nothing to do with the claims asserted by the Plaintiffs in this action. That is, the claims asserted after Bud Fidrych's injury in a Marriott-affiliated hotel in Milan do not in any sense 'arise out of or relate to' Marriott's connections to the hotels located in South Carolina. Because the Plaintiffs' claims do not arise from them, Marriott's hotel-related connections to South Carolina are not relevant to our specific-jurisdiction inquiry"); *XMission, L.C. v. Fluent Ltd. Liab. Co.,* 955 F.3d 833, 849 (10th Cir. 2020) (rejecting personal jurisdiction in Utah over internet service provider that received more than $3 million in revenue from Utah during the relevant time period because plaintiff failed "to show that Fluent's $3 million in Utah revenue reflected a sufficient 'affiliation between the forum and the underlying controversy.'"); *Matus v. Premium Nutraceuticals, LLC*, 715 Fed.Appx. 662, 663 (9th Cir. 2018) (rejecting plaintiff's claims that defendant could be haled into

court in California based on defendant's "online business in California," because "his claims do not 'arise from' an online purchase that Matus made from Premium's website.... Rather, Matus's claims 'arise from' only the online activities that Premium aimed at the entire world. If Premium can be haled into California merely on the basis of its universally accessible website, then, under Matus's proposed rule, it can be haled into every state, and respectively, every online advertiser worldwide can be haled into California."); *Advanced Tactical Ordnance Sys.*, 751 F.3d at 801-02 (7th Cir.) ("Looking at the over 600 sales that Real Action allegedly made to Indiana residents in the two years before suit was filed does not help matters. Specific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the proposed forum state. The only sales that would be relevant are those that were related to Real Action's allegedly unlawful activity. Advanced Tactical – which has the burden of proof here – has not provided evidence of any such sales.")

The same holds true here. Even if HML receives *some* amount of revenue from advertising on its website because United States based website users view one or more of the ***7.9 million videos hosted on the website***, from a jurisdictional basis, the only real question is whether HML received any substantial revenue as a result of United States based website visitors viewing the small handful of videos that appeared for a short time on the xHamster website *in which the Plaintiffs appeared*. And, while there are no allegations that *any* US website visitors viewed the videos at issue in this case (or that HML received revenuse from advertising that was displayed to any such viewers), even if Plaintiffs had made such an allegation, the amount of revenue attributable to the videos involving the Plaintiffs would be so infinitesimally small as to be jurisdictionally irrelevant.

II.     The Website's General Popularity Is Not Jurisdictionally Relevant.

Similarly, Plaintiff suggests that personal jurisdiction is appropriate simply because the xHamster website is popular within the United States. The mere fact that a website is popular within a jurisdiction, however, does not mean that the website is *aimed* at that jurisdiction.

Indeed, at least one other federal court has specifically rejected the argument that **HML** was subject to personal jurisdiction based on the percentage of U.S. visitors to the xHamster website. *See Fraserside IP L.L.C. v. Hammy Media, LTD*, 2012 U.S. Dist. LEXIS 5359 (N.D. Iowa Jan. 17, 2012) (rejecting personal jurisdiction despite allegations that "xHamster's website www.xHamster.com is visited daily by over 1,500,000 internet users worldwide with roughly 20 percent of the site's visitors being from the United States.") This is consistent with the numerous other federal courts have, in similar situations, rejected the argument that a foreign defendant may be subject to personal jurisdiction in the United States based simply on a website that garners significant traffic from the United States. *See, e.g.*, *AMA Multimedia, Ltd. Liab. Co. v. Wanat*, 970 F.3d 1201, 1210 (9th Cir. 2020)(finding no jurisdiction despite the fact that popular adult website received 20 percent of its traffic was from the United States because "the market for adult content is global," evidenced by the fact that the other 80% of ePorner's viewers were outside the United States,"); *Liberty Media Holdings, LLC v. Letyagin, et al.*, Civil No. 11-62107-CV-Williams (S.D. Fla. Dec. 14, 2011) ("Plaintiff contends that Defendant has 'considerable' web traffic originating from the United States and has presented an exhibit showing that fifteen percent of the visitors to the website are from the United States. Precedent, however, establishes that maintaining a website accessible to users in a jurisdiction does not subject a defendant to be sued there: those users must be directly targeted, such that the defendant can foresee having to defend a lawsuit...." (and cases cited therein)); *Fraserside IP, L.L.C. v. Youngtek Solutions, Ltd.*, 2013 U.S. Dist. LEXIS 3779 (N.D. Iowa Jan. 10, 2013) (allegations that "17 to 20 percent of visitors to Youngtek's websites are U.S. citizens"); *Fraserside IP L.L.C. v. Netvertising Ltd.,* 2012 U.S. Dist. LEXIS 180949 (N.D. Iowa Dec. 21, 2012) (allegations that "16.7% percent of HardSexTube's website's daily visitors are from the United States"); *Fraserside IP L.L.C. v. Letyagin*, 885 F. Supp. 2d 906 (N.D. Iowa 2012) (allegations that "eighteen percent of SunPorno's website's 2,500,000 daily visitors are from the

United States); *Fraserside IP L.L.C. v. Youngtek Solutions Ltd.,* 2012 U.S. Dist. LEXIS 98041 (N.D. Iowa July 16, 2012) (allegations that "the EmpFlix.com website is allegedly visited daily by over 1,500,000 internet users worldwide with approximately 16.9 percent of the site's visitors coming from the United States. The TNAFlix.com website is allegedly visited daily by over 3,000,000 internet users worldwide with approximately 21.5 percent of the site's visitors coming from the United States.").

      III.      The Appearance of Third-Party Geolocated Ads on the Website Does Not Subject HML to Personal Jurisdiction.

Utilizing the worst redaction ever to grace a federal filling, Plaintiffs point to two pictures that they claim are screen shots that counsel observed while allegedly accessing the xHamster website, suggesting that they support the supposition that some advertisements that appear on the xHamster website are customized based on the user's location (no matter where in the world that may be). Here, too, the Court can simply end its analysis by noting that neither the pictures, nor the allegations appear anywhere in Plaintiffs' pleadings. Or, the Court could note that the photos in question are completely unrelated to Plaintiffs' claims (the photos do not depict Plaintiffs) and, as such, are irrelevant to the question of specific personal jurisdiction. But, even if the Court were to proceed past all of the obvious reasons why Plaintiffs' "argument" fails, it should note that other federal courts have rejected the premise that the use of geolocated ads – advertisements that change depending on the location of the viewer[1] – is a sufficient basis for an exercise of personal jurisdiction. *See, e.g., AMA Multimedia, Ltd. Liab. Co. v. Wanat,* 970 F.3d 1201, 1211 (9th Cir.

---

[1] *AMA Multimedia, Ltd. Liab. Co. v. Wanat,* 970 F.3d 1201, 1204-05 (9th Cir. 2020)("The advertiser then 'geolocates' the advertisements, meaning visitors to ePorner.com see advertisements based on their perceived location. For example, visitors thought to be in the United States see selected advertisements in English, while visitors thought to be in France see selected advertisements in French.")

2020("AMA alleges, and Wanat's expert agreed, that ePorner uses geo-located advertisements, which tailor advertisements based on the perceived location of the viewer. This tailoring does not establish that Wanat *expressly aimed* ePorner at the United States. ePorner's geo-located advertisements, provided by a third-party advertising company ... are always directed at the forum: a viewer in the United States will see advertisements tailored to the United States while a viewer in Germany will see advertisements tailored to Germany.... If such geo-located advertisements constituted express aiming, ePorner could be said to expressly aim at *any* forum in which a user views the website... …To find specific jurisdiction based on this would run afoul of the Supreme Court's directive in *Walden* and "impermissibly allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis"); *Triple Up, Ltd. v. Youku Tudou, Inc.,* 2018 U.S.App.LEXIS 19699, *7-8 (D.C. Cir. July 17, 2018)(the appearance of 'geographically targeted' advertisements" on the website did not support a finding of personal jurisdiction); *Mireskandari v. Daily Mail & Gen. Trust PLC*, 2020 Va.Cir.LEXIS 104 (Fairfax Cir. Ct. July 27, 2020) (rejecting geotargeted ads as a basis for personal jurisdiction, particularly where such ads did not form the basis of plaintiffs' complaint); *Backgrid USA, Inc. v. Modern Notoriety, Inc.*, 2021 U.S. Dist. LEXIS 199388, at *16 (C.D. Cal. Sep. 15, 2021)("The Supreme Court 'made clear that the third-party advertiser's behavior cannot be attributed to the defendant as a contact.' …Because the targeted advertisements are selected by a third party, their geographic focus cannot support a finding that Defendant Castillo expressly aimed its intentional acts at Southern California.")

Plaintiffs, however, point to *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344 (4th Cir. 2020), claiming that it requires a different result here. It does not. In *Kurbanov,* the Fourth Circuit found personal jurisdiction over the Defendant to be proper based on a number of factors (all properly alleged by Plaintiffs there, as opposed to the complaint here), which included the fact that Plaintiffs there had alleged that the websites' primary purpose since its inception was the

11

infringement of Plaintiffs' copyrighted works. *Id.* at 348 ("The Websites offer visitors a 'stream-ripping' service through which audio tracks may be extracted from videos available on various platforms (e.g., YouTube) and converted into a downloadable format (e.g., mp3). A large portion, perhaps a majority, of the streams ripped using the Websites is alleged to derive unlawfully from YouTube videos.") In other words, the majority of visitors to the websites at issue were using the websites specifically to commit the copyright violations which were the subject of the lawsuit. In contrast, Plaintiffs here claim that a tiny number (less than 10) of videos were uploaded to xHamster.com by Defendant Murphy, where they could be viewed for a short time until HML was alerted to their existence and removed the offending content. *See,* Haladjian Decl., ¶¶17-19. This, on a website that hosts more approximately 17.9 million videos, that receives more than 1,000 user uploads a day. *Id.* Unlike *Kurbanov*, then, where the Fourth Circuit found personal jurisdiction appropriate based in large part on the allegations that the majority of the websites' use was the infringement of the copyrights of US-based defendants, Plaintiffs here claim that fewer than 10 of the 17.9 million videos that appear on the website are relevant to their claims.

      Moreover, the *Kurbanov* Court specifically held that the alleged geolocation was but one of many factors which – although individually might not have supported a finding of jurisdiction – did in the aggregate. *Id*. at 354 ("We also find several other relevant facts, together with those already discussed, suggest that Kurbanov intended to invoke the protections of Virginia and the United States more generally. … Kurbanov has also contracted with U.S.-based advertising brokers, registered his Websites with U.S.-based domain registers, and until recently relied on U.S.-based servers. These facts might not be *individually* sufficient to confer specific personal jurisdiction, but when viewed in the context of other jurisdictionally relevant facts, they contradict Kurbanov's contention that he could not have anticipated being haled into court in Virginia.") In short, the Court in *Kurbanov* was faced with a scenario in which Plaintiffs had properly alleged in their pleadings

multiple factors supporting personal jurisdiction, none of which Plaintiffs have alleged here.

### IV. Simply Alleging A Civil RICO Claim Is Not A Basis for Personal Jurisdiction.

Plaintiffs next claim (in a single sentence) that personal jurisdiction can be asserted over HML simply because Plaintiffs' complaint contains a Civil RICO claim, citing 18 U.S.C. §264 and a case from the Northern District of Alabama, *Roche Diagnostics Corp. v. Priority Healthcare Corp.,* 2020 U.S. Dist. LEXIS 81450, at *21 (N.D. Ala. May 8, 2020). What Plaintiffs fail to tell this Court, however, is that the civil RICO statute specifies that such jurisdiction may only be asserted in a district "in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. §265(a). The *Roche* case similarly held that jurisdiction in that case was proper under 18 U.S.C. §265(d), which allows for proceedings in a district where a defendant may be served "in which such person resides, is found, has an agent, or transacts his affairs."  The Court went on to note that "In this case, no Defendant has argued that Roche failed to serve him process 'in any judicial district in which [he] is found.'" *Id.* at *22. HML is not found in the United States (or South Carolina), has no agent here, and transacts no business here.

Additionally, as at least one Court in *this district* has held, an assertion of personal jurisdiction under the RICO statute still requires a finding that such jurisdiction is consistent with Due Process. *See, e.g., Grayson Consulting, Inc. v. Cathcart,* 2013 U.S. Dist. LEXIS 152149, at *20 (D.S.C. Oct. 22, 2013)("Grayson's assertion that personal jurisdiction is proper pursuant to RICO and Rule 4(k)(2) fails for the same reasons that doomed its assertion of specific personal jurisdiction. That is, Grayson has not shown that Vision should reasonably anticipate being haled into court in this country. Grayson has simply not demonstrated that Vision's contacts with the United States are enough to warrant the exercise of personal jurisdiction over it.")  And, of course, the RICO statute does not provide a basis for personal jurisdiction where, as here, the RICO claim itself is not strong enough to survive a motion to dismiss. *Dtex, LLC v. BBVA Bancomer, S.A.,* 405

F. Supp. 2d 639, 652 (D.S.C. 2005) ("Based on the above analysis, Plaintiff's RICO claim must be dismissed under Rule 12(b)(6). RICO'S nationwide service of process provision therefore cannot provide a basis for personal jurisdiction in this Court.")

      V.      <u>Section 230 Bars Plaintiffs' Claims.</u>

Finally, Plaintiffs argue that Section 230 of the Communications Decency Act does not bar their claims because, they say, the Section does not apply to Civil RICO claims. In support of this assertion, Plaintiffs cite to a single case from the Central District of Illinois, claiming that the case holds that "the CDA mat not be used to bar a Civil RICO claim because that would impair the enforcement of a Federal criminal statute." Opposition, p. 11, citing *Nieman v. Versuslaw, Inc.*, 2012 U.S. Dist. LEXIS 109069, at *25-26 (C.D. Ill. Aug. 2, 2012). The cited case says no such thing. To the contrary, the *Nieman* court first dismissed plaintiff's RICO claim for failing to state a claim upon which relief could be granted. In *dicta*, the Court then addressed the question of whether Section 230 applied to civil RICO claims, ultimately concluding that it could not – and need not – decide the question. *Id.* ("Finally, it is unclear whether § 230 would bar a RICO claim. This Court has found no caselaw on the issue. …arguably, § 230 of the CDA may not be used to bar a civil RICO claim because that would impair the enforcement of a Federal criminal statute. However, the Court need not resolve these issues as the Court has already determined that Plaintiff has not stated a claim under any of the Counts he alleged in his Second Amended Complaint.")

In reality, those Federal Courts to have directly addressed question have found that Section 230 does indeed preclude Civil RICO claims. *See, e.g., Baldino's Lock & Key Serv. v. Google, Inc.*, 88 F. Supp. 3d 543, 547 (E.D. Va. 2015)(first holding that all of plaintiff's claims, including its Civil RICO claims, were precluded by §230, before also holding that plaintiff had failed to properly plead a claim for Civil RICO); *Doe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015)(rejecting plaintiffs' arguments that §230 did not apply to Civil RICO claims and collecting

14

cases in support of this argument); *Icon Health & Fitness, Inc. v. ConsumerAffairs.com*, 2017 U.S. Dist. LEXIS 97761, at *13 (D. Utah June 22, 2017)("The court rejects Plaintiff's argument that the CDA does not immunize RICO violations. Plaintiff first cites to a portion of the CDA that states the Act must not 'be construed to impair the enforcement of . . . any other Federal criminal statute.' 47 U.S.C. § 230(e)(1). Plaintiff appears to believe this language exempts its civil RICO claim from application of the CDA. Yet the explicit statutory language of this exception precludes application of the CDA to federal *criminal* cases. It has no effect on civil matters.")

CONCLUSION

For the reasons stated hereinabove and in HML's Memorandum in Support of Motion for Judgment on the Pleadings, Plaintiff's Amended Complaint should be dismissed in its entirety with respect to Hammy Media, Ltd.

Respectfully Submitted,

**/s/ Hannah Rogers Metcalfe**
Hannah Rogers Metcalfe, Fed ID. 9943
Metcalfe & Atkinson, LLC
1395 South Church Street
Greenville, South Carolina 29605
(864) 214-2319

Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Valentin D. Gurvits (*pro hac vice*)
Frank Scardino (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459

Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com