UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| **JANE DOES 1-9,** | **Case No.: 7:20-cv-00947-JD** |
| **Plaintiffs,** | |
| **vs.** | |
| **COLLINS MURPHY, SHARON HAMMONDS, BRENDA F. WATKINS, LIMESTONE UNIVERSITY, MG FREESITES, LTD., d/b/a PORNHUB.COM, MG FREESITES II LTD., MINDGEEK S.A.R.L., MINDGEEK USA, INC., MG BILLING LTD., and HAMMY MEDIA LTD. d/b/a XHAMSTER.COM, TRAFFICSTARS LTD., WISEBITS LTD, XHAMSTER IP HOLDINGS LTD, WISEBITS IP LTD** | **FIFTH AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| **Defendants.** | |

The Plaintiffs, complaining of the Defendants, would respectfully show the Court the following:

**INTRODUCTION**

1.    This is a case about the pernicious, deliberate, and willful exploitation and trafficking of women through the creation and worldwide publication, distribution and monetization of non-consensual pornographic videos by sophisticated and almost impenetrable enterprises designed for that purpose; owned, operated, managed and / or controlled by Defendants MINDGEEK S.A.R.L. and HAMMY MEDIA, LTD., their parents, subsidiaries, affiliates, partners, divisions and / or associates.

2.      The Plaintiffs are all young women who fell victim to these criminal enterprises when Defendant Collins Murphy ("Murphy") intentionally placed a hidden "spy camera" in a locker room located within Defendant LIMESTONE COLLEGE, for the purpose of surreptitiously filming the Plaintiffs and other women in all stages of undress, and then uploading the video footage to one or more websites controlled by Co-Defendants.

3.      This is also a case about the negligence of Defendant LIMESTONE UNIVERSITY (then Limestone College) to reasonably investigate Defendant Murphy before hiring him and placing him in a position where he had access to carry out the secret non-consensual filming of the Plaintiffs, despite the fact that similar allegations of misconduct had been made against Murphy prior to his hiring and it was reasonably foreseeable that he would perform such actions.

4.      Plaintiffs bring this action against LIMESTONE for the described negligence and these Co-Defendants, who financially benefited from, or otherwise participated in a sex trafficking venture; who engaged in a plan, scheme, conspiracy and course of conduct that invaded the Plaintiffs rights under the United States Constitution in violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§1591, 1595, the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1962, 1964, and other laws as set forth below.

## JURISDICTION AND VENUE

5.      The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §1331, because this action arises under the laws of the United States.  Jurisdiction is further appropriate under 18 U.S.C. §1596, which provides for jurisdiction over any offender, in addition to any "domestic or extraterritorial jurisdiction otherwise provided by law," where the offender is "present in the United States, irrespective of the nationality of the alleged offender."  Subject

matter jurisdiction is also proper under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00 exclusive of interest and costs and is between citizens of different states.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought, and the defendants engage in substantial business activities in this judicial district.

## PARTIES

7.     Plaintiff, Jane Doe 1 (hereinafter referred to as "Plaintiff 1"), is and was at all times mentioned herein, a citizen and resident of Jeffersonville, Clark County, Indiana.

8.     Plaintiff, Jane Doe 2 (hereinafter referred to as "Plaintiff 2"), is and was at all times mentioned herein, a citizen and resident of Louisville, Jefferson County, Kentucky.

9.     Plaintiff, Jane Doe 3 (hereinafter referred to as "Plaintiff 3"), is and was at all times mentioned herein, a citizen and resident of Louisville, Jefferson County, Kentucky.

10.     Plaintiff, Jane Doe 4 (hereinafter referred to as "Plaintiff 4"), is and was at all times mentioned herein, a citizen and resident of Louisville, Jefferson County, Kentucky.

11.     Plaintiff, Jane Doe 5 (hereinafter referred to as "Plaintiff 5"), is and was at all times mentioned herein, a citizen and resident of Louisville, Jefferson County, Kentucky.

12.     Plaintiff, Jane Doe 6 (hereinafter referred to as "Plaintiff 6"), is and was at all times mentioned herein, a citizen and resident of Louisville, Jefferson County, Kentucky.

13.     Plaintiff, Jane Doe 7 (hereinafter referred to as "Plaintiff 7"), is and was at all times mentioned herein, a citizen and resident of Louisville, Jefferson County, Kentucky.

14.     Plaintiff, Jane Doe 8 (hereinafter referred to as "Plaintiff 8"), is and was at all times mentioned herein, a citizen and resident of LaGrange, Oldham County, Kentucky.

15.    Plaintiff, Jane Doe 9 (hereinafter referred to as "Plaintiff 9"), is and was at all times mentioned herein, a citizen and resident of San Antonio, Bexar County, Texas.

16.    At present, and all times relevant to this action, Defendant **LIMESTONE UNIVERSITY** (hereinafter referred as "Limestone") is a private co-ed liberal arts college located at 1115 College Drive, Gaffney, South Carolina 29340, and carries out its business by and through its agents, servants, and/or employees, and is therefore directly and vicariously liable for the wrongful acts described in this Complaint.

17.    Defendant **BRENDA F. WATKINS** is a citizen and resident of Gaffney South Carolina and was, at all times relevant to this action, Director of Human Resources for Limestone College.

18.    Defendant **SHARON HAMMONDS** is a citizen and resident of Gaffney South Carolina and was, at all times relevant to this action, Director of Human Resources for Limestone College.

19.    Defendant, **COLLINS MURPHY**, is a citizen and resident of Rockville, Maryland. At all times mentioned herein, Defendant, Collins Murphy, was employed by Limestone as its intramural/summer conference director.

20.    Under the doctrine of *respondeat superior*, Defendant Limestone was and is responsible for the actions and conduct of Defendants Watkins, Hammonds, and Murphy done while employed by Limestone as its agents and employees in the course and scope of their employment, including but not limited to hiring and supervising decisions, and Defendants are thereby jointly and severally liable to Plaintiffs for their injuries and damages.

21.    Defendant **MG FREESITES, LTD**., d/b/a Pornhub.com is a Cypress company with headquarters located at Block 1, Dali Industrial Area, 195-197 Old Road Nicosia-Limassol Dali, 2540 Cyprus, which conducts business throughout the United States, including within this District in South Carolina.  Upon information and belief, MG FREESITES, LTD is a wholly

owned subsidiary of MINDGEEK S.A.R.L., either directly or through intermediary companies that are also under the control of MINDGEEK S.A.R.L. Upon information and belief, MG FREESITES, LTD owns, operates, and/or manages one or several of the websites at issue and is predominantly under the control of and operated by directors, officers and employees working in MindGeek's offices in the United States and Canada, with little business operations being conducted within the Republic of Cyprus, where MG FREESITES, LTD is incorporated.

22.     Defendant **MG FREESITES II LTD**, is a foreign entity incorporated under the laws of the Republic of Cyprus conducting business throughout the United States, including within this District in South Carolina. Upon information and belief, MG FREESITES II LTD owns, operates, and/or manages one or several of the websites at issue or otherwise is responsible for content that is the subject matter of this action.  Upon information and belief, MG FREESITES II LTD is., either directly or through intermediary companies, under the control of MINDGEEK S.A.R.L.

23.     Defendant **MINDGEEK S.A.R.L.** is a foreign entity incorporated in Luxembourg conducting business throughout the United States, including within this District in South Carolina.  Formerly known as ManWin, MINDGEEK S.A.R.L. is the consolidation of two large pornography companies, Mansef and InterTube. Over the past decade, MINDGEEK S.A.R.L. acquired competing businesses and now owns and operates over one hundred (100) pornographic websites, production companies, and brands. MINDGEEK S.A.R.L.'s principal place of business is Montreal, Canada, with satellite offices in San Diego, Los Angeles, San Francisco, London, Bucharest (Romania), and Nicosia (Cyprus).

24.     Defendant **MINDGEEK USA, INCORPORATED**, is a corporation incorporated in the State of Delaware conducting business throughout the United States, including within this

District in South Carolina. Upon information and belief, MINDGEEK USA, INCORPORATED is a wholly owned subsidiary of MINDGEEK S.A.R.L., either directly or through intermediary companies also under the control of MINDGEEK S.A.R.L.

25.     Defendant **MG BILLING LTD** is a foreign entity incorporated under the laws of Ireland conducting business throughout the United States, including within this District in South Carolina. Upon information and belief, MG BILLING LTD owns, operates, and/or manages the subscription services for one or several of the pornographic websites under the control of MINDGEEK S.A.R.L.

26.     Herein, "**MindGeek**" refers to MindGeek S.A.R.L., MG Freesites, Ltd., MG Freesites II, Ltd., MindGeek USA, Incorporated, MG Billing LTD, and all of their parents, subsidiaries and affiliates, including but not limited to the business and website known as **PORNHUB**.

27.     Over the years, MindGeek's corporate grouping has included over one hundred subsidiaries and related companies around the world, including the United States. The complete details of this complex network of related companies is unknown to the Plaintiffs at this time. MindGeek S.A.R.L. exercises ultimate control and domination of the finances, policy, and business practices of the MindGeek entities. MindGeek entities are or were the alter egos of each other operating as a single business enterprise, commingling its funds and other assets to shelter and avoid liabilities and in an effort to hide the identity of all its owners and investors. All MindGeek Defendants are jointly and severally liable in this action as alter egos of the other.

28.     MindGeek and its subsidiaries have utilized the United States judicial system to enforce their intellectual property, contractual, and other rights relating to the business they systematically and routinely conduct within the United States, including their pornographic websites.

29.     Defendant **HAMMY MEDIA, LTD.** d/b/a **xHamster** (hereinafter referred to as "**HAMMY MEDIA" or "xHAMSTER**") is a Cypriot company operating pornographic media and social networking sites, headquartered in Limassol, Cyprus. and has a US office in Houston Texas.  It is the front for a number of alter-ego and affiliate corporations which all comprise the xHamster operation.

30.     Defendant Hammy Media LTD has made purposeful electronic contacts throughout the United States, including within this District of South Carolina.

31.     **TRAFFICSTARS LTD** is a Cypriot company conducting business throughout the United States, including within this District in South Carolina. Upon information and belief, TrafficStars owns, operates, and/or manages the advertising placement and revenue for one or several of the pornographic websites under the control of Hammy Media.

32.     **WISEBITS LTD** is a Cypriot company conducting business throughout the United States, including within this District in South Carolina. Upon information and belief, Wisebits LTD owns, operates, and/or manages the IT and content monitoring, among other services, for one or several of the pornographic websites under the control of Hammy Media, including xHamster.

33.     **XHAMSTER IP HOLDINGS LTD.** is believed to be a company registered in the British Virgin Islands with its principal place of business in St. John's, Antigua and it conducts business throughout the United States, including within this District in South Carolina.  It holds the XHamster trademark and does business in the name of XHamster.  XHamster IP Holdings is a subsidiary of Defendant Wisebits IP Ltd.

34.     **WISEBITS IP LTD.** is a Cypriot company conducting business throughout the United States, including within this District in South Carolina. Upon information and belief, Wisebits IP

LTD owns, operates, and/or manages the Defendant XHamster IP Holdings Ltd and controls the use of the XHamster brand.

35.    Herein, "**XHAMSTER**" includes defendants Hammy Media Ltd, TrafficStars Ltd, Wisebits Ltd, XHamster IP Holdings Ltd, Wisebits IP Ltd. and all of their parents, subsidiaries and affiliates, including but not limited to xHamster.com.

## BACKGROUND

36.    Defendant MindGeek owns and operates the pornographic website Pornhub.  As of 2020 Pornhub was amongst the five most trafficked sites in the world with 42 billion visits per year, 115 million visits per day, and 4.5 million visits per hour. The site boasts 6.8 million videos uploaded per year that would take a total of 169 years to watch.  According to Feras Antoon, the CEO of Enterprise MindGeek Canada, Pornhub is a leading free, ad-supported, adult content hosting and streaming website, offering visitors the ability to view content uploaded by verified users, individual content creators and third-party studios.  One study in 2020 concluded that Pornhub was the website with the third greatest impact on society in the 21st century, after Facebook and Google.

37.    MindGeek is an international pornography conglomerate that has obtained a near monopoly on the porn industry. It owns more than 100 websites, production companies and brands.  In addition to Pornhub, its properties include Redtube, Youporn, XTube, Tube8, Playboy Digital, SpankWire, ExtremeTube, Men.com, My Dirty Hobby, Thumbzilla, PornMD, Brazzers and GayTube, to name a few. As the New York Times put it, "Mindgeek is a porn titan. If it operated in any other industry the Justice Department could be discussing an antitrust case against it."

38.    Pornhub's business model is built as an ad-supported platform.  About 50% of Pornhub's revenues come from advertising.  And the industry is lucrative.  Pornhub's annual revenue is hundreds of millions of dollars per year.  Recent estimates suggest that the online porn industry as a whole may generate as much as $97 Billion per year.  The traffic producing this revenue is driven by content.  In the arms race to be the number one result in the Google search engine for porn, the defendants know it is a huge advantage to have more content than anyone else and to have exotic content that is difficult to find elsewhere. In the science of Search Engine Optimization, content drives traffic and the unrestricted accumulation of content is a critical factor in determining which website leads in Google search results.

39.    xHamster follows a similar ad revenue model.  Founded in 2007, with more than 10 million members, it is one of the four most popular pornography websites on the Internet. As of July 2020, xHamster was the 20th-most trafficked website in the world.

40.    Hammy Media / xHamster operates as the visible internet front for a tangle of shell corporations and affiliates designed to conceal their illegal operations and shield them from liability.  This network includes a company called TrafficStars LTD, which is ostensibly the advertising arm of the company, owned in turn by a Cypriot company called Wisebits LTD.  It is believed that a separate arm of the xHamster enterprise is Wisebits IP Ltd. which also owns a company in the British Virgin Islands called xHamster IP Holdings, also known as Online Media Entertainment Holding.  Online Media Entertainment Holding owns companies called Technius LTD and Tecom LTD.  These companies, in turn, own two more of the xHamster paid pornographic sites, xHamster Live and Faphouse.  All of these companies operate in reality as a single business entity and are alter egos of each other.

41.    Both of these defendants procure a vast amount of their content through third-party individuals uploading their own pornographic material.  At the time of the incidents set forth in this Complaint, anyone could upload content to Pornhub or xHamster with only an email address.  Users with Pornhub could become "verified" by submitting a photo of applicants holding a handwritten sign.  "Verified" users were eligible to share ad revenue from views of their content.  MindGeek offered several profit sharing programs with uploaders including, but not limited to, the Modelhub program, and the Content Partner Program.  xHamster offered a similar opportunity for uploaders to share ad revenue, without meaningful safeguards to ensure that the content was legal.

42.    The defendants' success is built, in large part, on the deliberate trafficking in illegal content.  The defendants' business model succeeded in creating a bustling marketplace for child pornography, rape videos, trafficked videos, and every other form of nonconsensual content, and they knew it.  They intentionally elected to not employ any effective monitoring of what was being uploaded, or process for removing content that was exploitive and illegal.  To the contrary, in the rare instance where the defendants were forced to remove content from their platform, whistleblowers have confirmed that they subsequently would reupload the content to their platform.

43.    In testimony before the Canadian Parliament in 2001, a lawyer currently prosecuting a case against Pornhub gave confirmed examples of the content and conduct regularly found on the site:

> A girl was raped at 15, and a video was posted on Pornhub and distributed through a community. Pornhub refused to remove the video for three weeks, then said it had been removed when in fact it wasn't removed for another two months, with several hundred thousand additional views, downloads and distribution in that community.

A child younger than 10 was sold into trafficking and was the subject of child pornography for almost 10 years. Those videos were distributed on various MindGeek platforms where they could remain at least until later last year.

A 15-year-old was secretly filmed via computer hack and then extorted to do other videos. Those videos were posted on Pornhub with her personal information, distributed widely, including to her community and to her family, and subjected her to long-term abuse and stalking. When she raised the issue at Pornhub, it refused to search for the videos or take any other proactive steps to prevent their distribution. The trauma led her to consider suicide.

A woman was raped on videotape and it was distributed on Pornhub, including through her community.

These are only a few among thousands of examples of the egregious illegal content routinely trafficked on the site.

44.     Like Pornhub the other porn tube sites including xHamster are set up for mass sexual exploitation and trafficking, allowing any user with a cell phone camera to anonymously, in under 10 minutes, upload filmed sex acts with only an email address. No government issued ID is required to prove these are not trafficked women and children and no consent form is required to attempt to demonstrate that these are not secretly recorded videos like those of the Plaintiffs. In fact, Pornhub even has designed its own VPN so that users can access and upload to the site without their IP addresses being revealed. They also launched a dark web mirror site that enables pedo-criminals to view child rape with added anonymity.

45.     Porn tube sites are the primary way that filmed sex acts are distributed to the world in the digital age, yet there is very little accountability or oversight with regard to the origins of the videos. That is intentional on the part of these websites, because the unlimited ability to upload content by any user in the world is the business model that generates the most profit. For Pornhub and xHamster, content is king. The more content that is uploaded to these porn tube sites, the more traffic is driven to the site, and the more profit is generated from advertising, premium memberships and the sale of user data.

46.    In early 2020 employee whistleblowers revealed that Pornhub employed under ten moderators per shift to review content on the site. Remember there are seven million videos and eleven million comments uploaded per year to Pornhub alone. Many of those comments emphatically indicate that the videos contain child rape, trafficking, hidden cameras and assault but are ignored for months and years. This lack of moderation is part of the porn tube business model because limiting content, even if illegal, limits traffic, and thus limits profits.

47.    Until recently, xHamster monitored its unpaid content through the use of volunteers, including self-proclaimed porn addicts.  These volunteers, called "the Reviewers Club" make decisions about the enormous amount of photographic content that is uploaded on a daily basis. xHamster administrators encouraged these reviewers to "waive through" any content unless they are 100 percent sure that it violates xHamster's often questionable rules for exclusion.  This includes content that appears to have been uploaded without the user's consent.

48.    In contrast, defendants do carefully monitor the demographics of their user base and the kinds of subject matter that draws the most traffic.  They then curate "categories" and "tags" to classify content and create sophisticated algorithms to direct traffic to lucrative subject matter based on user preferences.  One of the most popular categories is "amateur", which has been reported to tag 30% of all videos posted.  Catering to the individual users' specific prurient interests means more traffic for the site and more profit for the defendants.  Defendants' business model is therefore built to encourage "amateur" video, including nonconsensual surreptitious filming.

49.    Until December 2020, most of the videos and images on defendants' sites, including those for Jane Does 1-9, were uploaded with no attempt to verify the identification, age, or consent of the persons uploading it or featured in it.

50.     Although Pornhub and xHamster are tube sites, they do not rely exclusively on user-generated videos and images, but are also content producers.  Pornhub includes videos and images from a number of affiliated Content Partners, including Brazzers, Fake Taxi, Kink.com, and until recently, GirlsDoPorn, whose leaders now face sex trafficking charges for coercing women into producing pornography and earning money from doing it.  Content Partners share in ad revenues.  Pornhub also shares ad revenue with members of its "Modelhub" program, which is made up of 'verified' users.

51.     Pornhub admits that they create at least some videos and images on their website. At the bottom of most pages, Pornhub includes this statement: "The Pornhub team is always updating and adding more porn videos every day." In 2016, MindGeek boasted that it was producing "over 400 exclusive scenes every month."

52.     In cases where the defendants are not actually creating videos and images for content, they are developing, designing, and controlling videos, images, text, tags, advertising, and other aspects of the sites in some fashion, both visually and through unseen data manipulation. Defendants' business model is predicated on maximizing views and traffic to their sites. They accomplish this by tightly controlling through editing, creating, and modifying titles, tags, keywords, storylines, themes, and scenes of every single video on the site, despite its source

53.     At the time of the incidents forming the basis of this Complaint, the defendants did not require uploaders or users to verify the age or consent of performers in videos at the time of upload.

54.     MindGeek creates and suggests tags for users. MindGeek requires users to choose a minimum number of tags from provided options when a new video is uploaded and when users

choose certain tags MindGeek suggests related tags to increase traffic to the videos. MindGeek also 'coaches' contributors on the desired content.

55.    Keywords and tags are essential for search engine optimization which drives users Googling pornographic content to defendants' websites. Defendants' business model is centered on designing, modifying, developing, and controlling content to maximize search engine optimization. MindGeek's website describes itself as "A leader in IT, Web Development and SEO." MindGeek boasts, "[w]ith over 100 million daily visitors to some of the world's largest trafficked websites, we're uncovering trends and user habits overnight that takes others months to gather." MindGeek has a "Search Engine Marketing" team dedicated to "develop[ing] successful strategies to ensure top-ranking in search engine traffic."

56.    MindGeek ensures uploaders use the keywords, tags, and titles that increase SEO, and profits, by collecting and actively placing data regarding these in multiple places on their websites, through blogs to uploaders, the instructions and requirements for Modelhub members, verified users, and Content Partners, as well as the mandate to MindGeek formatters, those in charge of reviewing and editing content, to add tags to videos and change titles to increase viewing.

57.    MindGeek even penalizes those who use titles, tags, or categories incorrectly, threatening a "loss of earnings." Because MindGeek controls the flow of money to Modelhub members and Content Partners, they can force compliance with content creation according to their specific parameters.

58.    Data regarding search terms demonstrates that the keywords "teen" and "amateur" are consistently the top search terms in North America. Both of these keywords are associated with

victims of nonconsensual sexual activity or non-consensually shared content and the defendants know this.

59.     The defendants cater to fetishes and incorporate and highlight elements of the videos on their websites that data suggests are essential to success, including illegal elements such as rape, child sexual abuse, and other non-consensual activity.

60.     In 2020, Pornhub was continuing to promote the search term "hidden camera" in its home page "trending searches" category:



61.     MindGeek's websites also included a download button to allow for the transfer of images and videos, including child sexual abuse material, allowing an undisclosed number of child pornographers, sex traffickers, and pedophiles permanent access to and control over the material. In this way, MindGeek will distribute content -- including child pornography – to anyone.

62.     MindGeek will also automatically distribute content uploaded to Pornhub to other MindGeek sites to increase profits.  In this way, MindGeek actually originates this content on different platforms.

PH  Pornhub › help › en-us › articles

**Make More Money in the Model Program with Auto-Exports! – Pornhub**

Your content uploaded to Pornhub will automatically be exported to the other sites. *** Please do not upload your videos to Youporn, Redtube, or Tube8 directly as we ...

Missing: ~~shares~~ | Must include: shares

63.    The defendants knew or should have known that they were profit sharing with sex traffickers on their sites as evidenced by the thousands upon thousands of videos in their libraries titled or tagged with references to "spy cam", "hidden camera", "young", "teen", "secret filming", "underage", "rape" and numerous other lurid identifiers.

64.    The defendants embraced a business model in which they not only allowed users to populate their platform with virtually any type of pornographic content, they would carefully analyze those users and others who were drawn to such content to induce them to load more, watch more, and profit more from their platform. In the course of doing so, these defendants developed a detailed understanding of all the content on their platform, including non-consensual content, and nonetheless elected to monetize and exploit the illegal content.

65.    In December 2020, the New York Times published a scathing expose that brought significant international attention to the issue of child trafficking and exploitation on Pornhub. Shortly after the publication, Visa, Mastercard, and Discover confirmed the presence of illegal content on the Pornhub site and stopped allowing payments to be processed on Pornhub.

66.    Within 24 hours, Pornhub deleted 80% of its content, over 10 million videos, because it could not verify the videos did not contain child abuse, assault, and sex trafficking.  This event

also prompted Pornhub to overhaul its business model to impose facially stricter requirements for uploaders and eliminated the "download" button from its videos.

67. The 'deleted' videos continue to exist. MindGeek and xHamster maintain servers that archive the content and, in many cases, the individual videos have already been uploaded to other platforms.

68. Currently, Pornhub and xHamster still do not verify the age and consent of every individual in every video they profit from, thus enabling trafficking to continue to proliferate on the sites.

69. Both Pornhub and xHamster "push" uploaded content to other sites controlled by or in affiliation with those respective Defendants, increasing exposure and revenue; and making it difficult to track and eliminate illegal content once it comes under the control of the Defendants.

## FACTS

70. All of the allegations previously set forth are incorporated herein by reference.

71. In August 2012 Limestone College hired Collins Murphy as its intramural/summer conference director.

72. On October 5, 2012, the Bellarmine University Knights traveled to Gaffney, South Carolina to face the Limestone College Saints in women's field hockey. Plaintiffs were members of the Bellarmine Knights field hockey team.

73. Upon arrival, Limestone agents directed Plaintiffs to a men's locker room which was designated for their use both before and after the game.

74. While in the subject locker room, Plaintiffs showered and changed clothes such that they were in a state of nudity for periods of time.

75.     While in the subject locker room, Plaintiffs had a reasonable expectation of privacy and implicit assurance from Defendant Limestone that they were in a place secure from voyeuristic intrusion and they relied upon that assurance in appearing in a state of nudity.

76.     Defendant Murphy, secretly placed a video camera in the subject locker room prior to Plaintiffs' arrival on campus and recorded the Plaintiffs, without their knowledge or consent, while they were in a state of nudity.

77.     As intramural/summer conference director, Defendant Murphy, had knowledge of sporting events on campus and had access to athletic facilities, such as the subject locker room, with Limestone's knowledge and consent.  Without the consent and facilitation by Limestone, Murphy would not have that access.

78.     Defendant Murphy, secretly recorded multiple women, including women who are not Plaintiffs in this action, changing clothes and taking showers in locker rooms between September 2012 and October 2013.

79.     The videos recorded by Murphy were fraudulently obtained through the use of intentional deception for personal gain.

80.     Defendant Murphy's employment with Limestone ceased in October 2014.

81.     At some point prior to October, 2019, the recordings of the Plaintiffs were uploaded to defendant Pornhub and defendant xHamster and then disseminated to countless other pornographic websites, stripping the Plaintiffs of their innocence and subjecting them to painful humiliation and embarrassment.

82.     On information and belief, Defendant Murphy and / or other third parties (e.g. "Lordfauger18") participated in uploading the videos with the expectation and understanding that they would receive valuable consideration from MindGeek and/or xHamster.

83.      On October 10, 2019, the Gaffney Police Department opened an investigation into the illegal video recordings which took place on Limestone College's campus. Upon information and belief, the investigation remains ongoing.

84.      On October 18, 2019, the Plaintiffs were first made aware that they were secretly videotaped while showering and changing their clothes in the Limestone College locker room; and that the recording was posted to several pornographic websites.

85.      Upon information and belief, the nude videos of Plaintiffs and other female student athletes obtained by the use of the hidden camera in the Limestone locker room facility remains stored in the archives of defendants MindGeek and / or xHamster, and continues to be potentially accessible for viewing through other pornographic websites.

86.      The videos were posted through user accounts maintained by Murphy or other established members of both Pornhub and xHamster who obtained the videos directly or indirectly from Murphy.

87.      At least one such Pornhub member, known as Lordfauger18, is part of the Pornhub Modelhub program and is paid by MindGeek a share of ad revenues based on traffic to the member's uploaded videos.

88.      At least one or more individuals or entities received monetary payment from MindGeek and / or xHamster for viewing traffic to the nonconsensual videos of the Plaintiffs.

89.      Defendants Murphy, MindGeek, xHamster and / or others working in concert with these defendants derived profit from the publication of the videos, directly or indirectly through the sharing of revenues generated by the placement of advertisements with the videos by MindGeek and / or xHamster.

90.    The defendants MindGeek and / or xHamster knew or should have known that the videos depicted nonconsensual pornographic material, and they failed to adequately monitor the content of their uploads and, in fact, actively or tacitly encouraged the uploading of such content, all as described above, for the purpose of conducting the criminal enterprise of engaging in the trafficking of such material.

91.    Defendants MindGeek and xHamster actively participated in the creation of the end product videos through, among other things, coaching and directing uploading users on desired content, creation and manipulation of the metadata associated with the videos, including the production of 'thumbnails' and the addition of other digital content that allowed the videos to be directed to interested viewers, and shared revenue with other creators or suppliers of the solicited content.

92.    Defendants MindGeek and/or xHamster republished or permitted and encouraged the republishing of the videos either directly or through the facilitation of downloading the videos by any interested user.

93.    Defendant Limestone, through its agents and employee defendants Watkins and Hammonds, failed to meet their duty owed to its students and those visiting when they failed to properly investigate Defendant Murphy during the hiring process and/or allowed Murphy unfettered access to locker rooms in disregard of the likelihood that Murphy would use that access to engage in illegal conduct to the injury of students or student guests like the Plaintiffs.

94.    As a direct and proximate result of the secret and unauthorized videotaping, and the creation, dissemination and publishing of the videos to other individuals and the general public on Pornhub, xHamster and other pornographic websites, Plaintiffs have sustained, and will

continue to sustain, injuries and damages, including but not limited to anxiety, humiliation, embarrassment, serious mental and emotional distress and mental pain and suffering.

### FIRST CAUSE OF ACTION AGAINST DEFENDANTS MURPHY, MINDGEEK and XHAMSTER
### (VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT ("TVPRA"), 18 U.S.C. §§1591, 1595)

95.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

96.    In 2000, Congress passed the Trafficking Victims Protection Act("TVPA"). The TVPA was the first comprehensive law in the United States to penalize the full range of human trafficking offenses, including sex trafficking of children under the age of 18 or sex trafficking by force, fraud, or coercion.

97.    Congress reauthorized the TVPA in 2003. In doing so, the Trafficking Victims Protection Reauthorization Act ("TVPRA") created a civil cause of action, codified at 18 U.S.C. § 1595.

98.    The TVPRA permits a party to bring a civil claim against perpetrators and against persons or entities who, although not the direct perpetrator, knowingly benefits from participating in what they should know was a sex trafficking venture.

99.    Under 18 U.S.C. § 1591(e)(3), the term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3).

100.    Section 1591(a)(1) and (a)(2) make it a crime to benefit, financially or by receiving anything of value, from participation in a venture which knowingly recruits, entices, harbors, transports, provides, obtains, maintains, patronizes, or solicits by any means a person for commercial sex, where the person is under 18, or induced by force, fraud, or coercion. 18 U.S.C. § 1591(a)(1).

101.    In 2018, Congress passed a bill known as Fight Online Sex Trafficking Act ("FOSTA") and Stop Enabling Sex Traffickers Act ("SESTA") (collectively, "FOSTA/SESTA") to amend 47 U.S.C. § 230, the Communications Decency Act, to clarify that it was never intended to provide immunity for websites facilitating illegal commercial sex acts with children or adult victims of human trafficking on websites.  The FOSTA/SESTA amendment to Section 230 is retroactive, applying "regardless of whether the conduct alleged occurred, or is alleged to have occurred, before, on, or after … enactment."

102.    Plaintiffs have sufficiently pled that they were victims of sex trafficking within the meaning of 18 U.S.C. § 1591 and are therefore entitled to bring a civil action under 18 U.S.C. § 1595.

103.    Defendants knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(1) and 1595(a), occurring within the territorial jurisdiction of the United States.

104.    Defendants' conduct was in, or affected, interstate and/or foreign commerce.

105.    Defendants knowingly benefited from participation in what they knew or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a).

106.    Defendants monetize content on their platforms through user-focused products and services, such as advertisements and data collection as well as share profits with and make direct payments to traffickers with profits gained from the use of illegally trafficked content.

107.    Defendants knowingly benefited from, and/or received something of value for their participation in the venture, in which Defendants knew, should have known, or were in reckless disregard of the fact that the Plaintiffs and others were depicted and presented for pornographic purposes constituting commercial sex acts without their consent.

108.    Defendants knowingly benefited from, and/or received something of value for their participation in the venture, in which Defendants knew, should have known, or were in reckless disregard of the fact that the videos of Plaintiffs and others were obtained without knowledge or consent.

109.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595.

110.    Defendants' conduct has caused Plaintiffs serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**SECOND CAUSE OF ACTION AGAINST THE DEFENDANTS MURPHY, MINDGEEK and xHAMSTER**
**(CONDUCTING THE AFFAIRS OF AN ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY - 18 U.S.C. § 1962(c) and 1964(c))**

111.    Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

**THE ENTERPRISE**

112.    From on or about 2014, continuing through the filing of this Complaint, each Defendant was a "person" within the meaning of 18 U.S.C. § 1961(3).

113.    From on or about 2014, continuing through the filing of this Complaint, defendants, and others known and unknown, including agents and employees of the defendants, formed an associated-in-fact enterprise, or enterprises, within the meaning of 18 U.S.C. §§ 1961(4).

114.    From on or about 2014, continuing through the filing of this Complaint, the Enterprise(s) formed by these parties engaged in, and the activities of which affected, interstate and foreign commerce.

115.    From on or about 2014, continuing through the filing of this Complaint, defendants, and each of them individually, together with others known and unknown to Plaintiffs, acting in

concert, were each employed or were employed by and associated with the Enterprise(s) and have in the past, continuously and currently continue to, in an ongoing manner, knowingly and intentionally conduct the activities of the enterprise(s), directly or indirectly, through a continued pattern of racketeering activity consisting of numerous acts of racketeering in the State of South Carolina and elsewhere. Their actions include multiple, related acts in violation of the following provisions of the United States Code, including but not limited to: Sex Trafficking 18 U.S.C. §1591; Sexual exploitation of children 18 U.S.C. §1552; Record Keeping for sexually explicit material 18 U.S.C. §2257; Wire Fraud, 18 U.S.C. § 1343;

116.    Defendants formed the Enterprise(s) to execute and attempt to execute schemes to engage in the creation and dissemination of illegally obtained obscene footage of nonconsenting women. Defendants knowingly promoted, engaged in, created and published the illegal filming of women in all stages of undress for the specific purpose of exploiting their innocence for financial gain.

117.    It was the purpose of the Enterprise(s) to deceive the public, government, and its users that MindGeek and xHamster's Wisebits Ltd. were leading technology companies providing cutting edge SEO and online and marketing data services. The Enterprise(s) expended substantial resources and effort ensuring that its tubesites had all the indicia of legitimate internet media websites, including a polished appearance, comprehensive terms of service, policies, and customer service functions, and multiple layers of interaction. But these public images were a fraudulent front for a platform through which the Enterprise(s) ran its rackets and schemes.

118.    In furtherance of its fraudulent scheme, MindGeek and / or xHamster used the mails and wires to, by way of example only, (a) pay and communicate with its network of sex traffickers in Eastern Europe and Asia, (b) upload and reupload videos that it knew contained child

pornography, sex trafficking materials, sexual assault and exploitation materials and other illegal content like nonconsensual videos, and (c) push this content to all of its partner sites.

119.    Moreover, as set forth herein, in furtherance of this scheme, the Enterprise(s) intentionally disregarded adequate age and consent verification controls.  To the contrary, the Enterprise(s) intentionally solicited sex trafficked materials and other illegal content; directed sex traffickers on how to post their content to maximize the traffic and avoid removal of their videos from their tubesites; monitored and modified effective content; and reuploaded content to other affiliate sites.

120.    From on or about 2014, the Enterprise(s) has existed separate and apart from defendants' racketeering acts and their conspiracy to commit such acts. The Enterprise has an ascertainable structure and purpose beyond the scope and commission of defendants' predicate acts.

## THE PATTERN OF RACKETEERING

121.    The Enterprise(s) as described herein is at all relevant times a continuing enterprise because it continues to execute schemes to create and disseminate illegally obtained obscene footage of nonconsenting woman for the purpose of generating revenue.  The conduct of the racketeering enterprise has continued from its inception through the date of this Complaint and threatens to continue into the future, by virtue of repeated patterns of behavior by its members.

122.    The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), presents both a history of criminal conduct and distinct threat of continuing criminal activity. Such activity consists of multiple acts of racketeering by each defendant herein, is interrelated, not isolated and is perpetrated for the same or similar purposes by the same persons. Such activity extends over a substantial period of time, before, up to and beyond the date of this Complaint.

Such activities occurred after the effective date of 18 U.S.C. §§ 1961 et seq., and the last such act occurred within 10 years after the commission of a prior act of racketeering activity.

123.    Each defendant had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. Each defendant also attempted to benefit, and did benefit, from their activity as alleged herein, and thus were not passive victims of racketeering activity, but active perpetrators.

124.    Defendants have continued the pattern of exploiting women by monetizing surreptitiously filmed content under the guise of legitimate consensual adult entertainment.

125.    Defendant Pornhub and Defendant xHamster continue to work with and reward third-party content providers who develop a large internet following for the purpose of making money and sharing spy camera footage of women without their consent.

126.    Defendants maintained a presence worldwide to even include the illegal videos being disseminated in Japan and South America.

127.    Defendants advertise their great successes to continue the pattern and practice of the illegal recording of women to then share under the guise of a specific genre.

128.    This lewd, illegal, sexual content increases the viewership to their respective platforms which increases their own financial gain.

129.    Defendants continue to conspire to create and disseminate surreptitiously filmed videos of women and pay members of the Enterprise(s) to further this scheme.

130.    As a direct and proximate result of the defendants' violations of 18 U.S.C. §1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

131.    As a result of the violations of 18 U.S.C. § 1962(c) by the defendants, Plaintiffs suffered substantial damages in an amount to be proved at trial.

132.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys' fees, incurred by reason of defendants' violations of 18 U.S.C. § 1962(c).

### THIRD CAUSE OF ACTION AGAINST DEFENDANT MURPHY
#### (Invasion of Privacy – Wrongful Intrusion upon Private Affairs)

133.    Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

134.    Defendant Murphy, in his capacity as an employee and agent of Defendant Limestone, was given access to and/or control over the locker room facilities at Limestone.

135.    Utilizing that access, Defendant Murphy placed a hidden video camera in Defendant Limestone's locker room and captured video and images of the Plaintiffs their teammates, and other student athletes from around the nation, all while they were fully nude, or in various stages of undress.

136.    The secret and unauthorized videotaping by Defendant Murphy of the Plaintiffs and the other student athletes constitutes an intrusion in to the private affairs of the Plaintiffs and the other women.

137.    The intrusion was and is highly offensive, substantial and unreasonable to a reasonable person such that it constitutes a blatant and shocking disregard of Plaintiffs' rights.

138.    The secret and unauthorized videotaping by Defendant Murphy was intentional.

139.    The acts of Defendants, collectively, led to the wrongful intrusion of the Plaintiffs' private affairs.

140.    As a direct and proximate result of the conduct by Defendants, the Plaintiffs have sustained the injuries and damages referenced above, including serious mental and emotional injuries and distress.

141.    The conduct by Defendants was a willful and wanton violation of the privacy rights of the Plaintiffs and the other student athletes, such that the Plaintiffs are entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION AGAINST DEFENDANT MURPHY
### (Invasion of Privacy – Wrongful Publicizing of Private Affairs)

142.    Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

143.    The conduct of Defendant Murphy in secretly videotaping the Plaintiffs and the other student athletes while totally nude, or in various stages of undress, was done intentionally, and without consent, to Defendant's benefit.

144.     The secret and unauthorized videotaping by Murphy of the Plaintiffs and the other student athletes constitutes an intrusion in to the private affairs of the Plaintiffs and the other women.

145.    The intrusion was and is highly offensive, substantial and unreasonable to a reasonable person such that it constitutes a blatant and shocking disregard of Plaintiffs' rights.

146.    The Plaintiffs have an enforceable right to their identities/personas.

147.    The Defendant Murphy's use of Plaintiffs' identities/personas without permission in this manner allows for Defendant to be advantaged by the appropriation and publication of their private affairs.

148.    As a direct and proximate result of the conduct by Defendant Murphy, the Plaintiffs have sustained the injuries and damages referenced above, including serious mental and emotional injuries and distress.

149.    The conduct by Defendant Murphy was a willful and wanton violation of the privacy rights of the Plaintiffs and the other student athletes, such that the Plaintiffs are entitled to an award of punitive damages.

### FIFTH CAUSE OF ACTION AGAINST DEFENDANT MURPHY
### (Invasion of Privacy – Wrongful Appropriation of Personality)

150.    Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

151.    The conduct of Defendant Murphy in secretly videotaping the Plaintiffs and the other student athletes while totally nude, or in various stages of undress, was done intentionally, and without consent, to Defendant's benefit.

152.    The secret and unauthorized videotaping by Defendant Murphy of the Plaintiffs and the other student athletes constitutes an intrusion in to the private affairs of the Plaintiffs and the other women.

153.    The intrusion was and is highly offensive, substantial and unreasonable to a reasonable person such that it constitutes a blatant and shocking disregard of Plaintiffs' rights.

154.    The Plaintiffs have an enforceable right to their identities/personas.

155.    The Defendant Murphy's use of Plaintiffs' identities/personas without permission in this manner allows for Defendant to be advantaged by the appropriation.

156.    As a direct and proximate result of the conduct by Defendant Murphy, the Plaintiffs have sustained the injuries and damages referenced above, including serious mental and emotional injuries and distress.

157.    The conduct by Defendant Murphy was a willful and wanton violation of the privacy rights of the Plaintiffs and the other student athletes, such that the Plaintiffs are entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION AGAINST DEFENDANT MURPHY
### (Intentional Infliction of Emotional Distress)

158.    Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

159.    The conduct of Defendant Murphy in secretly videotaping the Plaintiffs and the other student athletes while totally nude, or in various stages of undress, was done intentionally to inflict severe emotional distress on the Plaintiffs and/or Defendant knew that such distress would likely result from such conduct.

160.    Defendant Murphy's conduct was so extreme and outrageous that it exceeded all possible bounds of decency and was furthermore atrocious and utterly intolerable in a civilized community.

161.    As a direct and proximate result of Murphy's wrongful conduct, the Plaintiffs have suffered, and continue to suffer, severe emotional distress.

162.     The emotional distress caused by Defendant's wrongful conduct was, and is, so severe such that no reasonable person could be expected to endure it.

163.    As a direct and proximate result of Defendant's wrongful and unlawful conduct, the Plaintiffs have sustained the injuries and damages referenced above, including serious mental and emotional injuries and distress.

164.    The wrongful conduct by Defendant was willful, wanton and undertaken in reckless disregard for the privacy rights of the Plaintiffs and the other student athletes, such that the Plaintiffs are entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS LIMESTONE and HAMMONDS
### (Negligent Hiring)

165.     Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

166.     Prior to being hired by Defendant Limestone, allegations of misconduct were made against Defendant Murphy.

167.     The existence of these allegations gave notice to Defendant Limestone that there may be a potential undue risk presented to students in hiring Defendant Murphy.

168.     The risk of Defendant Murphy could have been discovered through a reasonable investigation.

169.     Defendant Hammonds (as Director of Human Resources) was employed by Limestone in positions with responsibility for approving and hiring employees such as Murphy.

170.     Defendant Hammonds, individually and in her capacity as an employee of Limestone, had a duty to use reasonable care and diligence for the safety and protection of students and visiting athletes like the Plaintiffs in hiring Defendant Murphy.

171.     Defendants Hammonds breached her duty by either failing to conduct a reasonable investigation into Defendant Murphy prior to hiring him, or by hiring Defendant Murphy despite being on notice that he presented a foreseeable undue risk to female students.

172.     This negligent hiring of Defendant Murphy by Defendants was the direct and proximate cause of the Plaintiffs' injuries.

## EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS LIMESTONE, HAMMONDS and WATKINS
### (Negligent Supervision)

173.     Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

174.    Defendants Limestone, Watkins, and Hammonds each had a duty of care to supervise Limestone employees who had access to areas in which an individual's privacy could be violated.

175.    Defendants breached this duty by its failure to adequately supervise Defendant Murphy who had access to the women's locker rooms and other facilities on campus.

176.    Defendants had the ability and duty to control or supervise Murphy's conduct while he was on Limestone property.

177.    Defendant Limestone knew or should have known that providing Murphy access to women's locker rooms presented a foreseeable risk of harm to female students and visitors like the Plaintiffs.

178.    Defendant Limestone's failure to supervise Defendant Murphy enabled the placement of hidden cameras used to videotape the Plaintiffs while nude or in the stages of undress.

179.    Thus, the unfettered and unsupervised access to locker room facilities by Defendant Murphy was the result of Defendant Limestone's negligent supervision and is the direct and proximate cause of the Plaintiffs' injuries.

## NINTH CAUSE OF ACTION AGAINST DEFENDANTS MINDGEEK AND xHAMSTER
### (Negligent Monitoring)

180.    Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

181.    Defendant MindGeek and Defendant xHamster both operate and maintain pornographic websites.

182.    In maintaining such websites, Defendants were or should have been aware that content present on their respective websites was obtained illegally or contained illegal images.  They

were aware that illegal content was rampant on their respective sites and aware that such content was enormously profitable.

183.    Defendant MindGeek and Defendant xHamster had a duty to viewers and users of their websites, as well as to the individuals depicted, to properly monitor their content for illegal and nonconsensual material.

184.    Defendant Pornhub and Defendant xHamster breached this duty when they failed to take reasonable steps to monitor the content present on their websites, as described in this Complaint.

185.    This breach in failing to reasonably monitor content on their websites in conjunction with their business models and revenue sharing schemes, resulted in, and in fact encouraged, the presence of illegally filmed pornographic content being present on their respective websites.

186.    This failure to reasonably monitor was the direct and proximate cause of the injuries suffered by the Plaintiffs.

## TENTH CAUSE OF ACTION AGAINST DEFENDANTS MINDGEEK AND xHAMSTER
### (False Light)

187.    Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

188.    Defendant MindGeek and Defendant xHamster both operate and maintain pornographic websites.

189.    Both Defendants websites hosted videos of the Plaintiffs which exposed them in the various stages of undress and revealed their nude presence to numerous viewers under the guise of a "spy cam" or "hidden cam" porn film.

190.    These surreptitiously recorded videos falsely portray the Plaintiffs as exhibitionists/sexual deviants/pornstars, which the Plaintiffs are not.

191.    These videos of the Plaintiffs are highly offensive and embarrassing and has resulted in permanent mental anguish in the Plaintiffs.

192.    The Defendants took no steps in verifying whether the videos were filmed with the consent of the girls, thus shared these videos with a reckless and wanton disregard for their offensiveness.

193.    This reckless and wanton disregard depicted the Plaintiffs in a false light and is the direct and proximate cause of their injuries.

### ELEVENTH CAUSE OF ACTION AGAINST THE DEFENDANTS MURPHY, MINDGEEK and xHAMSTER
#### (Civil Conspiracy)

194.    Plaintiffs incorporate by reference and reasserts all previous allegations contained in this Complaint as if fully set forth herein.

195.     The Defendants conspired for the purpose of creating and trafficking sexually lewd content which directly invaded the Plaintiffs' rights to privacy guaranteed by the United States Constitution. More particularly, the Plaintiffs have been harmed as a direct and proximate result.

196.    During period alleged in this Complaint, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which resulted in the surreptitious and illegal filming of the Plaintiffs; the publication, republication and dissemination of the resulting videos; and the monetization of illegally obtained content. Such scheme was intended to, and, throughout timeframe alleged in this Complaint, did create content that was published on the Defendant MindGeek's Pornhub website, the xHamster website, and numerous other websites which exposed Plaintiffs to viewers on the internet for profit.

197.    As a direct and proximate result of the improper actions of the Defendants, Plaintiffs

have been damaged in actual, consequential and punitive damages.

### **PRAYERS FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against each of the Defendants **Jointly** and

**Severally**:

A.    for actual and consequential damages, including damages for emotional distress,

pain and suffering, in an amount to be determined at trial;

B.    for punitive damages;

C.    special damages in an amount to be determined at trial;

D.    attorney's fees

E.    treble damages

C.    such other and further relief as this Court deems just and proper.

Respectfully submitted,

**BELL LEGAL GROUP, LLC**

*s/J. Edward Bell, III*
J. Edward Bell, III (1280)
Joshua M. W. Salley (13214)
BELL LEGAL GROUP, LLC
219 North Ridge Street
Georgetown, SC  29440
TEL.: (843) 546-2408
FAX: (8430 546-9604
ebell@edbelllaw.com

**DOLT, THOMPSON, SHEPHERD &
CONWAY, PSC**

Tyler S. Thompson (admitted Pro Hac Vice)
Liz J. Shepherd (admitted Pro Hac Vice)
Jordan A. Stanton (admitted Pro Hac Vice)

DOLT, THOMPSON, SHEPHERD & CONWAY, PSC
13800 Lake Point Circle
Louisville, KY 40223
Telephone: (502) 244-7772
tthompson@kytrial.com
lshepherd@kytrial.com
jstanton@kytrial.com

**ATTORNEYS FOR PLAINTIFF**

Georgetown, SC
June 3, 2022