UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| JANE DOES 1-9,<br><br>     Plaintiffs,<br><br>vs.<br><br>COLLINS MURPHY, SHARON HAMMONDS, BRENDA F. WATKINS, LIMESTONE UNIVERSITY, MG FREESITES, LTD., d/b/a PORNHUB.COM, MG FREESITES II LTD., MINDGEEK S.A.R.L., MINDGEEK USA, INC., MG BILLING LTD., and HAMMY MEDIA LTD. d/b/a XHAMSTER.COM, TRAFFICSTARS LTD., WISEBITS LTD, XHAMSTER IP HOLDINGS LTD, WISEBITS IP LTD.,<br><br>     Defendants. | Case No.: 7:20-cv-00947<br><br>XHAMSTER IP HOLDINGS, LTD.'S REPLY IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FRCP 12(b)(2) and 12(b)(6) |

## INTRODUCTION

  Plaintiffs' Memorandum in Opposition reads as if Plaintiffs' have forgotten (1) what their Fifth Amended Complaint ("FAC") actually alleges (and, more significantly, what it does not); (2) basic legal precepts; (3) (at times) to which Defendant they are responding (ironic in a case in which Plaintiffs insist that they have not engaged in shotgun pleading); (4) what evidentiary support they have (or have not) offered the Court as part of their Opposition; and (5) that not everything on the internet is true.

  It is easy to understand why Plaintiffs' counsel might *want* to forget all of this (and for the Court to do similarly), because to recall the actual facts and law at issue in this case leads to the inescapable conclusion that the Court does not have personal jurisdiction over Defendant xHamster

IP Holdings, Ltd. ("XIH") and the case against it must be dismissed.

In further support of XIH's Motion, XIH states as follows.

## ARGUMENT

### I. Plaintiffs Appear to Have Forgotten The Basic Rules Governing Rule 12(b) Motions.

In general, motions brought pursuant to Fed. R. Civ. P. 12(b) are designed to test the sufficiency of the allegations within the four corners of the complaint, considering *only* the facts as alleged in the complaint, documents attached to the complaint, and documents that are referenced in, and central to, the complaint. *See, e.g., Sullivan v. City of Frederick,* 738 F. App'x 198, 199 (4th Cir. 2018); *In re Derivium Capital, LLC v. Cathcart*, 2008 U.S. Dist. LEXIS 138245, at *4 (D.S.C. June 17, 2008).

In the context of a Rule 12(b)(2) motion, however, the Court's examination expands slightly. Still, the general rule is that "the court considers only the complaint and any jurisdictional affidavits in making its determination under Rule 12(b)(2)…." *Dowdy v. St. Paul Travelers Cos.,* 2006 U.S. Dist. LEXIS 111062, at *9 n.1 (D.S.C. Apr. 21, 2006).

Moreover, the presumption of truth afforded to facts alleged in the complaint disappears when contradicted by a sworn declaration. *See Wolf v. Richmond Cty. Hosp. Auth.,* 745 F.2d 904, 908 (4th Cir. 1984)("In ruling on a motion to dismiss for lack of personal jurisdiction, the allegations of the complaint, except insofar as controverted by the defendant's affidavit, must be taken as true"); *Watters v. Kirk*, 2012 U.S. Dist. LEXIS 32465, at *6-7 (D.S.C. Mar. 12, 2012)("To satisfy that threshold, Plaintiff must present at least some evidence in support of its position. Wright & Miller[, *Federal Practice and Procedure*] § 1067.6 (the *prima facie* showing 'must be based on affirmative proof beyond the pleadings, such as affidavits, testimony or other competent evidence of specific facts'); *id.* ('When a defendant provides affidavits to support a Rule 12(b)(2) motion, the plaintiff

may not simply rest on the allegations of the complaint')); *Newbanks v. Cellular Sales of Knoxville, Inc.,* 2012 U.S. Dist. LEXIS 198521, at *4-5 (D.S.C. Oct. 18, 2012)(same).

And, while Plaintiffs acknowledge the indisputable truth of this legal proposition, they assert that a plaintiff "producing rebuttal evidence in the form of declarations maintain the assumption of truth for their *prima facie* case." Opposition, p. 2. This assertion is reasonable enough, as far as it goes, but irrelevant here inasmuch as **Plaintiffs did not actually support their Opposition to XIH's motion with any declarations whatsoever.**

Instead, Plaintiffs' Opposition is predominated not only by factual assertions that are not supported by declaration but also, in many instances, factual assertions that appear nowhere in the FAC. These "facts," of course, cannot be considered by the Court. *See, e.g., Holderfield v. Thyssenkrupp Elevator Corp.,* 2022 U.S. Dist. LEXIS 61088, at *23 n.2 (E.D. Va. Mar. 30, 2022)("Because this Court is constrained at the motion to dismiss stage to limit its review to the four corners of the Complaint, this Court does not consider any argument advanced by Plaintiff that builds off of additional allegations not contained in the Complaint.")

Here, Plaintiffs' two main contentions in support of their Opposition fall within these categories. First, Plaintiffs contend that XIH owns and operates the xHamster.com website, despite the unequivocal statement in the Declaration of Constantinos Christoforou (attached to XIH's original memorandum of law as Exhibit 1) that "XIH does not – in any way, shape, or form – own or operate the xHamster.com website." And, although Plaintiffs attempt to support this assertion with unverified documents which Plaintiffs misinterpret (as discussed below), they have failed to counter Mr. Christoforou's sworn declaration with any sworn testimony of their own. Even more egregious, though, is Plaintiffs' attempt to pierce XIH's corporate veil entirely through factual assertions that appear *nowhere* in the FAC (and which are also not supported by declaration). This

the Plaintiffs cannot do, and the Court should disregard and ignore Plaintiffs' reliance on unpled and unverified factual allegations in their entirety.

## II. Plaintiffs Appear to Have Forgotten the Basic Rules of Admissibility.

In one of their more shocking pronouncements, Plaintiffs make a blanket assertion that this Court may take judicial notice of literally anything that appears on the internet. Unsurprisingly, this flies in the face of the case law from the Fourth Circuit, not to mention common sense.[1] *United States v. Heijnen,* 149 F. App'x 165, 169 (4th Cir. 2005)("Our review leads us to conclude that the district court properly prevented Heijnen from introducing documents downloaded from the internet generally, as these documents are hearsay, and Heijnen provided no indication that he could establish a proper foundation to admitting this evidence, or to authenticate it"); *Lampman v. Dewolff*, 2007 U.S. Dist. LEXIS 112170, at *15 n.3 (D.S.C. Sep. 26, 2007)("The Fourth Circuit has held that website print-outs, particularly when provided without foundation, are inadmissible hearsay"); *Williamson v. Prince George's Cty.,* 2011 U.S. Dist. LEXIS 7518, at *26 (D. Md. Jan. 26, 2011)("electronically stored information must be properly authenticated. Williamson has not attempted to do so. When evidence from the internet is presented without adornment - without any attempt at authentication or any explanation as to how the hearsay rules are satisfied - it 'is adequate for almost nothing'"). *See also Victaulic Co. v. Tieman,* 499 F.3d 227, 236-37 (3d Cir. 2007)("Of particular concern is that the District Court used the website at http://www.victaulic.com to establish certain facts about Victaulic's business. While it is proper for a court to take judicial notice of facts not reasonably subject to dispute, FED. R. EVID. 201(b), several concerns come into play here. First, we require that evidence be authenticated before it can be admitted. ...Thus we allow judicial notice only from sources not reasonably subject to dispute. ...Anyone may purchase an internet

---

[1] If this Court can take judicial notice of anything, it is likely that not everything on the internet is true.

address, and so, without proceeding to discovery or some other means of authentication, it is premature to assume that a webpage is owned by a company merely because its trade name appears in the uniform resource locator. …We also note that the District Court employed judicial notice at an early stage in this litigation and outside the context of an evidentiary proceeding. While the rules allow a court to take judicial notice at any stage of the proceedings, FED. R. EVID. 201(f), we believe that it should be done sparingly at the pleadings stage. Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point. Resolving a thorny issue like reasonableness by resorting to a party's unauthenticated marketing material falls far short of the bar."); *United States v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000) (holding that information from the internet must be properly authenticated to be admitted); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 782-83 (C.D. Cal. 2004) ("Printouts from a web site do not bear the indicia of reliability demanded for other self-authenticating documents under FED. R. EVID. 902. To be authenticated, some statement or affidavit from someone with knowledge is required . . . .").

This issue is perhaps most egregious in connection with Plaintiffs' assertion that this Court can consider factual assertions contained in a German magazine article that Plaintiffs found on the internet, which is in direct contravention of the law of this circuit. *Gantt v. Whitaker,* 57 F. App'x 141, 150 (4th Cir. 2003)("This circuit has consistently held that newspaper articles are inadmissible hearsay to the extent that they are introduced to prove the factual matters asserted therein"); *Greene v. Scott*, 2015 U.S. Dist. LEXIS 59198, at *8 (D.S.C. May 6, 2015)("In evaluating the admissibility of newspaper articles in particular, the Fourth Circuit has consistently found that newspaper articles are inadmissible hearsay to the extent that they are introduced 'to prove the factual matters asserted therein.").  Indeed, Plaintiffs go so far as to suggest that this Court should take judicial notice of the facts alleged in the German magazine article, despite the wholesale absence of such facts in the FAC and despite the unreliability of such double hearsay. Obviously, this is something the Court cannot

5

do. *See, e.g., Goldfarb v. Mayor & City Council of Balt.,* 791 F.3d 500, 511 (4th Cir. 2015)("judicial notice must not be used as an expedient for courts to consider 'matters beyond the pleadings' and thereby upset the procedural rights of litigants to present evidence on disputed matters.").

**III.     Even Disregarding All of the Above, Plaintiffs' Opposition Appears to Be Based On Their Having Forgotten Which Defendants' Motion They Were Opposing Here.**

Ultimately, even if the Plaintiffs had pled facts that might allow the Court to consider XIH as being a "single business entity" with Hammy Media Ltd ("HML") (which they clearly did not) and even had they supported such assertions with materials the Court could consider (which, again, they did not), Plaintiffs argument hinges on its assertion that "personal jurisdiction over Hammy Media Ltd has been conceded and this Court has already determined that the claims against them may proceed." Opposition, p. 8. In so stating, Plaintiffs appear to have forgotten that HML has ***not*** conceded personal jurisdiction and this Court has ***not*** determined that the case against HML may proceed. To the contrary, HML has forcefully argued that it is not subject to personal jurisdiction in a motion that remains pending before this Court.

**IV.     Plaintiffs Seem To Have Forgotten How To Interpret A Trademark Filing.**

As noted above and in XIH's opening memorandum (which is supported by the Christoforou Declaration), XIH does not own or operate the xHamster.com website. And, although Plaintiffs do not counter this declaration with a sworn statement of their own (and the Court's inquiry could end there), Plaintiffs do point to the wording of XIH's Benelux registration (covering Belgium, The Netherlands and Luxembourg); and EUIPO registration (covering the EU)[2] as "proof" that XIH

---

[2] Tellingly, Plaintiffs do not even provide the Court with the actual registrations in either instance. And, while Plaintiffs provide the Court with the presumably more reliable Westlaw version of the Benelux registration (Plaintiffs' Exhibit 5), they submit to the Court an apparent summary of the EUIPO registration from a private website, trademarkelite.com (Plaintiffs' Exhibit 7), without any indication of the reliability of such website.

somehow owns the xHamster.com website. Indeed, Plaintiffs point to their Exhibit E (Exhibit 5) and ask "According to this registration, who owns xHamster?" Opposition, p. 7. Plaintiffs then purport to answer their own question by showing a snippet of the registration that lists the "current owner" as xHamster IP Holdings, Ltd. To say that this is disingenuous is an understatement. The document itself makes clear that it is **not** suggesting that XIH owns the xHamster business (known as Hammy Media Ltd.) or the xHamster.com website, but rather the xHamster *trademark*. This is, of course, precisely what Mr. Christoforou says in his declaration. Christoforou Decl., ¶5 ("XIH owns and maintains the 'xHamster' trademark, which includes making the necessary regulatory filings, monitoring the use of the xHamster name, and (when necessary) bringing legal claims to protect the xHamster trademark.").

V. **Plaintiffs' Counsel Misstates Almost Every Facet of The UDRP Actions It References.**

Similarly misplaced is Plaintiffs' attempted citation to certain UDRP (Uniform Domain-Name Dispute-Resolution Policy) cases involving XIH as purported "evidence" that XIH and HML are a single business entity. For example, Plaintiffs cite to – and then proceed to blatantly misrepresent – the arbitrator's decision in *Hammy Media, Ltd. and xHamster IP Holdings, Ltd. v. WhoisProtectService.net* as supporting the contention that HML and XIH are a single business entity operating the xHamster.com website. Opposition, pp. 9-10. Preliminarily, it should not go unnoticed that, despite providing a URL for where this opinion can be found, Plaintiffs chose not to actually provide the Court with a copy of the decision, hoping, apparently, that the Court would simply accept Plaintiffs' representations of what that opinion says. A true and accurate copy of the arbitrator's opinion is attached to the Declaration of Evan Fray-Witzer, attached as **Exhibit 1.**

Next, it is important to understand that, while XIH owns the xHamster trademark (as stated in the Christoforou Declaration), it has a licensing agreement with HML, which allows HML to use

the trademark in connection with its operation of the xHamster.com website. *See* Supplemental Declaration of Constantinos Christoforou, attached as **Exhibit 2**. Therefore, ***for the purposes of a trademark dispute*** (and in particular a trademark dispute with another website), wherein XIH owns the trademark but HML has an interest in the trademark by virtue of its license from XIH , it is true that the two companies, together, have "ultimate control" over the trademark and therefore can be considered a "single entity" for the purposes of a UDRP complaint. This does not mean, as Plaintiffs claim, that the two companies together own and operate the xHamster.com website. To the contrary, in the UDRP context, the term "single entity" is a term of art, specifically referring to one or more entities that, collectively, hold all of the intellectual property rights in a given trademark, often as a result of a licensing agreement between the parties.[3]

While unraveling Plaintiffs' casual misrepresentation to the Court takes a little effort, it is a valuable exercise. UDRP disputes involve complaints in which a trademark holder can complain that its trademark is being infringed by another website – often a squatter website trying to profit by using the mark of another company. Registrars (the companies that sell domain names) are required by ICANN to abide by the UDRP. *See* https://www.icann.org/resources/pages/help/dndr/udrp-en, last accessed January 23, 2023. A true and accurate copy of the UDRP is attached to the Fray-Witzer

---

[3] *See, e.g.,* Nguyen, Thao, *"The Uniform Domain Name Dispute Resolution Policy ('UDRP'): Not A Trademark Court But A Narrow Administrative Procedure Against Abusive Registrations"* (Dec. 22, 2021)("That the UDRP is not a trademark court is evident in the UDRP's refusal to handle cases where multiple legitimate complainants assert right to a single domain name registered by a cybersquatter. UDRP Rule 3(a) states: 'Any person or entity may initiate an administrative proceeding by submitting a complaint.' The Forum's Supplemental Rule 1(e) defines 'The Party Initiating a Complaint Concerning a Domain Name Registration' as a 'single person or entity claiming to have rights in the domain name, or multiple persons or entities who have a sufficient nexus who can each claim to have rights to all domain names listed in the Complaint.' UDRP cases with two or more complainants in a proceeding are possible only when the complainants are affiliated with each other as to share a single license to a trademark, for example, when the complainant is assigned rights to a trademark registered by another entity, or when the complainant has a subsidiary relationship with the trademark registrant."). A true and accurate copy is attached to the Fray-Witzer Declaration.

Declaration.

For example, in the arbitration decision referenced by Plaintiffs (and attached to the Fray-Witzer Declaration), the respondent – which had no rights to the xHamster trademark – were found to have registered the domain xHamsterPorn.com and used that domain to display "videos copied or embedded from Complainant Hammy Media Ltd.'s website." Decision, p. 2.

In addition to the rules set forth in the UDRP itself, the ADR Forum, which arbitrated that particular dispute, has its own Supplemental Rules, a true and accurate copy of which is attached to the Fray-Witzer Declaration. Pursuant to Supplemental Rule 1(e) (e): "'The Party Initiating a Complaint Concerning a Domain Name Registration,' as used in The Rules (Rule 1), means the single person or entity claiming to have rights in the domain name, or multiple persons or entities who have a sufficient nexus who can each claim to have rights to all domain names listed in the Complaint."[4]

Thus, while it is true that the decision speaks of the two companies being considered as a "single entity" it is clear in context that the decision is speaking about the two being a "single entity" for the purposes of a trademark dispute because – together – the two companies hold all of the trademark rights in the xHamster mark (XIH as the owner and HML as a licensee) and because that is the only way that the two entities could bring the UDRP action pursuant to the applicable rules. Had Plaintiffs attached the very decision that they cite to their Opposition, this Court would have been able to easily ascertain that the arbitrator's decision says as much. Far from stating that the two

---

[4] None of this is particularly surprising or complex. If HML had brought the action on its own, as the operator of the website that the respondent was improperly competing with, the Respondent might well have argued that HML lacked standing since it only held a license to the trademark and did not otherwise own it. Likewise, if XIH had brought the action as the owner of the trademark, the Respondent might have argued that XIH had licensed away the right to utilize the mark in connection with a website. Together, the two corporate entities could represent that they held all possible rights to use the xHamster mark in connection with a website. It is in this sense (and only this sense) that the two constitute a "single entity."

companies jointly operate the xHamster website, the decision also clearly delineates HML as the entity operating the website:

> Complainant Hammy Media Ltd. operates an adult-content website at <xhamster.com> with users from around the world. Complainants cite various surveys ranking the website among the most popular sites in the world. Hammy Media Ltd. and its predecessors in interest have used the XHAMSTER mark for this purpose since 2007. The mark is licensed from Complainant xHamster IP Holdings Ltd, which owns a Benelux registration and has applied to register the mark elsewhere.

Decision, p. 2.

Throughout his decision, the arbitrator is careful to always note that the website is operated by HML and not simply refer to the "Complainants" collectively as operating the website, which would have been incorrect:

> Complainant Hammy Media Ltd. operates an adult-content website at <xhamster.com> with users from around the world. …Hammy Media Ltd. and its predecessors in interest have used the XHAMSTER mark for this purpose since 2007.

*Id.*

> Complainants state that the domain name is being used for a website that allow users to view adult-oriented videos copied or embedded from Complainant Hammy Media Ltd.'s website.

*Id.*

> The disputed domain name combines Complainants' mark with a generic term associated with Complainants' business, and it is being used for a website that competes directly with Complainant Hammy Media Ltd.'s site.

*Id.*, p. 3.

> Respondent's use of a domain name incorporating Complainants' mark to profit from confusion by displaying content taken from Complainant Hammy Media Ltd.'s website is indicative of bad faith….

*Id.*

Similarly misleading is Plaintiff's assertion that, in the UDRP actions, XIH itself claimed to operate the xHamster.com website. XIH said no such thing. Instead, XIH has always maintained

that it is the owner of the xHamster trademark, which is licensed to HML, which operates the xHamster website and that the two should be considered as a single entity for the purpose of bringing a UDRP complaint, pursuant to the UDRP rules and the Forum's supplemental rules. *See, e.g.,* Amended Complaint in the above-discussed *Hammy Media, Ltd. and xHamster IP Holdings, Ltd. v. WhoisProtectService.net* case, attached to the Fray-Witzer Declaration.

This is not the first time that Plaintiffs have intentionally misstated the facts of this case. To the contrary, Plaintiffs seem to make a habit of making such unsupported assertions, only to abandon them for *new* unsupported assertions in Plaintiffs' next Court filing. It is not the type of behavior that the Court should expect from the attorneys who appear before it.

**VI.     Plaintiffs Appear To Have Forgotten What Is (And What Is Not) Alleged In Their *Fifth* Amended Complaint.**

In its opening memo, XIH discussed in detail the fact that Plaintiffs' theories of personal jurisdiction hinged entirely on its assertion that it could pierce the corporate veil and that, as a result, if personal jurisdiction could be asserted over HML, it could also be asserted over XIH under an alter ego theory. Putting aside the fact that HML argues in its own motion that Plaintiffs have failed to plead facts which would subject HML to personal jurisdiction, XIH argued that Plaintiffs failed to allege in the FAC a single fact necessary to support their alter ego theory. *See* XIH's Memorandum of Law, pp. 11-13. In their Opposition, Plaintiffs do not respond to this argument, seemingly conceding that they have not plead facts to support an alter ego theory, arguing instead that jurisdiction is proper under a "single business enterprise theory," which also allows for the piercing of the corporate veil under certain circumstances. Opposition, pp. 9-11. Here, too, however, Plaintiffs appear to have forgotten that they have not alleged a single fact in the FAC that would support a finding that XIH was a single business entity with HML.

In support of their "single business entity theory," Plaintiffs point to *Walbeck v. I'On Co., LLC*, 426 S.C. 494 (Ct. App. 2018), which they cite for the proposition that, unlike the alter ego theory, the single business entity theory does not require a showing that defendants failed to observe corporate formalities. This is a correct – but incomplete – summary of the holdings of *Walbeck*. In *Walbeck*, the South Carolina Appeals Court discussed a recent South Carolina Supreme Court case, *Pertuis v. Front Roe Restaurants, Inc.*, 423 S.C. 640 (2018), where the Court first adopted and outlined the single business entity theory. More recently, in *Stoneledge at Lake Keowee Owners' Association v. IML Dev. Co., LLC*, 435 S.C. 109 (2021), the South Carolina Supreme Court took the opportunity to expand on its holding in *Pertius*, explaining in more detail the contours of the "single business enterprise theory."

In *Walbeck* (the case relied on by Plaintiffs), the Court summarized the single business entity theory, as adopted by the *Pertuis* court thusly:

> "the single business enterprise theory requires a showing of more than the various entities' operations are intertwined," as the theory had previously been applied by our courts. ...Rather, "[c]ombining multiple corporate entities into a single business enterprise requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions."

*Walbeck* at 528, quoting *Pertuis*.

As the *Walbeck* Court noted the "resulting from" language in *Pertuis* was crucial: "Here, even though there is evidence showing the various entities' operations are intertwined, there is no evidence of 'bad faith, abuse, fraud, wrongdoing, or injustice *resulting from* the blurring of the entities' legal distinctions.'" *Id.* (emphasis in *Walbeck*).

In adopting the single business entity rule, the South Carolina Supreme Court quoted at length from a Texas Supreme Court case, specifically adopting its reasoning:

> As the Texas Supreme Court has put it:

12

> Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse, or . . . injustice and inequity. By 'injustice' and 'inequity' we do not mean a subjective perception of unfairness by an individual judge or juror; rather, these words are used . . . as shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield—fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like. Such abuse is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a 'bedrock principle of corporate law' - that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations. Disregarding the corporate structure involves two considerations. One is the relationship between two entities . . . . The other consideration is whether the entities' use of limited liability was illegitimate.

*Pertuis* at 654-55, *quoting SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008).

The *Pertius* Court stressed, however, that the single business entity rule was not to be applied lightly:

> As with other methods of piercing the corporate form that have previously been recognized in South Carolina, equitable principles govern the application of the single business enterprise remedy, and this doctrine 'is not to be applied without substantial reflection.' … If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons. The party seeking to pierce the corporate veil has the burden of proving that the doctrine should be applied.

*Perius* at 655 (internal citations and quotation marks omitted).

And, in *Stoneledge*, the South Carolina Supreme Court reversed the findings of the trial court and appeals court, which had found that the defendants constituted a single business entity based (in part) on a unification of business operations as between the defendants, self-dealing as between the defendants, and a finding that, because the defendants' "profits were entirely dependent" on their joint venture to sell townhomes in a residential development, meaning that "their operations were

13

clearly in pursuit of a common business purpose…." *Id.* at 125. In rejecting the lower courts' findings that the defendants together constituted a single business entity, the Court held that:

> Viewing the facts of this case with the requisite hesitancy to invade the LLC form, we do not believe these facts warrant the application of the single business enterprise theory. As noted above, in *Pertuis*, we held the single business enterprise theory requires more than just a showing that the various entities' operations are intertwined. A "common business purpose" is simply not enough. … For a court to combine different business entities into a single business enterprise, there must also be a showing of "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." …The conduct of Marick, Thoennes, and IMK did not rise to this level. Like other methods of invading the corporate form, invocation of the single business enterprise theory should be reserved for drastic situations and is the rare exception, not the rule.

*Stoneledge* at 126.

Similarly, this Court has recently had the opportunity to consider the single business entity rule in a case where Plaintiff made allegations similar to those made by Plaintiffs here to support its single business entity theory of liability. *Turtle Factory Bldg. Corp. v. ECS Southeast, LLP,* 2021 U.S. Dist. LEXIS 125238 (D.S.C. July 6, 2021). The defendants there included ECS Southeast, LLP, ECS Carolinas, and ECS Corporate, each of which was an operating subsidiary of Engineering Consulting Services, Ltd. *Id.* at *4-5. In *Turtle Factory Bldg. Corp.*, Plaintiff alleged that it had been harmed as a result of a Property Condition Assessment Report ("PCR") prepared and provided by Defendant ECS Carolinas. In support of its motion for summary judgment, ECS Corporate provided affidavits showing that it did not prepare the PCR at issue and, indeed, it "does not provide engineering services, is not licensed to perform those services, and its primary function is to oversee corporate, human resources, IT and general management matters pursuant to a Master Services Agreement [the "MSA"] with Engineering Consulting Services, Ltd." *Id.* at *4. Plaintiff, on the other hand, argued that: (1) defendants had failed to comply with corporate formalities, including the lack of a signed written agreement delineating " the scope of services it provided to ECS Carolinas, LLP"; (2) there was a lack of "clear identification of its corporate officers and structure which would help

distinguish it from any of the other ECS entities"; (3) "because ECS Corporate states it provided human resource services to all ECS entities, ECS Corporate was thus responsible for … a failure to properly train and supervise" the employee who prepared the PCR; (4) "ECS Corporate Services, LLC is part of the whole that has cause [sic] the harm to the Plaintiff"; and (5) "all Defendants appear to have the same address and utilize the same web address."  *Turtle Factory Bldg. Corp.* at *8-9.

Nonetheless, this Court had no hesitation in rejecting Plaintiffs' single business entity theory, holding that "Plaintiff has put forth no evidence indicating bad faith, abuse, fraud, wrongdoing, or injustice resulting from an improper blurring of legal entities. …'It is commonplace for companies to establish multiple corporate entities, who maintain individual corporate identity despite close collaboration between the different entities' …'Combining multiple corporate entities into a single business enterprise requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions.'" *Id.* at *6-9 (internal citations omitted).

Here – and despite Plaintiffs' attempts to argue facts not alleged anywhere in the FAC – Plaintiffs have not offered *any* factual basis for their single business entity theory. Reading the FAC generously – indeed reading *all* of Plaintiffs' submissions generously – Plaintiffs allege nothing more than their assertions that the various business entities named operate in furtherance of an ultimate common purpose (the operation of the xHamster.com website) and that they are all, in some respect, related to one another. Such allegations fall far short of what is necessary to pierce the corporate veil under a single business entity theory.

## CONCLUSION

For the reasons stated hereinabove and in XIH's Memorandum in Support of Motion to Dismiss, Plaintiff's Amended Complaint should be dismissed in its entirety with respect to xHamster IP Holdings, Ltd.

Respectfully Submitted,

/s/ Hannah Rogers Metcalfe
Hannah Rogers Metcalfe, Fed ID. 9943
Metcalfe & Atkinson, LLC
1395 South Church Street
Greenville, South Carolina 29605
(864) 214-2319

Evan Fray-Witzer (*pro hac vice application forthcoming*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Valentin D. Gurvits (*pro hac vice application forthcoming*)
Frank Scardino (*pro hac vice application forthcoming*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com

January 27, 2023
Greenville, South Carolina