**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

Jane Does 1-9,                                    Case No.: 7:20-cv-00947

                Plaintiffs,

vs.

Collins Murphy, et al.,

                Defendants.

---

## <u>DECLARATION OF EVAN FRAY-WITZER</u>

Evan Fray-Witzer being duly sworn, does hereby depose and state:

1.      My name is Evan Fray-Witzer.  I am an attorney of record in this matter for defendant xHamster IP Holdings, Ltd. (now known as Online Media IP Holding Ltd.) ("XIH"). Unless otherwise stated, I make this affidavit of my own personal knowledge.

2.      Attached hereto as <u>Exhibit A</u> is a true and accurate copy of the arbitrator's decision in the UDRP arbitration captioned as: *Hammy Media, Ltd. and xHamster IP Holdings, Ltd. v. WhoisProtectService.net*.

3.      Attached hereto as <u>Exhibit B</u> is a true and accurate copy of an article published by Thao Nguyen on December 22, 2021 and entitled: *"The Uniform Domain Name Dispute Resolution Policy ('UDRP'): Not A Trademark Court But A Narrow Administrative Procedure Against Abusive Registrations."*

4.      Attached hereto as <u>Exhibit C</u> is a true and accurate copy of the Uniform Domain Name Dispute Resolution Policy that can be found at the following webpage: https://www.icann.org/resources/pages/policy-2012-02-25-en.  (Pages 9-12 of the printout of this webpage were blank and are excluded from the exhibit).

5.      Attached hereto as <u>Exhibit D</u> is a true and accurate copy of the ADR Forum's Supplemental Rules to ICANN's UDRP rules.

6.      Attached hereto as <u>Exhibit E</u> is a true and accurate copy of the Amended Complaint filed in the arbitration case captioned as: *Hammy Media, Ltd. and xHamster IP Holdings, Ltd. v. WhoisProtectService.net.*

Signed under the pains and penalties of perjury this <u>24th</u>day of January, 2023.

_____
Evan Fray-Witzer

# **EXHIBIT A**



# DECISION

Hammy Media, Ltd. and xHamster IP Holdings Ltd v. WhoisProtectService.net / PROTECTSERVICE, LTD.
Claim Number: FA1704001725445

## PARTIES

Complainants are **Hammy Media, Ltd. and xHamster IP Holdings Ltd** ("Complainants"), represented by **Matthew Shayefar** of **Boston Law Group, PC**, Massachusetts, United States. Respondent is **WhoisProtectService.net / PROTECTSERVICE, LTD.** ("Respondent"), Cyprus.

## REGISTRAR AND DISPUTED DOMAIN NAME

The domain name at issue is **<xhamsterporn.net>**, registered with **EVOPLUS LTD**.

## PANEL

The undersigned certifies that he has acted independently and impartially and to the best of his knowledge has no known conflict in serving as Panelist in this proceeding.

David E. Sorkin as Panelist.

## PROCEDURAL HISTORY

Complainants submitted a Complaint to the FORUM electronically on April 5, 2017; the FORUM received payment on April 5, 2017.

On April 6, 2017, EVOPLUS LTD confirmed by email to the FORUM that the **<xhamsterporn.net>** domain name is registered with EVOPLUS LTD and that Respondent is the current registrant of the name. EVOPLUS LTD has verified that Respondent is bound by the EVOPLUS LTD registration agreement and has thereby agreed to resolve domain disputes brought by third parties in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy (the "Policy").

On April 10, 2017, the FORUM served the Complaint and all Annexes, including a Written Notice of the Complaint, setting a deadline of May 1, 2017 by which Respondent could file a Response to the Complaint, via email to all entities and persons listed on Respondent's registration as technical, administrative, and billing contacts, and to postmaster@xhamsterporn.net. Also on April 10, 2017, the Written Notice of the Complaint, notifying Respondent of the email addresses served and the deadline for a Response, was transmitted to Respondent via post and fax, to all entities and persons listed on Respondent's registration as technical, administrative and billing contacts.

Having received no response from Respondent, the FORUM transmitted to the parties a Notification of Respondent Default.

On May 8, 2017, pursuant to Complainants' request to have the dispute decided by a single-member Panel, the FORUM appointed David E. Sorkin as Panelist.

Having reviewed the communications records, the Administrative Panel (the "Panel") finds that the FORUM has discharged its responsibility under Paragraph 2(a) of the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules") "to employ reasonably available means calculated to achieve actual notice to Respondent" through submission of Electronic and Written Notices, as defined in Rule 1 and Rule 2. Therefore, the Panel may

issue its decision based on the documents submitted and in accordance with the ICANN Policy, ICANN Rules, the FORUM's Supplemental Rules and any rules and principles of law that the Panel deems applicable, without the benefit of any response from Respondent.

## RELIEF SOUGHT

Complainants request that the domain name be transferred from Respondent to Complainant xHamster IP Holdings Ltd.

## PARTIES' CONTENTIONS

A. Complainants
Complainants are affiliated companies with "similar owners and ultimate control," and state that they have been treated as a single entity in previous proceedings under the Policy. Complainant Hammy Media Ltd. operates an adult-content website at <xhamster.com> with users from around the world. Complainants cite various surveys ranking the website among the most popular sites in the world. Hammy Media Ltd. and its predecessors in interest have used the XHAMSTER mark for this purpose since 2007. The mark is licensed from Complainant xHamster IP Holdings Ltd, which owns a Benelux registration and has applied to register the mark elsewhere.

The disputed domain name **<xhamsterporn.net>** was registered by Respondent in December 2015, using a privacy registration service to conceal Respondent's true identity. Complainants state that the domain name is being used for a website that allows users to view adult-oriented videos copied or embedded from Complainant Hammy Media Ltd.'s website. Complainants state further that Respondent is not commonly known by the disputed domain name. Complainants contend on these grounds that the disputed domain name is confusingly similar to a mark in which Complainants have rights; that Respondent has no rights or legitimate interests in respect of the disputed domain name; and that the domain name was registered and is being used in bad faith.

B. Respondent
Respondent failed to submit a Response in this proceeding.

## FINDINGS

The Panel finds that the disputed domain name is confusingly similar to a mark in which Complainants have rights; that Respondent lacks rights or legitimate interests in respect of the disputed domain name; and that the disputed domain name was registered and is being used in bad faith.

## DISCUSSION

Paragraph 15(a) of the Rules instructs this Panel to "decide a complaint on the basis of the statements and documents submitted in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

Paragraph 4(a) of the Policy requires that Complainant must prove each of the following three elements to obtain an order that a domain name should be cancelled or transferred:

(1) the domain name registered by Respondent is identical or confusingly similar to a trademark or service mark in which Complainant has rights; and
(2) Respondent has no rights or legitimate interests in respect of the domain name; and
(3) the domain name has been registered and is being used in bad faith.

In view of Respondent's failure to submit a response, the Panel shall decide this administrative proceeding on the basis of Complainants' undisputed representations pursuant to paragraphs 5(f), 14(a) and 15(a) of the Rules and draw such inferences it considers appropriate pursuant to paragraph 14(b) of the Rules. The Panel is entitled to accept all reasonable allegations and inferences set forth in the Complaint as true unless the evidence is clearly contradictory. *See Vertical Solutions Mgmt., Inc. v. webnet-marketing, inc.*, FA 95095 (FORUM July 31, 2000) (holding that the respondent's failure to respond allows all reasonable inferences of fact in the allegations of the complaint to be deemed true); *see also Talk City, Inc. v. Robertson*, D2000-0009 (WIPO Feb. 29, 2000) ("In the absence of a response, it is appropriate to accept as true all allegations of the Complaint.").

## Identical and/or Confusingly Similar

The disputed domain name combines Complainants' XHAMSTER mark with the generic term "porn" and the ".net" top-level domain. These additions do not substantially diminish the similarity between the domain name and Complainants' mark. *See, e.g., Hammy Media, Ltd. & xHamster IP Holdings Ltd v. Domain Admin / Whois Privacy Corp.*, FA 1704574 (Forum Dec. 31, 2016) (finding <xhamsterdeutsch.net> confusingly similar to XHAMSTER); *Mattel, Inc. v. domainsforsalenow@hotmail.com a/k/a domain sales*, FA 187609 (Forum Oct. 6, 2003) (finding <barbieporn.net> confusingly similar to BARBIE). The Panel finds that the disputed domain name is confusingly similar to Complainants' mark.

## Rights or Legitimate Interests

Under the Policy, Complainants must first make a prima facie case that Respondent lacks rights and legitimate interests in the disputed domain name, and then the burden shifts to Respondent to come forward with concrete evidence of such rights or legitimate interests. *See Hanna-Barbera Prods., Inc. v. Entm't Commentaries*, FA 741828 (Forum Aug. 18, 2006).

The disputed domain name combines Complainants' mark with a generic term associated with Complainants' business, and it is being used for a website that competes directly with Complainant Hammy Media Ltd.'s site. Such use does not give rise to rights or legitimate interests under the Policy, *see, e.g., Amazon Technologies, Inc. v. Thejeswar Reddy*, FA 1721564 (Forum Apr. 18, 2017), and Respondent has failed to come forward with any other basis for rights or legitimate interests. Accordingly, the Panel finds that Complainants have sustained their burden of proving that Respondent lacks rights or legitimate interests in respect of the disputed domain name.

## Registration and Use in Bad Faith

Finally, Complainants must show that the disputed domain name was registered and has been used in bad faith. Under paragraph 4(b)(iii) of the Policy, bad faith may be shown by evidence that Respondent registered the disputed domain name "primarily for the purpose of disrupting the business of a competitor." Under paragraph 4(b)(iv), bad faith may be shown by evidence that "by using the domain name, [Respondent] intentionally attempted to attract, for commercial gain, Internet users to [Respondent's] web site or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of [Respondent's] web site or location or of a product or service on [Respondent's] web site or location."

Respondent's use of a domain name incorporating Complainants' mark to profit from confusion by displaying content taken from Complainant Hammy Media Ltd.'s website is indicative of bad faith under paragraphs 4(b)(iii) and 4(b)(iv). *See, e.g., Hammy Media, Ltd. & xHamster IP Holdings Ltd v. Domain Admin / Whois Privacy Corp.*, *supra* (finding bad faith registration and use under similar circumstances). Respondent's use of a privacy registration service to conceal its identity, although not itself dispositive, is a further indication of bad faith. *See, e.g., State Farm Mutual Automobile Insurance Co. v. John Reddoch / Reddoch Media Group*, FA 1701162 (Forum Dec. 1, 2016). Accordingly, the Panel finds that the disputed domain names were registered and being used in bad faith.

## DECISION
Having considered the three elements required under the ICANN Policy, the Panel concludes that relief shall be **GRANTED**.

Accordingly, it is Ordered that the **<xhamsterporn.net>** domain name be **TRANSFERRED** from Respondent to Complainant xHamster IP Holdings Ltd.

David E. Sorkin, Panelist

Dated: May 10, 2017

[Click Here](#) to return to the main Domain Decisions Page.

[Click Here](#) to return to our Home Page

# **EXHIBIT B**



# UNIVERSITY OF MINNESOTA LAW SCHOOL

## LAWSCI FORUM

News, Events, Opinion, and Commentary
by the Minnesota Journal of Law, Science & Technology

# The Uniform Domain Name Dispute Resolution Policy ("UDRP"): Not A Trademark Court But A Narrow Administrative Procedure Against Abusive Registrations

**TOPICS:**   Arbitration    Domain Name

Domain Registration    Internet    UDPR

**Posted By: mjlst**    December 22, 2021

**Thao Nguyen, MJLST Staffer**

SEARCH …

LAWSCI FORUM

About LawSci Forum

MJLST

MJLST Website

2022 Minnesota Journal of
Law, Science & Technology
Symposium







Anyone can register a domain name through one of the thousands of registrars on a **first-come, first-serve** basis at a low cost. The ease of entry has created so-called "cybersquatters," who register for domain names that reflect trademarks **before the true trademark owners are able to do so**. Cybersquatters often aim to profit from cybersquatting activities, either by **selling the domain names back** to the trademark holders for a higher price, by **generating confusion** in order to take advantage of the trademark's goodwill, or by **diluting the trademark and disrupting the business** of a competitor. A single cybersquatter can cybersquat on **several thousand** domain names that incorporate well-known trademarks.

**Paragraph 4(a) of the UDRP** provides that the complainant must successfully establish all three of the following elements: (i) that the disputed domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights; (ii) that the registrant has no rights or legitimate interests in respect of the domain name; and (iii) that the registrant registered and is using the domain name in bad faith. Remedies for a successful complainant include **cancellation or transfer** to the complainant of the disputed domain name.

Although prized for being focused, expedient, and inexpensive, the UDRP is not without criticism, the bulk of which focuses on the issue of **fairness**. The frequent charge is that the UDRP is inherently **biased in favor of trademark owners** and against domain name holders, not all of whom are "cybersquatters." This bias is indicated by statistics: **75% to 90%** of URDP decisions each year are decided against the domain name owner.

Nonetheless, the asymmetry of outcomes, rather than being a sign of an unfair arbitration process, may simply reflect the reality that most UDRP complaints are brought **when there is a clear case of abuse**, and most respondents in the proceeding are true cybersquatters who knowingly and willfully violated the UDRP.

RECENT POSTS

Saving the Planet With Admin Law: Another Blow to Tax Exceptionalism

Charged Up! the Inflation Reduction Act of 2022 and Its Impacts on Energy Storage Capacity in the U.S.

DNA Testing and Death: How Decades-Long Procedural Battles Determine Who Has to Die

Who Qualifies for the Patent Bar? Proposed Changes May Mean More Applicants With Computer Science Degrees Soon Will

The Crypto Wild West Chaos Continues at FTX: Will the DCCPA Fix This?



CATEGORIES

3-D Printing

Administrative Law

Agencies

Therefore, what may appear to be the UDRP's shortcomings are in facts signs that the UDRP is fulfilling its primary purpose. Furthermore, to appreciate the UDRP proceeding and understand the asymmetry that might normally raise red flags in an adjudication, one must understand that the UDRP is not meant to resolve trademark dispute. A representative case where this purpose is addressed is *Cameron & Company, Inc. v. Patrick Dudley*, FA1811001818217 (FORUM Dec. 26, 2018), where the Panel wrote, "cases involving disputes regarding trademark rights and usage, trademark infringement, unfair competition, deceptive trade practices and related U.S. law issues are beyond the scope of the Panel's limited jurisdiction under the Policy." In other words, the UDRP's scope is limited to detecting and reversing the damages of cybersquatting, and the administrative dispute-resolution procedure is streamlined for this purpose.[1]

That the UDRP is not a trademark court is evident in the UDRP's **refusal to handle cases where multiple legitimate complainants** assert right to a single domain name registered by a cybersquatter. **UDRP Rule 3(a)** states: "Any person or entity may initiate an administrative proceeding by submitting a complaint." The **Forum's Supplemental Rule 1(e)** defines "The Party Initiating a Complaint Concerning a Domain Name Registration" as a "single person or entity claiming to have rights in the domain name, or multiple persons or entities who have a sufficient nexus who can each claim to have rights to all domain names listed in the Complaint." UDRP cases with two or more complainants in a proceeding are possible only when the complainants are affiliated with each other as to share a single license to a trademark,[2] for example, when the complainant is assigned rights to a trademark registered by another entity,[3] or when the complainant has a subsidiary relationship with the trademark registrant.[4]

Since the UDRP does not resolve a good faith trademark dispute but intervenes only when there is clear abuse, the respondent's bad faith is central: a domain name may be confusingly similar or even identical to a trademark, and

Agriculture

Animal Law

Antitrust

Artificial Intelligence

Autonomous Vehicles

Bioethics

Biotechnology

Business Law

Class Action

Climate Change

Competition

Constitutional Law

Contract Law

Copyrights

Corporate Ethics

COVID-19

Criminal Law

Cryptocurrency

Cyber Security

Data

Data Privacy

yet a complainant cannot prevail if the respondent has rights and legitimate interests in the domain name and/or did not register and use the domain name in bad faith.[5] For this reason, the UDRP sets a high standard for the complainant to establish respondent's bad faith. For example, UDRP provides a defense if the domain name registrant has made demonstrable preparations to use the domain name in a *bona fide* offering of goods or services. On the other hand, the **Anticybersquatting Consumer Protection Act** ("ACPA") only provides a defense if there is prior good faith use of the domain name, not simply preparation to use. Another distinction between the UDRP and the ACPA is that the UDRP requires that complainant prove bad faith in both **registration *and* use** of the disputed domain to prevail, whereas the ACPA only requires complainant to prove bad faith in *either* registration *or* use.

Such a high standard for bad faith indicates that the UDRP is not equipped resolve issues where both parties dispute their respective rights in the trademark. In fact, when abuse is non-existent or not obvious, the UDRP Panel would refuse to transfer the disputed domain name from the respondent to the complainant.[6] Instead, the parties would need to **resolve these claims in regular courts** under either the ACPA or the Latham act. Limiting itself to addressing cybersquatting allows the UDRP to become extremely efficient in dealing with cybersquatting practices, a widespread and highly damaging abuse of the Internet age. This efficiency and ease of the UDRP process is appreciated by trademark-owning businesses and individuals, who prefer that disputes are handled promptly and economically. From the time of the UDRP's creation until now, ICANN has not shown intention for reforming the Policy despite existing criticisms,[7] and for good reasons.

[Notes]

[1] Gerald M. Levine, Domain Name Arbitration: Trademarks, Domain Names, and Cybersquatting at 102 (2019).

Discrimination

DNA Evidence

Drones

Drug Policy

Economics

Economy

Education

Elections

Employment

Employment Law

Endangered Species Act

Energy Law

Entertainment

Environment

Environmental Justice

Environmental Law

EPA

Ethics

EU Law

Event

Evidence

[2] *Tasty Baking, Co. & Tastykake Invs., Inc. v. Quality Hosting*, FA 208854 (FORUM Dec. 28, 2003) (treating the two complainants as a single entity where both parties held rights in trademarks contained within the disputed domain names.)

[3] *Golden Door Properties, LLC v. Golden Beauty / goldendoorsalon*, FA 1668748 (FORUM May 7, 2016) (finding rights in the GOLDEN DOOR mark where Complainant provided evidence of assignment of the mark, naming Complainant as assignee); *Remithome Corp v. Pupalla*, FA 1124302 (FORUM Feb. 21, 2008) (finding the complainant held the trademark rights to the federally registered mark REMITHOME, by virtue of an assignment); *Stevenson v. Crossley*, FA 1028240 (FORUM Aug. 22, 2007) ("Per the annexed U.S.P.T.O. certificates of registration, assignments and license agreement executed on May 30, 1997, Complainants have shown that they have rights in the MOLD-IN GRAPHIC/MOLD-IN GRAPHICS trademarks, whether as trademark holder, or as a licensee. The Panel concludes that Complainants have established rights to the MOLD-IN GRAPHIC SYSTEMS mark pursuant to Policy ¶ 4(a)(i).")

[4] *Provide Commerce, Inc v Amador Holdings Corp / Alex Arrocha*, FA 1529347 (FORUM Jan. 3, 2014) (finding that the complainant shared rights in a mark through its subsidiary relationship with the trademark holder); *Toyota Motor Sales, U.S.A., Inc. v. Indian Springs Motor*, FA 157289 (FORUM June 23, 2003) ("Complainant has established that it has rights in the TOYOTA and LEXUS marks through TMC's registration with the USPTO and Complainant's subsidiary relationship with TMC.")

[5] Levine, *supra* note 1, at 99; *see e.g., Dr. Alan Y. Chow, d/b/a Optobionics v. janez bobnik*, FA2110001967817 (FORUM Nov. 23, 2021) (refusing to transfer the <optobionics.com> domain name despite its being identical to Complainant's OPTOBIONICS mark and formerly owned by Complainant, since "[t]he Panel finds no evidence in the Complainant's submissions . . . [that] the Respondent a) does not have a legitimate interest in the domain name and b) registered and used the domain name in bad faith.").

Family Law

FDA

Financial Law

First Amendment

Food and Agriculture

Food and Drug Law

Foreign Intelligence

Forensic Evidence

Forensics

Fourth Amendment

FTC

Health

Healthcare

Healthcare Reform

Human Behavior

Human Rights Law

Immigration

Industry

Infrastructure

Insurance

Intellectual Property

[6] *Swisher International, Inc. v. Hempire State Smoke Shop*, FA2106001952939 (FORUM July 27, 2021).

[7] *Id.* at 359.

‹ **Previous post**        **Next post** ›

RELATED ARTICLES

**Constitutional Law**, **Data**, **Data Privacy**, **First Amendment**, **Internet**, **Regulatory**, **Social Media**

Save the Children . . . From Algorithms?

**Internet**, **Litigation**, **Social Media**

Growth of Social Media Outpaces Traditional Evidence Rules

**Data**, **Economics**, **Privacy**, **Social Media**, **Social Welfare**, **Uncategorized**

Whitelist for Thee, but Not for Me: Facebook File Scandals and Section 230 Solutions

**Administrative Law**, **Intellectual Property**, **Internet**, **Social Media**

After Hepp: Section 230 and State Intellectual Property Law

Internal Revenue Service

International Law

Internet

Invasive Species

Inventions

Law Enforecement

Legal Education

Legal Ethics

Litigation

Maritime Law

Medical Devices

natural disaster law

Net Neutrality

Neuroscience

New Technology

Patent Infringement Damages

Patents

Personalized Medicine

Pharmaceuticals

Privacy

Product Liability

Property Law

Public Health

Public Lands

Public Safety

Regulatory

Reproductive Health

Securities Law

Social Media

Social Welfare

Sociology

Solar Energy

Space Law

Sports Law

Supply Chain

Tax

Tax Law

Torts Law

Trade

Trademark Law

Transportation

Trusts and Estates

1/24/23, 12:48 PM    The Uniform Domain Name Dispute Resolution Policy ("UDRP"): Not a Trademark Court but a Narrow Administrative Procedure …

7:20-cv-00847-DCC    Date Filed 01/27/23    Entry Number 263-1    Page 16 of 51

Uncategorized

Video Games

Video Games

Weapon Law

| ARCHIVES | |
| --- | --- |

► 2022

► 2021

► 2020

► 2019

► 2018

► 2017

► 2016

► 2015

► 2014

► 2013

► 2012

**Home | Contact Publishing Services | My Account**

The copyright of these individual works published by the University of Minnesota Libraries Publishing remains with the original creator or editorial team. For uses beyond those covered by law, permission to reuse should be sought directly from the copyright owner listed in the About pages.

Privacy | Acceptable Use of IT Resources

# **EXHIBIT C**

# Uniform Domain Name (Domain Name) Dispute Resolution Policy

This page is available in:

English  |
العربية (https://www.icann.org/resources/pages/policy-2012-02-25-ar)  |
Deutsch (https://www.icann.org/resources/pages/policy-2012-02-25-de)  |
Español (https://www.icann.org/resources/pages/policy-2012-02-25-es)  |
Français (https://www.icann.org/resources/pages/policy-2012-02-25-fr)  |
Italiano (https://www.icann.org/resources/pages/policy-2012-02-25-it)  |
日本語 (https://www.icann.org/resources/pages/policy-2012-02-25-ja)  |
한국어 (https://www.icann.org/resources/pages/policy-2012-02-25-ko)  |
Português (https://www.icann.org/resources/pages/policy-2012-02-25-pt)  |
Русский (https://www.icann.org/resources/pages/policy-2012-02-25-ru)  |
中文 (https://www.icann.org/resources/pages/policy-2012-02-25-zh)

Policy Adopted: August 26, 1999
Implementation Documents Approved: October 24, 1999

> **Notes:**
>
> **1. This policy is now in effect. See www.icann.org/udrp/udrp-schedule.htm (/udrp/udrp-schedule.htm) for the implementation schedule.**
>
> **2. This policy has been adopted by all ICANN (Internet Corporation for Assigned Names and Numbers)-accredited registrars. It has also been adopted by certain managers of country-code top-level domains (e.g., .nu, .tv, .ws).**
>
> **3. The policy is between the registrar (or other registration authority in the case of a country-code top-level domain) and its customer (the domain-name holder or registrant). Thus, the policy uses "we" and "our" to refer to the registrar and it uses "you" and "your" to refer to the domain-name holder.**

Uniform Domain Name (Domain Name) Dispute Resolution Policy

(As Approved by ICANN (Internet Corporation for Assigned Names and Numbers) on October 24, 1999)

**1. Purpose.** This Uniform Domain Name (Domain Name) Dispute Resolution Policy (the "Policy") has been adopted by the Internet Corporation for Assigned Names and Numbers ("ICANN (Internet Corporation for Assigned Names and Numbers)"), is incorporated by reference into your Registration Agreement, and sets forth the terms and conditions in connection with a dispute between you and any party other than us (the registrar) over the registration and use of an Internet domain name registered by you. Proceedings under Paragraph 4 of this Policy will be conducted according to the Rules for Uniform Domain Name (Domain Name) Dispute Resolution Policy (the "Rules of Procedure"), which are available at https://www.icann.org/resources/pages/udrp-rules-2015-03-11-en (/resources/pages/udrp-rules-2015-03-11-en), and the selected administrative-dispute-resolution service provider's supplemental rules.

**2. Your Representations.** By applying to register a domain name, or by asking us to maintain or renew a domain name registration, you hereby represent and warrant to us that (a) the statements that you made in your Registration Agreement are complete and accurate; (b) to your knowledge, the registration of the domain name will not infringe upon or otherwise violate the rights of any third party; (c) you are not registering the domain name for an unlawful purpose; and (d) you will not knowingly use the domain name in violation of any applicable laws or regulations. It is your responsibility to determine whether your domain name registration infringes or violates someone else's rights.

**3. Cancellations, Transfers, and Changes.** We will cancel, transfer or otherwise make changes to domain name registrations under the following circumstances:

> a. subject to the provisions of Paragraph 8, our receipt of written or appropriate electronic instructions from you or your authorized agent to take such action;
>
> b. our receipt of an order from a court or arbitral tribunal, in each case of competent jurisdiction, requiring such action; and/or

c. our receipt of a decision of an Administrative Panel requiring such action in any administrative proceeding to which you were a party and which was conducted under this Policy or a later version of this Policy adopted by ICANN (Internet Corporation for Assigned Names and Numbers). (See Paragraph 4(i) and (k) below.)

We may also cancel, transfer or otherwise make changes to a domain name registration in accordance with the terms of your Registration Agreement or other legal requirements.

## 4. <u>Mandatory Administrative Proceeding</u>.

This Paragraph sets forth the type of disputes for which you are required to submit to a mandatory administrative proceeding. These proceedings will be conducted before one of the administrative-dispute-resolution service providers listed at www.icann.org/en/dndr/udrp/approved-providers.htm (/en/dndr/udrp/approved-providers.htm) (each, a "Provider").

**a. Applicable Disputes.** You are required to submit to a mandatory administrative proceeding in the event that a third party (a "complainant") asserts to the applicable Provider, in compliance with the Rules of Procedure, that

(i) your domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights; and

(ii) you have no rights or legitimate interests in respect of the domain name; and

(iii) your domain name has been registered and is being used in bad faith.

In the administrative proceeding, the complainant must prove that each of these three elements are present.

**b. Evidence of Registration and Use in Bad Faith.** For the purposes of Paragraph 4(a)(iii), the following circumstances, in particular but

7:20-cv-00947-DCC        Date Filed 01/27/23        Entry Number 263-1

without limitation, if found by the Panel to be present, shall be evidence
of the registration and use of a domain name in bad faith:

(i) circumstances indicating that you have registered or you have
acquired the domain name primarily for the purpose of selling,
renting, or otherwise transferring the domain name registration to
the complainant who is the owner of the trademark or service
mark or to a competitor of that complainant, for valuable
consideration in excess of your documented out-of-pocket costs
directly related to the domain name; or

(ii) you have registered the domain name in order to prevent the
owner of the trademark or service mark from reflecting the mark
in a corresponding domain name, provided that you have
engaged in a pattern of such conduct; or

(iii) you have registered the domain name primarily for the
purpose of disrupting the business of a competitor; or

(iv) by using the domain name, you have intentionally attempted
to attract, for commercial gain, Internet users to your web site or
other on-line location, by creating a likelihood of confusion with
the complainant's mark as to the source, sponsorship, affiliation,
or endorsement of your web site or location or of a product or
service on your web site or location.

**c. How to Demonstrate Your Rights to and Legitimate Interests in
the Domain Name (Domain Name) in Responding to a Complaint.**
When you receive a complaint, you should refer to Paragraph 5
(/resources/pages/udrp-rules-2015-03-11-en#5) of the Rules of
Procedure in determining how your response should be prepared. Any
of the following circumstances, in particular but without limitation, if
found by the Panel to be proved based on its evaluation of all evidence
presented, shall demonstrate your rights or legitimate interests to the
domain name for purposes of Paragraph 4(a)(ii):

(i) before any notice to you of the dispute, your use of, or
demonstrable preparations to use, the domain name or a name

corresponding to the domain name in connection with a bona fide offering of goods or services; or

(ii) you (as an individual, business, or other organization) have been commonly known by the domain name, even if you have acquired no trademark or service mark rights; or

(iii) you are making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue.

**d. Selection of Provider.** The complainant shall select the Provider from among those approved by ICANN (Internet Corporation for Assigned Names and Numbers) by submitting the complaint to that Provider. The selected Provider will administer the proceeding, except in cases of consolidation as described in Paragraph 4(f).

**e. Initiation of Proceeding and Process and Appointment of Administrative Panel.** The Rules of Procedure state the process for initiating and conducting a proceeding and for appointing the panel that will decide the dispute (the "Administrative Panel").

**f. Consolidation.** In the event of multiple disputes between you and a complainant, either you or the complainant may petition to consolidate the disputes before a single Administrative Panel. This petition shall be made to the first Administrative Panel appointed to hear a pending dispute between the parties. This Administrative Panel may consolidate before it any or all such disputes in its sole discretion, provided that the disputes being consolidated are governed by this Policy or a later version of this Policy adopted by ICANN (Internet Corporation for Assigned Names and Numbers).

**g. Fees.** All fees charged by a Provider in connection with any dispute before an Administrative Panel pursuant to this Policy shall be paid by the complainant, except in cases where you elect to expand the Administrative Panel from one to three panelists as provided in Paragraph 5(b)(iv) (/resources/pages/udrp-rules-2015-03-11-en#5biv) of the Rules of Procedure, in which case all fees will be split evenly by you and the complainant.

**h. Our Involvement in Administrative Proceedings.** We do not, and will not, participate in the administration or conduct of any proceeding before an Administrative Panel. In addition, we will not be liable as a result of any decisions rendered by the Administrative Panel.

**i. Remedies.** The remedies available to a complainant pursuant to any proceeding before an Administrative Panel shall be limited to requiring the cancellation of your domain name or the transfer of your domain name registration to the complainant.

**j. Notification and Publication.** The Provider shall notify us of any decision made by an Administrative Panel with respect to a domain name you have registered with us. All decisions under this Policy will be published in full over the Internet, except when an Administrative Panel determines in an exceptional case to redact portions of its decision.

**k. Availability of Court Proceedings.** The mandatory administrative proceeding requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding is concluded. If an Administrative Panel decides that your domain name registration should be canceled or transferred, we will wait ten (10) business days (as observed in the location of our principal office) after we are informed by the applicable Provider of the Administrative Panel's decision before implementing that decision. We will then implement the decision unless we have received from you during that ten (10) business day period official documentation (such as a copy of a complaint, file-stamped by the clerk of the court) that you have commenced a lawsuit against the complainant in a jurisdiction to which the complainant has submitted under Paragraph 3(b)(xiii) (/resources/pages/udrp-rules-2015-03-11-en#3bxiii) of the Rules of Procedure. (In general, that jurisdiction is either the location of our principal office or of your address as shown in our Whois database. See Paragraphs 1 (/resources/pages/udrp-rules-2015-03-11-en#1mutualjurisdiction) and 3(b)(xiii) (/resources/pages/udrp-rules-2015-03-11-en#3bxiii) of the Rules of Procedure for details.) If we receive such documentation within the ten (10) business day period, we will not implement the Administrative Panel's decision, and we will

take no further action, until we receive (i) evidence satisfactory to us of a resolution between the parties; (ii) evidence satisfactory to us that your lawsuit has been dismissed or withdrawn; or (iii) a copy of an order from such court dismissing your lawsuit or ordering that you do not have the right to continue to use your domain name.

**5. <u>All Other Disputes and Litigation</u>.** All other disputes between you and any party other than us regarding your domain name registration that are not brought pursuant to the mandatory administrative proceeding provisions of <u>Paragraph 4</u> shall be resolved between you and such other party through any court, arbitration or other proceeding that may be available.

**6. <u>Our Involvement in Disputes</u>.** We will not participate in any way in any dispute between you and any party other than us regarding the registration and use of your domain name. You shall not name us as a party or otherwise include us in any such proceeding. In the event that we are named as a party in any such proceeding, we reserve the right to raise any and all defenses deemed appropriate, and to take any other action necessary to defend ourselves.

**7. <u>Maintaining the Status Quo</u>.** We will not cancel, transfer, activate, deactivate, or otherwise change the status of any domain name registration under this Policy except as provided in <u>Paragraph 3</u> above.

**8. <u>Transfers During a Dispute</u>.**

    **a. Transfers of a <u>Domain Name (Domain Name)</u> to a New Holder.** You may not transfer your domain name registration to another holder (i) during a pending administrative proceeding brought pursuant to <u>Paragraph 4</u> or for a period of fifteen (15) business days (as observed in the location of our principal place of business) after such proceeding is concluded; or (ii) during a pending court proceeding or arbitration commenced regarding your domain name unless the party to whom the domain name registration is being transferred agrees, in writing, to be bound by the decision of the court or arbitrator. We reserve the right to cancel any transfer of a domain name registration to another holder that is made in violation of this subparagraph.

    **b. Changing Registrars.** You may not transfer your domain name registration to another registrar during a pending administrative

proceeding brought pursuant to <u>Paragraph 4</u> or for a period of fifteen (15) business days (as observed in the location of our principal place of business) after such proceeding is concluded. You may transfer administration of your domain name registration to another registrar during a pending court action or arbitration, provided that the domain name you have registered with us shall continue to be subject to the proceedings commenced against you in accordance with the terms of this Policy. In the event that you transfer a domain name registration to us during the pendency of a court action or arbitration, such dispute shall remain subject to the domain name dispute policy of the registrar from which the domain name registration was transferred.

**9. <u>Policy Modifications</u>.** We reserve the right to modify this Policy at any time with the permission of <u>ICANN (Internet Corporation for Assigned Names and Numbers)</u>. We will post our revised Policy at <<u>URL (Uniform Resource Locator)</u>> at least thirty (30) calendar days before it becomes effective. Unless this Policy has already been invoked by the submission of a complaint to a Provider, in which event the version of the Policy in effect at the time it was invoked will apply to you until the dispute is over, all such changes will be binding upon you with respect to any domain name registration dispute, whether the dispute arose before, on or after the effective date of our change. In the event that you object to a change in this Policy, your sole remedy is to cancel your domain name registration with us, provided that you will not be entitled to a refund of any fees you paid to us. The revised Policy will apply to you until you cancel your domain name registration

# **EXHIBIT D**



# Dispute Resolution for Domain Names

# Supplemental Rules

THE Forum's SUPPLEMENTAL RULES TO ICANN'S UNIFORM DOMAIN
NAME DISPUTE RESOLUTION POLICY

## 1. Definitions

(a) **The Rules** means the Rules for the Uniform Domain Name Dispute
Resolution Policy, approved by the Internet Corporation for Assigned Names
and Numbers (ICANN), having an effective date of July 31, 2015.

(b) **The Policy** means the Uniform Domain Name Dispute Resolution Policy
approved by ICANN on September 28, 2013.

(c) **The FORUM** also refers to the National Arbitration Forum.

(d) **"The Holder of a Domain Name Registration,"** as used in The Rules (Rule
1), means the single person or entity listed in the registration information, as
verified by the Registrar, at the time of commencement.

      (i)      A Complainant wishing to make an argument for a single
Respondent having multiple aliases must comply with
Supplemental Rules 4(c) and 17(a)(i).

(e) **"The Party Initiating a Complaint Concerning a Domain Name
Registration,"** as used in The Rules (Rule 1), means the single person or
entity claiming to have rights in the domain name, or multiple persons or
entities who have a sufficient nexus who can each claim to have rights to all
domain names listed in the Complaint.

(f) **Submit.** In these Supplemental Rules or in a FORUM or Panel Order,
documents are deemed Submitted when received by the FORUM's mail server
based on U.S. Central Time;

(g) **Calendar Days** means that all days, including weekends and international and
national holidays, shall be counted in determining all deadlines and due dates.

Exceptions-Deadlines:

(i) In the event that a deadline falls on a United States federal holiday, as defined by 5 U.S.C. §6103, the deadline shall be extended to the following Calendar Day.
(ii) In the event that a Calendar Day deadline falls on a Saturday or Sunday, the deadline shall be extended to the following Calendar Day.

## 2. Scope

The FORUM will apply the Rules, the Policy and the FORUM's Supplemental Rules in effect at the time a Complaint is Submitted. The FORUM's Supplemental Rules may be amended by the FORUM in its sole discretion.

## 3. Communications

All communications must be directed to the FORUM and not to the Panel.

## 4. The Complaint

(a) The Complaint must include all elements listed in Paragraph 3(b) of the Rules; and may not exceed fifteen (15) pages.

(b) The Complaint must be sent to the FORUM by e-mail (domaindispute@adrforum.com) or filed online through the FORUM's online filing platform at https://secure.adrforum.com/ddfiling.
   (i)   The Complaint (see sub-paragraph (a) above) must be a separate file (file must not include Annexes).
   (ii)  All documents must be in a format as specified in Annex A to these Supplemental Rules, unless approved by the FORUM in advance.
   (iii) Individual files must not exceed the file size restrictions as set forth in Annex A to these Supplemental Rules unless approved by the FORUM in advance. The Annexes may be divided into multiple files as needed.
   (iv)  No individual email, including attachments, may exceed the email size restrictions set forth in Annex A to these Supplemental Rules unless approved by the FORUM in advance. Multiple emails may be used to transmit a single set of Complaint documents; the subject line of each email relating to a single Complaint must reference the fact that multiple emails have been send (refer to Annex A for suggested wording)
   (v)   The FORUM may rename electronic files compatible with internal naming conventions, for ease of internal and Panel use.

(c) Any arguments alleging Respondent aliases must be included in the Complaint for Panel consideration.
   (i)   All Complaints alleging multiple aliases will be subject to an increased filing fee (see Supp. Rule 17 (a)(i)).

(ii)    If the Panel determines that insufficient evidence is presented to link the alleged aliases, the domain names held by the unrelated registrants will not be subject to further consideration by that Panel; no portion of the filing fee will be refunded.

## 5. The Response

(a) The Response must include all elements listed in Paragraph 5(b) of the Rules and may not exceed fifteen (15) pages.

(b) The method used by the FORUM to communicate to the Respondent will be:

(i)    the e-mail address Respondent provided in the Response;

(ii)    if no Response is Submitted or if no e-mail address is provided in the Response, the e-mail address of the Respondent is the email address provided to the FORUM by the Registrar.

(c)  The Response must be sent to the FORUM by e-mail (domaindispute@adrforum.com) or filed online through the FORUM's online filing platform at https://secure.adrforum.com/ddfiling.

(i)    The Response (see sub-paragraph (a) above) must be a separate file (file must not include Annexes).

(ii)    All documents must be in a format as specified in Annex A to these Supplemental Rules, unless approved by the FORUM in advance.

(iii)    Individual files must not exceed the file size restrictions as set forth in Annex A to these Supplemental Rules unless approved by the FORUM in advance.  The Annexes may be divided into multiple files as needed.

(iv)    No individual email, including attachments, may exceed the email size restrictions set forth in Annex A to these Supplemental Rules unless approved by the FORUM in advance; multiple emails may be used to transmit a single set of Response documents.

(v)    The FORUM may rename electronic files compatible with internal naming conventions, for ease of internal and Panel use.

## 6. Extensions and Stays

(a) Extensions for Filing a Response

(i)    To receive a four-day extension under Rule 5(b), Respondent must:

(A) Notify the Forum of the extension request via email (to the case coordinator and/or to domaindispute@adrforum.com), and

(B) copy Complainant.

The Forum will "reply to all," notifying the Respondent of the new Response deadline.

Receiving an Extension under Rule 5(b) and Supp. Rule 6(a)(i) does not preclude the Respondent from also seeking an extension under Rule 5(e) provided Supplemental Rule 6(a)(ii) is met.

(ii)    Rule 5(d) provides that the Respondent may request additional time to Submit a Response.  Any request by the Respondent for an extension or any joint request by the parties for an extension must:

(A) be Submitted in writing to the FORUM (copied to the complainant) within the time for the Response to be Submitted;

(B) state the exceptional circumstances warranting the request for an extension;

(C) state the length of the extension being requested (no more than twenty (20) additional Calendar Days); and

(D) be Submitted with an extension fee of $100.

(iii)    The FORUM may exercise its discretion in determining whether exceptional circumstances exist warranting an extension and if so, the length of the extension.  No request for an extension will be approved if any of the conditions set forth in Paragraph 6(a) have not been performed.

(b).  Stays of the Administrative Proceeding and Settlement

(i)    If a Panel has not been appointed by the FORUM, parties may jointly request a stay for a one-time period of forty-five Calendar Days, provided that both parties have agreed to the stay in writing and that the parties Submit the signed agreement to the FORUM; an electronic signature (refer to Annex A) will be accepted.  A Model Form is available on the FORUM's website: https://www.adrforum.com/domain-dispute/udrp

(ii)   Prior to expiration of the Stay, at least one party must request in writing that the case be reinstated.  Absent this written request, the FORUM will automatically dismiss the case without prejudice.

(iii)   Settlement

(C)  If the purpose of the Stay is to discuss and facilitate settlement, Rule 17 applies.  A settlement form must be provided to FORUM for the Registrar to unlock and transfer the domain name. The settlement form is available at https://www.adrforum.com/domain-dispute/udrp.

(D)  Once the settlement terms (e.g. transfer of the domain names) have been implemented by the Registrar, the Complainant must notify the FORUM in writing of that fact.  A form that may be used for this purpose is available at https://www.adrforum.com/domain-dispute/udrp .

## 7.  Submission of other Written Statements and Documents

If a party requests an additional written submission be considered by the Panel, the additional submission must be sent to FORUM along with proof of service on the opposing party(s).  FORUM will forward all additional submissions to the Panel. It is within the discretion of the Panel to accept or consider additional unsolicited submission(s).

## 8.  The Record of the Administrative Proceeding.

The Complaint, Response, and additional written statements and documents provided in Paragraph 12 of the Rules and Paragraph 7 of the Supplemental Rules constitute the complete record to be considered by the Panel.

## 9.  Appointment of the Panel and Timing of Decision

(a) The Forum will maintain and publish a list of Panelists and their qualifications to which any party will be directed on the FORUM's web site, https://www.adrforum.com/domain-dispute/search-panelists.   The FORUM will appoint a Panelist from this list to serve as a single-member Panel.

(b) In cases involving a three-member Panel, the FORUM will select a Chair for the three-member Panel and will endeavor to select a Chair who was not from the list of Panelist candidates provided by the parties pursuant to Paragraph 6(e) of the Rules.  The Chair will sign all Orders and the Decision, coordinate and preside over the proceeding, and forward to the FORUM the Panel's

decision, including any concurring or dissenting opinion as required by Paragraph 15 of the Rules.

(c) In cases where the Complainant requested a three-member Panel and no Response was Submitted as required by Rule 5(a), the Complainant may be given the option of converting the three-member Panel to a single-member Panel:

    (i)    After the time for the Response has expired, the FORUM will notify the Complainant that no response was Submitted and that the Complainant may convert its three-member Panel request to a single-member Panel request;

    (ii)    Within five (5) Calendar Days of this notification, the Complainant, by e-mail to the FORUM (domaindispute@adrforum.com), may request that the three-member Panel be converted to a single-member Panel;

    (iii)    If a single-member Panel is requested, the FORUM will select a Panelist from its list of Panelists, not on the list of Panelists Submitted by the Complainant; and

    (iv)    If a single-member Panel is appointed to decide the case, the Complainant will be reimbursed $1,000 of its fee.

(d) If the Complainant fails to request that the three-member Panel be converted to a single-member Panel as provided in paragraph 9(c)(ii) above, the selection of the three-member Panel will be as follows:

    (i)    The Complainant must provide a list of three candidates and the FORUM will endeavor to select a Panelist from that list as provided in Rule 6(e);

    (ii)    The FORUM will select a Panelist from its list of Panel members; and

    (ii)    The FORUM will supply to the parties a list of five candidates and will select a Panelist as provided in Rule 6(e).

(e) In cases where the Respondent requested a three-member Panel and the Complaint is withdrawn prior to the appointment of a Panel, the Respondent will be reimbursed $1,000 of its fee.

**10. Impartiality and Independence**

    (a) All FORUM Panelists will take an oath to be neutral and independent.

    (b) A Panelist will be disqualified if circumstances exist that create a conflict of interest or cause the Panelist to be unfair and biased, including but not limited to the following:

        (i)      The Panelist has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts;

        (ii)      The Panelist has served as an attorney to any party or the Panelist has been associated with an attorney who has represented a party during that association;

        (iii)      The Panelist, individually or as a fiduciary, or the Panelist's spouse or minor child residing in the Panelist's household, has a direct financial interest in a matter before the Panelist;

        (iv)      The Panelist or the Panelist's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

            (1) Is a party to the proceeding, or an officer, director, or trustee of a Party; or
            (2) Is acting as a lawyer or representative in the proceeding.

    (c) A party may challenge the selection of a Panelist, provided that a decision has not already been published, by filing with the FORUM a written request stating the circumstances and specific reasons for the disqualification.

    (d) A request to challenge must be filed in writing with the FORUM within five (5) Calendar Days of the date of receipt of the notice of the selection.

    (e) Provided a decision has not already been published by the selected Panelist, the FORUM will promptly review the challenge and determine whether circumstances exist requiring Panelist disqualification in accord with this rule.

**11. Communications Between Parties and the Panel**

    (a) No party may directly communicate with a Panelist.

    (b) The parties may communicate with the Case Coordinator assigned to their proceeding by phone or e-mail.

(c) Any request by a party for any type of action by the FORUM or Panel must be communicated in writing to the FORUM and the opposing party(s).

## 12. Withdrawal

(a) Prior to Commencement

(i)     Before the five (5) Calendar Day deficiency period described in Rule 4(b) expires, the Complainant may withdraw the Complaint without prejudice. A withdrawal request must be Submitted to the FORUM in writing and signed by the Complainant; an electronic signature complying (refer to Annex A) will be accepted. Upon the FORUM's receipt of the withdrawal request, the Complaint will be withdrawn without prejudice and the administrative proceeding will be terminated.

(ii)     The Complainant may re-initiate a proceeding, which was properly withdrawn pursuant to Supplemental Rule 12(a)(i), within thirty (30) Calendar Days. A re-initiation fee of $100 must accompany the request to re-initiate the proceeding.

(iii)     If the Complaint was withdrawn pursuant to Supplemental Rule 12(a)(i) and if the Complainant does not re-initiate the Complaint at the end of thirty (30) Calendar Days, a subsequent Complaint will be treated as a new Complaint and must be accompanied by payment of the appropriate fees.

(b) After Commencement and Prior to Response:

(i)     After commencement, but before the FORUM has received a Response that complies with Supplemental Rule 5, the Complaint may be withdrawn by the Complainant. A withdrawal request must be Submitted to the FORUM in writing and signed by the Complainant; an electronic signature (refer to Annex A) will be accepted. A Complaint dismissed by the FORUM pursuant to Supplemental Rule 12(b)(i) will be dismissed without prejudice.

(ii)     After commencement, but before the FORUM has received a Response that complies with Supplemental Rule 5, the Complaint may be withdrawn pursuant to a joint request made by both parties. A withdrawal request must be Submitted to the FORUM in writing and signed by both Parties; electronic signatures (refer to Annex A) will be accepted. A Complaint dismissed by the FORUM

pursuant to Supplemental Rule 12(b)(ii) will be dismissed with prejudice unless the parties agree otherwise.

(c) After Response is Received:  After a Response that complies with Supplemental Rule 5 has been received by the FORUM, but before a Panel decision is published, the Complaint may be withdrawn if both parties agree to the withdrawal.  A withdrawal request must be Submitted to the FORUM in writing and signed by both parties; electronic signatures (refer to Annex A) will be accepted.  A Complaint dismissed by the FORUM pursuant to Supplemental Rule 12(c) will be dismissed with prejudice unless the parties agree otherwise.

(d) The Complaint cannot be withdrawn after a Panel decision is published.

## 13.  Panel Decisions

Panel decisions will meet the requirements set forth in Paragraph 15 of the Rules and will be of a length that the Panel deems appropriate.

## 14.  Correction of Clerical Mistakes.

Clerical mistakes or clerical errors in the Panel's decision arising from oversight or omission by the Panel may be corrected by the Director of Arbitration for the FORUM.

## 15.  Communication of Decision to Parties; Publication of Decision.

(a)    The FORUM will publish the decision by submitting the Panel's decision to the parties, ICANN, and the Registrar as required by the Rules, and by publishing the full decision on a publicly accessible web site.

(b)    All requests pursuant to Policy paragraph 4(j) and Rule 16(b) to have a portion of the decision redacted, must be made in the Complaint, the Response, or an Additional Submission that is Submitted before the Panel's decision is published.

## 16.  Conclusion of the Proceedings.

Once the Panel's decision is issued, the case is closed with the FORUM.  No further submissions or requests will be considered.

## 17.  Fees (U.S. Dollars)

(a)  Fees:

| Number of Disputed Domain Names | Single-Member Panel | Three-Member Panel |
|---|---|---|
| 1 – 2 | $1,330 | $2,660 |
| 3 – 5 | $1,480 | $2,960 |

| 6 – 10 | $1,830 | $3,660 |
| 11 – 15 | $2,280 | $4,560 |
| 16 or more | Please contact the FORUM for a fee quote. | Please contact the FORUM for a fee quote. |

      (i)        If a Complainant alleges that a single Respondent is using multiple aliases and makes such arguments in the Complaint for Panel consideration per Supplemental Rule 4(e), the filing fee shall be increased proportionately to the number of aliases involved.  Please contact the FORUM at domaindispute@adrforum.com with the number of domain names and the number of aliases to obtain a fee quote.

(b) Participatory hearings:

As stated in the Rules, in exceptional circumstances (for example, in the event an in-person hearing is held), the FORUM may require the Parties to pay additional fees, which will be established by agreement of the Parties and the Director of Arbitration for the FORUM prior to the appointment of the Panel.

(c) Non-refundable fees:

Fees to be paid to the FORUM as provided in these Supplemental Rules must be paid in U.S. Dollars and are non-refundable, except as provided in Supplemental Rule 9(c)(iv) and 9(e).

(d) Forms of payment

Payment shall be made in one of the following forms:

      (i)        Credit card;

      (ii)       Certified check; or

      (iii)     Personal/business check.

(e)  If any form of payment is cancelled, stopped, returned unpaid or dishonored, without prior written authorization from the FORUM, the FORUM reserves the right to charge a service fee of $50 for each cancelled, stopped, returned or dishonored payment.

## 18.  Effective Date

These Supplemental Rules apply to all cases filed on or afterOctober 1, 2019.

## ANNEX A TO FORUM'S SUPPLEMENTAL RULES

The purpose of this annex is to define technical requirements for electronic submissions.

1. Types of Files Supported
The FORUM will accept files having the following extensions.  If you have a file in a format not specified, you must have advance permission from the FORUM or your submission may be rejected.
   - (a) .pdf
   - (b) .doc/.docx
   - (c) .rtf
   - (d) .jpg
   - (e) .tiff
   - (f) .xls/.xlsx
   - (g) .htm/.html
2. File Size Restrictions
   - (a) No individual file may exceed 10 MB; a preferred file size limitation is 5 MB.
   - (b) No party may submit electronic case documents in excess of 50MB, in the aggregate, per case number, without advance approval from the FORUM (such approval will be limited to very large or complex cases).
3. Email Size Restrictions
   - (a) No individual email may exceed 10 MB.
   - (b) The documents for a single case number may be sent in multiple emails, subject to the limitations in 2(b), above.

### SUGGESTIONS AND REMINDERS

Multiple Email Suggestions
   - (a) The FORUM suggests that each email relating to a single case be notated in the subject line with a single representative domain name by which all of the emails can be linked; if an FA number has already been assigned, the FORUM requests that the parties use that number in the subject line of all correspondence.
   - (b) The FORUM suggests that each email relating to a single case bear a notation in the subject line indicating the number of emails in the batch.
   - (c) The FORUM suggests that each email relating to a single case indicate what the party is filing.

*Example :  COMPLAINT regarding <domain.com>  1 of 3*
*Example:  RESPONDENTS ADDITIONAL SUBMISSION FA####### 1 of 1*

Electronic Signatures
   The UDRP permits "any electronic signature."  The FORUM recommends the following:
   - (a) A scanned signature inserted into the appropriate place in a document.
   - (b) The use of /s/ to indicate an electronic signature (i.e. /s/ John Doe)

The FORUM does not accept links to files located on external servers and is not responsible for gathering electronic files.  All files must be sent to the FORUM following the UDRP Rules and Supplemental Rules.

# **EXHIBIT E**



| | |
|---|---|
| Hammy Media, Ltd. ) | |
| 135 Arch. Makarios III Ave ) | |
| Emelle Building 4th Fl ) | |
| 3508 Limassol, Cyprus ) | |
| ) | |
| and ) | |
| ) | |
| xHamster IP Holdings Ltd ) | |
| 60 Nevis Street ) | |
| St. John's, Antigua ) | |
| ) | |
| **(Complainants)** ) | |
| ) | |
| v. ) | **Domain Name In Dispute:** |
| ) | |
| WhoisProtectService.net ) | xhamsterporn.net |
| ProtectService, Ltd. ) | |
| Agios Fylaxeos 66 and ) | |
| Chr. Perevou 2 ) | |
| Kalia Court, off. 601 ) | |
| Limassol 3025 Cyprus ) | |
| ) | |
| **(Respondent)** ) | |
| _____) | |

### AMENDED COMPLAINT IN ACCORDANCE WITH
### THE UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICY

[1.]    This Complaint is hereby submitted for decision in accordance with the Uniform Domain Name Dispute Resolution Policy (UDRP), adopted by the Internet Corporation for Assigned Names and Numbers (ICANN) on August 26, 1999 and approved by ICANN on October 24, 1999, and the Rules for Uniform Domain Name Dispute Resolution Policy (UDRP Rules), with an effective date of July 31, 2015, and the FORUM's Supplemental Rules (Supp. Rules). UDRP Rule 3(b)(i).

[2.]     **COMPLAINANTS' INFORMATION**

| | | |
|---|---|---|
| [a.] | Name: | Hammy Media, Ltd. |
| [b.] | Address: | 135 Arch. Makarios III Avenue |
| | | Emelle Building 4th Floor |
| | | Limassol 3508, Cyprus |
| [c.] | Telephone: | +1-617-928-1806 |
| [d.] | Fax: | +1-617-928-1802 |
| [e.] | E-Mail: | matt@bostonlawgroup.com |

and

| | | |
|---|---|---|
| [a.] | Name: | xHamster IP Holdings Ltd |
| [b.] | Address: | 60 Nevis Street |
| | | St. John's, Antigua |
| [c.] | Telephone: | +1-617-928-1806 |
| [d.] | Fax: | +1-617-928-1802 |
| [e.] | E-Mail: | matt@bostonlawgroup.com |

Hammy Media, Ltd. ("Hammy") is the operator of the website at xHamster.com and has operated the website since its incorporation on or about October 29, 2009.  *See* Affidavit of Constantinos Christoforou, Annex 1 hereto, ¶ 2.  At that time, Hammy took over operations for the website from its predecessor in interest and obtained all the trademark rights in XHAMSTER from its predecessor in interest.  *Id.*, ¶ 3.  In or about October of 2015, Hammy assigned all its rights in and to the XHAMSTER trademark to xHamster IP Holdings Ltd. ("xHamster").  *Id.*, ¶ 4.  At the same time as the assignment, xHamster licensed the XHAMSTER trademark back to Hammy for use on the xHamster.com website and related ventures.  *Id.*, ¶ 5.  Hammy and xHamster are affiliated companies with similar owners and ultimate control.  *Id.*, ¶ 6.  xHamster is the registered owner of the XHAMSTER trademark.  *See below*.

Supp. Rule 1(e) defines "The Party Initiating a Complaint Concerning a Domain Name Registration" as a "single person or entity claiming to have rights in the domain name, or multiple persons or entities that have a sufficient nexus who can each claim to have rights to all domain names listed in the Complaint."  "Previous panels have interpreted the FORUMS's Supplemental Rule 1(e) to allow multiple parties to proceed as one party where they can show a sufficient link to each other."  *Lucasfilm Entertainment Company Ltd. LLC and Lucasfilm Ltd. LLC v. George Ring /DN Capital Inc.*, FA1605001673825 (Nat. Arb. Forum June 7, 2016) (multiple cases cited therein).  "It has been accepted that it is permissible for two complainants to submit a single complaint if they can demonstrate a link between the two entities such as a relationship involving a license, a partnership or an affiliation that would establish the reason for the parties bringing the complaint as one entity."  *Vancouver Org. Comm. for the 2010 Olympic and Paralymic Games & Int'l Olympic Comm. v. Malik*, FA 666119 (Nat. Arb. Forum May 12, 2006).

Because there is an affiliation between xHamster and Hammy and there is a license between xHamster and Hammy, a sufficient nexus exists between the Complainants and they should be treated as a single entity in this proceeding.  *See*, *also*, *Disney Canada, Inc. and Disney Enterprises, Inc. v. Petkovic*, FA1605001676278 (Nat. Arb. Forum June 14, 2016) (sufficient

nexus exists between two complainants, one of which is a foreign subsidiary of the other); *Jody Kriss and East River Partners, LLC v. Sater / Yudina*, FA1602001660728 (Nat. Arb. Forum March 22, 2016) (sufficient nexus exists between complainants where there is a commonality of interest between the two).

Previous panels have held that these same Complainants should be treated as a single entity in proceedings such as this. *See, e.g.*, *Hammy Media, Ltd. and xHamster IP Holdings Ltd. v. Andrei Ivanov*, FA1611001701886 (Nat. Arb. Forum Dec. 7, 2016) ("The Panel accepts that the evidence in the Complaint is sufficient to establish a sufficient nexus or link between the Complainants."); *Hammy Media, Ltd. and xHamster IP Holdings Ltd v. Domain Admin / Whois Privacy Corp.*, FA1611001704574 (Nat. Arb. Forum Dec. 31, 2016) ("The Panel finds that the evidence in the Complaint is sufficient to establish a sufficient nexus or link between the Complainants."); *Hammy Media, Ltd. and xHamster IP Holdings Ltd v. Privacy Services Privacy Services / Privacy Services*, FA1612001706178 (Nat. Arb. Forum Jan. 16, 2017) ("The Panel accepts that the evidence in the Complaint is sufficient to establish a sufficient nexus or link between the Complainants.").

## [3.] COMPLAINANTS' AUTHORIZED REPRESENTATIVES, IF ANY

|       |            |                                            |
|-------|------------|--------------------------------------------|
| [a.]  | Names:     | Matthew Shayefar, Esq.                     |
|       |            | Valentin Gurvits, Esq.                     |
| [b.]  | Address:   | Boston Law Group, PC                       |
|       |            | 825 Beacon Street, Suite 20                |
|       |            | Newton Centre, Massachusetts 02459         |
| [c.]  | Telephone: | +1-617-928-1806                            |
| [d.]  | Fax:       | +1-617-928-1802                            |
| [e.]  | E-Mail:    | matt@bostonlawgroup.com                    |
|       |            | vgurvits@bostonlawgroup.com                |

UDRP Rule 3(b)(ii).

Complainants' preferred contact persons for correspondence relating to this case:

|       |                    |                                |
|-------|--------------------|--------------------------------|
| [a.]  | Contact Name(s):   | Matthew Shayefar, Esq.         |
|       |                    | Valentin Gurvits, Esq.         |
| [b.]  | Contact Emails(s): | matt@bostonlawgroup.com        |
|       |                    | vgurvits@bostonlawgroup.com    |

The Complainants chose to have this dispute heard before a **single-member** administrative panel.  ICANN Rule 3(b)(iv).

## [4.]     RESPONDENT INFORMATION

According to the Whois record, the following information is listed for the registrant of the Disputed Domain, which appears to be a privacy service. *See* Annex 2 hereto.  If and when additional information regarding the Respondent is made available, Complainants reserve the right to amend and/or supplement this Complaint:

|       |       |                          |
|-------|-------|--------------------------|
| [a.]  | Name: | WhoisProtectService.net  |

3

|       |               |                                      |
|-------|---------------|--------------------------------------|
| [b.]  | Organization: | PROTECTSERVICE, LTD.                 |
| [c.]  | Address:      | Agios Fylaxeos 66 and Chr. Perevou 2 |
|       |               | Kalia Court, off. 601                |
|       |               | Limassol 3025 Cyprus                 |
| [d.]  | Telephone:    | +357.95713635                        |
| [e.]  | Fax:          | N/A                                  |
| [f.]  | E-Mail:       | xhamsterporn.net@whoisprotectservice.net |

## [5.]  RESPONDENT AUTHORIZED REPRESENTATIVE, IF KNOWN

|       |               |                                      |
|-------|---------------|--------------------------------------|
| [a.]  | Name:         | WhoisProtectService.net              |
| [b.]  | Organization: | PROTECTSERVICE, LTD.                 |
| [c.]  | Address:      | Agios Fylaxeos 66 and Chr. Perevou 2 |
|       |               | Kalia Court, off. 601                |
|       |               | Limassol 3025 Cyprus                 |
| [d.]  | Telephone:    | +357.95713635                        |
| [e.]  | Fax:          | N/A                                  |
| [f.]  | E-Mail:       | xhamsterporn.net@whoisprotectservice.net |

Rule 3(b)(v).

## [6.]  DISPUTED DOMAIN NAME

[a.]  The following domain name is the subject of this Complaint: Rule 3(b)(vi).

xhamsterporn.net

[b.]  Registrar Information: UDRP Rule 3(b)(vii).

|         |                   |                        |
|---------|-------------------|------------------------|
| [i.]    | Registrar's Name: | EVOPLUS LTD            |
| [ii.]   | Registrar Address:| John Kennedy Iris House |
|         |                   | 7th Floor of 470B      |
|         |                   | 3106, Limassol, Cyprus |
| [iii.]  | Telephone Number: | +357.95713635          |
| [iv.]   | E-Mail Address:   | abuse@evonames.com     |

[c.]  Trademark/Service Mark Information: Rule 3(b)(viii).

Complainant xHamster IP Holdings Ltd ("xHamster") has received the following trademark registrations and has filed the following trademark registration applications upon which this Complaint is based for the mark XHAMSTER:

   (1)   Benelux Office of Intellectual Property Registration No. 0986331 for the work mark XHAMSTER.  A copy of the registration certificate is enclosed herewith as Annex 3.
   (2)   Application for Trademark Registration of XHAMSTER with the Registrar's Office of Antigua and Barbuda, with application number 169/2015.  A copy of that application is enclosed herewith as Annex 4.

Both the Benelux Registration and the Antigua Application cover the following class numbers and list of goods and services:

Cl 09   Digital media, namely, downloadable video recordings, motion pictures, film clips and images featuring adult entertainment.

Cl 35   Promotional services provided via a website, namely, promotion of online third-party offers of adult entertainment, especially videos, images and sound recordings, on the Internet; promotion of online third-party offers by providing a Web site featuring hyperlinks to the Web sites of others in the field of adult entertainment.

Cl 38   Telecommunication services, namely, streaming of adult- oriented audio, visual and audiovisual material via a global computer network; transmission of voice, data and images; streaming and live streaming of audio and video content on the Internet; video broadcasting services over the Internet in the field of adult entertainment; providing on-line forums for transmission of messages among computer users concerning adult-themed materials; providing access to a website that gives computer users the ability to upload, post, show, display and tag adult-themed information, photographs, audio, and video clips; providing access to a social networking website featuring videos, photographs, images, text and other multimedia content for entertainment purposes; providing access to a website featuring information on love, romance and interpersonal relationships.

Cl 41   Entertainment services, via a website featuring adult entertainment; entertainment services, via a website featuring videos, photographs, film clips, and other multimedia materials in the field of adult entertainment; publication of on-line journals, namely, a blog and user message board featuring adult-oriented entertainment, information and stories; providing adult-oriented entertainment in the nature of live show performances.

Cl 42   Web-based hosting of digital adult entertainment content for others, especially images, videos, and sound-recordings, via the Internet.

Cl 45   Internet-based social networking services.

Hammy Media Ltd. ("Hammy") is a licensee of xHamster and the current operator of the website at xHamster.com.  The xHamster.com website is a website where users from around the world can upload their own pornographic videos and photographs and share them with others. Hammy and its predecessors in interest have been operating the adult content-website at the xHamster.com domain name and using the XHAMSTER trademark in commerce for the above referenced goods and services since May 24, 2007.  Hammy or its predecessors in interest registered the xHamster.com domain name on or about April 2, 2007.  *See* xhamster.com WhoIs record, Annex 5.  Enclosed herewith as Annex 6 is a screen capture of the xhamster.com website on September 5, 2007 as kept by the WayBack Machine from the Internet Archive (web.archive.org), showing the use of the XHAMSTER trademark in connection with the above referenced classes of goods and services, including, without limitation, streaming of adult-oriented audiovisual material.  Enclosed herewith as Annex 7 is a more recent screenshot of the xhamster.com website (all explicit portions of annexes hereto have been censored).  Enclosed herewith as Annex 8 is a screenshot of xhamster.com/media/news, indicating that xhamster.com is operated by Hammy Media Ltd and explaining the history and use of xhamster.com.

5

Previous UDRP panels have found that Complainants have rights in the XHAMSTER mark. *See, e.g.*, *Hammy Media, Ltd. and xHamster IP Holdings Ltd. v. Andrei Ivanov*, FA1611001701886 (Nat. Arb. Forum Dec. 7, 2016) ("[T]he Panel finds that Complainant's registration grants it rights in the XHAMSTER mark under Policy ¶ 4(a)(i).... [T]he Panel finds that Complainant's operation of a domain name identical to the XHAMSTER mark since 2007, and the various media coverage of Complainant is sufficient to establish its common law rights in the mark under Policy ¶ 4(a)(i) and the Panel so finds."); *Hammy Media, Ltd. and xHamster IP Holdings Ltd v. Domain Admin / Whois Privacy Corp.*, FA1611001704574 (Nat. Arb. Forum Dec. 31, 2016) ("[T]he Panel holds that Complainant's BOIP registration grants it rights in the XHAMSTER mark under Policy ¶ 4(a)(i)... [T]he Panel finds that Complainant's operation fo a domain name identical to the XHAMSTER mark since 2007, and the various media coverage of Complainant is sufficient to establish its common law rights in the mark under Policy ¶ 4(a)(i)."); *Hammy Media, Ltd. and xHamster IP Holdings Ltd v. Privacy Services Privacy Services / Privacy Services*, FA1612001706178 (Nat. Arb. Forum Jan. 16, 2017) ("The Panel determines that Complainant's operation of a domain name identical to the XHAMSTER mark since 2007, and the various media coverage of Complainant is sufficient to award it common law rights in the mark under Policy ¶ 4(a)(i).").

## [7.]    FACTUAL AND LEGAL GROUNDS

To be entitled to the transfer of the domain name that is the subject of this Complaint (the "Infringing Domain"), the Complainants must prove the following: (i) the Infringing Domain is identical or confusingly similar to a trademark or service mark in which the Complainants have rights; (ii) Respondent has no rights or legitimate interests in respect of the Infringing Domain; and (iii) the Infringing Domain was registered and is being used in bad faith.

## A.    The Infringing Domain is Substantially Similar to Complainants' XHAMSTER Mark

As set forth in Section 6(c) above, Complainants have registered and common law trademark rights in the XHAMSTER mark with which the Infringing Domain is confusingly similar. Complainants and their predecessors-in-interest first began using the XHAMSTER trademark in commerce on or about May 24, 2007. xHamster owns Benelux Trademark Registration No. 0986331 and has applied for a trademark in Antigua and Barbuda with application number 169/2015 for the goods and services set forth above, including, without limitation, the operation of a website for displaying adult-oriented videos and pictures. The registration is prima facie evidence that the mark is distinctive and capable of source identification. Additionally, the xHamster.com domain name was first registered on April 2, 2007.

The Infringing Domain registered by Respondent subsumes Complainants' registered XHAMSTER trademark in its entirety. The xhamsterporn.net Infringing Domain is simply Complainants' XHAMSTER trademark followed by a generic term. "Porn" is nothing more than the type of content available on the xHamster.com website and the website at the Infringing Domain. The obvious similarity between the mark and the Infringing Domain is conclusive satisfaction of the requirement under the UDRP that the Infringing Domain be substantially similar to Complainants' XHAMSTER mark. *See, e.g.*, *Tenza Trading Ltd. v. WhoIs Privacy Corp.*, FA1508001634997 (Nat. Arb. Forum Nov. 16, 2015) ("Respondent's disputed domain

names are confusingly similar to Complainant's mark.  They incorporate the mark in its entirety, adding only (in each case) a short suffix that does not detract from, and indeed may further suggest affiliation with, plaintiff and its products or services."); *Am. Express Co. v. MustNeed.com*, FA257901 (Nat. Arb. Forum June 7, 2004) (finding the respondent's domain name confusingly similar to Complainant's AMEX mark because the "mere addition of a generic or descriptive word to a registered mark does not negate" a finding of confusing similarity under Policy ¶ 4(a)(i)).

Previous panels have already found in favor of Complainants and have transferred the domain names xhamsterdeutsch.net and xhamsterdeutsch.biz to Complainants, domain names that are substantially the same as the Infringing Domains here.  *See Hammy Media, Ltd. and xHamster IP Holdings Ltd v. Domain Admin / Whois Privacy Corp.*, FA1611001704574 (Nat. Arb. Forum Dec. 31, 2016) (Therefore, the Panel holds that both the <xhamsterdeutsch.net> and <xhamsterdeutsch.biz> domain names are confusingly similar to Complainant's XHAMSTER mark under Policy ¶ 4(a)(i).").  Another panel has ordered the transfers of the domain names xhamster9.com.  *See Hammy Media, Ltd. and xHamster IP Holdings Ltd. v. Andrei Ivanov*, FA1611001701886 (Nat. Arb. Forum Dec. 7, 2016).

However, there is significant additional evidence that not only is the Infringing Domain substantially similar to Complainants' trademark, but that the substantial similarity was intended and is compounded by Respondent's use of the Complainants' trademark on the website at the Infringing Domain.

The Infringing Domain is being used in a manner identical to Complainants' uses of their registered XHAMSTER trademark.  Specifically, and without limitation, Respondent is using the Infringing Domain for a website that allow users to watch adult-oriented videos.  *See* Annex 9, screenshot from the website at the Infringing Domain (the "Infringing Website") (pornographic content has been censored).  The Infringing Website prominently displays Complainants' registered XHAMSTER trademark at the top of the page.  *Id.*

Further review of the Infringing Website shows that many if not all videos displayed on the Infringing Website are either directly copied from Complainants' xHamster.com website or are inline framing videos from the xHamster.com website.  *See* Annex 10, showing Hammy's video player.  All of the foregoing confirms Respondent's knowledge about the Complainants' website and XHAMSTER trademark and that Respondent intended specifically for the Infringing Domain to be substantially similar to Complainants' registered mark.

Pursuant to the current WhoIs data, the Infringing Domain was registered on or about December 16, 2015. *See* Annex 2.  This was over eight-and-a-half years after Complainants registered the xhamster.com domain name on April 2, 2007 and began using the XHAMSTER mark in commerce on May 24, 2007.  *See* Annexes 3-5.

The Infringing Domain and the Infringing Website directly compete with Complainants' services.  A consumer looking for Complainants' services at the Infringing Domain is likely to be confused by the Infringing Website and believe that Respondent is the operator of xHamster.com or that Complainant is the operator of the Infringing Website.  This is because Respondent is using Complainants' trademark and offering the same services offered by Complainants.

A comparison of the Infringing Domain and the registered XHAMSTER trademark illustrates that the Infringing Domain subsumes Complainants' registered XHAMSTER trademark in its entirety. Further, both the trademark and the Infringing Domain are used in association with the display and distribution of adult-oriented videos and other content. Since the Infringing Domain and the registered XHAMSTER trademark are substantially similar and the Infringing Domain entirely subsumes the registered XHAMSTER mark, and since all are used in association with adult-oriented videos and other content, the Infringing Domain is likely to cause confusion with consumers.

**B.**     **Respondent Has No Legitimate Interest or Rights in the Infringing Domain**

The registration of the Infringing Domain, on December 16, 2015, is well after Complainants began use of their XHAMSTER trademark in commerce in May of 2007.

It is commonly understood that .com domain names and simpler domain names without extraneous numbers or letters or generic words are more valuable and the first to be purchased. Since Complainants' services and the website associated with the xHamster.com domain name are highly sought after, it is clear that Respondent knew that it had no legitimate rights or interest in registering the Infringing Domain which completely subsumes Complainants' XHAMSTER mark. When attempting to register the Infringing Domain, it is certain that Respondent encountered Complainants' website and knew that Complainants were the registrant of the xHamster.com domain name. It is clear that Respondent chose the Infringing Domain because the xHamster.com domain was already registered by Complainants, the xHamster.com website was popular and the Infringing Domain was substantially similar to and confusing with the XHAMSTER trademark, yet available.

Moreover, it is clear that Respondent knew about Complainants' website and trademark when Respondent registered the Infringing Domains because of the worldwide popularity of the xHamster.com website. xHamster.com is currently the 81st most popular website in the world as ranked by Alexa.com and the 36th most popular website in the world as ranked by SimilarWeb.com. *See* Annexes 11 and 12. According to rank2traffic.com, xhamster.com has been ranked within the top 150 most popular websites in the world since early 2009 and almost continually in the top 100 most popular websites in the world since late 2009. *See* Annex 13. According to Similarweb.com, xHamster.com had approximately 640 million mobile and desktop visits in February of 2017. Annex 12.

One cannot doubt that prior to launching Respondent's website under the name "xhamster" that Respondent did an internet search for the term. When Respondent did so, it was presented with Complainants' xHamster.com website and domain name, which put Respondent on notice that the XHAMSTER mark was protected. However, Respondent went forward with registering the Infringing Domain and starting services using Complainants' trademark in direct competition with Complainants. Respondent, from a clear look at the Infringing Website, did this with the intention of trading on the goodwill of Complainants.

Respondent does not have any rights to or legitimate interest in the Infringing Domain. Respondent obviously knew that it had no rights to the XHAMSTER mark before it began to use the website at the Infringing Domain. And given that Respondent is admittedly simply

reframing or copying the videos from the xHamster.com website, Respondent's Infringing Website is not a bona fide offering of goods or services. Consequently, Respondent is not, and cannot be deemed, to be using the XHAMSTER trademark with any *bona fide* offering of goods or services. Indeed, "[i]t is especially difficult to find a *bona fide* offering of goods when the [infringer] uses a domain name confusingly similar to a competitor's mark." *L.F.P. Inc. v. Hustlertv.com*, FA0201000-104134 (Nat. Arb. Forum Mar. 11, 2002), citing *America Online, Inc. v. Xianfeng Fu*, D2000-1374 (WIPO Dec. 11, 2000) (finding that it "would be unconscionable to find a bona fide offering of services in [an infringer's] operation of web-site using a domain name which is confusingly similar to [trademark owner's] mark and for the same business"); *Alcon, Inc. v. ARanked*, FA 1306493 (Nat. Arb. Forum Mar. 18, 2010) ("The Panel finds that capitalizing on the well-known marks of Complainant by attracting internet users to its disputed domain names where Respondent sells competing products of Complainant is not a bona fide offering of goods or services pursuant to Policy ¶ 4(c)(i) or a noncommercial or fair use pursuant to Policy ¶ 4(c)(iii).").

Furthermore, Respondent is not commonly known by the Infringing Domain. Quite to the contrary, Respondent makes no effort to identify itself as the operator of the Infringing Domain, setting forth no contact details and using a privacy service for the WhoIs information.

As evidenced above and as is self-evident from a simple look at the Infringing Website, Respondent's use of the Infringing Domain is strictly for commercial gain with the intent to divert consumers, and thus, Respondent cannot claim, nor can Respondent demonstrate, any legitimate noncommercial use or fair use of the Infringing Domain. Respondent's sole intent is to commercially gain from the infringing use of Complainants' trademark, which is evident from the Infringing Website.

In two previous UDRP proceedings with circumstances almost identical to those here, Panels have found that the respondents in those cases did not have rights or legitimate interests in the disputed domain names. *See, Hammy Media, Ltd. and xHamster IP Holdings Ltd. v. Andrei Ivanov*, FA1611001701886 (Nat. Arb. Forum Dec. 7, 2016) (setting forth six considerations for finding that respondent did not have rights or legitimate interests, all of which are directly applicable here); *Hammy Media, Ltd. and xHamster IP Holdings Ltd v. Domain Admin / Whois Privacy Corp.*, FA1611001704574 (Nat. Arb. Forum Dec. 31, 2016) (same).

In stark contrast to Respondent, Complainants have a legitimate interest and right in the Infringing Domain. Through Complainants' (and their affiliates' and predecessors') long and consistent use, the XHAMSTER trademark has become well-known and recognized by consumers throughout the world. Since 2007, Complainants and their predecessors have marketed and advertised their services around the world under the XHAMSTER mark. Complainants' efforts have resulted in xHamster.com becoming one of the most popular websites in the world, let alone one of the most popular adult content websites in the world. The xHamster.com website is colloquially known as a "tube site."

The xHamster.com website is regularly discussed in mainstream news outlets. For example, on July 12, 2016, Glamour published an article an article about how, after the release of the videogame Pokémon Go, Pokémon pornography has become the top searched term on xHamster.com. *See* <u>Annex 14</u>. On June 14, 2016, the International Business Times published an article about how xHamster decided to ban all videos that feature rape or non-consensual sex.

9

*See* Annex 15.  In May of 2016, xHamster.com garnered significant attention for releasing the first major pornography reality television show, The Sex Factor.  *See*, *e.g.*, Annex 16, article from The Independent.  The Sex Factor, which has become incredibly popular online with over 10 million visitors a month despite only being released in May of 2016, is marketed as "An xHamster original series."  *See* Annex 17, screenshot from sexfactor.com, and Annex 18, Similarweb.com analytics for sexfactor.com.  Around February and March of 2017, xHamster was in the news yet again when it announced it was looking for a Donald Trump lookalike to star in a pornographic film.  *See*, Annex 19, article from complex.com.

Complainants and their affiliates have even begun brewing and selling an XHAMSTER branded beer.  *See*, Annex 20 (screenshot of xhamster.com/media/beer).

In light of the vast and well-known use of the registered XHAMSTER trademark by Complainants, it is clear that not only was Respondent aware of the marketing value of Complainants' registered XHAMSTER mark and the consumer recognition of the mark, but Respondent was intentionally capitalizing on the strength of the mark by offering the same exact services to consumers.  Complainants have **not** permitted or authorized Respondent to engage in these activities.  This is classic trademark infringement and trading off the goodwill of another's trademark.  Therefore, Respondent has no legitimate interest or right in the Infringing Domain.

## C.    Respondent's Registration and Use of the Infringing Domain Was in Bad Faith

Complainants have already referenced in passing above the many ways in which it is certain that Respondent registered the Infringing Domain in bad faith and has since been using the Infringing Domain in bad faith.  Complainants now focus on these issues.

Respondent has used the Infringing Domain to point to a video streaming websites that is in direct competition with Complainants' xHamster.com website.  Respondent goes so far as to imbed videos taken from the xHamster.com website in the Infringing Website.  *See* Annex 10.

By using the Infringing Domain and by using Complainants' trademark on the Infringing Website, Respondent has intentionally attracted, for commercial gain, Internet users to the Infringing Website by creating confusion with Complainants' registered XHAMSTER mark as to the source, sponsorship, affiliation or endorsement of Respondent's website and domain names.

Evidence of Respondent's intent is illustrated by the fact that Respondent is using a domain name that entirely subsumes the registered XHAMSTER mark to divert Internet users to a website that features a service substantially similar to Complainants' services (in fact, Respondent offers a service that it copies from Complainants' service).  It is also clear that Respondent has income from its website as it serves advertisements throughout the Infringing Website.  Therefore, Respondent is commercially benefitting from the likelihood of confusion it has created through its use of the registered XHAMSTER mark and its actions evidence bad faith use.  *See*, *e.g.*, *MathForum.com, LLC v. Weiguang Huang*, D2000-0743 (WIPO Aug. 17, 2000) (finding bad faith where the infringer registered a domain name confusingly similar to the trademark owner's mark and the domain name was used to host a commercial website that offered similar services offered by the trademark owner under its mark); *Kmart v. Kahn*, FA 127708 (Nat. Arb. Forum Nov. 22, 2002) (finding bad faith where infringer registered a domain

10

name to infringe on trademark owner's goodwill and attract Internet users to infringer's website); *State Fair of Texas v. Granbury.com*, FA 95288 (Nat. Arb. Forum Sept. 12, 2000) (same); *Drs. Foster & Smith, Inc. v. Lalli*, FA 95284 (Nat. Arb. Forum Aug. 21, 2000) (finding bad faith where infringer directed Internet users seeking trademark owner's website to its own website for commercial gain).

Furthermore, based on the long prior use and worldwide awareness of Complainants' XHAMSTER mark and the facts that Respondent registered the Infringing Domain and used the XHAMSTER mark to attract Internet users to its Infringing Website, it is clear that Respondent had actual knowledge of Complainants' rights in the XHAMSTER mark when Respondent registered the Infringing Domain. As detailed above, Complainants registered the xHamster.com domain name over eight-and-a-half years before Respondent registered the Infringing Domain and the xHamster.com website has been one of the most popular websites in the world since before Respondent registered the Infringing Domain. Respondent knew that the xHamster.com domain name was registered and knew the strength of the XHAMSTER mark before it registered the Infringing Domain. Respondent also knew that Complainants offered identical or at least similar services to consumers on the xHamster.com website under the XHAMSTER mark. All of the foregoing confirms the bad faith of Respondent when it registered and used the Infringing Domain. *See, e.g., Yahoo! Inc. v. Butler*, FA 744444 (Nat. Arb. Forum Aug. 17, 2006) (finding bad faith where the infringer was "well-aware of the [trademark owner's] mark at the time of registration"); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. Feb. 11, 2002) (finding that "[w]here an alleged infringer chooses a mark he knows to be similar to another, one can infer an intent to confuse"); *Kmart v. Kahn*, FA 127708 (Nat. Arb. Forum Nov. 22, 2002) (same); *Minicards Vennootschap Onder FIrma Amsterdam v. Moscow Studios*, FA 1031703 (Nat. Arb. Forum Sept. 5, 2007) (holding that respondent registered a domain name in bad faith under Policy ¶ 4(a)(iii) after concluding that respondent "actual knowledge of Complainant's mark when registering the disputed domain name").

To the extent that there is any doubt that Respondent knew about Complainants' mark (which is virtually impossible given Respondent is directly ripping off Complainants on the Infringing Website), the inference that Respondent knew or should have known can be inferred given that Complainants' website was operational since long before Respondent's registration of the Infringing Domain, it prominently displayed Complainants' trademarks, was a high traffic site and commonly known in the marketplace. *See Tenza Trading Ltd. v. WhoIs Privacy Corp.*, FA1508001634997 (Nat. Arb. Forum Nov. 16, 2015) ("Here, it can be inferred that Respondent knew or should have known of Complainant's use of the mark, as Complainant's website was operational since long before Respondent's registration of the disputed domain names, prominently displayed Complainant's mark, and was a high traffic site and commonly known in the marketplace."); *Samsonite Corp. v. Colony Holding*, FA 94313 (Nat. Arb. Forum Apr. 17, 2000) (finding that evidence of bad faith includes actual or constructive knowledge of a commonly known mark at the time of registration).

It is inconceivable that Respondent was unaware of Complainants' XHAMSTER mark prior to its registration of the Infringing Domain. Yet, Respondent proceeded to register the Infringing Domain and draw customers away from Complainants for commercial gain by using Complainants' mark in a confusing manner. There is no other reason or purpose for Respondent's use and registration of the Infringing Domain and Respondent's use of the XHAMSTER mark. Accordingly, Respondent's registration and use of the Infringing Domain

and Respondent's use of the XHAMSTER mark was and is in bad faith and in willful disregard of Complainants' rights. Moreover, Respondent's actions can be interpreted to be motivated by the desire to directly trade off the goodwill of Complainants' trademark.

On the basis of the foregoing, there is undeniable evidence of bad faith, including, without limitation, under two of the four circumstances set forth in UDRP Policy ¶ 4(b). Specifically, Respondent has registered the domain name primarily for the purpose of disrupting the business of a competitor (UDRP Policy ¶ 4(b)(iii)) and Respondent has intentionally attempted to attract, by use of the Infringing Domain and for commercial gain, Internet users to the Infringing Website by creating a likelihood of confusion with Complainants' mark as to the source, affiliation, or endorsement of the Infringing Website (UDRP Policy ¶ 4(b)(iv)).

Two prior UDRP decisions concerning Complainants referenced multiple times above are again instructive as they are directly on point. *See Hammy Media, Ltd. and xHamster IP Holdings Ltd. v. Andrei Ivanov*, FA1611001701886 (Nat. Arb. Forum Dec. 7, 2016) (setting forth two separate reasons for why xhamster9.com was registered and used in bad faith); *Hammy Media, Ltd. and xHamster IP Holdings Ltd v. Domain Admin / Whois Privacy Corp.*, FA1611001704574 (Nat. Arb. Forum Dec. 31, 2016) ("[I]n view of Respondent's registration of the disputed <xhamsterdeutsch.net> and <xhamsterdeutsch.biz> domain names using the XHAMSTER mark and in view of the conduct that Respondent engaged in when using the domain names, Respondent registered and used them in bad faith within the generally accepted meaning of that expression.").

In light of the above, Complainants contend that they have demonstrated (a) that the Infringing Domain is substantially similar to, and entirely subsumes, the Complainants' registered XHAMSTER mark, (b) that Respondent has no legitimate interest in the Infringing Domain, and (c) that Respondent has registered and used the Infringing Domain in bad faith. Accordingly, Complainants respectfully request that the Infringing Domain be transferred to Complainant xHamster IP Holdings Ltd.

## [8.]  REMEDY SOUGHT

Complainants request that the Panel issue a decision that the domain name registration be ***Transferred*** to Complainant xHamster IP Holdings Ltd. UDRP Rule 3(b)(x); UDRP Policy ¶ 4(i).

## [9.]  OTHER LEGAL PROCEEDINGS

There are currently no other pending legal proceedings relating to the subject domain name. UDRP Rule 3(b)(xi).

## [10.]  MUTUAL JURISDICTION

The Complainants will submit, with respect to any challenges to a decision in the administrative proceeding canceling or transferring the domain name, to the location of the principal office of the concerned registrar. UDRP Rule 3(b)(xii).

[11.]  **CERTIFICATION**

Complainants agree that their claims and remedies concerning the registration of the domain name, the dispute, or the dispute's resolution shall be solely against the domain-name holder and waive all such claims and remedies against (a) the FORUM and panelists, except in the case of deliberate wrongdoing, (b) the registrar, (c) the registry administrator, and (d) the Internet Corporation for Assigned Names and Numbers, as well as their directors, officers, employees, and agents.

Complainants certify that the information contained in this Complaint is to the best of Complaints' knowledge complete and accurate, that this Complaint is not being presented for any improper purpose, such as to harass, and that the assertions in this Complaint are warranted under these Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument.

Respectfully Submitted,


/s/ Matthew Shayefar
 *[Signature]*

Matthew Shayefar
*[Name]*

April 7, 2017
*[Date]*

13