## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## SPARTANBURG DIVISION

JANE DOES 1-9,

           Plaintiffs,

vs.

COLLINS MURPHY, SHARON HAMMONDS, BRENDA F. WATKINS, LIMESTONE UNIVERSITY, MG FREESITES, LTD., d/b/a PORNHUB.COM, MG FREESITES II LTD., MINDGEEK S.A.R.L., MINDGEEK USA, INC., MG BILLING LTD., and HAMMY MEDIA LTD. d/b/a XHAMSTER.COM, TRAFFICSTARS LTD., WISEBITS LTD, XHAMSTER IP HOLDINGS LTD, WISEBITS IP LTD.,

           Defendants.

Case No.: 7:20-cv-00947

**DEFENDANTS' REPLY IN SUPPORT OF WISEBIT, LTD'S; WISEBITS IP, LTD'S, AND TRAFFICSTARS, LTD'S MOTIONS TO DISMISS**[1]

## <u>INTRODUCTION</u>

In a series of filings that resembles not so much Oppositions to Motions to Dismiss, but rather a giant conspiracy string board, Plaintiffs suggest that perceived connections (sometimes as flimsy as a shared office building address) between an ever-widening circle of foreign entities and individuals (many of whom are not actually defendants in this case), somehow support an exercise of personal jurisdiction over foreign defendants Wisebits Ltd. ("WL"); Wisebits IP Holdings, Ltd. ("WIP"); and TrafficStars, Ltd. ("TL"). They do not.

---

[1] Over the course of three oppositions, Plaintiffs present near-identical factual and legal arguments with respect to each of these three defendants. Rather than create three separate near-identical replies (forcing the Court to search for the small differences between the replies), WIP, WL, and TL have filed this same reply in response to Plaintiffs' oppositions. The Court should be confident that it needs read only one of the briefs as each reply is identical.

Even if the Court were to overlook the fact that: (a) ***none*** of the alleged "facts" supporting Plaintiffs' conspiracy theory are actually alleged in their Fifth Amended Complaint ("FAC"); (b) the "facts" that Plaintiffs present in their Oppositions are often drawn from wholly unreliable online sources; and (c) there is nothing remotely nefarious in corporations having multiple subsidiaries and related entities, at the end of the day, linking one foreign entity or individual to another foreign entity or individual hardly advances the argument that Plaintiffs actually need to make, namely that the named foreign defendants have taken some action within the forum (here, the United States) that is sufficient to subject them to personal jurisdiction in this Court.

Additionally, Plaintiffs use their Oppositions to attempt to advance arguments aimed primarily at defendant Hammy Media, Ltd. ("HML"), as the entity that operates the xHamster.com website (the "Website"), arguments that, for the most part, they failed to actually articulate in their opposition to HML's Motion for Judgment on the Pleadings.  It matters not.  Regardless of which filing the Plaintiffs use to present their arguments, they remain contrary to the prevailing case law. At the end of the day, the circle returns to its starting point: Plaintiffs' Fifth Amended Complaint must be dismissed with respect to WIP, WL, and TS because: (a) the Court lacks personal jurisdiction over each of those entities, (b) the claims against WIP, WL, and TS are precluded in their entirety by Section 230 of the Communications Decency Act ("Section 230"), and (c) the FAC fails to state claims upon which relief may be granted with respect to WIP, WL, and TL.

In further support of its Motion to Dismiss, WIP, WL, and TL state as follows.

## **FACTS AND NON-FACTS**

In their Oppositions, Plaintiffs employ a rhetorical device sometimes known as the "Gish

2

gallop,"[2] which, in turn, relies on what has become known as "Brandolini's Law."[3]  Gish's gallop is the technique of attempting to overwhelm one's opponent with an onslaught of half-truths and falsehoods, knowing that it will be nearly impossible to refute them all, a strategy that is often remarkably effective because, as "Brandolini's Law" postulates: "The amount of energy needed to refute bulls**t is an order of magnitude bigger than to produce it."  It is indeed exhausting and this Court need to do little more than review the *prior* Oppositions filed by Plaintiffs to realize that they have unleashed a firehose of such unfounded assertions, only to abandon them in turn when confronted with evidence of their falsity, and then move on to a new set of (equally unfounded) assertions in their next round of filings, knowing that it would be impossible to refute each and every one.  Nevertheless, some attention should be paid to at least *some* of Plaintiffs' half-truths and misstatements even if only to reinforce to the Court the importance of focusing its analysis only on those "facts" properly alleged in the FAC and/or supported by the Parties' declarations.

- In their Opposition, Plaintiffs assert that Mr. Chistoforou is the director of "well over 200 other Cyprus companies," inferring that those companies are somehow related to HML. (Opposition, pp. 4-5.)  And while, in the larger scheme of things, this particular untruth may seem comparatively minor, it is indicative of Plaintiffs' continuing willingness to misrepresent to the Court "facts" that it purports to have found on the internet.  It bears noting, of course, that this allegation appears nowhere in the FAC.  Instead, Plaintiffs refer, in a footnote, to information that

---

[2] *See* https://en.wikipedia.org/wiki/Gish_gallop#:~:text=The%20Gish%20gallop%20%2F%CB%88% C9%A1,or%20strength%20of%20those%20arguments, last accessed March 7, 2023

[3] *See, e.g.,* Pierre, Joe M.D., "Does America Have a Problem With Bullshit Receptivity," *Psychology Today*, July 3, 2020, located at https://www.psychologytoday.com/us/blog/psych-unseen/202007/does-america-have-problem-bullshit-receptivity and last accessed on March 7, 2023, and MacMillian, Thomas, "A Beginner's Guide to Calling BS," *The Cut,* June 26, 2017, located at https://www.thecut.com/2017/06/a-beginners-guide-to-calling-b-s.html and last accessed March 7, 2023

they purportedly gathered from a website, CyprusRegistry.com. This website does not even purport to be an official government website, but rather the product of a private company that bills itself as a "specialized service provider that gathers, searches, processes and analyses data from the Official Cyprus Company Registry." *See* Exhibit 1 to the Fray-Witzer Declaration, attached hereto as Exhibit 1.

Moreover, even if the Court could consider information from this private commercial website as having any measure of reliability, the website does not even support the "facts" that Plaintiffs claim it supports. Presumably, Plaintiffs derived their "more than 200" number from the fact that, if one searches the name Constantinos Chistoforou on the CyprusRegistry website, it returns a list of 228 instances in which that name – *or a similar name* – appears in a corporate record according to that website (if the same name is listed for more than one position at a company – for example, director and secretary – the entry will come up twice, contributing to the 228 figure). Indeed, the relevant pages of the website are titled "Cyprus Registered Companies Affiliations for Similarly Named Officials." The first page of results is attached hereto as Exhibit 2 to the Fray-Witzer Declaration. Constantinos Chistoforou is a common name in Cyprus. *See* Supplemental Declaration of Constantinos Chistoforou, attached hereto as Exhibit 2, ¶3. From a review of the companies listed, it appears that Mr. Christoforou (the *relevant* Mr. Christoforou), *never* had any connection to the vast majority of the listed entities (most of which seem to have been dissolved) and which, in any event, *also had no connection to HML*. *Id.,* ¶4. Some of the listed entities were entities for which Mr. Christoforou once served as a director, but no longer holds any role. *Id.*, ¶5. And still others are entities for which Mr. Christoforou serves as a director, but which are wholly unrelated to HML. *Id.,* ¶6. All told, the number of entities listed at the Cyprus Registry website that have any kind of connection to HML are a tiny fraction of the 228 entities listed. It should

also be noted that, despite Plaintiffs' insinuations to the contrary, there is nothing either nefarious or unusual with a large company having subsidiaries or related companies. Microsoft, for example, has hundreds of them. *See, e.g.,* https://www.microsoft.com/investor/reports/ar96/financials/sd.htm; https://www.microsoft.com/en-us/Investor/acquisition-history.aspx; *and* https://news.microsoft.com/facts-about-microsoft/#Subsidiaries, all accessed March 9, 2023.

Indeed, the Court should note that the other two "sources" that Plaintiffs offer to primarily support their contentions about the purported interrelationships between the supposed "xHamster group of companies" are: (a) a website called "Echo World News," which claims to have been founded in 2021 and which appears to do nothing but steal and reprint articles that it has found elsewhere on the web (or, as Globe Echo News characterizes it: "The Globe Echo is an independent English newspaper based in London, United Kingdom, established in mid-2021 with great aspirations to impartially deliver the most important news to our readers. … On our site, we offer a variety of news content from all international sources in different languages to put you in front of the latest news, moment by moment, all the latest news from all news agencies in all countries of the world. Subscribe to the newsletter or the postal notification service to receive all new with us")(see https://globeecho.com/about/, last accessed March 9, 2023), and (b) an "open-source website, Opencorporates.com." Opposition, p. 6. As the Court surely knows, an "open-source website" is one in which any anonymous individual can submit information, which the website then publishes. In this instance, the "reliable source" that Plaintiff feels appropriate to put before this Court (and ask that the Court take judicial notice) is from a user identified solely as "Bernd." See https://opencorporates.com/corporate_groupings/xHamster, last accessed on March 9, 2023. Really and truly, Plaintiffs are asserting that this Court should take judicial notice of facts (not

alleged in their FAC), that they found on a random commercial site on the internet because "Bernd" says so.

And, while it matters not (for personal jurisdiction purposes) whether Mr. Christoforou serves as the director for one Cypriot company or two hundred such companies, what *is* relevant is Plaintiffs' continued willingness to engage in their Gish gallop tactics, knowing full well that the effort it takes to respond to such nonsense is disproportionate to the effort that it took to spew it in the first place. That Plaintiffs are willing to make such representations to the Court – representing to the Court as "fact" that which is clearly not – should be deeply concerning.

●    In their Oppositions, Plaintiffs again insist that the Website uses Cloudflare as their Content Delivery Network (CDN), claiming in a footnote that xHamster IP Holdings, Ltd. ("XIH") did not, in *its* Reply Brief, address Plaintiffs' claim that the Website uses Cloudflare for CDN purposes. Opposition, p. 13, fn. 47. While it is technically true that XIH did not respond to this argument – since XIH has nothing to do with the operation of the Website – HML (which does operate the website), did respond to this argument. *See,* D.E. 239, pp. 11-12 and D.E. 186, pp. 5-6. Plaintiffs nonetheless seem confused on this point (pointing, again, to things they misinterpret from the internet) in support of their assumption that the Website uses Cloudflare for CDN purposes. It does not.[4] *See,* Supplemental Haladjian Declaration, attached hereto as Exhibit 3, ¶3.

Plaintiffs' exhibits also suggest that the xHamster website utilizes hosting services from "Lumen," which they categorize as a U.S. based company. And, while Plaintiffs are (slightly) closer to the truth here, they are only slightly so. As Mr. Haladjian stated in an earlier declaration, HML stores the content for the Website on servers located in the Netherlands. D.E. 174-2, ¶12.

---

[4] HML does use Cloudflare for DNS services – which have nothing to do with the hosting or speeding of content – as explained in HML's Reply Brief. D.E. 239, pp. 11-12.

As Mr. Haladjian also stated, the Website utilizes three European companies for provision of CDN services. D.E. 174-2, ¶13. One of those three companies is Lumen Technologies Europe Limited (which is also known as Level3 or CenturyLink) ("Lumen"). Supplemental Haladjian Declaration, ¶4. All the interactions HML has had with Lumen are with Lumen's UK offices, and the invoices Lumen issues to HML are from its UK office. *Id.,* ¶6. Lumen has servers located around the world and HML engages Lumen for CDN services worldwide. *Id.,* ¶7. Such services are not limited to the United States and, indeed, Lumen charges HML *less* for CDN services to users in North America (which, incidentally, includes more than just the United States) than it does for other parts of the world such as Latin America and Asia Pacific regions. *Id.,* ¶8. Ultimately, and despite Plaintiffs' arguments to the contrary, HML's use of Lumen's services (engaged with the UK branch) to speed content delivery worldwide, does not show an intent from HML to target the United States. And, lest the point be lost, none of this has anything to do with WIP, WL, or TL which do not own nor operate the Website.

● Plaintiffs go to great lengths in their Oppositions to argue that HML's very business model involves soliciting and displaying illegal content, including non-consensual content. This is patently false. First, such content is specifically prohibited by the Website's Terms and Conditions (located at https://xhamster.com/info/terms). Section 6.2.3 provides that an uploader of content must "have the written consent, release, and/or permission of each and every identifiable person in [the] submission to use the name or likeness of each individual for use in [the] submissions in the manner contemplated by these Terms and Conditions and you are also authorized to provide their ID documents for co-performer verification as required by the Creators' Program Agreement." And, Section 5.2.2 prohibits the uploading of any submission that is (among other things) "unlawful, harmful, threatening, abusive, harassing, tortious, defamatory, libelous,

[or] invasive of another's privacy…." *See also* Supplemental Haladjian Declaration, ¶¶9-11.

In support of their assertion, however, Plaintiffs include two screenshots of videos accessed on the Website – seemingly selected for their "shock" value, which Plaintiffs claim are "nonconsensual abuse videos," representing "the very type [of] tortious and invasive conduct that harmed Plaintiffs in this case." Opposition, pp. 18-19 and Exhibits 7-8 to the Pinter Declaration (Exhibit N to Plaintiffs' Opposition). These two videos are perfect vehicles to prove a point – just not the point Plaintiffs think they are making.

The first video pictured in Plaintiffs' Opposition is entitled "Young girl changing clothes in the locker room after school." And, although Plaintiffs have placed redaction bars in the photo, it is evident even in the Plaintiffs 'version of the screen shot that the woman in the video is holding her camera and recording herself. This unredacted screen shot makes that all the more self-evident:



Even on its face, there is nothing about this video that is illegal, nonconsensual, or invasive,

despite Plaintiffs' protestations to the contrary.  In addition, because HML now requires that every person uploading a video go through an age and identity verification process (described in detail below and in the Supplemental Haladjian Declaration), HML can attest that, prior to uploading content to the Website, the individual who uploaded the video had to provide HML with a copy of her passport and a selfie.  Haladjian Declaration, ¶¶12-13, 16-17.  HML used these documents to complete age and identity verification utilizing a third-party verification process through the website Yoti.com.  Haladjian Declaration, ¶¶14, 18.  The creator also executed an agreement whereby she is paid a percentage of ad revenues when website visitors view her video.  Haladjian Declaration, ¶¶15, 19.  *This* is HML's business model: the sharing of legal and consensual adult entertainment for the benefit of both HML and the content creators.  Haladjian Declaration, ¶15.

Plaintiffs' accusations seemingly arise entirely from the title of the video, "Young girl changing clothes in the locker room after school," which they take to be literal truth.  Preliminarily, the title to this video was created by the individual who uploaded the video and was not altered or modified by HML.  Haladjian Declaration, ¶16.  Moreover, and it seems shocking that this has to be said, but here it is: pornography involves an element of fantasy.  As with other forms of entertainment, that which is depicted is often fictional.  Surely Plaintiffs' counsel understands that no one was *actually* killed in the "Texas Chainsaw Massacre"; the shark in "Jaws" was rubber; and "Star Wars" was not filmed on location.  So too, here.  With all due respect to the video's creator, she is not a "young girl," she is not really "changing clothes," (so much as removing some of them – while holding a camera and intentionally filming herself) and it appears inconceivable that the video was recorded in a school locker room.

Nor does the second video presented by Plaintiffs advance their argument.  Once again, HML can attest that, prior to uploading content to the Website, the individual who uploaded the

video had to provide HML with a copy of her passport and a selfie. Haladjian Declaration, ¶17. HML then completed age and identity verification utilizing a third-party verification process through the website Jumio.com. Haladjian Declaration, ¶18. The creator also executed an agreement whereby she is paid a percentage of ad revenues when website visitors view her video. Haladjian Declaration, ¶19. This second video, as well, depicts only knowing, consensual conduct.

Given Plaintiffs' expansive and lengthy focus on HML's supposed current business model (a focus based entirely on speculation and unsupported allegations and with little actual relevance to the legal arguments at issue here), it seems useful to explain the full process now employed[5] before an individual is permitted to upload videos to the xHamster website.[6] Before an individual can post a video on the xHamster website, he or she must first register, generally, as a registered member of the website (individuals who just want to view videos do not need to register). Haladjian Declaration, ¶12. Next, the person must complete the "creator" registration form which requires, among other things, that the user provide a photo of an official identification document (such as a passport) and a selfie. Haladjian Declaration, ¶13. Once the individual provides this documentation, HML conducts age and identity verification through third party service providers, such as Jumio.com and Yoti.com. Haladjian Declaration, ¶14. Once this process has been completed, a member of HML's Moderation Team/Support Team manually double checks the information and documentation received and presented for verification. Haladjian Declaration, ¶14. At this point, if all the verification stages have been met, the individual's "creator application" is approved. Haladjian Declaration, ¶14. The creator then executes the advertising revenue agreement, which allows the creator to receive compensation for advertisements placed next to the

---

[5] This process was not in place at the time the videos of Plaintiffs were posted to the site.
[6] The process is similar but differs slightly for content produced by studios. Haladjian Declaration, ¶20.

creator's uploaded content.  Haladjian Declaration, ¶15. Only at this point can an individual upload content to the website.

When the approved and verified creator attempts to post a video, there are additional steps before the video is allowed to go live on the Website.  Haladjian Declaration, ¶21.  First, HML's moderation team checks the proposed video to make sure that the content is generally acceptable for publication (for example, that the video does not appear to include any underage individuals). Haladjian Declaration, ¶22.  Next, both the moderation team and the support team work to ensure that the creator of the video has provided: a model release for every performer in the video and an identification document for each person in the video sufficient to verify the performer's age. Haladjian Declaration, ¶ 23.  Only when all these steps have been completed does a video go live on the Website.  Haladjian Declaration, ¶24.  It is HML's understanding that it is one of very few adult websites to implement such rigorous screening procedures.  Haladjian Declaration, ¶25.

It is also worth mentioning that, despite Plaintiffs' insinuations to the contrary, HML has a zero-tolerance policy for the posting of child exploitation materials.  Indeed, xHamster is an Approved Guardian of ASACP, the Association of Sites Advocating Child Protection, which means that ASACP continually monitors the Website with the organization's Code of Ethics and that HML actively supports ASACP's mission of eliminating child exploitation materials from the Internet.  Haladjian Declaration, ¶26.

Two final points bear repeating here, as Mr. Haladjian stated in his prior sworn statements: (1) although someone (Plaintiffs are unable to say who), uploaded the videos of the Plaintiffs to the Website at a point in time before the identity verification system was implemented, xHamster acted to take down the videos as soon as they were notified by the police that someone had uploaded nonconsensual content to the Website, and (2) the uploader of the content never received

any compensation from HML for having uploaded such content.

● Although Plaintiffs point to yet another unverified private website – something called wappalyzer.com to claim that 76% of TL's customers come from the United States, in reality that number is much closer to 28%. Supplemental Christoforou Declaration, ¶7. In addition, despite the impression that the Court might have gotten from Plaintiffs' Oppositions, TL does not only provide advertising services to the Website, but rather it also provides advertising placement services to many unrelated third-party adult websites. *Id.*, ¶8.

## ARGUMENT

**I.    The Court Should Reject Plaintiffs' Attempts to Rely on Facts That Are Not Properly Pled In The Fifth Amended Complaint and For Which Plaintiffs Have Provided No Proper Support.**

In general, motions brought pursuant to Fed. R. Civ. P. 12(b)(6) are designed to test the sufficiency of the allegations within the four corners of the complaint, considering *only* the facts as alleged in the complaint, documents attached to the complaint, and documents that are referenced in, and central to, the complaint. *See, e.g., Sullivan v. City of Frederick,* 738 F. App'x 198, 199 (4th Cir. 2018); *In re Derivium Capital, LLC v. Cathcart*, 2008 U.S. Dist. LEXIS 138245, at *4 (D.S.C. June 17, 2008).

In the context of a Rule 12(b)(2) motion, however, the Court's examination expands slightly. Still, the general rule is that "the court considers only the complaint and any jurisdictional affidavits in making its determination under Rule 12(b)(2)…." *Dowdy v. St. Paul Travelers Cos.,* 2006 U.S. Dist. LEXIS 111062, at *9 n.1 (D.S.C. Apr. 21, 2006).

Moreover, the presumption of truth afforded to facts alleged in the complaint disappears when contradicted by a sworn declaration. *See Wolf v. Richmond Cty. Hosp. Auth.,* 745 F.2d 904,

908 (4th Cir. 1984)("In ruling on a motion to dismiss for lack of personal jurisdiction, the allegations of the complaint, except insofar as controverted by the defendant's affidavit, must be taken as true"); *Watters v. Kirk*, 2012 U.S. Dist. LEXIS 32465, at *6-7 (D.S.C. Mar. 12, 2012)("To satisfy that threshold, Plaintiff must present at least some evidence in support of its position. Wright & Miller[, *Federal Practice and Procedure*] § 1067.6 (the *prima facie* showing 'must be based on affirmative proof beyond the pleadings, such as affidavits, testimony or other competent evidence of specific facts'); *id.* ('When a defendant provides affidavits to support a Rule 12(b)(2) motion, the plaintiff may not simply rest on the allegations of the complaint')); *Newbanks v. Cellular Sales of Knoxville, Inc.,* 2012 U.S. Dist. LEXIS 198521, at *4-5 (D.S.C. Oct. 18, 2012)(same).

Despite this black letter law, Plaintiffs' Oppositions are predominated not only by factual assertions that are not supported by declaration but also, in many instances, factual assertions that appear nowhere in the FAC. These "facts," of course, cannot be considered by the Court. *See, e.g., Holderfield v. Thyssenkrupp Elevator Corp.,* 2022 U.S. Dist. LEXIS 61088, at *23 n.2 (E.D. Va. Mar. 30, 2022)("Because this Court is constrained at the motion to dismiss stage to limit its review to the four corners of the Complaint, this Court does not consider any argument advanced by Plaintiff that builds off of additional allegations not contained in the Complaint.")

Plaintiffs attempt to compensate for the lack of factual allegations in the FAC with a jumble of "facts" (often misunderstood, misinterpreted, or misrepresented, as discussed above) derived from random private websites that lack any indicia of reliability,[7] claiming that this Court may

---

[7] In addition to the misrepresentations discussed above, Plaintiffs represent in their Oppositions that Exhibit C to their Opposition is the Annual Report and Financial Statement of a non-party entity called "Bodo Project Ltd." Instead, Exhibit C appears to be a financial statement for yet another non-party, Wisebits Ad Net Ltd. Obviously, the Court cannot rely on Plaintiffs' citations to a document not actually provided to the Court. Perhaps even more fundamentally, the Court

take judicial notice of literally anything that appears on the internet.  *See* Oppositions, p. 2.

Unsurprisingly, this flies in the face of the case law from the Fourth Circuit, not to mention

common sense.  *United States v. Heijnen,* 149 F. App'x 165, 169 (4th Cir. 2005)("Our review leads

us to conclude that the district court properly prevented Heijnen from introducing documents

downloaded from the internet generally, as these documents are hearsay, and Heijnen provided no

indication that he could establish a proper foundation to admitting this evidence, or to authenticate

it"); *Lampman v. Dewolff*, 2007 U.S. Dist. LEXIS 112170, at *15 n.3 (D.S.C. Sep. 26, 2007)("The

Fourth Circuit has held that website print-outs, particularly when provided without foundation, are

inadmissible hearsay."); *Williamson v. Prince George's Cty.,* 2011 U.S. Dist. LEXIS 7518, at *26

(D.  Md.  Jan.  26,  2011)("electronically  stored  information  must  be  properly

authenticated. Williamson has not attempted to do so. When evidence from the internet is

presented without adornment - without any attempt at authentication or any explanation as to how

the hearsay rules are satisfied - it 'is adequate for almost nothing.'").  *See also Victaulic Co. v.*

*Tieman,* 499 F.3d 227, 236-37 (3d Cir. 2007)("Of particular concern is that the District Court used

the website at http://www.victaulic.com to establish certain facts about Victaulic's business. While

it is proper for a court to take judicial notice of facts not reasonably subject to dispute, FED. R.

EVID. 201(b), several concerns come into play here. First, we require that evidence be

authenticated before it can be admitted. ...Thus we allow judicial notice only from sources not

reasonably subject to dispute. ...Anyone may purchase an internet address, and so, without

---

can hardly rely on the rampant speculation of Plaintiffs' counsel interpretation of various financial
statements (all marked "Not For Official Use"), which are unsupported by *any* sworn declaration,
much less a declaration of some individual with the accounting background that would be
necessary to reach such conclusions.  Ultimately, the Court need not travel down this dark and
twisty path: despite having FIVE attempts to properly include the necessary factual allegation in
their Complaint, Plaintiffs' failure to do so should end the Court's inquiry.

proceeding to discovery or some other means of authentication, it is premature to assume that a webpage is owned by a company merely because its trade name appears in the uniform resource locator. …We also note that the District Court employed judicial notice at an early stage in this litigation and outside the context of an evidentiary proceeding. While the rules allow a court to take judicial notice at any stage of the proceedings, FED. R. EVID. 201(f), we believe that it should be done sparingly at the pleadings stage. Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point. Resolving a thorny issue like reasonableness by resorting to a party's unauthenticated marketing material falls far short of the bar."); *United States v. Jackson*, 208 F.3d 633, 638 (7th Cir. 2000) (holding that information from the internet must be properly authenticated to be admitted); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 782-83 (C.D. Cal. 2004) ("Printouts from a web site do not bear the indicia of reliability demanded for other self-authenticating documents under FED. R. EVID. 902. To be authenticated, some statement or affidavit from someone with knowledge is required . . . .").

This issue is perhaps most egregious in connection with Plaintiffs' assertion that this Court can consider factual assertions contained on the "Globe Echo World News" website and an open-source website called Opencorporates.com, both of which are discussed above. *See, e.g., Gantt v. Whitaker,* 57 F. App'x 141, 150 (4th Cir. 2003)("This circuit has consistently held that newspaper articles are inadmissible hearsay to the extent that they are introduced to prove the factual matters asserted therein."); *Greene v. Scott*, 2015 U.S. Dist. LEXIS 59198, at *8 (D.S.C. May 6, 2015)("In evaluating the admissibility of newspaper articles in particular, the Fourth Circuit has consistently found that newspaper articles are inadmissible hearsay to the extent that they are introduced 'to prove the factual matters asserted therein."). Indeed, Plaintiffs go so far as to suggest that this

Court should take judicial notice of the facts alleged in the German magazine article, despite the wholesale absence of such facts in the FAC and despite the unreliability of such double hearsay. Obviously, this is something the Court cannot do. *See, e.g., Goldfarb v. Mayor & City Council of Balt.,* 791 F.3d 500, 511 (4th Cir. 2015)("judicial notice must not be used as an expedient for courts to consider 'matters beyond the pleadings' and thereby upset the procedural rights of litigants to present evidence on disputed matters.").

## II.     Plaintiffs Have Failed To Support With Properly-Pled Facts Any of Their Shifting Theories of Personal Jurisdiction.

In the FAC, Plaintiffs allege only that personal jurisdiction is proper in this case under 18 U.S.C. §1596 and/or 28 U.S.C. §1331.   The former deals with personal jurisdiction over individuals present in the United States in criminal cases arising under various trafficking laws and the latter involves diversity jurisdiction over citizens of different states.  Obviously, neither applies to WIP, WL, or TL (or HML or XIH for that matter).  Recognizing that the *fifth* time was not a charm, Plaintiffs now argue that personal jurisdiction is appropriate under Fed. R. Civ. P. 4(k)(2), despite no mention of that Rule in the FAC.

More specifically, Plaintiffs argue that WIP, WL, and TL can be held liable under either an "alter ego" theory or a single business entity theory of personal jurisdiction.  In each of their opening memos, WIP, WL, and TL discussed in detail the wholesale lack of alleged facts to support a finding that any of the named entities are the alter ego of HML.  Plaintiffs' oppositions do nothing to advance Plaintiffs' alter ego arguments, but instead Plaintiffs primarily focus their arguments on their assertion that jurisdiction is proper under a "single business enterprise theory," which also allows for the piercing of the corporate veil under certain circumstances.  Here, too, however, Plaintiffs have failed to allege a single fact in the FAC that would support a finding that WIP, WL, TL, XIH, and HML operate in such a manner as to permit the court to pierce their

16

corporate veils under a single business enterprise theory.  As discussed, above, Plaintiffs attempt to make up for the complete lack of factual allegations in the FAC, with references to information that they have pieced together from random, unverified sources on the internet.  Even, there, however, Plaintiffs do nothing more than argue that their "evidence" shows that the various companies are interrelated.  This is insufficient as a matter of law.

In *Walbeck v. I'On Co., LLC*, 426 S.C. 494 (Ct. App. 2018), the South Carolina Court of Appeals discussed the recent South Carolina Supreme Court case, *Pertuis v. Front Roe Restaurants, Inc.*, 423 S.C. 640 (2018), wherein the Court first adopted and outlined the single business entity theory.  More recently, in *Stoneledge at Lake Keowee Owners' Association v. IML Dev. Co., LLC*, 435 S.C. 109 (2021), the South Carolina Supreme Court took the opportunity to expand on its holding in *Pertius*, explaining in more detail the contours of the "single business enterprise theory".

In *Walbeck* (the case relied on by Plaintiffs), the Court summarized the single business entity theory, as adopted by the *Pertuis* court thusly:

> "the single business enterprise theory requires a showing of more than the various entities' operations are intertwined," as the theory had previously been applied by our courts. ...Rather, "[c]ombining multiple corporate entities into a single business enterprise requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions."

*Walbeck* at 528, quoting *Pertuis.*

As the *Walbeck* Court noted the "resulting from" language in *Pertuis* was crucial: "Here, even though there is evidence showing the various entities' operations are intertwined, there is no evidence of 'bad faith, abuse, fraud, wrongdoing, or injustice *resulting from* the blurring of the entities' legal distinctions.'"  *Id.* (emphasis in *Walbeck*).

17

In adopting the single business entity rule, the South Carolina Supreme Court quoted at length from a Texas Supreme Court case, specifically adopting its reasoning:

As the Texas Supreme Court has put it:

Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse, or . . . injustice and inequity. By 'injustice' and 'inequity' we do not mean a subjective perception of unfairness by an individual judge or juror; rather, these words are used . . . as shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield—fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like. Such abuse is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a 'bedrock principle of corporate law' - that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations. Disregarding the corporate structure involves two considerations. One is the relationship between two entities . . . . The other consideration is whether the entities' use of limited liability was illegitimate.

*Pertuis* at 654-55, *quoting SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008).

The *Pertius* Court stressed, however, that the single business entity rule was not to be applied lightly:

As with other methods of piercing the corporate form that have previously been recognized in South Carolina, equitable principles govern the application of the single business enterprise remedy, and this doctrine 'is not to be applied without substantial reflection.' … If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons. The party seeking to pierce the corporate veil has the burden of proving that the doctrine should be applied.

*Perius* at 655 (internal citations and quotation marks omitted).

And, in *Stoneledge*, the South Carolina Supreme Court reversed the findings of the trial court and appeals court, which had found that the defendants constituted a single business entity based (in part) on a unification of business operations as between the defendants, self-dealing as

between the defendants, and a finding that, because the defendants' "profits were entirely dependent" on their joint venture to sell townhomes in a residential development, meaning that "their operations were clearly in pursuit of a common business purpose…." *Id.* at 125. In rejecting the lower courts' findings that the defendants together constituted a single business entity, the Court held that:

> Viewing the facts of this case with the requisite hesitancy to invade the LLC form, we do not believe these facts warrant the application of the single business enterprise theory. As noted above, in *Pertuis*, we held the single business enterprise theory requires more than just a showing that the various entities' operations are intertwined. A "common business purpose" is simply not enough. … For a court to combine different business entities into a single business enterprise, there must also be a showing of "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." …The conduct of Marick, Thoennes, and IMK did not rise to this level. Like other methods of invading the corporate form, invocation of the single business enterprise theory should be reserved for drastic situations and is the rare exception, not the rule.

*Stoneledge* at 126.

Similarly, this Court has recently had the opportunity to consider the single business entity rule in a case where Plaintiff made allegations similar to those made by Plaintiffs here to support its single business entity theory of liability. *Turtle Factory Bldg. Corp. v. ECS Southeast, LLP,* 2021 U.S. Dist. LEXIS 125238 (D.S.C. July 6, 2021). The defendants there included ECS Southeast, LLP, ECS Carolinas, and ECS Corporate, each of which was an operating subsidiary of Engineering Consulting Services, Ltd. *Id.* at *4-5. In *Turtle Factory Bldg. Corp.*, Plaintiff alleged that it had been harmed as a result of a Property Condition Assessment Report ("PCR") prepared and provided by Defendant ECS Carolinas. In support of its motion for summary judgment, ECS Corporate provided affidavits showing that it did not prepare the PCR at issue and, indeed, it "does not provide engineering services, is not licensed to perform those services, and its primary function is to oversee corporate, human resources, IT and general management matters pursuant to a Master Services Agreement [the "MSA"] with Engineering Consulting Services,

Ltd." *Id.* at *4.  Plaintiff, on the other hand, argued that: (1) defendants had failed to comply with corporate formalities, including the lack of a signed written agreement delineating " the scope of services it provided to ECS Carolinas, LLP"; (2) there was a lack of "clear identification of its corporate officers and structure which would help distinguish it from any of the other ECS entities"; (3) "because ECS Corporate states it provided human resource services to all ECS entities, ECS Corporate was thus responsible for … a failure to properly train and supervise" the employee who prepared the PCR; (4) "ECS Corporate Services, LLC is part of the whole that has cause [sic] the harm to the Plaintiff"; and (5) "all Defendants appear to have the same address and utilize the same web address." *Id.* at *6-9

Nonetheless, this Court had no hesitation in rejecting Plaintiffs' single business entity theory, holding that "Plaintiff has put forth no evidence indicating bad faith, abuse, fraud, wrongdoing, or injustice resulting from an improper blurring of legal entities. …'It is commonplace for companies to establish multiple corporate entities, who maintain individual corporate identity despite close collaboration between the different entities' …'Combining multiple corporate entities into a single business enterprise requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions.'" *Id.* (internal citations omitted).

Here – and despite Plaintiffs' attempts to argue facts not alleged anywhere in the FAC – Plaintiffs have not offered *any* factual basis for their single business entity theory.  Reading the FAC generously – indeed reading *all* of Plaintiffs' submissions generously – Plaintiffs allege nothing more than their assertions that the various business entities named operate in furtherance of an ultimate common purpose (the operation of the xHamster.com website) and that they are all,

in some respect, related to one another. Such allegations fall far short of what is necessary to pierce the corporate veil under a single business entity theory.

### III.    Plaintiffs' Allegations of Certain Minor Connections to the United States By TL Are Insufficient to Subject TL (or WL or WIP) to Personal Jurisdiction.

In their Oppositions, Plaintffs argue that certain minor connections (not mentioned anywhere in the FAC) as between TL and the United States support a finding of personal jurisdiction with respect to TL, WL, and WIP. They do not.

#### A.    The Appointment of a DMCA Agent

Plaintiffs argue that the mere fact that the TL has registered with the United States Copyright Office an agent for the receipt of takedown notices under the Digital Millennium Copyright Act (a "DMCA agent"), means that TL has purposeful expressly aimed itself at the United States. Putting aside the fact that this "contact" with the United States has nothing to do with Plaintiffs' claims and is, therefore, irrelevant, Plaintiffs are simply wrong about the relevance of such a contact to the jurisdictional analysis.

Preliminarily, the Court should note that TL's DMCA policy specifically notes that TL is not located within the United States and, as such, complies with the DMCA only on a voluntary basis:

> Although Our site is not based in the United States, we respect the intellectual property rights of copyright holders, and thus voluntarily comply with the Notice and Takedown provisions of the Digital Millennium Copyright Act ("DMCA"). We do not permit copyright infringing activities or infringement of intellectual property rights on the Site, and will promptly and without prior notice remove all content if properly notified of infringements on third party's intellectual property rights.

https://trafficstars.com/dmca, last accessed March 10, 2023

Evan if this were not the case, at least one federal district court to directly consider the question held specifically that: "The fact a DMCA agent is registered in the United States should

not be considered when evaluating contacts for personal jurisdiction." *Hydentra HLP Int., Ltd. v. Sagan Ltd.*, 266 F.Supp.3d 1196, 1203 (D. Ariz. 2017).

And, although the appointment of a DMCA agent does not even hold the same significance as the appointment of a statutory agent for the service of process, it has long been recognized in this Circuit (and elsewhere) that the appointment of a statutory agent within the forum is insufficient to confer personal jurisdiction over a defendant. *See*, *e.g.*, *Sebastian v. Davol, Inc.*, 2017 U.S. Dist. LEXIS 122466, at *31 (W.D.N.C. Aug. 3, 2017) ("[T]he designation of a statutory agent for service of process [is] insufficient to confer jurisdiction over an out-of-state corporation." (citing *Public Impact, LLC v. Boston Consulting Grp., Inc.*, 117 F.Supp.3d 732, 739 (M.D.N.C. 2015), *Gestao E Servicos LDA v. Virgin Enters. Ltd.*, 511 F.3d 437, 446 (4th Cir. 2007), and *Ratliff v. Cooper Labs., Inc.*, 444 F.2d 745, 748 (4th Cir. 1971))). Other courts have held similarly. *See King v. Am. Family Mut. Ins. Co.*, 632 F.3d 570, 576 (9th Cir. 2011) ("The simple act of appointing a statutory agent is not, nor has it ever been, a magical jurisdictional litmus test.").

Additionally, courts have long held that a party's interactions with a United States government agency cannot be part of the jurisdictional analysis. *See*, *e.g.*, *LG Display Co., LTD. v. Obayashi Seikou Co., LTD*, 919 F.Supp.2d 17, 27 (D.D.C. 2013) ("Stated simply, a party's contacts with government agencies do not enter the jurisdictional calculus."); *Freiman v. Lazur*, 925 F.Supp. 14, 24 (D.D.C. 1996) (government contacts doctrine prevented the exercise of personal jurisdiction when the defendant applied to register a copyright with the U.S. Copyright Office in Washington, D.C.); *Lamb v. Turbine Designs, Inc.*, 41 F.Supp.2d 1362, 1365 (N.D. Ga. 1999) ("Rooted in the constitutional right to petition the government and first recognized in the District of Columbia, the 'governmental contacts' principle prevents a court from exercising jurisdiction based solely on a defendant's contact with a federal instrumentality.").

Finally, it is worth noting that consideration of the TL's DMCA agent as part of a jurisdictional analysis would run counter to public policy and defeat the protections provided to rights-holders under the DMCA. Congress enacted the DMCA to "foster cooperation among copyright holders and service providers in dealing with infringement on the Internet...." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1021-22 (9th Cir. 2013). If a foreign website-operator were to subject itself to jurisdiction within the United States simply by virtue of designating a DMCA agent, the website operator would have strong incentive not to do so, thwarting the purposes of the DMCA.

**B.    TL's Tier-Based Pricing Structure Does Not Demonstrate Any Kind of Express Aiming" At the United States.**

Plaintiffs also point to the fact that TL employs a "Tier Based" pricing structure to argue that TL expressly aims itself at the United States, justifying an exercise of personal jurisdiction. This argument is incorrect for a variety of reasons. First, at the risk of beating a dead horse, the FAC contains not a single allegation concerning TL's pricing structure and, for this reason alone, the Court should reject Plaintiffs' argument. Even if Plaintiffs had alleged facts in the FAC concerning TL's pricing structure, however, such facts would be irrelevant to the Court's jurisdictional analysis because TL's pricing structure is wholly irrelevant to Plaintiffs' claims here. Because this argument is *so* far afield, it bears remembering that Plaintiffs' claims arise because Defendant Murphy allegedly surreptitiously recorded Plaintiffs while they were changing in a locker room and then, some seven years later, someone posted those videos to innumerable websites including xHamster.com. The fact that TL, which places ads on the Website along with many others, has a pricing structure that favors English-speaking countries has nothing to do with Plaintiffs' claims.

The Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), is particularly instructive on this point. In *Bristol-Myers*, "more than 600 plaintiffs, most of whom are not California residents, filed [a] civil action in a California state court against Bristol-Myers Squibb Company (BMS), asserting a variety of state-law claims based on injuries allegedly caused by a BMS drug called Plavix." *Id.*, at 1777.

Although the Supreme Court found that Bristol-Myers "engages in business activities in California and sells Plavix there," it nonetheless held that the California courts could not exercise personal jurisdiction over the claims brought by non-California residents. The Court reached this conclusion despite the fact that "five of the company's research and laboratory facilities, which employ a total of around 160 employees, are located" in California and the company "employs about 250 sales representatives in California and maintains a small state-government advocacy office in Sacramento." *Id*., at 1778. Indeed, the Supreme Court noted that "BMS does sell Plavix in California. Between 2006 and 2012, it ***sold almost 187 million Plavix*** pills in the State and took in more than $900 million from those sales." *Id.*, at 1778 (emphasis added).

Nevertheless, the Supreme Court rejected the argument that these contacts should be considered for specific jurisdiction purposes because the contacts did not relate directly to the claims brought by the non-resident plaintiffs:

> For a court to exercise specific jurisdiction over a claim there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.... When no such connection exists, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.... …What is needed is a connection between the forum and the specific claims at issue.

*Id.*, at 1776.

So too, here.  Given that Plaintiffs' claims have nothing to do with whether TL's pricing structure reflects higher rates for English-speaking countries, the allegations add nothing to Plaintiffs' jurisdictional argument.

Finally, and somewhat ironically, Plaintiffs' argument proves precisely the opposite of what they believe.  As the screen shot in Plaintiffs' Opposition shows, the "Tier-1" pricing is not limited to the United States, but rather extends to all of North America; all of Northern and Western Europe, Australia; and other countries.  This is the antithesis of the express aiming that Plaintiffs are required to prove.  Even if the Tiered pricing was demonstrative of anything (and it really is not), it would at most show that TL charges higher prices for advertisements displayed in countries around the world, including Australia, Europe, Mexico, and Canada.

## IV.     Plaintiffs' New Section 230 Arguments Fare No Better Than Their Prior Arguments.

### A.     The Use of Categories and Tags Does Not Eliminate Defendants' Section 230 Immunity.

In their Oppositions, Plaintiffs argue that HML's use of categories and tags on the Website somehow transforms HML into a "content creator," stripping it of its Section 230 immunity.  It is an argument that has been repeatedly made – and repeatedly rejected – by other Courts, including the Fourth Circuit.  *See, e.g., Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009)(affirming Rule 12(b)(6) dismissal of plaintiff's complaint because defendant was entitled to Section 230 immunity, despite Plaintiff's allegations that the defendant website's "structure and design" of its website so as to "steer" visitors to "specific categories"); *L.H. v. Marriott International, Inc.*, 2022 U.S. Dist. LEXIS 91756, *36 ("While some of her allegations demonstrate craigslist's appalling lack of diligence in preventing trafficking, not a single one establishes that craigslist created or developed the trafficking content. …her allegations that

craigslist 'created' classified categories titled, for instance, 'erotic services,' 'adult services,' 'casual encounters,' or 'massage services,' fare no better. None of those categories, just by their existence, required or induced craigslist users to post unlawful content. Indeed, as L.H. herself acknowledges, craigslist's published policies affirmatively prohibit such content. …Put differently, L.H. appears to conflate, on the one hand, craigslist's creation of a platform that her traffickers used to traffic her, with, on the other, craigslist's having actually materially contributed, itself, to the creation and development of the illegal postings at issue. At bottom, nothing about the platform that craigslist provided, at least on L.H.'s allegations, led users to necessarily engage in the illegal trafficking conduct alleged here. While L.H. was certainly trafficked under craigslist's watch, that alone is insufficient to remove § 230's shield of liability"); *Doe v. Reddit, Inc.*, 2021 U.S. Dist. LEXIS 235993 (C.D. Cal. 2021)(granting defendant's Rule 12(b)(6) motion because defendant website was protected by Section 230 from sex trafficking claim, despite plaintiff's allegation that Reddit, among other things, allowed the creation of categories - called subreddits - for users specifically seeking child sexual exploitation materials and providing "karma awards" recognizing the popularity of such subreddits); *M.L. v. Craigslist, Inc.*, 2021 U.S. Dist. LEXIS 223297, *9 (W.D. Wash. 2021)("The website does not materially contribute to unlawful content by merely augmenting the content generally or taking steps necessary to display the allegedly illegal content"); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1120 (9th Cir. 2003)("That the website classified user characteristics into discrete categories and collected responses to specific essay questions did not transform the website into a 'developer' of the 'underlying information'"); *Dart v. Craigslist, Inc.*, 665 F Supp 2d 961, 968 (N.D. Ill.2009)(rejecting plaintiff's argument that Craigslist "plays a more active role than an intermediary or a traditional publisher" by providing "an 'adult services' category" on its website).

Interestingly, although Plaintiffs cited to the United States Solicitor General's *amicus* brief to the Supreme Court in *Gonzales v. Google*[8] as supposedly disapproving of a single case cited by Defendants, in a much larger sense, that brief makes precisely the point argued by Defendants here:

> More fundamentally, deeming a website an "information content provider" whenever it enhances user access to third-party content would produce a "self-defeating" result. *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019).  Interactive websites invariably provide tools that enable users to create, and other users to find and engage with, information.  A chatroom might supply topic headings to organize posts; a photo-sharing site might offer a feature for users to signal that they like or dislike a post; a classifieds website might enable users to add photos or maps to their listings.  If such features rendered the website a co-developer of all users' content, Section 230(c)(1) would be a dead letter.

*Id.* at p. 23.

So, too, here.  Nothing that HML did – even if it provided the ability to create categories or tags for videos – substantially contributed to the illegality of the content allegedly recorded by Defendant Murphy and ultimately posted by some third party to any number of adult websites, including the xHamster.com site.

**B.    Plaintiffs' Have Failed To Allege That HML Or Any Entity Related To HML *Itself* Committed An Act In Violation of the Sex Trafficking Statute.**

Finally, Plaintiffs continue to argue that FOSTA created a blanket exemption to the immunity provided by Section 230 of the Communications Decency Act for all sex trafficking claims brought pursuant to 18 U.S.C. §1595.  But, the carve-out created by FOSTA does not cut such a broad swath and, in any event, only applies when the defendant *itself* committed an act that constitutes sex trafficking and not when a third-party has committed the alleged sex trafficking act.

---

[8]    https://www.supremecourt.gov/DocketPDF/21/21-1333/249441/20221207203557042_21-1333tsacUnitedStates.pdf

First, a "conspicuous majority of courts" have concluded "that FOSTA withdrew immunity only for those §1595 cases in which the defendant's conduct violated the TVPRA's criminal provision, 18 U.S.C. §1595." *L.H. v. Marriott International, Inc.*, 2022 U.S. Dist. LEXIS 91756, *41 (S.D. Fla. 2022)(collecting cases). *See also Doe v. Reddit, Inc.*, 2021 U.S. Dist. LEXIS 235993, *18 (C.D. Cal. 2021)("The parties have substantial disagreement over what is required to state a claim under Section 1595 that is exempt from §230 immunity. …The Court agrees with other courts that found that 'the most persuasive reading of section 230(e)(5)(A) is that it provides an exemption for immunity for a section 1595 claim if, but only if, the defendant's conduct amounts to a violation of section 1591")(collecting cases); *J.B. v. G6 Hospitality, LLC*, 2021 U.S. Dist. LEXIS 170338, *18 (N.D. Cal. 2021)("Referencing solely the language itself, the Court finds the most straightforward reading to be that the provision provides an exemption from CDA immunity for a section 1595 claim if the civil defendant's conduct amounts to a violation of section 1591. …if Congress meant to exempt all claims involving sex trafficking, it could have said 'if the claim arises out of a violation of section 1591,' or 'if the plaintiff is a victim of a violation of section 1591.'").

This is relevant in part because section 1595 encompasses participation in any venture that violates any part of the chapter, not just section 1591, and in part because "the standard for beneficiary liability pursuant to section 1591 is higher: to be held criminally liable as a beneficiary, a defendant must have actual knowledge of the trafficking and must 'assist, support, or facilitate' the trafficking venture." *Does v. Reddit*, 51 F.4th 1137, 1141 (9th Cir. 2022).

Additionally, the majority of courts to examine the question have held that §230 immunity is not lost simply by virtue of the fact that Plaintiff alleges that a defendant knew or should have known that they were *participating* in a venture that engaged in a violation of section 1591.

Instead, to lose section 230 immunity, the Plaintiff must plausibly allege that the specific defendant must itself have engaged in conduct that violates Section 1591.

Indeed, the Ninth Circuit decision in *Does v. Reddit*, *supra*, is particularly instructive inasmuch as it dealt with allegations closely analogous to those made by Plaintiffs here. There, the Plaintiffs, minor children and their parents, discovered sexually explicit photos and videos posted to various Reddit groups (subreddits). The Plaintiffs in that case alleged, *inter alia*, that:

> the presence of child pornography on Reddit is blatant, but Reddit has done little to remove the unlawful content or prevent it from being posted, because it drives user traffic and revenue. As of April 2021, when this suit was filed, Reddit hosted many subreddits that openly and explicitly marketed themselves as fora for child pornography, with names like /r/BestofYoungNSFW, r/teensdirtie, /r/TeenBeauties, and /r/YoungGirlsGoneWild. Users publicly "trade" and solicit child pornography on these pages, and advocacy groups and the press have repeatedly reported this activity to Reddit.

> Plaintiffs allege that Reddit earns substantial advertising revenue from subreddit that feature child pornography because they generate controversy and attract viewers. Indeed, third-party advertising tools have listed several subreddits dedicated to child pornography as some of the most popular pages on the platform, which encourages advertisers to buy ad space on those pages. As such, the plaintiffs contend that Reddit financially benefits from openly hosting child pornography.

> The plaintiffs further contend that, because it enjoys the revenue generated by child pornography, Reddit has taken little action to block it from the platform. The plaintiffs allege that Reddit does not adequately train its moderators to screen and remove unlawful content and that some moderators post child pornography themselves. Moreover, Reddit has not implemented basic security measures, such as age verification or IP-address tracking to ban repeat offenders, and it delayed adoption of automated image-recognition technologies like "PhotoDNA," which can detect child pornography and prevent it from being posted.

*Id.* at 1139-1140.

Based on the above allegations, Plaintiffs argued that the FOSTA exemption to Section 230 stripped Reddit of its immunity because it was a participant in a venture that violated Section 1591. The Ninth Circuit, however, rejected Plaintiffs' argument that a defendant loses its Section 230 immunity simply by being connected to a venture that violates Section 1591:

The parties dispute whose conduct must have violated 18 U.S.C. §1591 for a website to be held liable in a civil trafficking suit. Reddit argues that a website may only be liable for its own criminal conduct. Plaintiffs argue that a website may be liable as a beneficiary when someone's conduct (likely a user's conduct) violated the criminal statute and the claim against the website derives from that violation. …We have not had the opportunity to address the issue until now.  We hold that for a plaintiff to invoke FOSTA's immunity exception, she must plausibly allege that the website's own conduct violated section 1591.

…we conclude that the plain text of FOSTA and precedent interpreting a similar immunity exception establishes that a website can only be held liable if its own conduct—not a third party's—violates 18 U.S.C. §1591.

*Id.* at 1141.

And, after an exhaustive discussion of FOSTA, its legislative history, and the holdings of

other courts, the Ninth Circuit held that:

We agree with the reasoning of other courts to address the issue that, to hold a defendant criminally liable as a beneficiary of sex trafficking, the defendant must have actually "engaged in some aspect of the sex trafficking." …To run afoul of § 1591, a defendant must knowingly benefit from and knowingly assist, support, or facilitate sex trafficking activities. Mere association with sex traffickers is insufficient absent some knowing "participation" in the form of assistance, support, or facilitation. …The statute does not target those that merely "turn a blind eye to the source of their [revenue]."   …And knowingly benefitting from participation in such a venture requires actual knowledge and "a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit."

In this case, the plaintiffs have not alleged that Reddit knowingly participated in or benefitted from a sex trafficking venture. They allege that Reddit provides a platform where it is easy to share child pornography, highlights subreddits that feature child pornography to sell advertising on those pages, allows users who share child pornography to serve as subreddit moderators, and fails to remove child pornography even when users report it, as the plaintiffs did in this case. Together, they say, this amounts to knowing participation in a sex trafficking venture.

Taken as true, these allegations suggest only that Reddit "turned a blind eye" to the unlawful content posted on its platform, not that it actively participated in sex trafficking. … Moreover, the plaintiffs have not alleged a connection between the child pornography posted on Reddit and the revenue Reddit generates, other than the fact that Reddit makes money from advertising on all popular subreddits. …As such, the plaintiffs have failed to state a claim that Reddit violated 18 U.S.C. § 1591.

*Id.* at 1145-46.  *See also G.G. v. Salesforce.com, Inc.*, 2022 U.S. Dist LEXIS 87616, *28-29 (N. D. Ill. 2022)("In other words, must Plaintiffs show that Salesforce's own actions violated § 1591, or is it enough that someone (here, Backpage or G.G.'s trafficker) committed the § 1591 violation underlying the claim? … For the reasons discussed below, the Court agrees with those which find that, by the plain language of the statute, § 230(e)(5)(A) exempts claims brought under § 1595 only in circumstances in which the defendant's conduct constitutes a violation of § 1591.")

And, finally, as the Court in *G.G. v. Salesforce.com, Inc.* held, it is not sufficient to allege that a website knew generally that its site had been used by sex traffickers, it had to know specifically that the Plaintiffs were being trafficked:

> Section 1595 requires that the venture engage in an act in violation of § 1591, which requires knowledge **as to a specific victim**. …Accordingly, a claim under § 1595 requires that "the defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated [§ 1591] **as to the plaintiff**."

*Id.* at *42-43 (emphasis in original).

As these cases make clear, Plaintiffs have failed to allege facts that would take the case outside of the immunity offered by Section 230.

## **CONCLUSION**

For the reasons stated hereinabove and in Defendants' opening memoranda of law, Plaintiffs' Fifth Amended Complaint should be dismissed in its entirety with respect to Wisebits IP, Ltd.; Widebits, Ltd.; and TrafficStars, Ltd, as well as the other Hammy-related defendants.

Respectfully Submitted,

/s/ Hannah Rogers Metcalfe
Hannah Rogers Metcalfe, Fed ID. 9943
Metcalfe & Atkinson, LLC
1395 South Church Street

Greenville, South Carolina 29605
(864) 214-2319

Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Valentin D. Gurvits (*pro hac vice*)
Frank Scardino (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com

*Attorneys for Defendant Trafficstars, Ltd.*

March 10, 2023
Greenville, South Carolina