# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# SPARTANBURG DIVISION

| | |
|---|---|
| JANE DOES 1-9,<br><br>               Plaintiffs,<br><br>vs.<br><br>COLLINS MURPHY, SHARON HAMMONDS, BRENDA F. WATKINS, LIMESTONE UNIVERSITY, MG FREESITES, LTD., d/b/a PORNHUB.COM, MG FREESITES II LTD., MINDGEEK S.A.R.L., MINDGEEK USA, INC., MG BILLING LTD., and HAMMY MEDIA LTD. d/b/a XHAMSTER.COM, TRAFFICSTARS LTD., WISEBITS LTD, XHAMSTER IP HOLDINGS LTD, WISEBITS IP LTD.,<br><br>               Defendants. | Case No.: 7:20-cv-00947 |
| JANE DOE,<br><br>               Plaintiff,<br><br>vs.<br><br>LIMESTONE UNIVERSITY F/K/A LIMESTONE COLLEGE, COLLINS MURPHY, MG FREESITES, LTD., d/b/a PORNHUB.COM, and HAMMY MEDIA, LTD. d/b/a XHAMSTER.COM,<br><br>               Defendants. | Case No.: 7:21-cv-03193 |

**WISEBITS IP, LTD.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO RECONVENE RULE 30(B)(6) DEPOSITION OF DEFENDANT WISEBITS, IP, LTD., TO COMPEL TESTIMONY, AND TO IMPOSE SANCTIONS**

*"Judges are not like pigs, hunting for truffles buried in briefs."*

- *Teague v. Bakker*, 35 F.3d 978, 985 n.5 (4th Cir. 1994)

## INTRODUCTION

The present motion is, in essence, the mirror image of Wisebits IP, Ltd.'s ("Wisebits" or "Wisebits IP") Motion for Protective Order. After Wisebits moved for a protective order declaring the deposition of its Rule 30(b)(6) witness concluded, Plaintiffs opposed that motion and, at the same time, filed the present motion, seeking, *inter alia*, the reopening of the 30(b)(6) deposition. As such, the vast majority of the arguments made overlap. In the interest of sparing the Court having to read the same arguments over and over again, Wisebits attempts in this Opposition – to the extent feasible – to avoid repeating arguments presented in its Memorandum of Law in support of its Motion for Protective Order as well as its Reply in support of that motion, which Wisebits incorporates by reference herein. Instead, Wisebits focuses in this Opposition on arguments raised for the first time in Plaintiffs' Motion.

With all that being said, Plaintiffs' Motion is dizzying to say the least. Plaintiffs claim that Wisebits' 30(b)(6) witness, Constantinos Christoforou ("Mr. Christoforou"), refused to answer approximately 100 questions during the course of his deposition. Plaintiffs claim that, because of page limitations, discussing each of the 100 questions would not be feasible, directing the Court instead to the deposition transcript, where they say "all 100 questions… are redlined on Pls. Ex. 3 and are covered by this motion to compel." And, while it is true that *some* questions are redlined on Plaintiff's Exhibit 3, others are mysteriously highlighted (though seemingly counting towards the questions that Plaintiffs believe "are covered by this motion to compel.") If this were not confusing enough, portions of discussions between counsel that are not questions at all are highlighted and, in some instances, answers to questions (but not the questions themselves) are

either redlined or highlighted without any apparent governing rationale.  In short, Plaintiffs ask this Court (and Wisebits) to go on precisely the type of truffle hunt in which courts frequently decline to engage.

Before turning to the specifics of the questions at issue, it is important to address Plaintiffs' repeated assertion that Wisebits' 30(b)(6) witness refused to answer 100 questions during the deposition.  First, a quick search of the transcript reveals that the witness was asked a total of 556 questions.  By Plaintiffs' own lights, then (and before delving deeper into the questions), the witness answered some 456 questions, or more than 82% of the questions posed.  Thus, when Plaintiffs claim that a deposition in which 82% of their questions were answered "nearly worthless" and a "largely fruitless inquiry" (Plaintiffs' Motion, pp. 2, 16), the Court might rightly ask why Plaintiffs were asking so many questions that were "worthless" to their claims.  Certainly, Wisebits wondered the same during the deposition.

Regardless, as the Court can see by even the most cursory review of the transcript, the "approximately 100" number is both wildly inflated and wildly misleading.  First, this number counts each time that Plaintiffs asked the witness the same question.  So, for example, Plaintiffs counsel asked the witness no less than seven different times to name the companies – *other than Wisebits IP* – for which he serves (or has served) as a director.  Tr. p. 24 (li. 6-22); Tr. pp. 90-91 (li. 12-3).  Plaintiff counted each of those instances as another "refusal" to answer a question.

Moreover, with respect to questions Plaintiffs have redlined and highlighted, the vast majority fall into one or more of three categories:

1. Questions improperly seeking information not actually within the company's knowledge.  Such questions generally either asked Wisebits' 30(b)(6) witness – a resident of Cyprus who could not be deposed individually – to (a) answer questions in his personal capacity based on his personal (non-Wisebits) knowledge, or (b) answer questions on behalf of other corporate entities who have not designated Mr. Christoforou as their witness, during Wisebits' deposition.  By Wisebits' count,

3

   approximately 51 of the questions marked by Plaintiffs fall into this category. As Mr. Christoforou states in his declaration, filed contemporaneously with this Opposition, with respect to those questions, he did not answer because the information was not within the Company's knowledge.

2. Questions where, although the witness might have stated that he should not have to answer, he actually did answer the question posed. By Wisebits' count, approximately 27 of the questions marked by Plaintiffs fall into this category. As Mr. Christoforou states in his declaration, he provided answers to each of these questions (even if he did not believe he should have to.)

3. Questions not only outside the scope of the 30(b)(6) notice, but also unrelated to Plaintiffs' actual claims and allegations in this case (as opposed to the case that Plaintiff is trying to mount against the industry as a whole).

All told and, again, this becomes obvious once one spends even a little time reading the deposition transcript, Plaintiffs attempted to use Wisebits' 30(b)(6) deposition for wholly improper and impermissible purposes, crying foul when its actions are brought to the Court's attention.

## ARGUMENT

### I.     Plaintiffs' Attempts To Question Wisebits' Corporate Representative About Information Outside Wisebits' Knowledge Is Simply Improper.

As discussed in Wisebits' Memorandum and Reply, Plaintiffs repeatedly attempted to utilize the deposition of Wisebits's 30(b)(6) witness to ask questions that were outside of Wisebits' knowledge. With respect to some of these questions, Plaintiffs claim that the witness should have to answer because he knew the information in his personal capacity (for example, names of the non-Wisebits companies for which his separate, private company, Global HR Solutions, provided services). With respect to others, Plaintiffs claim that, somehow, Wisebits' 30(b)(6) witness should have to answer questions about other corporate entities (both parties and non-parties) and the terms of agreements those other entities entered into, despite Wisebits not being a party thereto. Plaintiffs' argument appears to be that, since Wisebits might conceivably be able to gather information about these other corporate entities (and their contracts), that Rule 30(b)(6) obligates

4

them to do so. None of these arguments make sense and none comport with the purpose of Rule 30(b)(6). *See, e.g. Va. Dep't of Corr. v. Jordan,* 921 F.3d 180, 193 (4th Cir. 2019)("Rule 30(b)(6) deponents testify on behalf of entities, not themselves, and often do so based on careful advance preparation, not personal knowledge"); *Abu-Eid v. Discover Prods.,* 589 F. Supp. 3d 555, 560 (E.D. Va. 2022)("Plaintiff's argument fails, as plaintiff ignores the fact that a Rule 30(b)(6) witness testifies not on the basis of personal knowledge about a particular event but rather testifies as to a corporation's general polices, practices, and procedures. In this respect, the Fourth Circuit has instructed that 'Rule 30(b)(6) deponents testify on behalf of entities, not themselves, and often do so based on careful advance preparation, not personal knowledge.' …In sum, as a Rule 30(b)(6) designee, Sanchez was not testifying to his personal knowledge of a particular event, but instead was testifying on behalf of Discover as to Discover's general policies and procedures.")

    **II.**    **Plaintiffs Have Identified Questions That the Witness Answered As Questions That He Would Not Answer.**

Further inflating Plaintiffs' claims that the witness refused to answer questions is their identifying (though redlining and highlighting) questions that the witness, in fact, did answer (although sometimes adding that he would not answer additional questions about the subject). A full list of those questions (and the witness' answers) are attached to Mr. Christoforou's Declaration as Exhibit B. As an example, a sampling of those questions identified by Plaintiffs include:

    Q    What is -- what is an intangible asset?
    A    An intangible asset is an asset that doesn't -- that you cannot touch. It's what we call intellectual property. It doesn't say that -- I'm not here to explain the financial statements, accounting statements, financial accounting issues, comments on accounts. I am here to give the general how Wisebits IP generates its income. It's clear from the financial statements that we did -- that you have already how it gets it, one line, one source of income, royalty. Amortization is the way to distribute the expense over the years, the use of the amortize of the intangible assets.

Tr. pp. 44-45 li. 23-12.

\*\*\*

Q    Are you designated as the director in paragraph 2 of Wisebits Ad Net Limited?
A    At the time of the signature I was director, yes, the company Wisebits Ad Net, Bodo Project Management. This document does not include Wisebits IP, and I will not answer any more questions about it.

Tr. p. 55 li. 4-10

\*\*\*

[Q]    Are you aware of any of the CDN servers --
A    No, I am not.
Q    -- that has been used from 2019 to the present?
A    Sorry to interrupt you. I am not aware.
Q    Are you aware of -- of any CDN servers that were used prior to -- to 2019?
A    Wisebits IP does not hire servers for CDN or anything technical, anything that has to do with xHamster.com. And I don't know.

Tr. p. 93 li. 7-15.

In total, more than 30 questions identified by Plaintiffs as being questions that the witness "refused to answer" are, in actuality, questions that the witness did answer.

### III.    Plaintiffs Are Playing a Game of Bait-and-Switch With The Court.

In their Memorandum, Plaintiffs state that the supposed 100 questions that the witness allegedly failed to answer fall within "five primary categories of questions." Plaintiffs' Memorandum, p. 11. And, while Plaintiffs go on to identify these "five primary categories," in actuality, very few of the questions about which Plaintiffs complain fall within those categories. Glossing over this fact, Plaintiffs then ask the Court to reconvene the 30(b)(6) deposition and require the witness to answer all of the questions identified by Plaintiffs in the transcript by redline or highlighting. By doing so, Plaintiffs articulate their arguments about only a tiny subset of questions, while asking the Court to compel responses to all of the highlighted and redlined

6

questions, without having any argument as to why they are entitled to ask the majority of the questions so identified. Even with respect to this very limited subset of questions, however, Plaintiffs are largely misguided.

1.      **Questions Concerning the Source of the Witness' Compensation as Director of Wisebits IP**: Plaintiffs asked the witness the source of his compensation for serving as the director of Wisebits IP, Ltd. Mr. Christoforou declined to answer this question. Plaintiffs argue that, if Mr. Christoforou was paid by a related entity, this fact might have some relevance to their "alter ego" argument and, as such, should be answered. Here, Plaintiffs have at least a colorable argument that the information sought could lead to the discovery of admissible evidence. The answer to this inquiry, however, is that Mr. Christoforou's compensation was paid by Wisebits IP, Ltd. As Mr. Christoforou states in his accompanying Declaration:

> During the course of the deposition, I was asked the source of my compensation for serving as the Director of Wisebits IP, Ltd., a question that I declined to answer. The bottom line answer to this question is that I was compensated by Wisebits IP, Ltd. The compensation was paid to me pursuant to a consulting agreement that I had with Wisebits IP, Ltd. The contract was between Wisebits IP, Ltd. and a consulting company that I own and operate. I did not (and do not) want to make the name of that consulting company public because I do not want it to be publicly connected to adult content. Companies (and individuals) connected to the adult entertainment industry are often targeted for threats and violence and I do not want to risk that kind of exposure. I do not believe that the name of my consulting company is relevant to the Plaintiffs' claims. Had I thought about it at the time, I would have simply testified to the fact that my compensation came from Wisebits IP, Ltd., as I have in this affidavit.

Christoforou Declaration, ¶10.

2.      **Questions Concerning Financial Statements**: As was discussed in Wisebits' Memorandum and Reply, Plaintiffs attempted to transform Wisebits IP's 30(b)(6) witness into an accounting expert witness, asking him questions about why the Company's outside auditors issued a qualified opinion on some audited financial statements and an unqualified opinion on others. Or, they would ask him to explain accounting terms and why certain amounts were amortized in the

financial statements. As just one example, the following exchanges took place during the deposition:

> Q   What are the different -- remember I asked you about the word "opinion," you see the word "opinion" there in the title, and then the bases for the opinion below that, what are the different types of --
> A   No.
> Q   -- opinions released by auditors?
> A   I will not answer that.

Tr. p. 41, li. 16-23.

\*\*\*

> Q   On the line that says "amortization of intangible assets, ▆▆▆▆," why is that a negative number?
> A   I will not answer.
> Q   Did Wisebits IP Limited turn a profit for this year, this -- this year that's --
> A   No.
> Q   -- listed in the report?
> A   No, it's a loss.
> Q   Why won't you -- why did you not answer the -- the first question about why the amortization amount is a negative number?
> A   Because we did not agree to go through the financial statements. And this goes on and on. The more questions I answer, the more questions I get. We will never finish. I don't see how this is related. I explained what is amortization already.

Tr. p. 48, li. 7-23

As the Court can see, when the question was within the realm of questions for a corporate representative – for example, whether the company showed a profit in a given year – Mr. Christoforou answered the question (even if it wasn't remotely relevant to Plaintiffs' claims). It was only where Plaintiffs attempted to turn Mr. Christoforou into their accounting expert that Mr. Christoforou declined to answer the questions posed.

Moreover, Plaintiffs claim that they need additional discovery from Wisebits IP concerning its financial statements because this is "relevant to the substantive claims to enable the Plaintiffs to determine if revenues from the pornographic website are paid to Wisebits IP," (Plaintiffs' Memorandum, p. 13) is misleading at best. First, the questions posed (such as the ones listed

above) have nothing to do with this claimed need to track revenues. Even if that were not the case, the issue is wholly irrelevant to the Plaintiffs' claims. But, perhaps most importantly, to the extent that Plaintiffs actually needed to know the source of Wisebits IP's revenues, the witness testified to that specifically, repeatedly, and completely:

> Q   According to this report, [Wisebits IP's financial statement] is royalty income the sole form of income for Wisebits IP Limited?
> A   Yes.
> Q   Are you aware of any other form of income that would have applied in 2016 at the time of this report?
> A   No other income.

Tr. p. 44, li. 3-8

\*\*\*

> Q   Are you aware of what the sources of revenue were for the royalties that were referred to in this report?
> A   Yes.
> Q   Who paid the royalties?
> A   The licensee paid the royalty.
> Q   Was there more than one licensee?
> A   No, it was only one licensee.
> Q   Who is the licensee?
> A   A company called Wisebits Ad Net.
> Q   Would you say that name just one more time?
> A   Wisebits Ad Net.
> Q   Wisebits Ad Net?
> A   You want me to spell it?

\*\*\*

Tr. pp. 49-50, li. 21-9.

> Q   Are any -- has -- have any of these three companies that are listed here, Hammy Media Limited, Wisebits Ad Net Limited or Bodo Project Management Limited, have any of them ever given revenue to Wisebits IP?
> A   Wisebits Ad Net as I said, yes.
> Q   And the revenue is for royalties, right?
> A   Yes, for the usage of intellectual property, trademark.
> Q   And that agreement for the royalties and the use of the trademark was entered in 2015, right?
> A   Yes.

9

Tr. p. 55, li. 11-22.

\*\*\*

Q       What is the top line revenue for Wisebits IP in -- in 2020?
A       Revenue, ▮
Q       Thank you. Do you know how much of that is -- is royalty income?
A       All of it, a hundred percent.

Tr. p. 66, li. 18-24
\*\*\*

Q       Does the amount of royalties change over time, does it -- does it -- is it tied to a market or is it static?
A       No, it's a percentage of the revenue.
Q       Percentage of what revenue?
A       Of the revenue that is derived from the usage of the trademark.
Q       How is that revenue calculated?
A       It was calculated by the licensor – the licensee, sorry. By the licensee.
Q       When -- so when the -- the marks are used and they are successful in getting more business, the amount of royalty would go up, right?
MR. GURVITS: Objection.
A       Yes, it was the responsibility of the licensee to utilize the -- the trademarks.
Q       What about the -- the cost of the software, how was that calculated?
A       Sorry, what is the question? What do you --
Q       We're talking.
A       Sorry, I understand. There is no software agreement. It is just a percentage of the revenues derived. No separate agreement for the software. It is one licensing agreement for the intellectual property and a percentage of the revenues. That's it.
Q       Okay. One percentage for both?
A       Yes. Yes, for everything.

Tr. pp. 111-112, li. 19-20

As the Court can see, far from being evasive or failing to answer questions concerning Wisebits IP's revenue sources, Wisebits' witness provided comprehensive testimony on the topic. So, when Plaintiffs claim that they need Wisebits' corporate representative to answer additional questions about the financial statements (without actually showing the Court the questions the witness did and did not answer), they are being disingenuous at best.

3. **Questions Concerning the Name of the Shareholder of Wisebits IP:** The only other category of information within the company's knowledge that the witness *originally* declined to answer (other than the source of his compensation, now provided) was the name of the Cyprus corporation that is the current sole shareholder of Wisebits, Ltd. Specifically, at his deposition, the witness first testified that, during the relevant timeframe of 2019-2020, the sole shareholder was xHamster IP Ltd. And, although Mr. Christoforou did initially say that he would not provide the name of the new sole shareholder, in actuality he did, testifying that Wisebits IP Ltd. became a wholly owned subsidiary of Wisebits, Ltd. Tr., p. 74. As Mr. Christoforou states in his accompanying affidavit, Wisebits Ltd. changed its name and, as such, the name of Wisebits' IP, Ltd.'s current shareholder is IT Masterland Ltd. (formerly Wisebits Ltd.) In other words, although Plaintiffs claimed that Mr. Christoforou refused to answer this question during his deposition, he actually did so.

4. **Questions Concerning the Use of CDN Servers:** Plaintiffs next complain that Wisebits' 30(b)(6) witness would not or could not answer questions concerning the use of CDN servers for the xHamster.com website. This is not remotely surprising since Wisebits did not operate the website, had nothing to do with the use of CDN servers, and had no information available to it on the topic. This issue is addressed more fully in Wisebits' Memorandum and Reply in Support of its Motion for Protective Order but to briefly remind the Court what that exchange entailed, it included the following:

>        Q:    What is – what is a CDN server?
>        A:    I have no idea. And it's not a document of Wisebits IP, I will not comment anything on it.
>
> …    Q:    …Are you aware of any of the CDN servers –
>        A:    No, I am not.
>        Q:    -- that has been used from 2019 to the present?
>        A:    Sorry to interrupt you. I am not aware.

> Q: Are you aware of – of any CDN servers that were used prior to – to 2019?
> A: Wisebits IP does not hire servers for CDN or anything technical, anything that has to do with xHamster.com. And I don't know.
> Q: When I asked you a question about this, you said that you would refuse – you're refusing to answer any questions about this, but your attorney is saying that Wisebits IP will provide a witness to testify as to the location of all CDN and cache servers, right; that's what it says, right?
>
> MR. GURVITS: It does not say that. It says to the extent that information is available, and he just testified he doesn't have any of that information and neither does the company. Literally, he just told you there was no information. Why would you mischaracterize it like that, his response.
>
> BY MR. GENTALA:
> Q: The – is there any information available responsive to this category, Mr. Christoforou?
> A: No. And as I said, Wisebits IP does not recruit servers of CDN. And even if I testified about the other company, I still wouldn't know. I'm not technical, I don't…
>
> MR. GENTALA: Let's go back to Tab 12.
> BY MR. GENTALA:
> Q: Do you know if this document covers the provision of CDN servers?
> A: I don't know.

Tr. pp. 91-94, li. 24-15.

Plaintiffs' continued insistence that Wisebits' 30(b)(6) witness was required to be prepared to testify about information that Wisebits does not possess misapprehends the purpose and scope of Rule 30(b)(6) entirely.

**5.     Questions Concerning TrafficStars' Alleged Use of Intellectual Property Licensed By Wisebits IP**: Finally, Plaintiffs complain that Wisebits' witness failed to answer questions concerning TrafficStars' purported use of intellectual property licensed by Wisebits IP. This is not entirely accurate. As discussed above, Mr. Christoforou testified that Wisebits IP had a single licensing agreement for the intellectual property with Wisebits Ad Net Ltd. as the licensee. When asked if TrafficStars "used" any of the license of intellectual property, Mr. Christoforou testified that this was not information that Wisebits IP possessed and then declined to answer the question in his personal capacity:

12

| | |
|---|---|
| Q | Is any of the license by Wisebits IP Limited used by Traffic Stars Limited? |
| A | This is not something that Wisebits IP would know. It's the business of the licensee. |
| Q | Are you personally aware if Traffic Stars Limited uses the IP that is licensed by Wisebits IP? |
| A | I am not here to answer that question. |
| Q | Are you refusing to answer that question? |
| A | Yes. |

Tr. pp. 106-107, li. 19-3.

## CONCLUSION

As should be evident at this point, there is a reason why Plaintiffs have attempted to send the Court on a truffle hunt, as opposed to simply presenting the Court with a simple, straightforward presentation of questions they claim the witness improperly failed to answer: far from the 100+ questions claimed, Wisebits' witness really only failed to answer one question that was within the company's knowledge, which question has now been answered.

Ultimately, Wisebits presented a witness who was properly prepared to answer questions within the company's knowledge and who did so. Accordingly, Wisebits' motion for a protective order declaring the deposition concluded should be allowed; Plaintiffs' counter-motion to reconvene the deposition should be denied; and Plaintiffs' request for sanctions should be summarily brushed aside as the frivolous argument that it is.

Respectfully Submitted,

/s/ Hannah Rogers Metcalfe
Hannah Rogers Metcalfe, Fed ID. 9943
Metcalfe & Atkinson, LLC
1395 South Church Street
Greenville, South Carolina 29605
(864) 214-2319

Evan Fray-Witzer (*pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116

        Telephone: 617-426-0000
        Facsimile: 617-423-4855
        Evan@CFWLegal.com

        Valentin D. Gurvits (*pro hac vice*)
        Frank Scardino (*pro hac vice*)
        BOSTON LAW GROUP, PC
        825 Beacon Street, Suite 20
        Newton Centre, Massachusetts 02459
        Telephone: 617-928-1804
        Facsimile: 617-928-1802
        vgurvits@bostonlawgroup.com
        frank@bostonlawgroup.com

        *Attorneys for Wisebits IP, Ltd.*

March 27, 2024
Greenville, South Carolina