**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| JANE DOES 1-9,<br><br>          Plaintiffs,<br><br>     v.<br><br>COLLINS MURPHY, et al.,<br><br>          Defendants. | CASE NO. 7:20-CV-00947-DCC |
| JANE DOE,<br><br>          Plaintiff,<br><br>     v.<br><br>LIMESTONE UNIVERSITY, et al.,<br><br>          Defendants. | CASE NO. 7:21-CV-03193-DCC |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS MG
FREESITES LTD AND MINDGEEK S.À R.L. FOR SUMMARY JUDGMENT**

## INTRODUCTION

This lawsuit arises from the surreptitious video recording of ten college athletes ("Plaintiffs") while they were showering and changing their clothes in a locker room at Limestone College. It is undisputed that the videos at issue ("Videos") were created by Defendant Collins Murphy in 2012 and 2013 and posted to the adult entertainment website Pornhub.com ("Pornhub Website") by third-party users in 2019—all without Plaintiffs' knowledge or consent, and in violation of the Pornhub Website's terms of service. Defendants MG Freesites Ltd and MindGeek S.à r.l.—the operator of the Pornhub Website and its parent company (together, the "MindGeek Defendants")—had no involvement in the creation or posting of the Videos and acted immediately to remove them from the Pornhub Website. After years of discovery, it is now manifestly clear that Plaintiffs cannot prevail on any of their claims against the MindGeek Defendants, as a matter of law, and thus the MindGeek Defendants are entitled to judgment in their favor.

*First*, the MindGeek Defendants are immune from liability under Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), which immunizes an interactive computer service against any claim that seeks to treat it "as the publisher or speaker of any information provided by another information content provider." Section 230(c)(1). All of Plaintiffs' claims accuse the MindGeek Defendants of allowing third-party content providers to post the Videos at issue on the Pornhub Website. This is the quintessential function of a "publisher" under Section 230, and Plaintiffs cannot show the narrow "FOSTA" exception applies.

*Second*, even if they did not have statutory immunity, the MindGeek Defendants still are entitled to judgment in their favor because all of Plaintiffs' claims independently fail on the merits. After multiple amendments and motions to dismiss, five claims remain against the MindGeek Defendants: (1) sex trafficking in violation of the Trafficking Victims Protection Reauthorization

Act, 18 U.S.C. § 1595 ("TVPRA"); (2) racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"); (3) negligent monitoring; (4) false light; and (5) civil conspiracy. Plaintiffs have not and cannot establish elements that are essential to each of these claims. In fact, one of Plaintiffs' claims—for false light—does not even exist under South Carolina law.

Accordingly, and as discussed more fully below, the Court should grant the MindGeek Defendants' Motion for Summary Judgment in its entirety and enter judgment in their favor.

## I.    STATEMENT OF UNDISPUTED FACTS.

### A.    The MindGeek Defendants and the Pornhub Website.

In 2019,[1] Defendant MG Freesites Ltd operated a portfolio of websites that hosted adult-oriented content (*e.g.*, videos), including the popular content-sharing platform Pornhub.com. *See* Declaration of Andreas Andreou ("Andreou Decl.") ¶ 5. Defendant MindGeek S.à r.l. was the corporate parent of MG Freesites Ltd and various other entities. *Id.* ¶ 12.[2]

The Pornhub Website hosted user-uploaded adult-oriented content. *See* Declaration of Andreas Ignatiou ("Ignatiou Decl.") ¶ 5. Subject to their compliance with certain requirements, any member of the public could upload content to the Pornhub Website for others to view. *Id.* ¶ 6. In this respect, the Pornhub Website was similar to platforms such as YouTube and Twitter—*i.e.*, "People from around the world can sign up for the platforms and start posting content on them, free of charge and without much (if any) advance screening by defendants. Once on the platforms, users can upload messages, videos, and other types of content, which others on the platform can

---

[1] The time period most relevant to this lawsuit is 2019, which, as discussed *supra*, is the year in which the Videos at issue were uploaded to, displayed on, and removed from the Pornhub Website.

[2] After this lawsuit was filed, the "MindGeek" group of companies rebranded as "Aylo." *Id.* ¶ 2. To avoid confusion, the MindGeek Defendants will continue to use "MindGeek" herein.

then view, respond to, and share." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 480 (2023).[3]  In 2019

alone, users uploaded over *6 million* videos to the Pornhub Website.  *See* Ignatiou Decl. ¶ 5.

## B.  The Upload and Monetization of User-Uploaded Content.

In 2019, to upload content to the Pornhub Website, members of the public had to create an

account with the Pornhub Website and agree to the Terms of Service ("TOS").  *Id.* ¶ 7, Ex. A .

Users completed this process online via the Pornhub Website, without communicating with any

representative of the MindGeek Defendants.  *Id.*  Pursuant to the TOS, users acknowledged and

agreed that "[they] own[ed] or ha[d] the necessary licenses, rights, consents, and permissions to

publish [c]ontent [they] submit[ted] [to the Pornhub Website]."  *Id.* ¶ 8, Ex. A at 7.  The TOS also

expressly prohibited the upload of content that "violate[d] any law (including without limitation

laws related to torts, contracts, patents, trademarks, trade secrets, copyrights, defamation,

obscenity, pornography, rights of publicity or other rights) or encourage[d] or provide[d]

instructions to another to do so;" content "for which [the user had] not maintained written

documentation sufficient to confirm that all subjects of [its] posts [were], in fact, over 18 years of

age (or older in any other location in which 18 [was] not the minimum age of majority);" and

content that was "obscene, illegal, unlawful, defamatory, libelous, harassing, hateful, racially or

ethnically offensive, or encourage[d] conduct that would be considered a criminal offense, [gave]

rise to civil liability, violate[d] any law, or [was] otherwise inappropriate."  *Id.* ¶ 8, Ex. A at 11.

Amateur content creators participating in the MindGeek Defendants' "Model Payment

Program" ("MPP") (sometimes referred to as "Model Program" or "Modelhub Program") could

monetize their content on the Pornhub Website.  *See* Ignatiou Decl. ¶ 9.  The MPP was a feature

---

[3] The Pornhub Website differs from the social media platforms described in *Taamneh* in other respects.  As discussed *infra*, the MindGeek Defendants conduct a robust advance screening.

of the Pornhub Website that enabled amateur content creators to upload and monetize content. *Id.* In 2019, in order to participate in the MPP, members of the public not only had to create an account with the Pornhub Website and agree to the TOS, but also were required to submit two forms of identification via the Pornhub Website for verification purposes. *Id.* ¶ 10. In 2019, there were approximately 115,000 participants in the MPP. *Id.* Participants in the MPP were eligible to receive a portion of the advertising revenue generated in connection with their content, but would not be paid unless the amount payable exceeded a $100 threshold. *Id.* ¶ 11. The MindGeek Defendants also regularly performed audits prior to making the initial payment to confirm that the user possessed consent documentation for all of the performers appearing in their content and otherwise was in compliance with the MPP's requirements. *Id.*

Subject to the foregoing requirements and restrictions, users (whether in the MPP or not) decided what content to upload to the Pornhub Website. *Id.* ¶ 12. Apart from providing a platform, the MindGeek Defendants played no role in the upload of users' content. As part of the upload process, users had to select one or more relevant "categories" from a pre-set list, and create "tags" and "titles" for their content. *Id.* ¶¶ 13-17.[4] The purpose of these items was to catalog and organize the content, and help ensure that a user browsing or searching for a particular type of content was able to find what they were looking for (to the extent that it existed). *Id.* ¶ 13; *accord* Declaration of Marc E. Mayer,[5] Ex. A (Transcript of Deposition of Ramsey Belmaaza ("Belmaaza Tr.")) at 62:18-63:1. In an effort to avoid the upload of potentially noncompliant content, the MindGeek Defendants maintained a list of "banned words." *See* Ignatiou Decl. ¶ 16. Any title or tag containing a "banned word" was automatically rejected. *Id.* ¶¶ 15, 17. Also during the upload

---

[4] In rare instances, tags were automatically populated based on the users' selected category. For example, if the user selected the category "POV," the tag "Point of View" would apply. *Id.* ¶ 15.

[5] The exhibits to this Declaration are cited herein as "Mayer Ex. A," "Mayer Ex. B.," etc.

process, users had to upload their own custom "thumbnails" or select from automatically-generated thumbnails, which were displayed for preview purposes on the Pornhub Website. *Id.* ¶ 18.

### C.    <u>Moderation of User-Uploaded Content.</u>

Once users uploaded their content and provided the requisite items (*i.e.*, categories, tags, title, thumbnails), the MindGeek Defendants used a combination of human reviewers and automated tools to moderate the content. *Id.* ¶¶ 19-21. Every piece of user-uploaded content was reviewed by at least one moderator before it went "live" on the Pornhub Website. *Id.* ¶ 22. The moderators were extensively trained to identify—and reject—any content that may have been illegal or otherwise violated the TOS, including nonconsensual content. *Id.* ¶¶ 23-25. The MindGeek Defendants also deployed a robust suite of tools designed to automatically detect and prevent the publication (and re-publication) of potentially noncompliant content. *Id.* ¶ 27.

Assuming the user-uploaded content was not rejected during the moderation process, it quickly went "live" on the Pornhub Website. *Id.* ¶ 28. As an additional layer of quality control, the MindGeek Defendants had various policies and procedures to ensure the prompt detection and removal of any noncompliant content that was inadvertently published on the Pornhub Website. *Id.* For example, the MindGeek Defendants audited recently-posted content. *Id.* ¶ 29. The MindGeek Defendants also had a "flagging" system and a robust "notice-and-takedown" system, which enabled any member of the public to report and/or request removal of potentially illegal or noncompliant content on the Pornhub Website. *Id.* ¶¶ 30-31. Any reported content that was found to be potentially noncompliant was permanently removed from the Pornhub Website. *Id.* ¶ 31.

### D.    <u>Plaintiffs and the Videos at Issue.</u>

Plaintiffs in this action are ten women who allege to have been surreptitiously recorded over a decade ago in a locker room at Limestone College. *See* Dkt. No. 193 ("Fifth Amended

Complaint" or "5AC");[6] IUP Dkt. No. 91 ("IUP Compl.").  Nine of the Plaintiffs (*i.e.*, in the 2020 action) ("Bellarmine Plaintiffs") were student-athletes at Bellarmine University who visited Limestone College on or about October 5, 2012.  *See* 5AC ¶ 72.  The tenth Plaintiff (*i.e.*, in the 2021 action) ("IUP Plaintiff") was a student-athlete at Indiana University of Pennsylvania who visited Limestone College on or about September 8, 2013.  *See* IUP Compl. ¶ 67.[7]  All of the Plaintiffs were adults at the time of the alleged incidents.  *See* Mayer Decl., Exs. B-C.  In the Videos, Plaintiffs are shown in various states of undress while engaged in ordinary post-game locker room activities (*e.g.*, changing clothes).  *See* Mayer Exs. D-F.  None of the Videos depict Plaintiffs engaging in any sexual activity.  *See id.*; *see also* JD1 Tr. at 100:11-18; JD2 Tr. at 129:5-18; JD3 Tr. at 118:12-19; JD4 Tr. at 197:17-198:22; JD5 Tr. at 189:23-190:5; JD6 Tr. at 185:3-11; JD7 Tr. at 224:15-22; JD8 Tr. at 110:23-111:6; JD9 Tr. at 157:17-24; IUP Tr. at 30:13-20.[8]

The Videos allegedly were recorded by Defendant Collins Murphy ("Murphy"), a former employee of Defendant Limestone College.  *See* 5AC ¶ 78.  Murphy has not denied the allegation, but has asserted his Fifth Amendment right against self-incrimination and refused to testify.  *See* Mayer Ex. Q (Transcript of Deposition of Collins Murphy ("Murphy Tr.")) at 77:18-78:10.  Murphy never has been investigated for, or charged with, sex trafficking.  *See* Mayer Ex. R (report from Gaffney Police Department, describing matter as involving "peeping tom").

The MindGeek Defendants had no role in the creation of the Videos nor any connection to

---

[6] All "Dkt. No." citations herein refer to the docket in *Jane Does 1-9 v. Collins Murphy, et al.*, Case No. 7:20-CV-00947-DCC (D.S.C.).  All "IUP Dkt. No." citations refer to the docket in *Jane Doe v. Limestone Univ., et al.*, Case No. 7:21-CV-03193-DCC (D.S.C.).

[7] Although her pleading states the "fall of 2012," the IUP Plaintiff clarified at her deposition that she visited Limestone College on September 8, 2013.  *See* Mayer Ex. G ("IUP Tr.")) at 27:2-10.

[8] The transcripts of the Bellarmine Plaintiffs' depositions are attached as Exhibits H-P to the accompanying Declaration of Marc Mayer, and cited herein as "JD1 Tr.," "JD2 Tr.," etc.  As noted *supra*, the IUP Plaintiff's deposition transcript is attached as Exhibit G and cited as "IUP Tr."

Murphy.  *See* Ignatiou Decl. ¶¶ 34-35.  Prior to this lawsuit, the MindGeek Defendants did not have any knowledge of Murphy nor any reason to know that Murphy (or anyone else) had hidden a camera in a locker room at Limestone College.  *Id.* ¶¶ 34-35.

### E.    Third Parties Uploaded the Videos to the Pornhub Website.

Approximately ***six years after the recordings were created***, the Videos—eight in total, each containing clips from the same recordings—were uploaded to the Pornhub Website by third-party users.  *See* Ignatiou Decl. ¶ 36, Ex. B.  Specifically, on August 8, 2019, the user account "CWDistribution" uploaded six Videos to the Pornhub Website.  *Id.*  On August 30, 2019 and September 4, 2019, the user account "LordFauger18" (together with CWDistribution, the "Uploaders") uploaded two more Videos.  *Id.*[9]

Apart from the fact that they uploaded content to the Pornhub Website (and thus had created accounts with the Website), the Uploaders had no relationship with the MindGeek Defendants.  *Id.* ¶¶ 38-39.  They were never employed by the MindGeek Defendants.  *Id.* ¶ 38. Nor did they ever communicate with the MindGeek Defendants.  *Id.*  Although LordFauger18 participated in the MPP, he never received payment from the MindGeek Defendants in connection with the Videos (or any other content).  *Id.* ¶ 39.

The Uploaders also had no connection to Murphy.  *See* Murphy Tr. at 79:16-21, 91:1-2, 93:16-94:13, 98:21-99:6, 99:18-100:3.  There is no evidence that they ever communicated with Murphy, much less that they obtained the Videos from him.  While the manner in which the Uploaders obtained the Videos is unknown, the Videos were available online for years before the Uploaders uploaded them to the Pornhub Website.  For example, by 2016, the Videos had been

---

[9] LordFauger18 is associated with an individual in Romania.  *Id.* ¶ 37.  The MindGeek Defendants do not have sufficient information to identify the individual associated with CWDistribution.  *Id.*

posted anonymously on the website "4chan." *See* Mayer Decl. ¶ 18, Ex. S. By 2019, the Videos appeared on more than a dozen other websites. *See id.*, Ex. G. None of these websites ever have been affiliated with the MindGeek Defendants. *See* Andreou Decl. ¶¶ 6-7.

At the time of upload, the Uploaders selected and/or created the categories, tags, and titles for the Videos—without any input from anyone at the MindGeek Defendants. *See* Ignatiou Decl. ¶ 40. The Uploaders' tags and titles did not contain any words on the MindGeek Defendants' "banned words" list in 2019. *Id.* ¶ 41. Nor any that were inherently unlawful or indicative of illegal content. *Id.*, Ex. B. In fact, adult entertainment studios commonly produced fake "voyeur" content, including content featuring professional, consenting adults pretending to be "caught" by a "hidden camera" in a private location. *Id.* ¶ 24. After conducting their standard, diligent, good-faith review of the Videos, the MindGeek Defendants' content moderation team concluded that the Videos complied with the TOS and they went "live" on the Pornhub Website. *Id.* ¶ 42.

### F. The MindGeek Defendants Received Notice and Promptly Removed the Videos.

On October 17, 2019, the MindGeek Defendants received a search warrant from the Gaffney Police Department regarding the six Videos uploaded by CWDistribution. Mayer Ex. U. The same day, the MindGeek Defendants removed the identified Videos from the Pornhub Website and removed CWDistribution's account. *See* Ignatiou Decl. ¶¶ 44-45, Ex. B. On October 21, 2019, the MindGeek Defendants received another search warrant, this time regarding the two Videos uploaded by LordFauger18. *See* Mayer Ex. V. The next day, the MindGeek Defendants removed both Videos and LordFauger18's account. *See* Ignatiou Decl. ¶¶ 44-45, Ex. B. Plaintiffs do not claim—nor have they proffered evidence—that any of the Videos appeared on the Pornhub Website (or any other website affiliated with the MindGeek Defendants) at any time thereafter.

### G.     **Procedural History.**

The Bellarmine Plaintiffs initiated this action on March 4, 2020.  *See generally* Dkt. No. 1.

On September 30, 2021, the IUP Plaintiff initiated a separate action.  *See* IUP Dkt. No. 1.  The two

actions have been consolidated for discovery and trial.  *See* Dkt. No. 269.

On June 3, 2022—after years of litigation, including multiple amended complaints (Dkt.

Nos. 5, 33, 60, 99) and motions to dismiss (Dkt. Nos. 46, 64, 70, 102, 104)—the Bellarmine

Plaintiffs filed the operative Fifth Amended Complaint (Dkt. No. 193), which for the first time

asserted a sex trafficking claim.  Specifically, the Fifth Amended Complaint asserts the following

claims against the MindGeek Defendants:[10]  (1) "violation of the [TVPRA];" (2) "conducting the

affairs of an enterprise through a pattern of racketeering activity" in violation of RICO; (3)

"negligent monitoring," (4) "false light;"; and (5) "civil conspiracy." On August 9, 2022, the IUP

Plaintiff filed the operative Third Amended Complaint (IUP Dkt. No. 1) with the same claims.[11]

On November 14, 2022, the MindGeek Defendants moved to dismiss Plaintiffs' claims

pursuant to Fed. R. Civ. P. 12(b)(6), asserting, among other things, that the MindGeek Defendants

were immune from liability under Section 230.  *See* Dkt. No. 233.  Although the Court denied the

motion, at the hearing on August 16, 2023, the Court "caution[ed] the [P]laintiffs … that there is

a very narrow path to navigate for [their] claims to ever get to a jury," because "it's pretty clear

from the case law that [the MindGeek Defendants] sit in a position of strength …. [and] have the

protections of [Section] 230."  Mayer Ex. W (Transcript of August 16, 2023 Hearing ("MTD

---

[10] The Bellarmine Plaintiffs' Fifth Amended Complaint named various other MindGeek-affiliated entities, but they were dismissed for lack of personal jurisdiction.

[11] On August 9, 2022, "National Center on Sexual Exploitation" ("NCOSE"), an anti-pornography group, appeared as additional counsel for Plaintiffs.  *See* Dkt. Nos. 209-212.  NCOSE has publicly touted its objective to "#DismantlePornhub," and also has advocated for repeal or "reform" of Section 230.  *See* https://endsexualexploitation.org/ (last visited Jan. 10, 2025).

Hearing Tr.")) at 62:2-4, 10-13.  Discovery has foreclosed that narrow path, leaving no doubt that Section 230 bars all of Plaintiffs' claims against the MindGeek Defendants as a matter of law.  For this reason and others discussed below, the MindGeek Defendants respectfully request that the Court grant their Motion for Summary Judgment in its entirety.

## II.     ALL OF PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT.

All of Plaintiffs' claims arise from the MindGeek Defendants' alleged publication of user-uploaded Videos to the Pornhub Website.  They are barred by Section 230 as a matter of law.

Section 230 immunizes websites from civil liability for user-uploaded content.  *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.").  It states "[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  As the Fourth Circuit has explained:

> [Section] 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone[,] or alter content—are banned.

*Zeran*, 129 F.3d at 330; *see, e.g.*, *id.* at 328 (affirming dismissal of claims against website, because Section 230 "plainly immunizes computer service providers [] from liability for information that originates with third parties"); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (same, because Section 230 prohibits "holding interactive computer service providers legally responsible for information created and developed by third parties").

"[C]ircuit courts have been in general agreement that the text of Section 230 should be

construed broadly in favor of immunity." *M.P. by & through Pinckney v. Meta Platforms, Inc.*, 692 F. Supp. 3d 534, 538 (D.S.C. 2023) (collecting cases).  To that end, courts have applied Section 230 immunity to all civil claims (federal and state) arising from third-party content, including each and every type of claim that Plaintiffs assert against the MindGeek Defendants in this action.  *See, e.g.*, *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1146 (9th Cir. 2022) (applying Section 230 to dismiss claim for sex trafficking in violation of the TVPRA); *Loomer v. Zuckerberg*, 2023 WL 6464133 (N.D. Cal. Sept. 30, 2023) (RICO claim); *J.R. v. Mancino,* 2024 WL 3048368, at *2 (D.S.C. May 31, 2024) (sex trafficking in violation of the TVPRA, negligence, invasion of privacy, civil conspiracy), *report and recommendation adopted*, 2024 WL 3047553 (D.S.C. June 18, 2024); *Zeran*, 129 F.3d 327 (negligence); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 402, 417 (6th Cir. 2014) (false light).  "[W]hat matters is not the name of the cause of action … [but] whether [it] inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo! Inc.,* 570 F.3d 1096, 1101-02 (9th Cir. 2009).

For Section 230 immunity, three conditions must be met: (1) "[defendant must be] a 'provider or user of an interactive computer service;'" (2) "the relevant information [must have been] 'provided by another information content provider;'" and (3) "plaintiff's claims [must seek to] hold [defendant] 'responsible as the publisher or speaker of [that] information.'" *Mancino,* 2024 WL 3048368, at *3 (cleaned up).  As discussed *infra*, all three conditions are met here, and thus all of Plaintiffs' claims against the MindGeek Defendants should be dismissed.

A.    **The Pornhub Website Is An "Interactive Computer Service."**

The Pornhub Website falls squarely within the definition of an "interactive computer service," which includes "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]"  47 U.S.C. §

230(f)(2).  This definition is "construed broadly to effectuate [Section 230's] speech-protective purpose."  *Ricci v. Teamsters Union Local* 456, 781 F.3d 25, 28 (2nd Cir. 2015).  "Courts generally conclude that a website falls within this definition," *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 473-74 (E.D.N.Y. 2011), and have found various content-sharing websites are "interactive computer services" and entitled to Section 230 immunity.  *See L.W. through Doe v. Snap, Inc.*, 675 F. Supp. 3d 1087, 1095 (S.D. Cal. 2023) ("Courts have noted that providers of interactive computer services include entities that create, own, and operate applications that enable users to share messages over its internet-based servers."); *see also, e.g.*, *Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 603-04 (S.D.N.Y. Jan. 15, 2020) (granting Section 230 immunity to Vimeo); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1171 (N.D. Cal. 2017) (YouTube).

### B.    The Videos Were Provided By Third-Party "Information Content Providers."

It is undisputed that the Videos were provided to the Pornhub Website by third-party "information content providers."  Under 47 U.S.C. § 230(f)(3), an "information content provider" is "any person or entity that is responsible, in whole or in part, for the ***creation or development*** of information provided through the Internet or any other interactive computer service."  Here, Plaintiffs allege—and have never disputed—that the Videos were created by Murphy (5AC ¶¶ 76, 78-79) and uploaded to the Pornhub Website by user accounts maintained by "third parties," *i.e.*, CWDistribution and Lordfauger18 (*id.* ¶¶ 82, 86).  *See also* Ignatiou Decl. ¶ 36.[12]

By contrast, the MindGeek Defendants had ***no involvement*** in the creation or development of the Videos.  *Id.* ¶ 34.  It is undisputed that the MindGeek Defendants did not record the Videos or assist Murphy in doing so.  *See* JD1 Tr. at 33:12-18; JD2 Tr. at 34:20-35:3; JD3 Tr. at 37:10-

---

[12] Plaintiffs initially alleged that Murphy uploaded the Videos to the Pornhub Website.  *See* 5AC ¶ 82.  This has been disproven and is not disputed.  *See* Ignatiou Decl. ¶ 36; Murphy Tr. at 79:16-21 (admitting that he has never gone by the usernames CWDistribution and LordFauger18).

16; JD4 Tr. at 41:1-15; JD5 Tr. at 42:21-23, 43:17-22; JD6 Tr. at 32:10-16; JD7 Tr. at 33:2-34:4; JD8 Tr. at 36:13-19; JD9 Tr. at 40:13-19; IUP Tr. at 34:8-13. The MindGeek Defendants have never had any relationship with Murphy or even communicated with him. *See* Ignatiou Decl. ¶ 35. The MindGeek Defendants simply (1) provided a platform through which third parties uploaded the Videos (*id.* ¶ 5); and (2) performed the standard, content-neutral steps necessary to display the Videos on the Pornhub Website (*id.* ¶ 42). This falls far short of the "material contribution" required to deem the Pornhub Website an "information content provider" with respect to the Videos at issue. *See Gonzalez*, 282 F. Supp. 3d at 1170-71 ("The critical issue is whether ... [the website] acts as an information content provider ***with respect to the information at issue***."); *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164-68 (9th Cir. 2008) (website is an "information content provider" only if it "materially contribut[es] to [the] unlawfulness" of the content at issue); *Kimzey v. Yelp! Inc*., 836 F.3d 1263, 1269 n.41 (9th Cir. 2016) (courts "have consistently drawn the line at the 'crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable").

Based on the Plaintiffs' arguments throughout this litigation, Plaintiffs likely will argue that the MindGeek Defendants themselves are "information content providers" because they purportedly: (1) create "metadata" associated with third-party content, including categories, tags, titles, and thumbnails (5AC ¶ 91); (2) use "search engine optimization" ("SEO") to "drive[] traffic" to the Pornhub Website (*id.* ¶ 38); (3) "fail[] to adequately monitor the content" uploaded to the Pornhub Website (*id.* ¶ 90); and (4) offer the MPP, which permits third-party users to "shar[e] [in] ad revenue" generated from their content (*id.* ¶¶ 41, 50). As discussed below, all of Plaintiffs'

theories are factually incorrect and/or legally irrelevant, and in no way transform the MindGeek Defendants into "information content providers" or otherwise preclude Section 230 immunity in this case.

*First*, the MindGeek Defendants did not create the so-called "metadata" associated with the Videos. *See* Ignatiou Decl. ¶ 43. At the time of upload, the ***Uploaders*** were the ones who generated and/or selected the categories, tags, titles, and thumbnails for the Videos. *Id.* ¶ 40. These are standard processes that include very little, if any, involvement on the MindGeek Defendants' part. *Id.* ¶¶ 12-18, 40. Faced with similar circumstances, in *Doe v. Webgroup Czech Republic, A.S., et al.*, 2024 WL 3533426 (C.D. Cal. July 24, 2024), the court declined to treat the website as an "information content provider" and granted Section 230 immunity:

> [T]he mere creation of thumbnails is [not] sufficient to show that Defendants created new and distinct [illegal content].… If [] Defendants create thumbnails from "all videos," … then this appears either to be a standard publishing function or a neutral tool made available to all third parties seeking to upload material onto Defendants' websites.… [It has been] confirmed that the creation of thumbnails is a standard function of Defendants' websites.…
>
> [S]imilar problems plague Plaintiff's contention that the existence of "titles, tags, keywords, search terms, and categories indicative of [illegal content]" itself promotes or encourages [such content]. These tools are, again, either a standard publishing function or a neutral tool made available to all third parties seeking to upload material onto Defendants' websites.… Plaintiff … did not deny that most tags and keywords in use on Defendants' websites are user-generated.

*Id.* at *8.[13] Further, there is no evidence that the MindGeek Defendants suggested or modified any of the titles, tags, or thumbnails associated with the Videos or otherwise made any changes that contributed to the nonconsensual nature of the Videos. *See* Ignatiou Decl. ¶ 43.

---

[13] In *Webgroup*, the court found Section 230 immunity even though the titles, tags, and categories were "indicative" of illegal content. *Id.* at **7-8. By contrast, there is nothing inherently unlawful about tags and titles with terms such as "hidden" and "locker." *A fortiori* immunity exists here.

The MindGeek Defendants expect Plaintiffs to attempt to rely on the Northern District of Alabama's recent decision in *Doe et al. v. MG Freesites, Ltd. et al*, No. 7:21-cv-00220-LSC, Dkt. No. 261 (N.D. Ala. Dec. 19, 2024). Although the decision involves the Pornhub Website, the decision in that case does nothing to disturb the MindGeek Defendants' entitlement to Section 230 immunity here. As Plaintiffs' counsel is aware,[14] *Doe* is a class action suit involving a broad category of illegal content—*i.e.*, **all** child sexual abuse material ("CSAM") on the MindGeek Defendants' various websites over more than ten years (*id.* at \*19)—whereas this case involves a discrete set of non-CSAM Videos briefly on (and removed from) the Pornhub Website in 2019.

In finding an issue of fact on Section 230 immunity, the *Doe* court found that "Defendants create new CSAM by creating thumbnails that advertise CSAM videos to users, which is done for every video on the sites." *Id.* at \*24. This is directly contrary to *Webgroup*, which rightly held that "the mere creation of thumbnails is [not] sufficient to show that Defendants created new and distinct [illegal content]." 2024 WL 3533426, at \*8. Moreover, unlike in *Doe* or *Webgroup*, in which the content at issue was illegal CSAM, here the Videos were nonconsensual in violation of the TOS, and nothing about the automated creation of thumbnails contributed to their nonconsensual nature. Finally, if merely creating thumbnails were enough to destroy Section 230 immunity, it would have wide-ranging implications: YouTube, for example, offers automatically generated thumbnails to all uploaders, and only allows custom thumbnails for users with verified accounts. *See* https://www.youtube.com/watch?v=YMSx_TuCuKk (last visited Jan. 8, 2024).

The *Doe* court also emphasized that the MindGeek Defendants "creat[ed] tags and categories associated with CSAM (*e.g.*, "young")." *Id.* at \*\*25-26. By contrast, here, none of the categories associated Videos had any association with their alleged nonconsensual nature. *See*

---

[14] Several members of Plaintiffs' legal team in this case also represent the lead plaintiff in *Doe*.

Ignatiou Decl., Ex. B.  In any event, the *Doe* decision conflicts with both the Fourth Circuit's decision in *Zeran*, 129 F.3d at 332-33 ("whether to publish, edit, or withdraw the posting" is the "the publisher role … for which § 230 specifically proscribes liability"), and the weight of authority holding that use of "algorithms" to "direct" content to viewers does not preclude Section 230 immunity.  *See Mancino,* 2024 WL 3048368, at **6-7 (collecting and citing cases with approval, including *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019), which explained that "arranging and distributing third party information inherently forms 'connections' and 'matches' among speakers, content, and viewers of content"); *see also Webgroup*, 2024 WL 3533426, at *7.

The *Doe* court principally relied on *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024), a tragic case in which a ten-year-old girl died after engaging in activity encouraged in a video she saw on the social media platform TikTok.  *Id.* at 181-82.  Because the girl did not search for the video herself and instead viewed it on her "For You" page—a highly personalized feed of videos curated by TikTok's sophisticated algorithm—the Third Circuit held that TikTok engaged in its "own expressive activity" and thus fell outside of Section 230.  *Id.* at 184.  The *Anderson* decision is limited to the facts presented and does not apply here.  The Pornhub Website does not have a "For You" page, and nothing in the record suggests that the MindGeek Defendants recommended, curated, or presented any third-party content—let alone the Videos at issue—in such a way as to add their own creative stamp.  Moreover, the Third Circuit recognized that its holding "may depart" from the "views of [seven] other circuits," *Anderson*, 116 F.4th at 184, n.13 (collecting cases), and confirmed in a subsequent decision that Section 230 immunity still applies in cases like this one.  *See Metroka v. Penn. State Law Enforcement*, 2024 WL 4164272, at *2 (3d Cir. Sept. 12, 2024) (affirming dismissal of claims against Google under Section 230, because even though "Google [allegedly] 'indexed, published, maintained, and disseminated' the information in the []

post, … [the post] was created by [a third party], not Google").

**Second**, the MindGeek Defendants' SEO practices are content-neutral, and insufficient as a matter of law to vitiate Section 230 immunity. *See, e.g.*, *Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F. Supp. 3d 1311, 1321 (M.D. Fla. 2015) ("[SEO] does not vitiate immunity under Section 230"); *Dowbenko v. Google Inc.*, 582 F. App'x 801, 803-04 (11th Cir. 2014) (applying Section 230 immunity, despite website's alleged use of "algorithms to manipulate its search results"); *Ascentive,* 842 F. Supp. at 476 (same, despite efforts "to make [its] pages appear higher in search engine results").

**Third**, far from a failure to monitor, in 2019, the MindGeek Defendants' moderation team reviewed every piece of content that third parties uploaded to the Pornhub Website, in a good-faith effort to avoid publication of content that was nonconsensual, illegal, or otherwise violated the TOS. *See* Ignatiou Decl. ¶ 22. Perfection is not required. Indeed, it is well-established that a website's failure to monitor third-party content does not strip the website of Section 230 immunity. To hold otherwise would undermine the purpose of Section 230, which is to encourage websites to undertake the often daunting task of reviewing the staggering amount of content provided by third parties without fear of liability. *See Zeran*, 129 F.3d at 331 (an "important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services"). As the Fourth Circuit explained in *Zeran:*

> The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Zeran*, 129 F.3d at 331.  Accordingly, the notion that a website "could be liable for reviewing materials but ultimately deciding to allow them" has been flatly rejected, *Doe v. Bates*, 2006 WL 3813758, at *4 (E.D. Tex. Dec. 27, 2006), including recently by a court in this District:

> Plaintiffs cannot establish that [the platform] made a material contribution to illegal communications by claiming that [the platform] *failed to monitor* those communications and *failed to implement* certain policies to prohibit those communications, as these claims do not allege affirmative conduct beyond merely providing a platform to communicate…. The Complaint does not allege that [the platform] created, altered, or edited any of the communications at issue. Rather, the Complaint makes clear that [the other defendants] created the content at issue and then proceeded to exchange that content [via the platform]. As such, the … [platform] provided a communication ***service***, and did not create the ***content***.

*Mancino,* 2024 WL 3048368, at *4; *see also, e.g.*, *Doe v. Reddit, Inc.,* 2021 WL 5860904 (C.D. Cal. Oct. 7, 2021) (holding Reddit is not an "information content provider" and is entitled to Section 230 immunity, despite allegation that it used "barely-trained moderators who failed to enforce its policies"), *aff'd in part, rev'd in part,* 51 F.4th 1137 (9th Cir. 2022); *Doe (K.B.) v. Backpage.com, LLC*, 724 F. Supp. 3d 882, 884 (N.D. Cal. 2024) (holding Instagram is not an "information content provider" and is entitled to Section 230 immunity, despite allegation that its failure to police its website created a "breeding ground" for sex traffickers, because plaintiff failed to demonstrate that "[Instagram], rather than third parties, created and developed such content").

***Fourth and finally***, it is undisputed that one of the Uploaders (LordFauger18) was among the thousands of verified third-party users in the MPP, and thus was eligible to monetize content on the Pornhub Website. *See* Ignatiou Decl. ¶ 39.[15]  However, this does not somehow render the

---

[15] Because LordFauger18 did not meet the $100 revenue threshold for pay-out, LordFauger18 never received any payment from the MindGeek Defendants. *See* Ignatiou Decl. ¶ 39.

MindGeek Defendants responsible for the "creation" or "development" of the Videos. As an initial matter, it was *Murphy*, not LordFauger18, who allegedly created the Videos. Moreover, there is no evidence that the MPP encouraged or incentivized the upload of any particular type of content, much less that the MindGeek Defendants specifically encouraged LordFauger18 (or anyone else) to upload the Videos at issue (or any other nonconsensual content). *Id.* ¶ 38. To the contrary, the TOS for the Pornhub Website (to which LordFauger18 agreed) explicitly prohibited the upload of nonconsensual content. *Id.* ¶¶ 7-8. Courts have not hesitated to grant Section 230 immunity in these circumstances. *See, e.g.*, *Webgroup*, 2024 WL 3533426, at **7-8 (website that provides "neutral tools" to "accomplish a benign objective—e.g., posting videos and allowing for monetization based on views—[] cannot be said to be a co-developer of illicit content," particularly where its "terms of service explicitly prohibit [such content]"); *In re Bitconnect Securities Litig.*, 2019 WL 9104318, at **5, 12-13 (S.D. Fla. Aug. 23, 2019) (Section 230 "thoroughly foreclosed" claims against YouTube, despite allegations that the third-party users were in the "YouTube Partner Program" and thus could "monetize their content"); *Gonzalez*, 282 F. Supp. 3d at 1155, 1171 (holding Section 230 barred claims against YouTube, despite allegations that it "agreed to share with [the] users a percentage of revenues generated by the[] ads [placed on their content]").

### C.     **Plaintiffs' Claims Seek to Treat the MindGeek Defendants as a "Publisher."**

It is readily apparent that all of Plaintiffs' claims seek to treat the MindGeek Defendants as a "publisher" of third-party content. Each arises from the MindGeek Defendants' purported decision to allow third parties to upload the Videos (and other purportedly "illegal content") to the Pornhub Website. *See* 5AC ¶¶ 106-107 (alleging MindGeek Defendants permitted "content on their platforms" in "disregard of the fact that the Plaintiffs … were depicted … for pornographic purposes constituting commercial sex acts without their consent"); *id.* ¶¶ 118-119 (alleging

MindGeek Defendants engaged in "enterprise" that "solicited" and "directed" the "upload [of] … illegal content"); *id.* ¶¶ 184-185 (alleging MindGeek Defendants negligently "failed to take reasonable steps to monitor," resulting in "the presence of illegally filmed pornographic content" on the Pornhub Website); *id.* ¶¶ 189, 192 (alleging MindGeek Defendants "depicted the Plaintiffs in a false light" by "host[ing] [the] videos" without "verify[ing] whether the videos were filmed with the [Plaintiffs'] consent"); *id.* ¶¶ 196 (alleging MindGeek Defendants engaged in a conspiracy "which resulted in … the publication … of the [] videos" on the Pornhub Website").[16]

The decision to allow third-party content to be present on a website is a quintessential function of a publisher under Section 230. *See Zeran*, 129 F.3d at 330 ("a publisher's traditional editorial functions" include "deciding whether to publish, withdraw, [ ] or alter content"); *see also Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003) ("decisions relating to the monitoring, screening, and deletion of content from its network" are "quintessentially related to a publisher's role"). Because Plaintiffs' claims "derive[] from the [MindGeek Defendants'] status or conduct as a publisher, § 230(c)(1) of the CDA prohibits liability." *Cox v. Twitter, Inc.*, 2019 WL 2513963, at *3 (D.S.C. Feb. 8, 2019), *report and recommendation approved*, 2019 WL 2514732 (D.S.C. Mar. 8, 2019); *see also, e.g.*, *Richard v. Facebook, Inc.,* 2019 WL 8324749, at **6-8 (S.C. Com. Pl. May 22, 2019) (applying Section 230 immunity, where claims derived from Facebook's "exercise of a publisher's traditional editorial functions"); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021) (same, where claims derived from Twitter's "fail[ure] to remove the

---

[16] It is irrelevant that Plaintiffs' claims do not explicitly refer to "third-party content," especially considering the referenced "content" and "videos" undisputedly were uploaded to the Pornhub Website by third-party users. *See Gonazlez*, 282 F. Supp. 3d at 1164 ("[Section 230] is implicated not only by claims that explicitly point to third party content but also by claims which … implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party [content].").

[v]ideos after being notified of them and instead allowing them to be broadly disseminated on Twitter"), *aff'd in part, rev'd in part,* 2023 WL 3220912 (9th Cir. May 3, 2023).

### D.     The FOSTA Exception to Section 230 Does Not Apply Here.

Plaintiffs' TVPRA claim—asserted for the first time in their ***Fifth*** (or, in the case of the IUP Plaintiff, ***Third***) Amended Complaint—is a misguided effort to take advantage of the limited exception to Section 230 set forth in the Allow States and Victims to Fight Online Sex Trafficking Act, 47 U.S.C. § 230(e)(5)(A) ("FOSTA"). The FOSTA exception does not apply here.

FOSTA provides, in relevant part: "Nothing in [Section 230] … shall be construed to impair or limit … any claim in a civil action brought under [S]ection 1595 of [the TVPRA**],** if the conduct underlying the claim constitutes a violation of [S]ection 1591" (*i.e.*, the ***criminal*** sex trafficking statute). 47 U.S.C. § 230(e)(5). In other words, to take advantage of the FOSTA exception to Section 230 immunity, a plaintiff's civil claim brought under Section 1595 of the TVPRA ***must also meet*** the standards imposed by Section 1591 of the TVPRA for ***criminal*** liability. Specifically, Section 1591 requires a plaintiff must establish the website "***knowingly … benefit[ted]***, financially or by receiving anything of value, from participation in a venture which has engaged in [a sex trafficking act]." *Reddit*, 51 F.4th at 1145. "Participation" means "***knowingly*** assisting, supporting, or facilitating [sex trafficking activities]." 18 U.S.C. § 1591(e)(4). Construing this language, the Ninth Circuit held that "knowingly benefitting … requires ***actual knowledge*** and '***a causal relationship*** between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit.'" *Reddit*, 51 F.4th at 1145.

Plaintiffs cannot establish that the MindGeek Defendants "knowingly benefitt[ed]" from their purported participation in a sex trafficking venture. To the contrary, the undisputed evidence confirms that, prior to this lawsuit, the MindGeek Defendants had ***no knowledge*** of Murphy or his

alleged surreptitious recording of the Plaintiffs, much less the requisite "actual knowledge" that the MindGeek Defendants somehow "assist[ed], support[ed], or facilitate[d]" Murphy in doing so. *See* Ignatiou Decl. ¶ 35.  At worst for the MindGeek Defendants, Plaintiffs have shown that the MindGeek Defendants incorrectly concluded that the Videos were lawful and made money from them in the same way as they do for all content on the Pornhub Website.  But even "'turn[ing] a blind eye' to the unlawful content posted on [their] platform" and "the source of their [revenue]" is not enough to meet the high standard of knowledge required to strip a platform of its Section 230 immunity.  *Reddit*, 51 F.4th at 1145-46 (rejecting FOSTA exception and dismissing TVPRA claim, where plaintiffs "suggest[ed] only that Reddit 'turned a blind eye'" and failed to "allege[] a connection between the child pornography posted on Reddit and the revenue Reddit generates, other than the fact that Reddit makes money from advertising on all popular subreddits").

Thus, even if Plaintiffs' civil TVPRA claim were legally supportable (as discussed *infra*, it is not), Plaintiffs still would not be able to avail themselves of the FOSTA exception because there can be no serious dispute Plaintiffs have not, and cannot, establish the MindGeek Defendants are ***criminally*** liable for Murphy's alleged trafficking conduct.  Thus, the MindGeek Defendants remain immune from TVPRA liability under Section 230.

## III. ALL OF PLAINTIFFS' CLAIMS ALSO INDEPEDENTLY FAIL ON THE MERITS AS A MATTER OF LAW

As discussed *supra* (§ II), all of Plaintiffs' claims are squarely barred by Section 230. Additionally, for the reasons discussed *infra*, Plaintiffs' claims independently fail on the merits.

### A.    <u>Plaintiffs' TVPRA Claim Fails as a Matter of Law.</u>

Plaintiffs cannot prevail on their civil claim under Section 1595 of the TVPRA (5AC ¶¶ 95-110) as a matter of law.  "Section 1591 [of the TVPRA] criminalizes two categories of actors involved in a sex trafficking venture:  direct traffickers and those who benefit financially from the

venture." *Fleites v. MindGeek S.A.R.L.,* 617 F. Supp. 3d 1146, 1159 (C.D. Cal. 2022). "[S]ection 1595 [of the TVPRA] provides a private right of action to victims of violations of … [S]ection 1591," and accordingly tracks the structure of Section 1591. *Id.* Specifically, the first clause of Section 1595(a) creates liability for "perpetrators", which corresponds to the direct trafficker portion of Section 1591(a)(1), *i.e.* "[w]hoever knowingly… recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person … knowing, or, except where the act constituting the violation … is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion … or any combination of such means will be used to cause the person to engage in a commercial sex act." The second clause of Section 1595(a) creates civil liability for beneficiaries—*i.e.*, "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]." Plaintiffs' TVPRA claim is premised on "beneficiary" (or "participant") liability under the second clause of Section 1595(a), and fails as a matter of law.[17]

### 1. Plaintiffs Are Not Victims of "Sex Trafficking."

Plaintiffs' TVPRA claim initially fails because Plaintiffs are not victims of "sex trafficking"—which is defined as engaging in a "commercial sex act" as a result of "force, threats of force, fraud, [or] coercion." 18 U.S.C. § 1591(a)(2). Neither of these elements occurred here.

***First***, while Murphy's alleged surreptitious recording of Plaintiffs is egregious and

---

[17] Plaintiffs have never claimed—nor could they claim—that the MindGeek Defendants are "perpetrators" of sex trafficking under the first part of Section 1595(a). In addition to the undisputed facts that Plaintiffs did not engage in any "commercial sex act" and were not subjected to any "force, threats of force, fraud, [or] coercion," the MindGeek Defendants undisputedly had no contact with Plaintiffs nor any role in the creation of the Videos (Ignatiou Decl. ¶ 35), and thus could not possibly have "recruit[ed], entice[d], harbor[ed], transport[ed], provide[d], obtain[ed], advertise[d], maintain[ed], patronize[d], or solicit[ed]" any relevant activity. 18 U.S.C. § 1591(a).

inexcusable, Plaintiffs admittedly did not engage in any "sex act"—let alone the requisite "commercial sex act"—and thus ***do not even qualify as victims of "sex trafficking."*** In the context of the TVPRA, the term "sex act" is accorded its ordinary dictionary meaning—that is, "an act performed with another for sexual gratification." *U.S. v. Bazar*, 747 F. App'x 454, 456 (9th Cir. 2018). A "commercial sex act" is one for which money or something of value is exchanged. *See* 18 U.S.C. § 1591(e)(3) (defining "commercial sex act" as a sex act "on account of which anything of value is given to or received by any person"); *U.S. v. Clark*, 435 F.3d 1100, 1115 (9th Cir. 2006) ("commercial sex act" occurs when "money is exchanged for sex acts"). While the Videos may depict Plaintiffs in various states of undress, Plaintiffs admit that they did not engage in any "sex act" in the locker room the day of the incident. *See* JD1 Tr. at 100:11-18; JD2 Tr. at 129:5-18; JD3 Tr. at 118:12-19; JD4 Tr. at 197:17-198:22; JD5 Tr. at 189:23-190:5; JD6 Tr. at 185:3-11; JD7 Tr. at 224:15-22; JD8 Tr. at 110:23-111:6; JD9 Tr. at 157:17-24; IUP Tr. at 30:13-20. Plaintiffs also admit that they did not receive money or anything of value—from Murphy, the MindGeek Defendants, or anyone else—in connection with the Videos. *See* JD1 Tr. at 32:17-20; JD2 Tr. at 33:19-22; JD3 Tr. at 36:15-18; JD5 Tr. at 41:11-13; JD6 Tr. at 31:15-18; JD7 Tr. at 32:7-10; JD8 Tr. at 35:18-21; JD9 Tr. at 39:17-20; IUP Tr. at 33:3-5.

***Second***, Plaintiffs were not subjected to any "force, threats of force, fraud, [or] coercion." 18 U.S.C. § 1591(a); *see also A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 940 (D. Or. 2020) ("The TVPRA targets commercial sex activity" procured by "threats of force, fraud, coercion …, or any combination of such means…. The statute 'does not address commercial sex generally."). Plaintiffs admit that they were not forced, threatened with force, fraudulently induced, or coerced—by Murphy, the MindGeek Defendants, or anyone else—to engage in any conduct or appear in the Videos. *See* JD1 Tr. at 31:1-19; JD2 Tr. at 31:22-32:15; JD3 Tr. at 34:20-

35:13; JD4 Tr. at 39:15-40:18; JD5 Tr. at 38:15-39:8; JD6 Tr. at 29:22-30:15; JD7 Tr. at 30:22-31:15; JD8 Tr. at 34:3-22; JD9 Tr. at 38:6-24; IUP Tr. at 31:17-32:10. Plaintiffs were engaged in routine, non-sexual activity—showering and changing clothes after athletic activity—that was not induced by Murphy and would have occurred whether or not he was secretly recording the Videos.

This alone warrants dismissal of the TVPRA claim. *See, e.g.*, *Corradino v. Liquidnet Holdings Inc.*, 2021 WL 2853362, at *3-4 (S.D.N.Y. July 8, 2021) (dismissing TVPRA claim because complaint failed to allege a "commercial sex act" and did "not allege that 'force, threats of force, fraud or coercion' were used to cause Plaintiff to engage in [a commercial sex] act"); *Doe (S.J.C.) v. ESA P Portfolio LLC*, 2024 WL 4808137, at *3 (N.D. Ga. Nov. 15, 2024) (same, "[b]ecause Plaintiff's Complaint [did] not contain any non-conclusory allegations which would show that she was a victim of trafficking through force, fraud or coercion").

2.     The MindGeek Defendants Did Not "Participate" In A Sex Trafficking Venture or "Knowingly Benefit" Therefrom.

The Court also should dismiss Plaintiffs' TVPRA claim as a matter of law because the undisputed evidence confirms that the MindGeek Defendants did not "knowingly benefit[] … from participation in a venture which [they] knew or should have known has engaged in an act [of sex trafficking]." 18 U.S.C. § 1595(a).

**First**, even assuming *arguendo* that Murphy engaged in sex trafficking in violation of the TVPRA (which cannot be established),[18] there is no evidence to suggest that the MindGeek Defendants knew or should have known this. The undisputed facts are to the contrary: Murphy recorded the Videos years before they were uploaded to the Pornhub Website. *See* 5AC ¶ 78; IUP

---

[18] As noted *supra*, Murphy has never been charged with, or investigated for, sex trafficking.

Compl. ¶ 73.[19]  Prior to this lawsuit, the MindGeek Defendants had no communication with Murphy nor any knowledge or reason to know that he existed.  *See* Ignatiou Decl. ¶ 35.  There simply is no basis to conclude that the MindGeek Defendants had any notice of Murphy's alleged sex trafficking of Plaintiffs.  *See, e.g.*, *Croft v. Dolan,* 2024 WL 3915148 at *6 (C.D. Cal. 2024) (dismissing beneficiary claim, because "[t]here [were] simply no allegations that [defendants] had any notice that [the alleged trafficker] was coercing [p]laintiff into unwanted sexual activity").

*Second*, the MindGeek Defendants did not "participate" in any sex trafficking of Plaintiffs.  Under the TVPRA, "participation" means "knowingly assisting, supporting, or facilitating" sex trafficking.  18 U.S.C. § 1591(e)(4).  In other words, "the defendant must have actually 'engaged in some aspect of the sex trafficking.'"  *Reddit*, 51 F.4th at 1145; *see also U.S. v. Afyare*, 632 F. App'x 272, 286 (6th Cir 2016) (requiring "some 'overt act' that furthers the sex trafficking aspect of the venture").  The MindGeek Defendants did nothing of the sort.  As Plaintiffs admit, it is undisputed that the MindGeek Defendants did not create the Videos or do anything to assist, support, or facilitate Murphy in doing so.  *See* Ignatiou Decl. ¶ 35; *see also* JD1 Tr. at 33:12-18; JD2 Tr. at 34:20-35:3; JD3 Tr. at 37:10-16; JD4 Tr. at 41:1-15; JD5 Tr. at 42:21-23, 43:17-22; JD6 Tr. at 32:10-16; JD7 Tr. at 33:2-34:4; JD8 Tr. at 36:13-19; JD9 Tr. at 40:13-19; IUP Tr. at 34:8-13.  They did not encourage Murphy to create the Videos, did not pay him for the Videos, and had no other transactional or business relationship with him.  *See* Ignatiou Decl. ¶¶ 35, 39.

Plaintiffs likely will argue that the MindGeek Defendants "participated" by providing a platform that allowed nonconsensual content to be distributed, and purportedly failing to effectively moderate the content.  But the Ninth Circuit has made clear that this is not enough:

> [Plaintiffs] allege that Reddit provides a platform where it is easy to

---

[19]  As noted *supra*, Murphy has no connection to the Uploaders.  He never has even communicated with the Uploaders.  *See* Murphy Tr. at 79:16-21, 91:1-2, 93:16-94:13, 98:21-99:6, 99:18-100:3.

> share child pornography, highlights subreddits that feature child
> pornography to sell advertising on those pages, allows users who
> share child pornography to serve as subreddit moderators, and fails
> to remove child pornography even when users report it….
>
> Taken as true, ***these allegations suggest only that Reddit 'turned a
> blind eye' to the unlawful content posted on its platform, not that
> it actively participated in sex trafficking***.

*Reddit*, 51 F.4th at 1145; *see also Snap*, 675 F. Supp. 3d at 1100 ("failing to efficiently monitor or

police user-generated content is not punishable under Section 1591"); *A.B. v. Wyndham Hotels &

Resorts, Inc.*, 532 F. Supp. 3d 1018, 1027 (D. Or. Mar. 31, 2021) ("the [law] does not impose an

affirmative duty to police and prevent sex trafficking").

      Plaintiffs also have claimed that the MindGeek Defendants "participated" by inducing and

eliciting the ***uploaders*** to create and post nonconsensual videos on the Pornhub Website, but any

purported relationship between the MindGeek Defendants and the Uploaders is irrelevant. The

question is whether the MindGeek Defendants "knowingly assist[ed], support[ed], or facilitat[ed]"

the ***alleged trafficker***, *i.e.*, Murphy. Those plaintiffs "who have successfully alleged beneficiary

liability for sex trafficking have charged defendants with far more active forms of participation

than the plaintiffs allege here." *Reddit*, 51 F.4th at 1146.[20]

      ***Third and finally***, there is no evidence that the MindGeek Defendants "knowingly

---

[20] Plaintiffs have previously highlighted *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023), in which the Seventh Circuit held a plaintiff may demonstrate participation in a venture by showing a "continuous business relationship" and "desire to promote the wrongful venture's success." *Id.* at 599. In that case, Salesforce provided direct and specific business advice, support, and software to Backpage.com, which hosted prostitution ads, thereby "facilitat[ing] the growth of ... a business ... whose business model was built upon systematic and widespread violations of [federal sex trafficking law]." *Id.* at 560-61. *Salesforce* is not helpful to Plaintiffs in this case because they have not demonstrated any business relationship whatsoever, let alone a continuous or substantial relationship, between the MindGeek Defendants and Murphy. Moreover, the Seventh Circuit in *Salesforce* specifically confirmed the "continuous business relationship" theory of participant liability would not apply in the case of "plaintiffs [who] had been secretly recorded on video while they were undressed in locker rooms, bathrooms, and showers [and] …. sued the company that had provided web-hosting services for websites that had offered the videos for sale" because "the alleged activities of the web-hosting services did not amount to culpable assistance[.]" *Id.* at 562.

benefitt[ed] from [their purported] participation in such a venture," which requires "'a causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit.'"  *Reddit*, 51 F.4th at 1145.  At most, Plaintiffs have established that the MindGeek Defendants generated revenue from the Videos—as they do for all content on the Pornhub Website.  *See* Mayer Ex. X (Transcript of Deposition of Graham Collie) at 37:14-38:2.  Because Plaintiffs do not (and cannot) establish a direct connection between the Videos and the MindGeek Defendants' revenue, Plaintiffs' TVPRA claim must fail.  *See, e.g.*, *Reddit*, 51 F.4th at 1145-46 (dismissing beneficiary claim, where "the plaintiffs have not alleged a connection between the child pornography posted on Reddit and the revenue Reddit generates, other than the fact that Reddit makes money from advertising on all popular subreddits"); *Noble v. Weinstein,* 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) (insufficient connection between benefits defendant received from working for a perpetrator of sex trafficking and the perpetrator's conduct toward the victim).

### B.     Plaintiffs' RICO Claim Fails as a Matter of Law.

Plaintiffs' RICO claim (5AC ¶¶ 111-132) arises under the statute's third prong, 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce," from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]"  To recover civil RICO damages, the plaintiff must have been "injured in [her] business or property by reason of [the] violation."  18 U.S.C. § 1964(c).  In sum, Plaintiffs here must prove: (1) injury to their "business or property"; (2) participation in an "enterprise"; and (3) "a pattern of racketeering activity."  Plaintiffs cannot establish ***any*** of these elements.[21]

---

[21] Plaintiffs also lack standing to bring their RICO claim.  Plaintiffs do not allege, let alone proffer evidence to substantiate, any connection between their purported injuries and any alleged predicate act by the MindGeek Defendants.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

**First**, there is no evidence that Plaintiffs suffered "any 'injur[y] *in [their] business or property*' that was proximately caused by the alleged RICO violation." *Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir. 1995). As Plaintiffs concede, they are **only** claiming mental and emotional distress damages. *See* JD1 Tr. at 96:19-22; JD2 Tr. at 124:5-22; JD3 Tr. at 114:21-24; JD4 Tr. at 159:22-160:3; JD5 Tr. at 161:20-162:8; JD6 Tr. at 178:8-23; JD7 Tr. at 217:9-218:25; JD8 Tr. at 107:21-24; JD9 Tr. at 152:25-156:5; IUP Tr. at 77:7-78:21. This alone requires dismissal. *See, e.g.*, *Bast*, 59 F.3d at 495 (affirming dismissal of RICO claim, where plaintiff "[a]t most … plead[ed] that he 'suffer[ed] extreme mental anguish,'" noting "allegation[s] of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property'"); *Bowen v. Adidas Am. Inc.,* 84 F.4th 166, 173-178 (4th Cir. 2023) (same, where plaintiff failed to prove a "business or property" injury).

**Second**, there is no evidence that the MindGeek Defendants participated in a requisite "enterprise." *See* 18 U.S.C. § 1961(4) (defining "enterprise" for RICO purposes). The Supreme Court has explained that such an "enterprise," for RICO purposes, is "a group of persons associated together for a common purpose of engaging in a course of conduct[,]" the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *U.S. v. Turkette,* 452 U.S. 576, 583 (1981). Not only have Plaintiffs failed to produce any such evidence, but the undisputed evidence in the record **negates** the existence of such an "enterprise." Indeed, far from establishing an "ongoing organization" that "function[s] as a continuing unit," the MindGeek Defendants had no relevant communications with any of the other defendants (or anyone involved in the creation or distribution of the Videos) at any relevant time. *See* Ignatiou Decl. ¶¶ 35, 38. Also, given the nature of the Defendants' lines of work (*i.e.*, a college, a former college employee, and competing

adult-oriented websites) and the undisputed lack of profit-sharing among them, there is no basis to find that they acted together for a "common purpose." *See, e.g.*, *U.S. v. Pinson*, 860 F.3d 152, 162 (4th Cir. 2017) (no "common purpose" and thus no RICO enterprise, where the "ventures [at issue] involved different memberships, methods, and motives" and "any fruits of these ventures accrued only to members of each venture").

**Third and finally**, the MindGeek Defendants have not engaged in a "pattern of racketeering activity," which requires proof of "at least two [of the enumerated] acts of racketeering activity." 18 U.S.C. § 1961(5); *see also* 18 U.S.C. § 1961(1) (enumerating predicate acts fo "racketeering activity"). Plaintiffs allege four bases of purported "racketeering activity" (5AC ¶ 115), one of which ("record keeping for sexually explicit material") is not among the statute's enumerated predicate acts, and thus cannot form the basis of a RICO claim as a matter of law. *See, e.g.*, *Pagan v. Westchester Cnty.*, 2014 WL 982876, at *29 (S.D.N.Y. Mar. 12, 2014) (dismissing RICO claim where alleged predicate acts were not listed in § 1961), *on reconsideration*, 2015 WL 337403 (S.D.N.Y. Jan. 26, 2015); *Park S. Assocs. v. Fischbein*, 626 F. Supp. 1108, 1114 (S.D.N.Y.) ("[a]ssault is not a crime that can constitute a predicate 'racketeering act' under RICO" because it is not listed in § 1961), *aff'd sub nom.*, 800 F.2d 1128 (2d Cir. 1986).[22]

The other three alleged bases—*i.e.*, "sex trafficking," "sexual exploitation of children," and "wire fraud"—are unsupported. As discussed *supra*, Plaintiffs' "sex trafficking" claim cannot stand. Likewise, as a matter of law, the MindGeek Defendants did not "sexual[ly] exploit[] [any] children," particularly as Plaintiffs undisputedly were adults when the Videos were recorded. *See*

---

[22] Plaintiffs' "record keeping" claim under 18 U.S.C. § 2257 also has no merit, since the MindGeek Defendants were not "producers" of the Videos. *See* 18 U.S.C. §2257(h)(2)(B)(iv)-(v) (excluding from liability parties, like the MindGeek Defendants, engaged in "transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication").

Mayer Ex. B-C at Response No. 1.  Lastly, the MindGeek Defendants did not commit "wire fraud," which involves the use of interstate wires to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises[.]" 18 U.S.C. § 1343.  There is no evidence of any "intent to perpetrate a fraudulent scheme," *Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, 88 F. Supp. 3d 543, 550 (E.D. Va.), *aff'd*, 624 F. App'x 81 (4th Cir. 2015), nor that the MindGeek Defendants made any "false or fraudulent representation," *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Del.*, 805 F. Supp. 1277, 1290 (D.S.C. 1992), *aff'd*, 998 F.2d 1009 (4th Cir. 1993).  "Since the record cannot support the conclusion that any predicate acts of racketeering activity occurred, a pattern of racketeering activity could not have existed."  *Id.* at 1290-91.

### C.     Plaintiffs' "Negligent Monitoring" Claim Fails as a Matter of Law.

Plaintiffs' so-called "Negligent Monitoring" claim (5AC ¶¶ 180-186) also fails as a matter of law.  No court in this Circuit ever has held a website liable for "negligent monitoring" because, as discussed *supra*, "decisions relating to the monitoring … of content [on] its network" are "quintessentially related to a publisher's role" and barred by Section 230.  *Green*, 318 F.3d at 465 ("[Plaintiff's] fundamental tort claim is that [the defendant website] was negligent in promulgating harmful content and in failing to address certain harmful content on its network.…  Section 230 'specifically proscribes liability' in such circumstances.") (quoting *Zeran*, 129 F.3d at 332-33).

In any event, Plaintiffs cannot prove a fundamental element of any negligence claim:  that the MindGeek Defendants owed Plaintiffs a duty of care.  It is black letter law that "[a]n affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance."  *Doe v. Porter-Gaud Sch.,* 649 F. Supp. 3d 164, 174 (D.S.C. 2023).  Here, Plaintiffs have not alleged any facts, far less adduced evidence, of such a relationship or

special circumstance.  The few courts that have addressed the issue concluded a website owes no

duty to the public to monitor and filter out potentially noncompliant third-party content.  *See, e.g.*,

*Vesely v. Armslist, LLC*, 2013 WL 12123650, at **1-2 (N.D. Ill. Oct. 11, 2013) (website owes no

duty to public to prevent criminal conduct by third parties on its site), *aff'd*, 762 F.3d 661 (7th Cir.

2014); *Ethridge v. Samsung SDI Co.*, 604 F. Supp. 3d 556, 560-61 (S.D. Tex. 2022) (website owes

no duty to the users of a third-party product sold on its site).

### D.     Plaintiff's "False Light" Claim Fails as a Matter of Law.

Plaintiffs' "false light" claim (5AC ¶¶ 187-193) should be dismissed for the simple reason

"this cause of action does not exist under South Carolina law."  *BidZirk, LLC v. Smith*, 2007 WL

3119445, at *4 (D.S.C. Oct. 22, 2007) (dismissing false light claim, noting "[n]o South Carolina

court has recognized a cause of action for false light invasion of privacy"); *see also Kent v.

Hennelly*, 2019 WL 5896442, at *11 (D.S.C. Nov. 12, 2019) (same, rejecting "unconvincing policy

argument for the court to create a new cause of action [for false light] under South Carolina law").

### E.     Plaintiffs' "Civil Conspiracy" Claim Fails as a Matter of Law.

Plaintiffs' "civil conspiracy" claim (5AC ¶¶ 194-197) is without merit.  As an initial matter,

Plaintiffs' claim must fail "because Plaintiffs have not identified 'additional acts in furtherance of

the conspiracy separate and independent from other wrongful acts alleged in [their] complaint.'"

*Doe 1 v. Varsity Brands, LLC*, 2023 WL 4191600, at *20 (D.S.C. June 26, 2023).  Plaintiffs also

have not established another essential element of this claim:  As discussed *supra*, there is no

evidence of any agreement or coordinated activity among the MindGeek Defendants and another

person, much less an agreement to create and/or distribute the Videos with the intent or primary

purpose of harming Plaintiffs.  *See id.* at *19 (civil conspiracy claim requires "the combination or

agreement of two or more persons" "to commit an unlawful act or a lawful act by unlawful means,"

and "an intent to harm" is "an inherent part of th[is] analysis"). For this additional reason, dismissal is warranted. *See, e.g.*, *Richard*, 2019 WL 8324749, at **9-10 (dismissing civil conspiracy claim where plaintiff failed to "demonstrate any agreement between [the platform] and [the uploader], much less an agreement whose 'primary purpose… [was] to injure the plaintiff").

## IV. THERE IS NO BASIS FOR JURISDICTION OVER MINDGEEK S.À R.L.

Plaintiffs' claims against MindGeek S.à r.l.—a Luxembourg company with no employees or operations of its own (Andreou Decl. ¶¶ 11, 13)—narrowly survived a motion to dismiss for lack of personal jurisdiction. *See* MTD Hearing Tr. at 22:2-22. Recognizing MindGeek S.à r.l.'s only connection to this lawsuit is its corporate relationship with MG Freesites, Plaintiffs allege they are "alter egos." 5AC ¶ 27:7-13. But as this Court advised, to continue to subject MindGeek S.à r.l. to this lawsuit, Plaintiffs must come forward with evidence of "***actual control***." MTD Hearing Tr. at 22:7-13 ("With respect to MindGeek [S.à r.l.], which acknowledged to be the parent company [of MG Freesites], I'm going to leave [it] in for right now" and "let [Plaintiffs] do some additional discovery solely to see what that relationship is. And if that relationship is not such that there is any evidence of any actual control, then I'll be open to another motion on that matter.").

After more than a year of discovery, Plaintiffs have utterly failed to elicit evidence of actual control, let alone the "'***total domination and control***'" resulting in "inequitable consequences" necessary for application of the alter ego doctrine. *In re AuditHead, LLC*, 624 B.R. 134, 142–43 (Bankr. D.S.C. 2020). Nor have they established a "single business enterprise." *See Pertuis v. Front Roe Restaurants, Inc.*, 423 S.C. 640, 655 (2018). It remains unrebutted that MindGeek S.à r.l. is nothing more than a holding company, and does not exercise any control over the day-to-day business operations of MG Freesites. *See* Andreou Decl. ¶ 12. For this additional reason, Plaintiffs' claims against MindGeek S.à r.l. should be dismissed. *See, e.g.*, *In re AuditHead*, 624

B.R. at 142-43 (granting summary judgment alter ego doctrine).[23]

## **CONCLUSION**

For the foregoing reasons, the MindGeek Defendants respectfully request that the Court grant summary judgment in their favor on all of Plaintiffs' claims.


Respectfully submitted,

DATED: January 10, 2025          TURNER, PADGET, GRAHAM AND LANEY, P.A.

Columbia, South Carolina          By: /s/ Mark Goddard
                                  Mark Goddard | Attorney ID: 09194
                                  email | mgoddard@turnerpadget.com
                                  direct | 803-227-4334
                                  1901 Main Street, 9th Floor
                                  Columbia, SC 29201


                                  MITCHELL SILBERBERG & KNUPP LLP

                                  Marc E. Mayer | admitted *pro hac vice*
Los Angeles, California           email | mem@msk.com
                                  direct | 310-312-3154
                                  2049 Century Park East
                                  18th Floor
                                  Los Angeles, California 90067

                                  *Attorneys for Defendant MG Freesites Ltd and MindGeek S.à r.l.*

---

[23] While the *Doe* court found a fact issue on whether MindGeek S.à r.l. could be liable as an alter ego, the analysis was based on the Eleventh Circuit's "laundry list" test. *See Doe*, at * 44. In South Carolina, the test is "total domination and control." *In re AuditHead*, 624 B.R. at 142-43.