**UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| JANE DOES 1-9,<br><br>　　　　　　Plaintiffs,<br>vs.<br><br>COLLINS MURPHY, et al.,<br><br>　　　　　　Defendants. | Case No.: 7:20-cv-00947 |
| JANE DOE,<br><br>　　　　　　Plaintiff,<br>vs.<br><br>LIMESTONE UNIVERSITY, et al.,<br><br>　　　　　　Defendants. | Case No.: 7:21-cv-03193 |

**TRAFFICSTARS LTD'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56**

## <u>INTRODUCTION</u>

In a case well known to most law school students – *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339 (1928) – Justice Cardoza famously confronted the limits of proximate cause.  There, a man was running to catch a train as it pulled out of the station.  Seeming to be unsteady and on the verge of falling, a train guard sought to pull him aboard while another platform guard tried to help push him from behind.  As a result, a small package the man was holding (covered by a newspaper and with no indication of its contents) fell.  The package contained fireworks, which exploded, the shock of which caused scales many feet away to fall, injuring the plaintiff, who sued the railroad for the actions of its guards.  Justice Cardoza found it too much, rejecting liability, writing "Proof of negligence in the air, so to speak, will not do."

1

Plaintiffs here have constructed a similarly Rube Goldberg-like theory of liability with respect to TrafficStars, Ltd. ("TrafficStars") a Cyprus-based advertising broker that sells advertising space on thousands of websites including xHamster.com, which is owned and operated by Defendant Hammy Media, Ltd. ("Hammy"): in 2012, before TrafficStars ever existed, someone (possibly Collins Murphy) surreptitiously recorded the Plaintiffs as they showered and changed in the women's locker room at Limestone College. Seven years later, someone, using the username "cwdistribution" uploaded the recordings of the plaintiffs to multiple websites, including xHamster.com. And, although xHamster is just one of thousands of websites that use TrafficStars as an advertising broker – and even though there is no claim that Plaintiffs appeared in or were harmed by any advertisement placed by TrafficStars – Plaintiffs have nonetheless brought suit against them.

While there may well be wrongdoing in the air (or on the web, as the case may be), that will not do. And yet, after years of discovery, that is all that Plaintiffs have with respect to TrafficStars. Discovery has not strengthened Plaintiffs' jurisdictional arguments nor has it strengthened Plaintiffs' substantive claims against TrafficStars. This is not even a little bit surprising. Plaintiffs' claims arise out of: (1) their having been improperly recorded in 2012 by a third party who had no connections to either TrafficStars or Hammy; and (2) the posting of the improper recordings in 2019 to various websites including xHamster.com, again by a third party who had no connections to either TrafficStars or Hammy. And, while Plaintiffs' Fifth Amended Complaint ("FAC"), which contained barely a mention of TrafficStars, managed to barely avoid dismissal owing to the deferential standard afforded to pleadings at the Rule 12 stage, that time has passed. Now is the time for admissible evidence and legal arguments. With respect to TrafficStars, Plaintiffs have neither. Accordingly, TrafficStars' Motion for Summary Judgment should be allowed in its entirety.

## FACTS

The operative facts have not really changed from what TrafficStars represented them to be two years ago; there are simply more details and the existence of record citations that the Court could not previously consider at the Rule 12 stage. One thing, however, is remarkably clear, two years of discovery have not advanced Plaintiffs' case against TrafficStars, either from a personal jurisdiction standpoint or from a substantive standpoint. The material undisputed facts are as follows:

The Plaintiffs are residents of the states of Kentucky, Texas, and Indiana. FAC ¶¶7-15. In the Fall of 2012, Plaintiffs, who were then members of Indiana University's field hockey team, traveled to Limestone College ("Limestone") to participate in a game against the Limestone College team. FAC, ¶72. Someone – Plaintiffs allege Collins Murphy ("Murphy"), then Limestone's intramural/summer conference director – surreptitiously placed cameras in the locker room and recorded Plaintiffs and their teammates as they changed their clothes and showered. FAC, ¶¶73-76.

At the time these videos were recorded, TrafficStars *did not even exist*, not having been founded until 2014.[1] *See* Declaration of Dorothea Leonidou, ("Leonidou Decl." Exhibit 11) at ¶8. Each of the Plaintiffs admit either that the Hammy Defendants[2] played no role in the creation of the

---

[1] It should go without saying but apparently must be said that a company that did not exist at the time surreptitious videos were taken could not have encouraged the taking of such videos.

[2] For the purposes of their Depositions, the parties agreed that the term "Hammy Defendants" (or "Hammy Media Defendants") included "xHamster.com, Hammy Media Ltd., Wisebits IP Ltd., Wisebits Ltd., TrafficStars Ltd., and xHamster IP Holdings Ltd." Doe 1 Tr. pp. 119-20, li. 20-2; Doe 2 Tr. pp. 148-49, li. 19-1; Doe 3 Tr. pp. 132-33, li. 21-6; Doe 4 Tr. pp. 210-11, li. 13-2; Doe 5 Tr. p. 208, li. 10-21; Doe 6 Tr. p. 205, li. 3-14; Doe 7 Tr. p. 241 li. 12-23; Doe 8 Tr. p. 120, li. 5-14; Doe 9 Tr. pp. 177-78 li. 19-3; Doe 10 Tr. pp. 147-48, li. 18-2 (respective transcripts excerpts filed under seal as Exhibits 1-10).

videos at issue in this case,[3] or, at a minimum, that they have no evidence that the Hammy Defendants played such a role.[4] In addition, each of the Plaintiffs admit that they have no evidence or knowledge of Collins Murphy, ever communicating with the Hammy Defendants or receiving any form of compensation from the Hammy Defendants.[5] Likewise, the Plaintiffs admit that they have no evidence or knowledge of the person who uploaded the videos in question ever communicating with the Hammy Defendants or receiving any form of compensation from the Hammy Defendants. *See id.*

Seven years later – in 2019 – the recordings of the Plaintiffs and their teammates were uploaded to "countless pornographic websites," including xHamster.com, which is owned and operated by Hammy. FAC, ¶¶81.

TrafficStars has never owned or operated the xHamster.com website. *See*, Leonidou Decl. ¶7; *see also* Declaration of Nikita Popov DE 468-1, ("Popov Decl." Exhibit 12), ¶¶12-15. TrafficStars is an online advertising company that operates as a platform connecting advertisers and publishers that was founded in 2014. Leonidou Decl., ¶8. It has two types of clients: (1) publishers, companies that operate websites, and (2) advertisers, companies that wish to place advertisements on those websites. *Id.* at 10. TrafficStars facilitates the placement of ads on thousands of websites, with the xHamster.com website being just one. *Id.* at ¶11; TrafficStars Answers to Interrogatories (Exhibit 13) p. 7 Ans. 9. In 2019, for example, TrafficStars placed ads on 3,054 different websites,

---

[3]*See* Doe 1 Tr., p. 120, li. 13-18; Doe 2 Tr., p. 149, li. 7-16; Doe 3 Tr., p. 133, li. 13-22; Doe 4 Tr., p. 211, li. 5-15; Doe 5 Tr., p. 209, li. 7-23; Doe 6 Tr., pp. 205-06, li. 19-4; Doe 8 Tr., p. 120, li. 15-25; Doe 9 Tr., pp. 180-81, li. 23-8.

[4] *See*, Doe 7 Tr., pp. 244-45, li. 25-11; Doe 10 Tr., pp. 149-50 ln. 14-6.

[5] *See* Doe 1 Tr., pp. 121-22, li. 15-14; Doe 2 Tr., pp. 150-51, li. 16-14; Doe 3 Tr., pp. 134-35, li. 22-20; Doe 4 Tr., pp. 212-13, li. 14-15; Doe 5 Tr., pp. 211-13, li. 9-11; Doe 6 Tr., p. 208, li. 1-24; Doe 7 Tr., pp. 247, li. 4-11, 248-49, li. 10-10; Doe 8 Tr., pp. 122-23, li. 4-2; Doe 9 Tr., pp. 182-84 li. 14-13; Doe 10 Tr., pp. 151-53, li. 16-1).

including xHamster.com, and in 2020, that number rose to 4,194 websites. *Id.*

Other than the placement of the ads themselves, TrafficStars has no control over the content on its clients' websites. Leonidou Decl., ¶16. This includes the xHamster.com website. *Id.* Indeed, other than the ads themselves, TrafficStars has no knowledge of the specific content that appears on webpages where the ads appear. *Id.* To fully appreciate this, the Court should understand the magnitude of the number of ad views at issue. In 2019, TrafficStars placed a total of 625,502,467,512 advertisements on its clients' websites and in 2020, TrafficStars placed a total of 863,522,096,070 advertisements on its clients' websites. *Id.*; TrafficStars Int. Ans. , p. 4 Ans. 5.

TrafficStars and Hammy are separate and distinct corporate entities. Leonidou Decl., ¶3; Popov Decl., ¶12. The two companies do not share any Directors and there is no overlap in officers between the two companies. Leonidou Decl., ¶¶3-4; Popov Decl., ¶¶12-13. There is no overlap in employees between TrafficStars and Hammy. *See* Leonidou Decl., ¶5; Popov Decl., ¶13. TrafficStars and Hammy operate independently and have entirely different operating procedures. Leonidou Decl., ¶6; Popov Decl., ¶15.

TrafficStars has offices in Cyprus, where it is headquartered. Leonidou Decl., ¶8. It has no offices in either South Carolina or the United States, nor has it ever had offices in those locations. *Id.* TrafficStars has approximately 60 employees, none of whom are located in South Carolina or the United States. *Id.* ¶9. TrafficStars has never had employees in South Carolina or the United States. *Id.*

A certain number of TrafficStars' advertising clients identified themselves as United States businesses – approximately 13% in each of 2019 and 2020. *Id.* ¶13; TrafficStars Int. Ans. , pp. 3-4 Ans. 3-4. It is important to note, most of TrafficStars' clients come to TrafficStars of their own accord, having found TrafficStars through independent sources such as referrals, search engines, or conferences. Leonidou Decl., ¶13. To the extent that TrafficStars solicits clients at all, it does not

do so on a geographic basis but rather it does so on a product basis; in other words, it does not specifically solicit clients from the United States (or any other geographic location), but it may, for example, solicit publishers who have dating websites, e-commerce websites, or gambling websites, regardless of where in the world the publishers are located. *Id.*

All of TrafficStars' client relationships are governed by the Terms and Conditions published on TrafficStars' website, which are accepted by publishers and advertises when creating an account on the platform. *Id.* ¶14; Hammy Media Answers to Interrogatories, pp. 41-42 (excerpt attached hereto as Exhibit 14). These Terms and Conditions specify that they are governed by the laws of Cyprus, and both publishers and advertises agree to the exclusive jurisdiction of the courts of Cyprus when they enter into such contracts. *Id.*; See also Terms and Conditions (Exhibit 15).

As with all advertising brokers, TrafficStars offers its advertising clients (the companies placing the ads, not the websites where the ads appear) the ability to direct their ads to a specific location. Leonidou Decl., ¶15. In 2019, approximately 14.5% of TrafficStars' advertising clients chose to direct their ads towards the United States and 0.09% of TrafficStars' advertising clients chose to direct their ads towards South Carolina. *Id.*; TrafficStars Int. Ans., p. 6, Ans. 7, 8. It should be stressed that TrafficStars is not advertising *itself* into these locations, it is simply directing its clients' ads where the clients have asked them to be directed. Leonidou Decl., ¶15.

## **ARGUMENT**

### I.    **Summary Judgment Standard**

Rule 56 provides that, as to a party who has moved for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law." *Progressive Se. Ins. Co. v. Rodriguez,* 2024 U.S. Dist. LEXIS 193519, at *4-6 (D.S.C. Oct. 24,

2024), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.*

The party seeking summary judgment bears the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, (1986). "Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. …Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. …Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. …Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. …Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted…" *Progressive Se. Ins. Co., supra* (citations omitted).  When Rule 56(c) "has shifted the burden of proof to the non-movant, he must produce evidence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits." *Id.  See also Gillespie v. Spartanburg Cty. Sch. Dist. Five,* 2024 U.S. Dist. LEXIS 127783, at *5-7 (D.S.C. July 18, 2024).

## II.     Plaintiffs Have Failed to Adduce Any Evidence That This Court Can Assert Personal Jurisdiction Over TrafficStars.

Following a hearing before this Court on Defendants' Motions to Dismiss, this Court specifically held that, although it was not at that time dismissing TrafficStars from the case on jurisdictional grounds, that the issue remained open to be revisited at the summary judgment stage:

> There are questions about exactly how these entities work together, how they reach into this jurisdiction, whether or not your showing of purposeful availment is

ultimately justified based upon the facts that will be demonstrated through discovery. Jurisdiction is something that can be raised at any -- any time and all of these other things can be raised on summary judgment.

Transcript of August 16, 2023 Hearing (DE 305), p. 62.

With discovery now closed, it is obvious that – as TrafficStars said from the start – it has no connections with South Carolina that would permit an exercise of personal jurisdiction over it in this forum.

Once a defendant raises a challenge to the exercise of personal jurisdiction "the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). And, although a determination of personal jurisdiction under a state's long-arm statute is often viewed as a two-step process – consideration of whether the state statute authorizes an exercise of jurisdiction, followed by a constitutional due process analysis – where, as here, the state's long-arm statute extends to the limits of the United States Constitution's Due Process Clause, the two inquiries merge into one. *See*, *e.g.*, *Wallace v. Yamaha Motors Corp., U.S.A.,* 2022 U.S. App. LEXIS 447, at *4-5 (4th Cir. Jan. 6, 2022)("Because South Carolina has interpreted its long-arm statute to extend personal jurisdiction to the constitutional limits imposed by federal due process, our inquiry must focus on due process")(citations omitted); *Goldowsky v. Gareri,* 2018 U.S. Dist. LEXIS 26212, at *4-5 (D.S.C. Jan. 29, 2018)("The South Carolina Supreme Court has held that the State's long-arm statute, S.C. Code Ann. § 36-2-(803), is coextensive with the limits of the Due Process Clause. …As a result, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'")(citations omitted). Under Fed. R. Civ. P. 4(k)(2), the Court conducts the same constitutional analysis, only applied to the entire country as opposed to a single state. *See*, *e.g.*, *Base Metal Trading v. Ojsc Novokuznetsky Aluminum Factory*, 283 F.3d 208, 215 (4th Cir. 2002)("Rule 4(k)(2) allows a federal court to assert jurisdiction in cases 'arising under federal law'

when the defendant is not subject to personal jurisdiction in any state court, but has contacts with the United States as a whole.")

"To satisfy the constitutional due process requirement, a defendant must have sufficient 'minimum contacts' with the forum state such that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009)(quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). "The minimum contacts test requires the plaintiff to show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arise[s] out of' those activities." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "This test is designed to ensure that the defendant is not 'haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.' ... It protects a defendant from having to defend himself in a forum where he should not have anticipated being sued." *Id.* (citations omitted).

The United States Supreme Court has reaffirmed that the due process inquiry must focus "'on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). As the *Walden* court explained:

> For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State. Two related aspects of this necessary relationship are relevant in this case.
>
> First, the relationship must arise out of contacts that the "defendant *himself*" creates with the forum State.... We have consistently rejected attempts to satisfy the defendant-focused "minimum contacts" inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State....
>
> Second, our "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.

*Id.* at 284-85.

In conducting its analysis, the Court must take extra care before exercising jurisdiction over foreign defendants. As the Supreme Court and the Fourth Circuit have cautioned, "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 115 (1987); *Ellicott Mach. Corp. v. John Holland Party, Ltd.,* 995 F.2d 474, 479 (4th Cir. 1993)(quoting *Asahi* and noting that the need for caution in exercising personal jurisdiction applies "with particular force in actions against foreign national defendants").

The Fourth Circuit has "synthesized the due process requirements for asserting specific personal jurisdiction in a three-part test in which 'we consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Consulting Eng'rs Corp.*, 561 F.3d at 277 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

And, perhaps most crucially for the present motion, in examining the question of personal jurisdiction, the Court must examine the jurisdictionally-relevant contacts of each defendant separately, without conflating the contacts of one defendant with another. *See, e.g., Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 n.13 (1984)("It does not of course follow from the fact that jurisdiction may be asserted over Hustler Magazine, Inc., that jurisdiction may also be asserted over either of the other defendants. … It does not of course follow from the fact that jurisdiction may be asserted over Hustler Magazine, Inc., that jurisdiction may also be asserted over either of the other defendants"); *Luberda v. Purdue Frederick Corp.,* 2014 U.S. Dist. LEXIS 41951, at *8-9 (D.S.C. Mar. 28, 2014)("In a lawsuit with multiple defendants, the court must examine each defendant's separate and distinct contacts with South Carolina individually"); *Gordon v. Huncke*, 2011 U.S. Dist. LEXIS 116196, at *7 (D.S.C. Sep. 27, 2011)("In either case, each defendant's

contacts with the forum state must be assessed individually"); *Estate of Thomson v. Toyota Motor Corp.*, 2009 U.S. Dist. LEXIS 52144, at *4 n.5 (D. Md. June 12, 2009)("The plaintiff bears the burden of showing that the court has personal jurisdiction over each defendant"); *Colson v. Samson Hair Restoration, LLC,* 837 F. Supp. 2d 564, 570 (D.S.C. 2011)("Although § 1367(a) permits a federal court to entertain pendent claims over which it would otherwise lack subject matter jurisdiction, federal due process still requires that a court have personal jurisdiction over each defendant.")

### A.    Purposeful Availment

The Fourth Circuit has articulated a series of nonexclusive factors to be considered in determining whether a defendant has engaged in purposeful availment including: "whether the defendant maintains offices or agents in the forum state ... whether the defendant owns property in the forum state ... whether the defendant reached into the forum state to solicit or initiate business ... whether the defendant deliberately engaged in significant or long-term business activities in the forum state ... whether the parties contractually agreed that the law of the forum state would govern disputes ... whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship ... the nature, quality and extent of the parties' communications about the business being transacted ... and whether the performance of contractual duties was to occur within the forum." *Consulting Eng'rs Corp.*, 561 F.3d at 278.

As the above recitation of facts should make clear – and as discovery has confirmed – there are insufficient relevant contacts between TrafficStars and South Carolina or the United States as a whole to support an exercise of personal jurisdiction.  TrafficStars: has no offices or agents in South Carolina or the United States; has never solicited or initiated business in South Carolina or the United States (on a geographical basis); has no significant or long-term business activities in South Carolina or the United States; there is no contract between TrafficStars and Plaintiffs selecting

South Carolina or United States law or jurisdiction (indeed, there is no contract at all between the parties); the parties have never communicated with one another; and there were no contractual duties to be performed within South Carolina or the United States.

TrafficStars anticipates that Plaintiffs will try to argue that because approximately ten percent of TrafficStars' customers identify themselves as United States businesses and/or because ten to fifteen percent of the ads placed by TrafficStars on its clients' behalf are directed towards the United States, that these client-initiated contacts are sufficient to establish personal jurisdiction in this case. They are not.

The Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017), is particularly instructive here. In *Bristol-Myers*, "more than 600 plaintiffs, most of whom are not California residents, filed [a] civil action in a California state court against Bristol-Myers Squibb Company (BMS), asserting a variety of state-law claims based on injuries allegedly caused by a BMS drug called Plavix." *Id.*, at 1777.

Although the Supreme Court found that Bristol-Myers "engages in business activities in California and sells Plavix there," it nonetheless held that the California courts could not exercise personal jurisdiction over the claims brought by non-California residents. The Court reached this conclusion despite the fact that "five of the company's research and laboratory facilities, which employ a total of around 160 employees, are located" in California and the company "employs about 250 sales representatives in California and maintains a small state-government advocacy office in Sacramento." *Id.*, at 1778. Indeed, the Supreme Court noted that "BMS does sell Plavix in California. Between 2006 and 2012, it ***sold almost 187 million Plavix*** pills in the State and took in more than $900 million from those sales." *Id.*, at 1778 (emphasis added).

Nevertheless, the Supreme Court rejected the argument that these contacts should be considered for specific jurisdiction purposes because the contacts did not relate directly to the claims

12

brought by the non-resident plaintiffs:

> For a court to exercise specific jurisdiction over a claim there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State....  When no such connection exists, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State....  …What is needed is a connection between the forum and the specific claims at issue.

*Id.*, at 1776.

The same analysis applies here.  Although TrafficStars has website clients who identify themselves as being located in the United States, those clients have nothing to do with Plaintiffs' claims and, as such, those contacts are irrelevant to the Court's jurisdictional analysis in this case. Similarly, the fact that TrafficStars has advertising clients who have asked to run campaigns directed towards the United States has nothing to do with the claims brought by Plaintiffs and, as such, cannot factor into the Court's jurisdictional analysis.

### B.    The Claims do not Arise Out of TrafficStars' Activities Directed at the Forum

As is noted above, to the extent that TrafficStars has contacts with the United States because it has clients other than Hammy, Plaintiffs claims do not arise from those activities.  And, to the extent that some advertising clients have asked for their campaigns to be directed towards the United States, this too is irrelevant to Plaintiffs' claims.  Plaintiffs' claims arise out of the fact that someone surreptitiously recorded them showering and changing in a locker room and someone else uploaded those recordings seven years later to numerous websites, including one that TrafficStars just happens to provide advertising services for (along with thousands of others).

### C.    The Exercise of Jurisdiction Would Not Be Reasonable

In determining if an exercise of personal jurisdiction is constitutionally reasonable, the Fourth Circuit has dictated the consideration of five factors: (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the

plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies. *Consulting Eng'rs Corp,* 561 F.3d at 277-79 (citations omitted).

1.      *Burden on the Defendant* **–** TrafficStars is a Cypriot company.  It has no employees or offices in South Carolina or the United States, solicits no work in the United States on a geographical basis, has no relevant connections to the United States and, as such, it would present an inordinate burden for TrafficStars to be required to defend itself in this Court.

2.      *The Interest of the Forum State* – Although a state certainly has an interest in protecting its citizens from harm, including the harm allegedly inflicted on the Plaintiffs in this action, it should first be noted that Plaintiffs are not actually residents of South Carolina.  More importantly, TrafficStars is not alleged to have taken any actions within (or aimed at) South Carolina or the United States in connection with the Plaintiffs, as such, the state has a diminished interest in the resolution of the present complaint, at least insofar as it sounds against TrafficStars. Indeed, although it is also true that the United States as a whole has an interest in protecting its citizens, the US has no discernable interest in allowing Plaintiffs to pursue a claim against a company that has done nothing other than serve as the advertising broker for a website operated by another Defendant in this action, particularly where Plaintiffs' claims do not arise out of the placement of advertisements on the website.  Plaintiffs' claims are completely unconnected to the existence of advertisements on the xHamster.com website and would be precisely the same whether or not any advertisements existed.

3.      *Plaintiffs' Interests in Convenient and Effective Relief* – Plaintiffs would presumably face their own burdens in having to litigate claims against TrafficStars in Cyprus, and yet this factor, too, must be weighed against the wholesale lack of legitimate claims against TrafficStars.

4.      *The Final Factors* – To the extent that the final factors are applicable, they weigh in

favor of a denial of personal jurisdiction given the important sovereignty concerns at play. *Ellicot Mach. Corp.*, 995 F.2d 474, 480 (4th Cir. 1993)("Continuing in the *World-Wide Volkswagen* analysis, we perceive that the issues here implicate fundamental substantive social policies affecting international trade, business, and sovereignty concerns. The involvement of these policies weighs against the reasonableness of jurisdiction in Maryland.... In our view, the total picture implicates the concerns expressed in *Asahi* for constraint in the exercise of personal jurisdiction in an international context.") *See also*, *Sinatra v. National Enquirer*, 854 F.2d 1191, 1199 (9th Cir. 1988) ("a higher jurisdictional barrier" exists where, as here, the defendants are aliens as opposed to simply citizens from different states "because important sovereignty concerns exist.")

### III.    Neither the Alter Ego Theory Nor The Single Business Entity Theory Saves Plaintiffs' Jurisdictional Arguments.

In an attempt to sidestep this lack of relevant connection between TrafficStars and the jurisdiction, Plaintiffs previously attempted to argue that jurisdiction is appropriate because of TrafficStars' relationships with one or more of the other Defendants in this action (as well as certain unnamed entities, though it's unclear how Plaintiffs believe that to be relevant), claiming that jurisdiction is appropriate under either an alter ego theory or a single business enterprise theory. Again, however, discovery has produced not a shred of evidence to support either theory.

Under South Carolina law, alter ego liability is a means by which a plaintiff may pierce the corporate veil of a defendant by proving *both* that: (1) there is "total domination and control of one entity by another," *and* (2) the controlling entity's "fraud or misuse" of the alter ego company has resulted in "inequitable consequences." *Colleton Cty. Taxpayers Ass'n v. Sch. Dist.,* 371 S.C. 224, 237-38 (2006).

The level of control must be such that the "subservient entity manifests no separate interest of its own and functions solely to achieve the goals of the dominant entity." *Id.  See also Guldenzoph*

15

*v. Indigo Rd. Hosp. Grp.*, 2024 U.S. Dist. LEXIS 98989, at *12 (D.S.C. June 4, 2024) ("The alter-ego doctrine is a theory of piercing the corporate veil under South Carolina common law…As with other veil-piercing theories, it 'is not to be applied without substantial reflection.' …It 'requires a showing of [1] total domination and control of one entity by another and [2] inequitable consequences caused thereby.' … Notably, the inequitable consequences element requires some 'fraud or misuse of control by the dominant entity which results in <u>some injustice</u>.'" (emphasis in original); *Jones v. Enter. Leasing Co. Southeast*, 383 S.C. 259, 267-68 (S.C. Ct. App. 2009)("[T]he alter ego doctrine is merely a means of piercing the corporate veil …Under this theory, when a parent company controls the business decisions and actions of its subsidiary, the subsidiary becomes an instrument or alter ego of the parent. …Control required for liability under an alter ego doctrine amounts to total domination of the subsidiary to the extent the subsidiary manifested no separate corporate interests and functioned solely to achieve the purpose of the dominant corporation. …Moreover, '[c]ommon officers and/or directors and public identification of one corporation as the other's subsidiary do not, without more, support the conclusion the subsidiary is its parent's alter ego or agent for the transaction of its business.' However, merely establishing the level of control or dominance a parent must have over a subsidiary, in order to prove it is the alter ego of the subservient corporation, is not sufficient to maintain an alter ago action.  Instead "one must [also] show that the retention of separate corporate personalities would promote fraud, wrong or injustice, or would contravene public policy")(numerous internal citations omitted).

Indeed, "one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil." *Bittle-Lindsey v. Seegars Fence Co.,* 2022 U.S. App. LEXIS 13490, at *8 (4th Cir. May 18, 2022).  "Nor does the exercise of 'oversight' permit disregard of the incidents of separate corporate entities." *Johnson v. Flowers Indus., Inc.,* 814 F.2d 978, 982 (4th Cir. 1987).

Plaintiffs have adduced no evidence that would allow them to meet either prong of the articulated test. Presumably (and it is only presumably because Plaintiffs have never actually articulated which entity they believe TrafficStars to be the alter ego of), Plaintiffs are arguing that TrafficStars is the alter ego of Hammy. The problem with this argument, of course, is that there is no evidence that Hammy had any control over TrafficStars (pervasive or otherwise). Indeed, TrafficStars' director confirms that there are no overlap of officers, directors, or employees of the two companies. *See* Leonidou Decl. at ¶¶3-5. Nor is there any evidence that Hammy somehow misused TrafficStars' corporate identity in some sort of fraudulent manner. In short, Plaintiffs' alter ego theory fails in its entirety.

Plaintiffs' "single business enterprise theory," fares no better. Three South Carolina state cases set out the scope of this theory. In *Walbeck v. I'On Co., LLC*, 426 S.C. 494 (Ct. App. 2018), the South Carolina Appeals Court discussed a then recently-decided South Carolina Supreme Court case, *Pertuis v. Front Roe Restaurants, Inc.*, 423 S.C. 640 (2018), where the state Supreme Court first adopted and outlined the single business entity theory. More recently, in *Stoneledge at Lake Keowee Owners' Association v. IML Dev. Co., LLC*, 435 S.C. 109 (2021), the South Carolina Supreme Court took the opportunity to expand on its holding in *Pertuis*, explaining in more detail the contours of the "single business enterprise theory."

In *Walbeck* (the case relied on by Plaintiffs), the court thusly summarized the single business entity theory, as adopted by the *Pertuis* Court:

> …"the single business enterprise theory requires a showing of more than the various entities' operations are intertwined," as the theory had previously been applied by our courts. ...Rather, "[c]ombining multiple corporate entities into a single business enterprise requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions."

*Walbeck* 426 S.C. at 528, quoting *Pertuis*.

As the *Walbeck* Court noted the "resulting from" language in *Pertuis* was crucial: "Here,

even though there is evidence showing the various entities' operations are intertwined, there is no evidence of 'bad faith, abuse, fraud, wrongdoing, or injustice *resulting from* the blurring of the entities' legal distinctions.'" *Id.* (emphasis in *Walbeck*).

In adopting the single business entity rule, the South Carolina Supreme Court quoted at length from a Texas Supreme Court case, specifically adopting its reasoning:

> Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse, or . . . injustice and inequity. By 'injustice' and 'inequity' we do not mean a subjective perception of unfairness by an individual judge or juror; rather, these words are used . . . as shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield—fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like. Such abuse is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a 'bedrock principle of corporate law' - that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations. Disregarding the corporate structure involves two considerations. One is the relationship between two entities . . . . The other consideration is whether the entities' use of limited liability was illegitimate.

*Pertuis* 423 S.C. at 654-55, *quoting SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008).

The *Pertuis* Court stressed, however, that the single business entity rule was not to be applied lightly:

> As with other methods of piercing the corporate form that have previously been recognized in South Carolina, equitable principles govern the application of the single business enterprise remedy, and this doctrine 'is not to be applied without substantial reflection.' … If any general rule can be laid down, it is that a corporation will be looked upon as a legal entity until sufficient reason to the contrary appears; but when the notion of legal entity is used to protect fraud, justify wrong, or defeat public policy, the law will regard the corporation as an association of persons. The party seeking to pierce the corporate veil has the burden of proving that the doctrine should be applied.

*Pertuis* 423 S.C. at 655 (internal citations and quotation marks omitted).

And, in *Stoneledge*, the South Carolina Supreme Court reversed the findings of the trial court

and appeals court, which had found that the defendants constituted a single business entity based (in part) on a unification of business operations between the defendants, self-dealing between the defendants, and a finding that, because the defendants' "profits were entirely dependent" on their joint venture to sell townhomes in a residential development, that "their operations were clearly in pursuit of a common business purpose…." *Stoneledge* 435 S.C. at 125.  In rejecting the lower courts' findings that the defendants together constituted a single business entity, the *Stoneledge* Court held that:

> Viewing the facts of this case with the requisite hesitancy to invade the LLC form, we do not believe these facts warrant the application of the single business enterprise theory. As noted above, in *Pertuis*, we held the single business enterprise theory requires more than just a showing that the various entities' operations are intertwined. A "common business purpose" is simply not enough. … For a court to combine different business entities into a single business enterprise, there must also be a showing of "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." …The conduct of Marick, Thoennes, and IMK did not rise to this level. Like other methods of invading the corporate form, invocation of the single business enterprise theory should be reserved for drastic situations and is the rare exception, not the rule.

*Stoneledge* at 126.

Similarly, this Court recently had the opportunity to consider the single business entity rule in a case where Plaintiff made allegations similar to those made by Plaintiffs here to support its single business entity theory of liability.  *Turtle Factory Bldg. Corp. v. ECS Southeast, LLP,* 2021 U.S. Dist. LEXIS 125238 (D.S.C. July 6, 2021).  The defendants there included ECS Southeast, LLP, ECS Carolinas, and ECS Corporate, each of which was an operating subsidiary of Engineering Consulting Services, Ltd.  *Id.* at *4-5.  In *Turtle Factory Bldg. Corp.*, Plaintiff alleged that it had been harmed as a result of a Property Condition Assessment Report ("PCR") prepared and provided by Defendant ECS Carolinas.  In support of its motion for summary judgment, ECS Corporate provided affidavits showing that it did not prepare the PCR at issue and, indeed, it "does not provide engineering services, is not licensed to perform those services, and its primary function is to oversee

19

corporate, human resources, IT and general management matters pursuant to a Master Services Agreement [the 'MSA'] with Engineering Consulting Services, Ltd." *Id.* at *4 (brackets in original). The plaintiff, on the other hand, argued that: (1) defendants had failed to comply with corporate formalities, including the lack of a signed written agreement delineating " the scope of services it provided to ECS Carolinas, LLP"; (2) there was a lack of "clear identification of its corporate officers and structure which would help distinguish it from any of the other ECS entities"; (3) "because ECS Corporate states it provided human resource services to all ECS entities, ECS Corporate was thus responsible for … a failure to properly train and supervise" the employee who prepared the PCR; (4) "ECS Corporate Services, LLC is part of the whole that has cause [sic] the harm to the Plaintiff"; and (5) "all Defendants appear to have the same address and utilize the same web address." *Id.* at *6-9

Nonetheless, this Court had no hesitation in rejecting plaintiffs' single business entity theory, holding that "Plaintiff has put forth no evidence indicating bad faith, abuse, fraud, wrongdoing, or injustice resulting from an improper blurring of legal entities. …'It is commonplace for companies to establish multiple corporate entities, who maintain individual corporate identity despite close collaboration between the different entities' …'Combining multiple corporate entities into a single business enterprise requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions.'" *Id.* (internal citations omitted).

One last case from this Court deserves mention as representative of just how extensive connections between companies can be and still not qualify as a single business entity if the intertwining corporate structure enabled the defendants to engage in some sort of fraud or abuse. *Guldenzoph v. Indigo Rd. Hosp. Grp.*, 2024 U.S. Dist. LEXIS 98989 (D.S.C. June 4, 2024). In *Guldenzoph*, the Plaintiffs alleged that Defendant the Indigo Road Hospitality Group ("IRHG"), a South Carolina Limited Liability Company, operated a number of sushi restaurants across the South

20

under the name O-Ku. "Each Restaurant Defendant is a separate LLC organized according to the laws of its respective state. …For example, O-Ku Charleston is a South Carolina LLC, O-Ku Nashville is a Tennessee LLC, O-Ku Atlanta is a Georgia LLC, and so on. …However, each of the Restaurant Defendants lists its principal office in its respective state business registration paperwork as 1426 Meeting Street in Charleston, South Carolina." *Guldenzoph* at *3-4. The *Guldenzoph* plaintiffs alleged that IRHG exercised complete control over each of the restaurant LLCs:

> Notably, Guldenzoph asserts that IRHG makes all employment related decisions for the Restaurant Defendants, including hiring and firing the Restaurant Defendants' employees and providing centralized Human Resources services for all Restaurant Defendants. … This control includes directly hiring the various general managers, chefs, and other management level employees for the Restaurant Defendants. … IRHG also allegedly controls the material aspects of the Restaurant Defendants' non-management workers' employment. … Guldenzoph accuses IRHG of defining the employees' job titles, positions, and duties; determining whether each position is hourly or exempt; determining whether each job receives the tip wage or the federal minimum wage; setting labor budget and staffing levels for each restaurant; mandating employee qualifications and training; retaining the ability to fire non-management employees; and mandating that all of the Restaurant Defendants use the same job descriptions, which include the name, "Indigo Road Hospitality Group," when advertising vacancies.
> In addition, IRHG asks employees working for one of the Restaurant Defendants to work for one of the other Restaurant Defendants. For example, while Guldenzoph regularly worked at O-Ku Nashville, she was asked to work at O-Ku Jacksonville for a few months when the latter was first opening.

*Id.* At *4-5.

Despite all of this evidence of pervasive control, this Court declined to find the single business entity theory applicable:

> The South Carolina Supreme Court… has made especially clear that the injustice requirement under the single business enterprise theory analysis necessitates something more than "a subjective perception of unfairness.
>
> [R]ather, these words are used . . . as shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield—fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct,

and the like. Such abuse is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a 'bedrock principle of corporate law'—that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations.

*Id.* at *13.

And, while the Court found that the Plaintiff there had alleged "that IRHG exerted an extreme level of control over the Restaurant Defendants," it nevertheless found that "her allegations fall short of indicating that defendants' corporate structure allowed them to perpetuate their allegedly unlawful employment practices." *Id.* at *15.

In the present case, and after years of discovery, Plaintiffs can show nothing but that there is some relationship between the companies and that they directly or indirectly play some role in ultimate operation of Hammy's business. As this Court noted during the hearing on the parties' Motions to Dismiss, there is nothing unusual or improper about such an arrangement:

I mean, in many industries, separate subsidiaries are created for different purposes for -- for exactly that reason. There's nothing illegal about that.

Hearing Transcript, August 16, 2023, p. 9 (DE 305).

Ultimately, despite years of costly discovery, there remains no evidence that would support an exercise of personal jurisdiction over TrafficStars and, accordingly, TrafficStars' Motion for Summary Judgment should be allowed.

##### IV.    TrafficStars is Entitled To Judgment on Each of Plaintiffs' Claims as a Matter of Law.[6]

###### A.    Section 230 of the Communications Decency Act

---

[6] Although TrafficStars believes that the Court can and should dismiss the action against it on jurisdictional grounds, it would also respectfully ask this Court – given the time and expense invested at this point – to also rule on the substantive grounds of its motion so as to provide a more fulsome record for the Fourth Circuit if the Plaintiffs were to appeal dismissal of their complaint.

As this Court is well aware, Section 230 of the Communications Decency Act ("Section 230") creates a broad federal immunity protecting computer service providers against liability of any kind for information originating with a third-party user of the service. *See, e.g., Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997) and *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 254-55 (4th Cir. 2009). If the Court were to accept Plaintiffs' alter ego or single business entity theories and consider TrafficStars to somehow be part of a unified entity operating the xHamster.com website, then TrafficStars would be equally entitled to the immunity offered by Section 230. To that end, and to avoid inundating the Court with duplicative arguments, TrafficStars incorporates by reference herein the Section 230 arguments made by Hammy in its Motion for Summary Judgment.

On the flip side, to the extent that the Court finds that Plaintiffs have failed to produce sufficient evidence to support their alter ego or single business entity theories and thereby concludes that TrafficStars has no role in operating the xHamster.com website and is, therefore, not a "computer service provider," it necessarily follows that, while TrafficStars cannot rely on Section 230 immunity, it is nonetheless entitled to Summary Judgment because each of Plaintiffs' claims against it would fail as a matter of law. Indeed, although it becomes somewhat nonsensical to even attempt to discuss the myriad of ways in which Plaintiffs' claims fail with respect to TrafficStars once the Court has rejected Plaintiffs' alter ego and single business entity theories, in the interest of being comprehensive, TrafficStars will attempt to do so.

### B.      18 U.S.C. §1591 (a)(1) and (a)(2) and §1595 (Count I)

The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a civil right of action for persons who have been subjected to sex trafficking. *See* 18 U.S.C. §§1591(a), 1595. Section 1591 of the TVPRA articulates criminal provisions of the statute and section 1595 provides that, under certain circumstances, a civil right of action is available for the crimes articulated in

§1591. More specifically, Plaintiffs may assert a civil cause of action against: (1) those who directly trafficked the Plaintiff; and (2) those who did not "directly traffic the victim, but benefitted from what the facilitator should have known was a trafficking venture." *See, e.g., J.C. v. Choice Hotels Int'l, Inc.,* 2020 WL 6318707, at *3 (N.D. Cal. Oct. 28, 2020) (citation omitted).

In January 2023, the TVPRA was amended to include liability for anyone who "attempts or conspires to benefit" from a TVPRA violation, but the amendment does not apply retroactively to conduct that occurred prior to the amendment. *See* Abolish Trafficking Reauthorization Act of 2022, Pub. L. No. 117-347, § 102, 136 Stat., 6199 (2023) (hereinafter, the "ATRA"); *Ratha v. Rubicon Res., LLC,* 111 F.4th 946, 969 (9th Cir. 2024)("we conclude that ATRA does not apply to pre-enactment conduct.")

Turning to Plaintiffs' TVPRA claim, then, the claim – insofar as it sounds against TrafficStars – can only be a beneficiary claim. To succeed on such a claim, Plaintiffs must prove that (1) TrafficStars knowingly benefited financially or by receiving anything of value; (2) from its participation in an undertaking or enterprise; (3) that the undertaking or enterprise violated the TVPRA with respect to the Plaintiffs; and (4) that TrafficStars knew or should have known was violating the TVPRA with respect to the Plaintiffs. *See, e.g., K.H. v. Riti, Inc*., 2024 U.S. App. LEXIS 3127, at *6 (11th Cir. Feb. 9, 2024); *Doe v. Red Roof Inns, Inc.,* 21 F.4th 714, 723 (11th Cir. 2021); *Doe v. Twitter, Inc.,* 555 F. Supp. 3d 889, 922 (N.D. Cal. 2021).

### i.     Section 1595 has no extraterritorial application

As a threshold matter, however, and before the Court even turn to an examination of the factors outlined above, Plaintiffs' TVPRA claim fails in its entirety for one simple reason: Section 1595, the only section that permits Plaintiffs to bring a civil claim, has no extraterritorial application. *See, e.g., Doe v. Apple Inc.,* 2021 U.S. Dist. LEXIS 237710, at *38-39 (D.D.C. Nov. 2, 2021)("The foregoing assumes that § 1595 of the TVPRA even applies in this case, which involves allegations

of conduct and harm in the DRC. But not every statute applies extraterritorially. Indeed, courts 'presume that a statute applies only domestically.' …This presumption can be rebutted only if the statute 'gives a clear, affirmative indication' that it covers foreign conduct. … 'When a statute gives no clear indication of an extraterritorial application, it has none'"); *Doe v. WebGroup Czech Republic*, 2024 U.S. Dist. LEXIS 131697, at *30 (C.D. Cal. July 24, 2024)("First, the court presumes that a statute applies only domestically. …This presumption can only be rebutted if the statute 'gives a clear, affirmative indication' that it covers foreign conduct. … 'When a statute gives no clear indication of an extraterritorial application, it has none.' … This appears to be the case here. The text of § 1595 does not include anything concerning extraterritorial jurisdiction.")  TrafficStars is a Cypriot company and any acts or omissions it is charged with occurred fully within Cyprus.  As such, §1595 has no application and TrafficStars is entitled to judgment on this claim as a matter of law.

### ii.     No violation of §1591(a)(1) or §1591(a)(2)

Even if the Court were to consider the merits of Plaintiffs' TVPRA claim, however, it fails from start to finish.  Before turning to the four-factors required to prove a claim under the statute, there is again a simpler and more structural reason why Plaintiffs' TVPRA claim fails as a matter of law.  In order to have a civil cause of action under §1595, there first must be an underlying "violation of this chapter."  In this case, Plaintiffs allege underlying violations of §1591(a)(1) and (a)(2).

A violation of §1591(a)(1) – the direct violation portion of the statute – makes it an offence for whomever knowingly "in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person." 18 U.S.C.S. § 1591(a)(1).  *The only act that could arguably meet this definition is the original surreptitious recording of the Plaintiffs in 2012.*

25

A violation of §1591(a)(2) – the beneficiary portion of the statute penalizes whomever knowingly "benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1)."  In other words, the benefit derived must come from participation *in the venture engaged in the act that violated paragraph 1.*

Here, the seven-year disconnect between the violation of paragraph 1 and the alleged "benefit" being derived in paragraph 2 makes it impossible for a reasonable jury to conclude that the benefit arose from "participation" in an act that took place seven years earlier (and, possibly, involved different actors).  Indeed, with respect to TrafficStars, it is an event that took place at a time before TrafficStars had even been formed.  As a matter of law, the statute simply cannot be twisted to reach such an absurd result.

### iii.     Plaintiffs cannot prove any of the four factors of a violation of the TVPRA

Even if this were not the case, however, Plaintiffs have failed to meet their burden of proof with respect to any of the four factors required to prove their claim for a violation of the TVPRA.

First, there is no evidence that TrafficStars knowingly received a benefit from its participation in a sex trafficking venture.  To the contrary, the undisputed evidence demonstrates that the only revenues TrafficStars received in connection with the xHamster.com website were the commissions it received for placing advertisements on the website for TrafficStars' advertising clients – just as it does for thousands of other websites.  It received no special amounts for advertisements that may have appeared in connection with the videos at issue in the case, nor did TrafficStars even know what was contained in the videos. This is a far cry, however, from proof that TrafficStars knowingly benefitted from its participation in an enterprise that sexually trafficked the Plaintiffs, which is required to meet just the first prong of the test and which cannot be met with proof of generalized revenue.  *See, e.g., Does v. Reddit, Inc.,* 51 F.4th 1137, 1145-46 (9th Cir. 2022)("Moreover, the plaintiffs have not alleged a connection between the child pornography posted

on Reddit and the revenue Reddit generates, other than the fact that Reddit makes money from advertising on all popular subreddits"); *citing Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) (finding insufficient connection between general benefits defendant received from working for individual who perpetrated sex trafficking and the perpetrator's conduct toward the victim).

Next, Plaintiffs cannot prove, as they must, that TrafficStars knew that it was participating in an enterprise or venture.[7] And, although §1595 does not define "participation," a number of the cases have endeavored to do so, finding that the term requires a defendant to have provided actual substantive assistance to the trafficking venture. *See, e.g., K.H. v. Riti, Inc.,* 2024 U.S. App. LEXIS 3127, at *10 (11th Cir. Feb. 9, 2024)("allegations of financial benefit alone are not sufficient to establish that the defendant participated in a sex trafficking venture and observing signs of sex trafficking 'is not the same as participating in it.'") And, in *Does v. Reddit, Inc.,* 51 F.4th 1137 (9th Cir. 2022), the Ninth Circuit specifically addressed the question of what it meant for a website defendant to "participate" in a sex trafficking venture:

> In a sex trafficking beneficiary suit *against a defendant-website*, the most important component is the *defendant-website's* own conduct—its 'participation in the venture.' *See* 18 U.S.C. § 1595(a) (authorizing lawsuits against those who "benefit[] . . . from participation in a [trafficking] venture"). A complaint against a website that merely alleges trafficking by the website's users—without the participation of the website—would not survive. Proof that a user committed criminal trafficking may "entitle a plaintiff to relief" in a case against the *user*, but not against the website.

*Id.* at 1142 (emphasis in original).

---

[7] Although it is admittedly a little confusing, the second prong of §1595, participation in a venture, requires actual knowledge, as opposed to the fourth prong of §1595, which requires either actual or constructive knowledge. *See, e.g., Woodhull Freedom Found. v. United States,* 461 U.S. App. D.C. 425, 443, 72 F.4th 1286, 1304 (2023)("While both Sections 1591 and 1595 prohibit 'participation in a venture' that has engaged in sex trafficking, Section 1595's civil liability provision does not explicitly specify a *mens rea* for 'participation in a venture[.]' While the statutory text is not explicit and a few initial rulings were contradictory, court rulings are now consistent that Section 1595 requires an actual knowledge *mens rea* for participation in a venture.")

And, with respect to TrafficStars, of course, there is even less of a basis to find "participation," given that TrafficStars is a step removed from even being a "website defendant" having only served as an advertising broker for xHamster.com, as it does for thousands of websites. This is hardly the type of "participation" required under §1595.

Finally, there is no evidence whatsoever that TrafficStars knew – or had reason to know – either that the Plaintiffs had allegedly been trafficked or that it was involved in any way (if it was) with such a violation of the TVPRA. TrafficStars had no connection with the operation of the xHamster.com website and did not know the content of what was or was not posted on the website. As such, it could not have known anything about Plaintiffs' alleged trafficking.

Because §1595 does not apply extraterritorially and because Plaintiffs, in any event, cannot meet their burden to prove any of the elements of a claim under that section, TrafficStars is entitled to judgment as a matter of law on Count I of the FAC.

## C.     Civil RICO (Count II)

In order to prevail on claim for Civil RICO, Plaintiffs would first have to have admissible evidence to show that TrafficStars engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity that must include at least two racketeering acts." *Brooks v. Field*, 2015 U.S. Dist. LEXIS 33950, at *24 (D.S.C. Feb. 20, 2015), *citing Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479 (1985). Again, and with apologies for the repetition, there is no record evidence to support any of these factors because TrafficStars is nothing more than an advertising broker providing services to thousands of websites.

Although the Court's inquiry could certainly end there, establishment of the four elements outlined above is only the first part of establishing a claim for relief under the Civil RICO statute. "To make out a civil action for damages under the RICO statute a private plaintiff must demonstrate

not only that the defendants have violated § 1962, but also that he has been 'injured in his business or property by reason of [the alleged] violation of section 1962.' 18 U.S.C. § 1964(c). The quoted language requires the plaintiff to make two closely related showings: (1) that he has suffered injury to his business or property; and (2) that this injury was caused by the predicate acts of racketeering activity that make up the violation of § 1962.  …it is clear that a civil RICO complaint is vulnerable to a motion to dismiss if it fails to allege either an adequate injury to business or property… or an adequate causal nexus between that injury and the predicate acts of racketeering activity alleged…" *Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir. 1988).

And, to add to the laundry list of infirmities in Plaintiffs' Civil RICO case, Plaintiffs have no admissible evidence of an injury to their "business or property."   This is fatal to their Civil RICO claim.  *See, Brandenburg, supra; Bast v. Cohen, Dunn & Sinclair, P.C.,* 59 F.3d 492, 495 (4th Cir. 1995)("Bast does not have standing to assert a claim for civil damages under 18 U.S.C. § 1964(c) because he fails to allege any 'injury in his business or property' that was proximately caused by the alleged RICO violation. 18 U.S.C. § 1964(c); ...At  most, Bast pleads that he 'suffered extreme mental anguish' when he learned of Pettit's recordings. … An allegation of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property'")(citations omitted); *Dickerson v. TLC The Laser Eye Ctr. Inst., Inc.,* 493 F. App'x 390, 394 (4th Cir. 2012)("Dickerson can only recover if he shows that his injury caused by the RICO violation damaged his business or property. … Thus, any allegation of personal injuries and losses from those injuries will not be considered injuries to business or property under the act"); *Bowen v. Adidas Am., Inc.,* 541 F. Supp. 3d 670, 676 (D.S.C. 2021)("Allegations of personal injuries and the pecuniary losses incurred therefrom do not qualify as injury to 'business or property.'")

Because Plaintiffs have failed to adduce evidence that could support any of the required

elements of a claim for relief for Civil RICO, TrafficStars is entitled to Summary Judgment on Count II of the FAC.

### D.    Negligent Monitoring (Count III)

Plaintiffs next attempt to state a claim for the "negligent monitoring" of the xHamster.com website, alleging that TrafficStars had a legal duty to properly monitor the content of the xHamster.com website for illegal and nonconsensual material. FAC, §183.   Given that it is undisputed that TrafficStars had no role in operating the xHamster.com website, it had neither the ability nor the obligation to monitor the content posted there by third parties.   And, even if TrafficStars had the *ability* to monitor the content posted to the xHamster.com website by third parties, Plaintiffs' claim for "negligent monitoring" would still fail as a matter of law as there is no independent duty for a website to monitor the content posted by third parties. *See. e.g., Doe v. GTE Corp.,* 347 F.3d 655, 661 (7th Cir. 2003)(internet service provider that hosted website selling videotapes of collegiate athletes secretly recorded in sports team locker rooms and bathrooms had no duty to plaintiffs to prevent the misuse of its services); *Est. of Bride v. YOLO Techs., Inc.,* 112 F.4th 1168, 1181 (9th Cir. 2024)("No website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content"); *Teasley v. Tyler Techs., Inc.,* 2024 U.S. Dist. LEXIS 207486, at *7 (M.D.N.C. Nov. 15, 2024)("Ms. Teasley alleges that Tyler owed her a duty of care to ensure that it 'was not publishing false and libelous information about her in the internet website portal,' and to 'remove any false and libelous information published.' But these conclusory allegations do not give rise to a duty of care. Ms. Teasley has not provided any cases, statutes, or other legal authority suggesting that corporations that operate websites owe a duty of care to members of the public")(citations omitted); *M.L. v. Craigslist Inc.,* 2020 U.S. Dist. LEXIS 166836, at *38 (W.D. Wash. Apr. 17, 2020)("plaintiff provides no factual basis or argument supporting her assertion that craigslist has a generally duty to ensure that their

30

website is not endangering minors. Additionally, plaintiff cites no authority, and the undersigned is aware of none, supporting the proposition that craigslist has a general duty to ensure that their website does not endanger minors. Accordingly, plaintiff's bald assertion that craigslist has some duty to protect minors is insufficient to state a claim for negligence"); *Doe v. MySpace, Inc.,* 474 F. Supp. 2d 843, 851-52 (W.D. Tex. 2007)("Plaintiffs have failed to state a claim for negligence or gross negligence because MySpace had no legal duty to prevent the alleged sexual assault….MySpace had no duty to protect Julie Doe from Pete Solis's criminal acts nor to institute reasonable safety measures on its website.")

Because TrafficStars neither had nor breached any duty to the Plaintiffs to monitor the xHamster.com website, they are entitled to judgment as a matter of law on Count IX of the FAC, alleging Negligent Monitoring.

### E.     False Light (Count X)

In Count Ten, Plaintiffs claim that the posting of the videos on the xHamster.com website cast them in a false light because they "falsely portray the Plaintiffs as exhibitionists/sexual deviants/pornstars, which the Plaintiffs are not." FAC, ¶190. Preliminarily, there is something unseemly about Plaintiffs having spent so much time and energy arguing that the videos in question were clearly taken without their consent only to turn around and argue that the videos somehow portray the Plaintiffs as having consented to their recording. Be that as it may, the claim again fails at its root because TrafficStars had no control over what was or was not posted on the xHamster.com website. And, even if this were not the case, TrafficStars would still be entitled to judgment as a matter of law because South Carolina simply does not recognize a cause of action for "false light." *See, e.g., Wedlake v. Bd. of Dirs. of Woodington Homeowners' Ass'n*, 2022 S.C. App. Unpub. LEXIS 224, at *3-4 (Ct. App. Apr. 27, 2022)(noting that no South Carolina case has recognized a cause of action for false light); *Erickson v. Jones St. Publishers, LLC*, 368 S.C. 444, 482 (2006)(same)*;*

*Brown v. Peterson*, 326 S.C. 409, 422 (1997)(same); *Parker v. Evening Post Publishing Co.*, 317 S.C. 236, 246 (1994)(same).

Because South Carolina does not recognize a cause of action for false light and because, even if it did, the undisputed evidence demonstrates that TrafficStars had no control over what was or was not published on the xHamster.com website, TrafficStars is entitled to judgment as a matter of law on Count X of the FAC, alleging False Light.

### F.     Civil Conspiracy (Count XI)

Finally, Plaintiffs' claim for Civil Conspiracy has, surprise, found absolutely no factual support through the course of discovery.  Under South Carolina law, "a plaintiff asserting a civil conspiracy claim must establish (1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." *Paradis v. Charleston Cty. Sch. Dist.*, 433 S.C. 562, 574 (2021).  One is, of course, left to guess with whom TrafficStars allegedly combined to commit an unlawful act (since the complaint simply lumps all of the defendants together as having joined together to do so), but since the improper acts described are: (1) the surreptitious recording of the Plaintiffs in 2012, and (2) the posting of the recordings of the Plaintiffs to various websites including xHamster.com in 2019, one would have to assume that TrafficStars would have had to have entered into some sort of combination and agreement with the individual responsible for recording the plaintiffs and/or uploading the videos. There is no evidence whatsoever of either and – with respect to the former – it would have been an impossibility since TrafficStars had not even been formed when the recordings were made.  And, with respect to the uploader of the videos, there is no evidence that TrafficStars (or Hammy for that matter) ever communicated with the person responsible for uploading the videos.  And, moreover, there is no evidence that TrafficStars (or Hammy) had the intent to post non-consensual videos of

the Plaintiffs.

In considering the level of intent and causal connection necessary to support a conspiracy claim in the context of the operation of a website (which, of course, TrafficStars did not even do), it is instructive to consider the Supreme Court's recent decision in *Twitter, Inc. v. Taamneh, et al.,* 598 U.S. 471 (2023). And, although that case dealt more with the related cause of action of "aiding and abetting" (as discussed above) as opposed to conspiracy (although the Court also discussed conspiracy in its opinion), that makes the case, if anything, *more* compelling since it is *easier* to prove aiding and abetting then it is to prove conspiracy. *Twitter,* 598 U.S. at 489-90 ("Moreover, unlike its close cousin conspiracy, aiding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts, thus eliminating a significant limiting principle.")

Plaintiffs in *Twitter* were family members of victims of the 2017 Reina nightclub bombing in Istanbul, Turkey orchestrated by the Islamic State of Iraq and Syria ("ISIS"). Plaintiffs brought suit against Twitter, Facebook, and Google (which owns and operates YouTube) for aiding and abetting ISIS in the commission of the bombing. Plaintiffs alleged that ISIS posted videos to Defendants' websites in order to radicalize and recruit new members to ISIS. Plaintiffs also alleged, *inter alia*, that the Defendants encouraged users to watch ISIS recruitment videos by recommending such videos to users once they had watched one terrorism-related video; that the defendant websites profited from displaying such videos by displaying advertising with and alongside such videos; and that:

> …defendants have known that ISIS has used their platforms for years. Yet, plaintiffs claim that defendants have failed to detect and remove a substantial number of ISIS-related accounts, posts, and videos. (For example, plaintiffs aver that defendants "have failed to implement . . . a basic account detection methodology" to prevent ISIS supporters from generating multiple accounts on their platforms. …Accordingly, plaintiffs assert that defendants aided and abetted ISIS by knowingly allowing ISIS and its supporters to use their platforms and benefit from their "recommendation" algorithms, enabling ISIS to connect with the broader public, fundraise, and radicalize new recruits. And, in the process, defendants allegedly have

profited from the advertisements placed on ISIS' tweets, posts, and videos.

Plaintiffs also provide a set of allegations specific to Google. According to plaintiffs, Google has established a system that shares revenue gained from certain advertisements on YouTube with users who posted the videos watched with the advertisement. As part of that system, Google allegedly reviews and approves certain videos before Google permits ads to accompany that video. Plaintiffs allege that Google has reviewed and approved at least some ISIS videos under that system, thereby sharing some amount of revenue with ISIS.

*Id.* at 481-82.

Accordingly, Plaintiffs sued Defendants under the Justice Against Sponsors of Terrorism Act (JASTA).  As the Supreme Court stated, "as the law now stands, those injured by an act of international terrorism can sue the relevant terrorists directly under §2333(a)—or they can sue anyone 'who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism' under §2333(d)(2)." *Id.* at 483.

Following an extensive discussion of the civil and criminal caselaw concerning secondary liability, the Supreme Court returned to Plaintiffs' arguments in support of their claim that Defendants had "aided and abetted" ISIS and rejected them in their entirety:

The mere creation of those platforms, however, is not culpable. To be sure, it might be that bad actors like ISIS are able to use platforms like defendants' for illegal— and sometimes terrible—ends. But the same could be said of cell phones, email, or the internet generally. Yet, we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large. Nor do we think that such providers would normally be described as aiding and abetting, for example, illegal drug deals brokered over cell phones—even if the provider's conference-call or video-call features made the sale easier.

…To be sure, plaintiffs assert that defendants' "recommendation" algorithms go beyond passive aid and constitute active, substantial assistance. We disagree.

*Id.* at 499.

Ultimately, the Supreme Court rejected as too broad the blanket imposition of aiding and abetting liability on companies that provide online platforms to third parties, even if those third

parties utilize the platforms to unlawful ends:

> The fact that some bad actors took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted those wrongdoers' acts. And that is particularly true because a contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them. That conclusion would run roughshod over the typical limits on tort liability and take aiding and abetting far beyond its essential culpability moorings.

*Id.* at 503.

The same reasoning applies equally here. Even had Plaintiffs shown any evidence that TrafficStars joined with other Defendants to operate the xHamster.com website (which they have not), the fact that third parties took advantage of that platform to post surreptitiously recorded videos of the Plaintiffs cannot support a claim for conspiracy and any contrary conclusion "would run roughshod over the typical limits on tort liability" and take conspiracy "far beyond its essential culpability moorings." Because Plaintiffs have failed to produce evidence from which a reasonable jury could find that TrafficStars had engaged in a Civil Conspiracy, it is entitled to a judgment as a matter of law on Count XI of the FAC.

## CONCLUSION

For the reasons stated hereinabove, TrafficStars' Motion for Summary Judgment should be allowed in its entirety.

<div style="margin-left:40%">

Respectfully submitted,


/s/ Hannah Rogers Metcalfe
Hannah Rogers Metcalfe, Fed ID. 9943
Metcalfe & Atkinson, LLC
1395 South Church Street
Greenville, South Carolina 29605
(864) 214-2319

Evan Fray-Witzer (*pro hac vice*)

</div>

CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
Telephone: 617-426-0000
Facsimile: 617-423-4855
Evan@CFWLegal.com

Valentin D. Gurvits (*pro hac vice*)
Frank Scardino (*pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
Telephone: 617-928-1804
Facsimile: 617-928-1802
vgurvits@bostonlawgroup.com
frank@bostonlawgroup.com

*Attorneys for Defendant TrafficStars Ltd.*

January 10, 2025
Greenville, South Carolina