UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

```
* * * * * * * * * * * * * * *
JANE DOES 1-9,              * CIVIL NO. 7:20-cv-0947
                           * CIVIL NO. 7:21-cv-3193
            Plaintiff,     * CIVIL NO. 7:22-cv-3576
                           * FEBRUARY 20, 2025  10:29 A.M.
v                          * MOTIONS HEARING
                           *
COLLINS MURPHY, ET AL.,    * Before:
                           * HONORABLE DONALD C. COGGINS, JR.
                           * UNITED STATES DISTRICT JUDGE
            Defendants.    * DISTRICT OF SOUTH CAROLINA
* * * * * * * * * * * * * * *
```

For the Plaintiffs:     GABRIELLE ANNA SULPIZIO, ESQUIRE
                        AUGUSTE FOUT, ESQUIRE
                        Bell Legal Group
                        P.O. Box 2590
                        Georgetown, SC  29442

For MG Freesites, Ltd:  MARK BRANDON GODDARD, JR., ESQUIRE
                        Turner Padget Graham & Laney
                        PO Box 1473
                        Columbia, SC  29202

For Collins Murphy:     THOMAS A. BARROW, ESQUIRE
                        Hall Booth Smith
                        111 Coleman Blvd., Suite 301
                        Mt. Pleasant, SC  29464

For Hammy Media:        HANNAH ROGERS METCALFE, ESQUIRE
                        Metcalfe & Atkinson, LLC
                        1395 South Church Street
                        Greenville, SC  29605

Michele E. Becker, RMR, CRR, RPR
U.S. District Court Reporter
250 East North Street, Room 3404
Greenville, SC  29601

2

                    **I N D E X  CONT'D**

For Hammy Media:          EVAN M. FRAY-WITZER, ESQUIRE
                          Ciampa Fray-Witzer, LLC
                          20 Park Plaza, Suite 505
                          Boston, MA   02360

                          VAELNTIN D. GURVITS, ESQUIRE
                          Boston Law Group PC
                          825 Beacon Street, Suite 20
                          Newton, MA   02459

For Limestone College:    JOHN A. HUBERT, ESQUIRE
                          Rahimi Hughes & Padgett, LLC
                          33 Bull Street, Suite 590
                          Savannah, GA   31401


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided software.

**P R O C E E D I N G S**

(Court is called to order on Thursday, the 20th of February 2025, at 10:29 a.m.)

THE COURT:  Thank you.  Please be seated.  All right.  This morning we are here in the cases that are styled Does or Doe Versus Murphy, et al.  These case numbers are 20-947, 21-3193, and 22-3576.  There are several motions, discovery motions that we need to deal with.  In addition to that when we get through with those I want to talk with counsel about scheduling in terms of where we go from here on all three cases.  I also want to talk with you about the potential effect of a recent decision by the Fourth Circuit that came out a couple of weeks ago, although I will tell you I think that case is going to come up in the context of some of these discovery disputes.  So we may cover that anyway. And then actually I'll start with this.

The filings in these cases have been somewhat of a challenge for the clerk staff to deal with.  Obviously, a large number of exhibits have been filed, and given the nature of the case a large number of those exhibits have been filed under seal.  They have not always been clearly identified as to which motion or pleading they relate to.  And in a couple of cases I think there has been confusion about which case they were filed in or supposed to be filed in.  For example, this morning I believe one of these motions to compel actually

got filed in the 3576 case, which is Mr. Few's case, but it was not a motion that affected parties in that case. And so I just want to not necessarily admonish but encourage counsel to work with the clerk's office to make sure that what you are filing is clearly labeled and is clearly related to the motion or briefing that you intend it to relate to so that the Court doesn't have any question about exactly what the exhibits are and what they relate to, and I don't have to try to figure that out. So just bear that in mind. Let's start as the old Chinese proverb says, "*The journey of a thousand miles begins with a single step.*" So let's take the first step.

The first motion that I wanted to deal with this morning is the plaintiffs' motion to compel with respect to defendant's MG Freesites and MindGeek. This motion affects the 20-947 and 21-3193 cases. Looks like plaintiff is seeking supplemental or sufficient responses to a first request for admission, a fourth request for production, and a fourth set of interrogatories.

So, Ms. Sulpizio, or whoever is going to take that, I'll hear from you folks first.

MS. SULPIZIO: Yes, Your Honor. Judge, Mr. Goddard and I have spoken this morning and I think we resolved a majority of these issues just this morning, so that is good news, and I think we might be able to move some things along.

THE COURT: Good. It's always amazing what happens

when you get everybody in the same room.

MS. SULPIZIO:  Yes, sir.  Yes, sir.

So as for our first set of request for admissions, I believe that -- I'll ask Mr. Goddard.  I believe we have come to an agreement that he is going to go back to his client and relook at those and see if you will be able to serve some supplemental answers.

MR. GODDARD:  As part of an agreement for what you hear on other discovery --

THE COURT:  I understand there are probably several moving parts here.

MR. GODDARD:  We will provide without any -- we will provide responses to requests for admissions subject to objections as to relevance, but we will answer the admission.

THE COURT:  All right.

MS. SULPIZIO:  So I believe that motion is resolved, Judge.

THE COURT:  All right.  We will note that that part of the motion has been resolved.

MS. SULPIZIO:  As to the second part of our motion, Your Honor, fourth set of request for production.  Originally our motion has requests for production 1, 2, 3 and 4.  And I believe that we can condense that just down to the first request for production.

So, to give some background here, Your Honor, there

was a company called Ethical Capital Partners. That company was created in 2022. Also in 2022 the top executives, Antoon and Tassillo, who were part of MindGeek resigned. They now remain shareholders but they did resign in 2022 after a public report had come out, you know, alleging that Pornhub hosted sexually explicit nonconsensual content on its video -- as for videos on its site for years. So ECP was then created. And then shortly thereafter in March of 2023, ECP, Ethical Capital Partners, announced the acquisition and re-branding of Pornhub and they merged. So ECP has publicly stated through its founding partner, Solomon Friedman, that as part of the transaction they did a due diligence. And, you know, it's quite common, Your Honor, as you know that when acquisitions happen there is a period of due diligence where the new company acquiring the old company looks at the financials and, you know, the policies and some other information within the company structure to make sure that what they're merging into is sound, and they have a good idea, and there's some transparency. So as part of that due diligence process, you know, there was financial documents that would have been exchanged, and it talks about revenue streams and items as part of MindGeek.

So, I wanted to provide that background because that's really where these questions stem from. And as part of what we are seeking is really the sound financial backing of

MindGeek in 2019 only. We are not asking for a large amount of time. It's solely 2019, which is at issue for these RFPs. So what we ask for are in our first request for production is documents that relate to the due diligence inquiries made by Ethical Capital Partners in the review and purchase of ALO, formerly known as MindGeek. And requests 2, 3 and 4, which as I told you I think kind of merge into one, so we're willing to just forgo those and talk about the first RFP, kind of expanded that a little bit and talked about the tax documents and the insurance documents. And what we received in response was first the defendants objected to just the definition of ECP. And you know, if you go to ECP's website it says it's a private equity firm managed by multidisciplinary team of regulatory, law enforcement, public engagement, finance experience, and they've acquired MindGeek, a technology and media company, owner of a large portfolio adult entertainment properties including Pornhub.

**THE COURT:** Let me ask this question.

**MS. SULPIZIO:** Yes, sir.

**THE COURT:** You've got this private equity firm that acquires this company. Clearly there would be due diligence done.

**MS. SULPIZIO:** Yes, sir.

**THE COURT:** Vast majority of that is going to be financial in nature. And it's going to be with regard to the

operation and value of the company as a whole.  Now, whatever we think about it from a moral or policy standpoint, the vast majority of the content on that website or that's published by this company is legal under the laws of the countries in which it operates.  There may be relevance to limited subject matter regarding due diligence with regard to potentially illegal content, content that is procured by illegal means, content that is procured without the consent or knowledge of the person being filmed and published.  There could be information related to profits and financial, you know, income related to those type of videos, that type of content.

And so I guess what I'm getting at, Ms. Sulpizio, is I think there's -- I think there's a subset of information in that due diligence that may have more relevance to this and might be a proper type of discovery to seek.  But when you ask the defendant to produce all documents related to the due diligence involved with the acquisition of this company, it opens that up to such a large universe that my concern is that whatever scant relevance there may be in one small portion of that universe, when I do a proportionality review it gets outweighed by all of the other stuff that you would expect in the due diligence of an acquisition of a company that has absolutely nothing to do with this case.  So help me with that.

You're asking for everything.  And I don't know --

and all -- I can't make the discovery request for you.  So I have to weigh what you've asked for.  And you've asked for everything.  And if I look at that total universe versus what is likely to be there or could be there that might be relevant, it's hard to make that proportionality work.  So tell me about that.

MS. SULPIZIO:  Yes, sir.  So we've had a few meet-and-confers on this and we've also sent a deficiency letter on July 23rd kind of narrowing that scope a little bit because we understood that we -- you know, maybe that RFP should have been in a more larger scope.  So as we were talking through, the discussions came to, we just want 2019 and we just want that year of your financial documents.  And I agree with you, Judge, and I think it might be helpful for the Court to understand kind of the climate of what was happening in MindGeek during this time because during 2019 there were no policies in place regarding this illegal nonconsensual consent on their platform.  So that happened 2020 and after.  And it was kind of during this same timeframe of when ECP was being created, and publicly ECP has stated we want to be the company to go in there and clean it up.  And there's also some information that, you know, Pornhub had to delete and get rid of millions of videos that were nonconsensual or flagged as nonconsensual on their platforms at the time.  So I agree with you.  I think there is a small sliver that would be relevant

within those due diligence documents.  We are not asking for everything under the sun in that entire portfolio.  But I do think, you know, the 2019 time period of financials and maybe compliance regulatory materials specific to the illegal or nonconsensual items would be relevant to this case.

THE COURT:  Let me ask this.  As part of this agreement that you-all discussed this morning, based on your discussions with the defense you have agreed that as to the other request for production, which I think are 2, 3, and 4, that you are withdrawing your motion as to those and consolidating everything into this request, correct?

MS. SULPIZIO:  That was my proposal, Judge.  And I am agreeing to that.  I think Mr. Goddard still disputes the need for my RFP number 1.

THE COURT:  Probably along the lines that I just outlined, but I'll hear from him in a minute.

MS. SULPIZIO:  Yes.  Yes, Judge.  And as part of my proposal as well, we're willing to forgo our fourth set of interrogatories 1 and 2 because it really asks for some similar items.  And I think if we can just get that small sliver of the due diligence portfolio of what I just mentioned, that would really cover what we need.

THE COURT:  All right.  And so that would take care of the interrogatories as well?

MS. SULPIZIO:  Yes, sir.

THE COURT: All right. Let me hear from Mr. Goddard.

MR. GODDARD: Briefly, Your Honor. Mark Goddard here for the MindGeek defendants.

Just to be clear, Your Honor, so we're clear on the record, our agreement as to certain discovery matters before the Court aren't necessarily in any way related to the issues currently being argued. We were told they're withdrawing the interrogatories and they're withdrawing the three RFPs and only going after the due diligence. Our agreement is to the RFAs and as to certain deposition testimony they were seeking prior to this. Your Honor, we wholly object to production of further due diligence information in this case. This is an --

THE COURT: You said further production. Have you produced any thus far?

MR. GODDARD: Yes. And that's what I was going to get to, Your Honor.

THE COURT: Okay.

MR. GODDARD: What they're seeking is the due diligence for a transaction that happened in 2023. And they've come today to say, well, it's only related to what happened in 2019 and we should be able to produce all of that. What's lost in all of that is, we've had four years of discovery, Your Honor. And specific as to their motion today when they said they want to limit it to 2019, they want income

statements, balance sheets, cash flow statements, summaries for past, current, and potential litigation, insurance documents, documents related to compliance, policies, procedures, employee handbooks, client information, and internal policy compliance from 2019.

THE COURT:  Yeah.

MR. GODDARD:  Your Honor, that is much more than a small financial thing.  That is significant.  And what's even more significant is there's no question or no argument before the Court that any of this information from 2019 hasn't already been produced.  We've produced tens of thousands of documents -- of pages of documents of financial statements, content moderation policies, employee policies.  We have gone above and beyond on the --

THE COURT:  Let me ask this, Mr. Goddard.  You said the transaction was in 2023.

MR. GODDARD:  Yes, Your Honor.

THE COURT:  Was there due diligence being done by ECP in 2019?

MR. GODDARD:  I have to be honest, Your Honor, I'm not aware of any.  ECP was formed I think in 2022.  I don't have knowledge of that to represent to the Court yes or no, but it's my understanding, no.  This was a purchase by an independent party in 2023.

THE COURT:  Because I'm reading the request and, you

know, I'm not getting into any clarifying correspondence you-all had between each other, but just the request says, "Produce all documents that relate to the due diligence inquiries made by Ethical Capital Partners in the review and purchase of Aylo, formerly known as MindGeek."

Now, today they're telling me that they consider 2019 to be the relevant time period and so that's all they're asking for.  Well, if ECP is not formed until '22, and the transaction takes place in '23, sort of spurs the question in my mind is, is there anything that would be responsive to that in 2019?

MR. GODDARD:  Your Honor, and I think that's part of our -- the burden that would be on us is to go back and review all of the due diligence material that was produced and see what relates to 2019, what relates after there.  And I want to put on the record, we do have a disagreement as to the facts as to what was removed in 2020 and the basis of why they were removed.

THE COURT:  I'm sure I'll hear about that later.

MR. GODDARD:  Why they would removed, we clearly have a disagreement.  But as to what policies happened in 2020, as to what -- and what ECP ultimately considered, ultimately from a proportionate context, Your Honor, we've produced everything relevant as to 2019.  What they're asking us to do is go back, look at the due diligence that was

produced, and then go back and back check and see, well, is that what they produced to us.  Because there's no question and there's no motion to compel, and there has not been a motion to compel before this Court that we have not produced 2019 financials; that we have not produced the relevant policies and procedures that were in place in 2019; that we haven't produced all the custodial documents they've asked for related to this; all of the text messages or internal chats or emails between the important parties.  What they're wanting to do now is go back and review all of that by saying it's only 2019, but without putting forth anything before the Court of what they may be missing because all of this has already been produced.  Anything relevant has already been produced and has already been the subject.  These requests for production were filed on the last day available under the deadline period under the discovery deadline and were for a complete, on its face, significant amount of documents over and above what was already produced.  But nowhere in this and no where in our discussions was there discussions of, hey, we're missing all of this.  It's, we want to do a, quote, a comprehensive review of everything that was produced.

THE COURT:  So your understanding of what they're asking for is not necessarily new information, but asking you to do their document review for them.

MR. GODDARD:  Well, Your Honor, I think what my

position is is what they're asking for in due diligence that may be relevant to this case exactly under your -- what you were annunciating earlier has been produced.  The policies and procedures as to alleged nonconsensual conduct, financials, income sheets, content -- monetization policies, advertising policies.  We've produced tens of thousands of documents.  We've produced at least seven 30(b)(6) witnesses that would cover all aspects of this.  Tens of hours and hours of testimony.  Fact witnesses.  All of this that's been produced on these very issues that they say they want now.  Financials.  Employee handbooks.  Company policies.  Procedures.  Internal policy compliance.  All of that.  They've had so many different avenues of discovery on those very issues, and now at the last second they come and say, oh, by the way, we want it all again from whatever you produced to ECP in a transaction four years after the time period in question.  And because of that, Your Honor, we just don't believe that it's proportional to the need of this case.  And it's certainly burdensome on the client to go reproduce -- or review and then reproduce what's already been produced.  Thank you, Your Honor.

THE COURT:  Ms. Sulpizio, Mr. Goddard says they produced this stuff.

MS. SULPIZIO:  Judge, I'm not asking for him to go back and look through what he's already produced.  What I'm

asking I think is a very different question.  So in the answer to that RFP the defendants say, quote, defendant will not produce documents in response to this request.  So when I look at that answer, it's deficient in my mind that I don't have the due diligence documents.  I have nothing in production that says that I have anything from the due diligence process through this acquisition.  And in our July 23rd letter we did make it clear, and this is docket entry 426-7, that we were limiting our request to financial documents for the year of 2019.  So that was a topic of conversation in our meet-and-confer.  We were not asking for everything under the sun.

THE COURT:  Whether you got it in the context of a due diligence inquiry by ECP or whether you got it in the contention of some previous request for production in the case just relative to that financial information, I'm hearing a couple of different things.

MS. SULPIZIO:  Yes, sir.

THE COURT:  I'm hearing that as to these requests the defense answer was, we're not producing documents.  But I'm also hearing from counsel's argument that, Your Honor, with respect to these financial documents and whatnot, they have them.  We've produced them.  We've produced 30(b)(6) witnesses.  They could ask about them.  So what I'm trying to determine is if this is something that is brand new, or if

this is something that's being asked for in a different context.

MS. SULPIZIO:  Your Honor, and I think I have that same sort of question as well, because for me I don't know what was a part of that due diligence period.  All I know is the few documents that I have and when I look at them, I don't know if they're part of the due diligence process or not.  So that's why we asked the question.  And from the answer, they're not producing anything in response to this request, and then they object to it.  That seems to me as a deficient answer in that I don't necessarily have the due diligence financial documents that I'm supposed to have.

THE COURT:  All right.  Here's what I'm going to do. Regardless of whatever agreement you-all have, I will tell you that these requests for production 1 through 4 and the interrogatories that follow -- which I think are just 1 and 2, if I recall correctly.

MS. SULPIZIO:  Yes, sir.

THE COURT:  As they are currently stated, I find that to the extent they could possibly be seeking relevant information, that relevance is so scant that it's not proportional to the needs of the case and it's not proportional to the burden on the party making the production. And to put it in another manner that counsel's fond of putting in their objections, it's just way overly broad.

However, I think plaintiffs' counsel makes a pretty good argument as to 2019. Given that that was the year in which these videos were apparently uploaded, that makes the relevance go up significantly. And it makes the relevance go up significantly if the request is narrowly tailored to due diligence inquiries by Ethical Capital Partners for information in 2019 that relates to these hidden lockers, spy cam nonconsensual videos, and anything related to the solicitation, publication, and financial gain related to those videos.

So here's what I'm going to do, Ms. Sulpizio. I'm going to deny your motion as to these requests for production. As to request for production number 1, I'm going to allow a modification and I'm going to give you ten days to submit that to the defendant that strictly limits your request to due diligence inquiries related to those types of content, any financial incentives for, you know, solicitation of that content, any financial benefit to the defendant from that content. And I can't stress enough how narrowly this needs to be tailored.

And for Mr. Goddard's standpoint, if the answer to that is that 2019 predates the information requested by ECP, that there isn't an inquiry for a 2023 transaction that goes back to 2019, then the answer is, there are no documents. Likewise, if there are documents that are responsive but those

have already been produced to you, then the defendant can answer that and they can tell you what those are. Because by narrowing it down to that, that should significantly reduce the burden on the defendant to go through this information and make that response to you. And that's a fair response much like the responses to the contention interrogatories we're going to talk about here in a few minutes. So, I'm going to give you ten days to reformulate that. You-all are certainly free to meet-and-confer and talk about the language and the scope and hopefully get that to a resolution that you can live with. But I think that's where you are, and so that's going to be my ruling on that.

MS. SULPIZIO: Yes, sir.

MR. GODDARD: Thank you, Your Honor.

THE COURT: All right. With respect to the next motion which I believe is the, let's see, the Freesites motion to compel, this is on the contention interrogatories. This is for purposes of the docket, I believe this motion is ECF number 248 in the 21-3193 case and also relates to number 435 in the 20-947 case.

And Mr. Goddard, are you taking this one as well?

MR. GODDARD: Yes, Your Honor. May it please the Court?

THE COURT: Yes, sir.

MR. GODDARD: MindGeek defendants served our second

set of interrogatories and it turned out to be a third set of interrogatories on certain -- all plaintiffs back on May 1st, 2024, requesting answers to certain contention interrogatories that we believe were at the heart of the issues in this case. And the purpose of those contention interrogatories were to really allow the defense to narrow and sharpen -- narrow the scope of what we were really -- was at issue, and narrow the field of evidence of what has been produced to what is actually material and what is being relied on and to support the allegations that were being made. These contention interrogatories as I think the Court's aware from our couple of meet-and-confers we had with you on it had a procedural history where we received answers, albeit a day late, but received answers with objections and did have some factual explanation as to many of the contention interrogatories. But what was missing at that time was any description of the actual documents and testimony that was being relied on in support of those factual allegations.

And today we're not here to say that the factual allegations part of the contention interrogatories are deficient. What we are saying is, after a lot of meet-and-confers we went back. Plaintiffs' counsel did come back and inserted a supplemental answer to all contention interrogatories that made a blanket reference to what was exhibit A. And exhibit A had thousands of pages of documents

and also referenced every deposition that has been taken in the case including all seven of our 30(b)(6) witnesses, all of our fact witnesses, all ten plaintiffs depositions, all plaintiffs' experts and their testimony and reports. And from our perspective, Your Honor, we have worked with plaintiffs' counsel to try to narrow the scope. We agreed after conferences with Your Honor to do only the principal and material exhibits to be relied on at trial, which was consistent with the case law in South Carolina of what was allowed for contention interrogatories. We have tried to get the plaintiff to give us the information specific as to each contention interrogatory and instead we haven't made any progress in that. We've got the blanket request -- blanket reference to all of the documents and all of the testimony as to every contention interrogatory. It is clear on its face that cannot be -- all of those documents and all of that testimony is not relevant to every contention interrogatory that is asked. Testimony related to the Hammy Media defendants and their 30(b)(6) witnesses can no way be relevant to some of the questions we asked as to the MindGeek defendants actions in this case.

Your Honor, all we're simply trying to do and ask the plaintiff to do was to narrow the field of documents to allow us to properly present our defense in this case. These contention interrogatories are very narrowly drafted in a way

to get to the heart of the issue, or a heart of some of the legal issues in this case.  The interrogatory 15, documents by Bates number that support the allegation that we actively participated in the creation of the end product videos. Documents to show that MindGeek knowingly benefited from and received some value from their participation in alleged sex trafficking venture.

THE COURT:  Let me ask you this, Mr. Goddard.

I know briefing is not complete, but there are dispositive motions and memoranda and significant exhibits that have now been filed so that we're further down the road than we were last summer and early fall.  While that's not technically a response to your interrogatory, has some of that information become more clear?  Because some of those interrogatories you just read out for me as examples go to some of the key issues in this matter.

MR. GODDARD:  Without question some of the evidence used directly on some of those points have been included as evidence in response to our motion for summary judgment, without question on that.  I think our concern is, Your Honor, if they want to stipulate that the evidence they've used to support the allegations in the summary judgment motion is the material and principal evidence they plan to use at trial, we are fine.  What our concern is is relying on that to say at this point in litigation we wish we would have had it in

preparation for our motion.  But at this point our concern is, if we were to go forward, there's other evidence that they plan to use to support those specific issues whether it be at trial or some other spot.  So we still are asking for a supplement unless they're stipulating that the exhibits used --

THE COURT:  All right.  Well, let me ask this. Let's -- you folks love to deal with definitions in discovery request responses.  Let's talk about "principal," because generally when you send contention interrogatories, the party that receives them, the trap they don't want to fall into is, I've got thousands and thousands of pages of discovery which came from this crowd who's asking me this question, so presumably they know what's in what they sent me.  And now they want me to tell them what I'm going to use on these various -- to support these various allegations that are, you know, in most cases you're asking about material allegations to the claims.  And the trap that the plaintiffs' lawyer -- in this case it can go either way -- doesn't want to fall into is, that they answer that question specifically and without condition.  And then we get closer to trial, and in going through trial preparation and interviewing witnesses, in reviewing documents or whatever, they find additional supporting evidence.  And when they attempt to use that at trial, then the person who propounded those interrogatories

says, oh, no, no, no, Judge, they're trying to ambush us. We're moving in limine. They can only use what they told us they were going to use.

Now, if you're telling me that the accommodation you-all have reached is that as long as they give you sort of their principal justification or their principal support for that particular allegation and they're not precluded from, you know, something else that may come up in the preparation for the trial, then I think you're on solid ground because I think the case law pretty much says that you've got to give specific responses to contention interrogatories.

On the other hand, if we're -- if we're in a gotcha game, then I'm going to tell them that when they supplement these answers, if they want to make it conditional or they want to make it as of now, or subject to our further review, or any of those words to that effect, I'm going to let them do that because, I mean, that's just common sense. As much as you've got to go through in this case to defend your client, I would hazard to guess that you're likely to discover some additional support for some things as we get closer to trial.

MR. GODDARD:  Absolutely, Your Honor. And that was not -- during our meet-and-confers we came to principal material fact based on the case law that's out there, but we absolutely agreed that it was not limiting. It was examples of such documents.

THE COURT: Okay.

MR. GODDARD: I think what the problem we have, Your Honor, is what was produced is the equivalent of no answer at all. It's all testimony.

THE COURT: I understand your concern about this supplemental answer that basically just references everything in the world.

MR. GODDARD: Correct, Your Honor. As to these material issues in the case, while I understand we've produced certain -- all the documents they may be relying on, the problem is some of these we don't know where they're coming from, how they're getting to these allegations. So that's what we're asking for is --

THE COURT: I understand.

MR. GODDARD: -- how are you saying this is a commercial sex act, or how, you know, what documents are you relying on to say that. It is not a gotcha moment. We met and conferred on this extensively. Agreed to kind of examples of principal and material facts. What I was saying earlier is --

THE COURT: And I want to apologize to you. I didn't mean to insinuate that that's what you were doing here. I'm just saying that's the danger involved.

MR. GODDARD: Yes. I totally understand. I guess what I was saying earlier was, to the extent if we were going

to stipulate or withdraw anything, I still think we would like answers to the questions unless they're, you know, going to be limited to what's in their summary judgment.

THE COURT: Okay. Well, let me hear from them. And if you need to reply, I'll be happy to give you another opportunity. All right. Ms. Sulpizio.

MS. SULPIZIO: Your Honor, I think you hit the concern right on the head when you said we don't want to be precluded for this universe in our answer with the contention interrogatory. And you know, that is my biggest concern when trying to answer these. And I supplemented them. And, you know, at the time that we had our last conversation about this there was no need to do deposition designation sites. There was a need to just identify Bates that would be useful and pertinent and material to those answers. And we believe that we did that in our exhibit A. I think now that we are past the summary judgment phase, do I agree that maybe could be refined a little bit? Of course. It always can be refined as you continue to go through the litigation process.

Again, my concern is though that I do not want to be precluded at a gotcha moment later on where they say, look, you're now giving in one example of a chain of 5,000 SEO change orders that they provided to us. The conglomerate of those 5,000 change orders is what's so important, not just the one example. So it was very difficult, Judge, to try and

provide what example and then have the pushback that you can only pick one.  You can't use all 5,000 documents that go to your support for that certain cause of action.  So I'd be more than willing to take another look at our exhibit A, of course.  But I really truly don't know how much more refined it can get.  I can maybe try and group it into topic areas.  But to me what I hear from Mr. Goddard and his client is what they're asking for is us to do our pretrial disclosures very early on, when that's why we have a pretrial disclosure deadline.  So, you know, we're I think eventually going to get to what Mr. Goddard and his client want.  But that's for pretrial disclosures when we give him our exhibit list.

THE COURT:  Yes.  I understand.  Here's where I think you are though.  The law is pretty clear that on contention interrogatories it's not sufficient to say these witnesses will speak to that and all of these documents in Exhibits 1, 2, 3 through 800 may relate to this.  The law requires that you give a little bit more specific answer.

And so what I'm going to require you to do is, I'm going to require you within two weeks from today to supplement your responses.  You can either put a condition in your answer that retains wiggle room or you can do a confirming email with Mr. Goddard and defense counsel that your agreement is that, you know, these are your principal sources but you're not, you know -- they include these but you're not limited to these.  I

think that at this point in time given the fact that a number of these issues have either been addressed in the summary judgment motion so that you may be able to just refer to exhibits or affidavits or deposition excerpts, that shouldn't be tremendously difficult.  And there is a benefit to weeding out if there are any issues that at the beginning of the case may have seemed like they were issues, but as we've gotten into discovery there's really not much there and you're not really pursuing those.  It is helpful to kind of weed those out.  And so I'm going to get you to go ahead and supplement these.  Certainly would encourage you-all to meet-and-confer about it.  I've heard on the record from defense counsel as an officer of this Court that they are not utilizing these for any kind of gotcha moment.  They understand that in preparation for trial you may find additional support for some of this stuff, so you're not going to be limited.  So that should alleviate a large part of your concern.  But they're entitled to know on a given topic, on a given allegation, if you have somebody who is going to testify in support of that, who it is and what they said, and if you have a document that you're going to offer in support of that, what it is.  Now, like the search engine optimization documents you refer to, maybe more than one.  And if the answer is, a thousand pages, then the answer is, a thousand pages.  But they're entitled to an answer.  And so I'm going to have you do a supplemental

response to those.  All right.

MS. SULPIZIO:  Yes.  And we can definitely talk about this.  Mr. Goddard and I work very well together.  But I think it might be helpful to maybe group it in buckets of those causes of action, right?  Would that be sufficient?

MR. GODDARD:  Your Honor, I think it's difficult to do it in buckets.  I think we've tried to narrowly tailor our questions to the material issues in each one.  I mean --

THE COURT:  How many interrogatories are we talking about?  Is it 15?

MS. SULPIZIO:  Thirty-five.  It's a lot of interrogatories and each interrogatory overlaps.  And that's really the problem, Your Honor, is some of them go to a part of an element of a cause of action.  So then the next interrogatory would be another part of the same element of a cause of action.  So then I'm putting a duplicative answer which is really where exhibit A came in because they all kind of overlapped.

THE COURT:  Well, here's the thing.  Whether they agree to put it in buckets as you put it or not --

MS. SULPIZIO:  Yes.

THE COURT:  -- if the source is the same, you just incorporate by reference the previous answer and move on.  If that's the -- you know, if that's the answer.  You know, to the extent that they have broken it down to where it's a

different source, because we all know if you're trying to meet the element of a given cause of action you may have multiple witnesses and multiple documents to support, you know. So the answer may be different the way they have it broken down. Like you said, it may overlap. If it overlaps just incorporate by reference and move on.

MS. SULPIZIO: Yes, Your Honor.

THE COURT: If it's the same witness, same set of documents, you know, then that's the answer. And hopefully it will be and that will save you a lot of time.

MR. GODDARD: Your Honor, from what I'm reviewing I think it was a total of 10.

THE COURT: Total of 10.

MR. GODDARD: Fifteen to 25, yes, Your Honor.

THE COURT: All right. If that's -- if Mr. Goddard says it's 15 to 25 --

MR. GODDARD: I think there's different numbers for different plaintiffs, but it's a total of --

MS. SULPIZIO: It's a total of 35.

MR. GODDARD: There's 35 total interrogatories, 10 of which have never been answered.

THE COURT: So let me just get this clear because it's your motion.

MR. GODDARD: Yes, Your Honor.

THE COURT: You're only wanting 10 interrogatories

supplemented; is that right?

MR. GODDARD: Your Honor, I'm looking at defendants second set of interrogatories to plaintiff Jane Doe 10.

THE COURT: Right.

MR. GODDARD: It starts at interrogatory number 15 and ends at interrogatory number 25.

THE COURT: Okay. And I assume that that's the same for all Jane Does?

MR. GODDARD: Yes, Your Honor.

MS. SULPIZIO: No, sir. They're different. That's the problem. So we answered Jane Does 1 through 9, which was 35 interrogatories. And then a separate set to Jane Doe 10, which is 15 interrogatories.

MR. GODDARD: I want to be clear to the Court what you're saying. Of the contention interrogatories that are in the second set of interrogatories -- here --

MS. SULPIZIO: Uh-huh.

MR. GODDARD: -- it is.

MS. SULPIZIO: Two different sets. So there's a set to Jane Doe 10 and a set to Jane Does 1 through 9.

MR. GODDARD: And Jane Doe 10 has -- you said it was 15. It starts at 15 and ends at 25.

THE COURT: All right. And is that the --

MR. GODDARD: This is as to Jane Doe 10.

THE COURT: I was going to say, is that the basis

for your motion?

MR. GODDARD:  As to -- in the 3193 case, yes, Your Honor.

THE COURT:  Okay.

MR. GODDARD:  And the 00947.  I'll work with her on -- this doesn't have to be before the Court.  There are different sets.

THE COURT:  Here's the only thing I'm wanting to do is.  I'm directing her to do supplemental responses within two weeks, within 14 days.

MR. GODDARD:  Correct, Your Honor.

THE COURT:  And I'm not going to direct her to do supplemental responses to any interrogatories except the ones that are the subject of this motion.  So I'm trying to make sure which ones it is that you say are deficient.  And as to Jane Doe 10, it appears to be 15 through 25.

MR. GODDARD:  That's correct, Your Honor.  I thought I had a copy of them, and I'm looking for them now as to -- here they are.  Sorry.  Starts at interrogatory for Jane Does 1 through 9.  It starts at interrogatory -- Gabby, I'm not seeing what you're saying.  This is your response to Jane Does 1 through 9?

MS. SULPIZIO:  So we served a response for 1 through 9 and then a separate response for 10 because they were different.  So there's two supplemental responses.  So we

supplemented in July and then we supplemented again in August. August came with a set for 1 through 9, which was different than a set for 10 because there was a little difference in the way that the interrogatories were worded for each of those two. So there's a second supplemental.

MR. GODDARD: And Your Honor, I'm up with their answers to the answer. I'll work with her. They are two separate sets. They were answered that way. To the extent they're different, they were served differently, they are not -- there is 10 served on Jane Doe 10.

THE COURT: I mean, the claims are pretty similar --

MR. GODDARD: Yes, Your Honor.

THE COURT: -- for these women.

MR. GODDARD: Yes, Your Honor.

THE COURT: I'm going to direct you to do supplemental responses to 15 through 25 on Jane Doe 10. That will be the scope of the order. Now, to the extent that there is any difference with respect to the interrogatories in 1 through 9, Jane Does 1 through 9, you-all can confer and see. I mean, I'm assuming that the evidentiary basis for a lot of this is going to be the same regardless of which case. There may be some differences, and I'll let you-all work on that. But at this point in time based on what's in front of me, that's the directive.

MS. SULPIZIO: Thank you, Your Honor.

THE COURT: All right. Next is the plaintiffs' motion to compel on this 30(b)(6) deposition with Mr. Beauchesne?

MS. SULPIZIO: Beauchesne.

THE COURT: Beauchesne.

MS. SULPIZIO: Judge, I'll make it really quick.

THE COURT: And this is topics 12 and 19?

MS. SULPIZIO: Yes, sir. I think I can make this one really quick.

THE COURT: Good. So I thought there was some reference to this earlier, but I wasn't sure.

MS. SULPIZIO: Yes, sir. So, you know, I believe this is resolved. So we did have an agreement to produce a transcript for one of the original 30(b)(6) designated witnesses, Mr. Bulloch, who was then, you know, swapped out per an agreement with those other two individuals. And we did receive the transcript for Mr. Bulloch for his individual deposition. We did not receive it for the 30(b)(6) portion of it. We originally had requested the 30(b)(6) portion of it, but I believe that we've come to the agreement that we are not going to press forward on the 30(b)(6) portion of it, and that would fully resolve this motion.

MR. GODDARD: Yes, Your Honor. My understanding is we have reached an agreement back in October with their counsel, Mr. Gentala, that we would produce Mr. Bulloch's

individual testimony. We withdrew him as a 30(b)(6) witness and replaced him with Mr. Belmaaza and Ms. Graziani (phonetic). So therefore we did not agree to produce any 30(b)(6) testimony he might have given. And at that time Mr. Gentala responded to the email that he's in agreement with that back in October. There may be disagreements as to that, but I believe we're in agreement that the depositions in this case as to the MindGeek defendants are completed.

**MS. SULPIZIO:** Yes.

**THE COURT:** Is that correct?

**MS. SULPIZIO:** Yes, Your Honor. That's correct. Thank you.

**THE COURT:** All right. And the only thing -- I'm just going to mark that motion as resolved. The only thing I will mention to counsel is that the scope of this litigation is such and the parties and people involved are such that I would encourage you that on any of these things that you reach agreements about in the discovery domain that may later impact the presentation of evidence that you document somehow whether it's as informal as a confirming email, or as formal as a stipulation, but just so that whatever you've agreed to today, when we get three or four months down the road there's no question about what the scope of that agreement is. So I'll just encourage you-all to -- even though you're working well together and, you know, at the time it sounds like, oh, we've

got it covered, stuff happens.

MR. GODDARD:  Completely understand, Your Honor. And we have tried.  We do work well.  We have lots of correspondence back and forth and have been able, you know, luckily to resolve the vast majority of discovery issues we've had by agreement and by email.  So we'll continue to do that, and I appreciate that, Your Honor.

THE COURT:  All right.  Looks like now we get to have some of our other folks participate.  I believe this is a motion to compel from the plaintiff regarding responses from Hammy Media.

MS. FOUT:  Yes, sir.

THE COURT:  Ms. Fout?

MS. FOUT:  Yes, sir.  Good afternoon, Your Honor. Auguste Fout on behalf of the plaintiffs.

So throughout this whole entire discovery process the Hammy Media defendants have been completely invasive and have failed to meaningfully participate.  In this instant motion Hammy's failure to comply with properly propounded timely served and narrowly tailored discovery requests is not only unjust but in violation of their obligations under the discovery rules.  The Court has the authority to compel compliance and plaintiff's respectfully request that they do so in this instance.

As a preliminary matter, I would like to turn the

Court's attention to June 17th motions here. I think we all remember that. It was very long. I know I do. And at that hearing you, Your Honor, indicated that the discovery deadline was being extended to August 31st. You further indicated that this was to give plaintiffs, quote, somewhat of a limited do-over. You further indicated in the record that the scope of this segment of discovery should be focused on the defendant's business, these types of videos. And when I say that I mean nonconsensual spy cam hidden camera voyeuristic videos. This type of uploading of content whether or not this content is solicited, whether or not there's advertising tied directly to this type of content, whether the defendants take steps to encourage this type of content, or whether there's policies and procedures in place to police this type of content on defendants' websites. And you further stated, Your Honor, that, quote, these types of inquiries may very well be relevant. They may very well be proportional. And they may very well need to be answered. It is important to note that you, Your Honor, did not restrict the form of additional discovery that could be propounded on the Hammy Media defendants at that hearing. But rather granted plaintiffs permission to serve focused discovery requests.

Embracing this advice fully we then served a very narrowly tailored set of requests for admissions and requests for production on the Hammy Media defendants on July 29th,

2024.  We received deficient answers on August 28th, 2024. There were some deficiency letters exchanged and ultimately this was a meet-and-confer on October 17th, 2024.  At that meet-and-confer Hammy agreed to revisit RFP number 13, 14, 16, 17, and 19.  However, to date we still have not received supplemental answers regarding those RFPs.  And for efficiency purposes to lay some foundation, I'm going to take up the RFPs first if that is okay with the Court.

THE COURT:  That's fine.  I've got some general questions about the requests for admissions.  Let's do the RFPs first.

MS. FOUT:  Yes, sir.  So all of the plaintiffs RFPs correspond to three different categories of information whereas my client likes to say, buckets.  All of which pertain to information Your Honor indicated as relevant and proportional at that June 17th hearing.  Category number 1 relates to SCO, and the corresponding RFPs are numbers 8 and 20.

So search engine optimization refers to the process of optimizing a website or online content to improve its visibility on search engines such as Google, Bing, Yahoo, et cetera.  The goal of SCO is to attract more organic non-pay traffic to the site by ensuring that it ranks higher when you Google -- when you put in Google, you know, "Voyeur," Pornhub is the first thing that comes up.  That's search end

optimization.  Information on how Hammy utilizes SCO on their website pertaining to voyeuristic and nonconsensual content is relevant and essential to understanding how the Hammy defendants invited and solicited spy cam or content onto their website by intentionally adding tags, categories, ultimately seeking to increase the visibility of spy cam material on their website through these SCO tactics.  Plaintiffs have designated an expert on SCO alone.  And if I may approach, I have a summary of our expert's opinion in this binder, as well as a couple of other exhibits.

So if Your Honor would, if you turn to tab 2, you'll see a summary of our expert's opinions, Mr. Scott Brandon.

So in summary, both of these RFPs ask for information pertaining to SCO mechanisms.  And number 20 is narrowly tailored to nonconsensual content and the interaction that type of content has with the defendants utilization of SCO.  We've received thousands of SCO change reports from the MindGeek defendants.  We have not received one SCO document from the Hammy Media defendants even though we know they use SCO as confirmed by deposition testimony and our expert.  And once again to reiterate, these requests are narrowly tailored, they're relevant, and the defendant's objections here and excuses bear no meaning.  The plaintiffs are entitled to this information.  And Hammy must be compelled to produce these documents.

THE COURT:  All right.  I mentioned earlier that I was going to ask you-all about this Fourth Circuit case, and I think now we've reached a point where I need to ask you about it.

First, Ms. Fout, are you familiar with the *MP versus Meta Platforms, et al.* case that was handed down about two weeks ago?

MS. FOUT:  Briefly familiar.

THE COURT:  Well, let me tell you what my concern is.

MS. FOUT:  Yes, sir.

THE COURT:  The panel that -- the question before the panel and just by way of quick factual background, this was a child of one of the victims of the Mother Emanuel Church shooting who had brought a civil case against Meta or Facebook and several other platforms, related platforms and related companies to Facebook raising several state court causes of action, some product liability type actions, negligence action, and also a couple of federal claims, civil rights type claims, 1985, 1986.

The theory was that through algorithms and search engine optimization that Facebook curated and provided content to persons like Dylann Roof that was of a hate speech type of content, that for somebody like him who was looking at that type of thing and allegedly being radicalized, that it was

programmed to provide more content and take him further and further down the rabbit hole with one possible exception, which Judge Rushing put in her descent, and we'll talk about it.

The Court basically found that any algorithms and search engine optimization techniques that allowed for the curation and presentation of material provided by third party for viewing and review by customers or clients or members or whatever you call people who are on Facebook, that that was the very essence of what a publisher does. And therefore it falls squarely within the immunity granted by Section 230. And while the Court acknowledged, you know, reasonable minds can differ on the policy wisdom of that, that's a legislative function. That's not up to the Court. And Congress has already provided that broad protection. Judge Rushing agreed with all of that, concurred with all of that. Her one descent was that where Facebook then based on that content being viewed corresponded directly with the viewer by suggesting that they join a particular group where there's more of that content or whatever, basically soliciting their viewing, that she surmised that that type of direct solicitation might be beyond the scope of the protection of 230.

As I read her descent, she didn't necessarily say that it would be, but this case arose in the context of a motion to dismiss. And so at the point of just alleging a

cognizable cause of action, she indicated she thought that would be distinguished from otherwise.

So I guess my first question is, in light of that Fourth Circuit opinion which is a published opinion, how much relevance is there to all of these questions about algorithms and search engine optimization in terms of how Hammy or MindGeek or anybody else curates this information once it's uploaded by a third party?  Still get into solicitation and the legal or not legal nature of that content.  Those are other questions.  But when you're asking all of these interrogatories and seeking production of all of these documents relative to search engine optimization and algorithms that curate and deliver this content based on viewing history or whatever, or automatically develops thumbnails to announce its availability or whatever, how does that not fall squarely within what the Fourth Circuit has said is absolutely immune?

**MS. FOUT:**  I think that's a great question.  But I think there is a distinction between a neutral algorithm and what the defendants are doing on the back end within their own system.  By adding key words and titles to not only on the back end of certain types of content, but those same key words and titles are then matched up to the advertisements that surround the videos.  And I think that our allegations are that because this is pertaining to illegal content,

voyeuristic, nonconsensual contact, we can't look at it in a vacuum. It's all of these factors that will end up getting us over 230. We have a whole --

THE COURT: So if it's illegal when you accept it or realize it's on your platform, then anything you do to manipulate it after that point in time is illegitimate because you knew it was illegal to begin with.

MS. FOUT: And I think that's right. And I think that we're just trying to fill holes that we have. We have 2,500 documents from Hammy. So we don't know if they're using neutral algorithm tools, if they're using SCO mechanisms specifically pertaining to voyeuristic or nonconsensual content. We've been left in the dark as to how that's been working. So I think that that was the basis of these RFPs. And we took your advice, narrowly tailored them to the content at issue in this case. And I think that we deserve answers on that. And I also think that it just raises a genuine dispute of material fact.

THE COURT: All right. Let's talk about the request for admissions and then I'll hear from them on both.

MS. FOUT: Yes, sir. So I have some more RFPs. Do you want me to finish those?

THE COURT: Yes. Go ahead and finish those.

MS. FOUT: Thank you, Your Honor. So the second category of information that the RFPs pertain to is ad

revenue, which as I stated earlier at the June 17th hearing you put on the record that ad revenue pertaining to these types of videos is relevant and proportional.

THE COURT:  Because your allegation is that they tie the ads, prepare the ads with the type of --

MS. FOUT:  Using key words on the back end, yes, sir.  So regarding ad revenue we're asking basic information pertaining to the amount of revenue that was generated from our videos as well as voyeuristic nonconsensual content. Defendants' original search engine was -- which was put in a verified interrogatory was that our videos were viewed on their platform -- and this is the Hammy Media platform -- less than 3,000 times and generated less than three dollars of advertising revenue.  So then we have this long drawn out fight about the metadata, and this turns out to be demonstratively false.  So if you turn to tab 1, and then -- also that's a summary of all of the views per video.  One video alone, Your Honor, had 42,000 views.  That generated way more than less than three dollars of ad revenue.  So, we are entitled to this information because now we know that the view count was significantly underrepresented, and by extension the ad revenue as well.

So as I will reiterate that one video was viewed 43,000 times.  That's significant.  That's just one video. And these figures also don't represent the times that the

videos were pushed to sponsor sites and re-uploaded by the defendants, which is in the metadata.  If you look at tab 5 on the last page you can see that Hammy uploaded one of the videos of our plaintiffs in December of 2022 to a sponsor site.  So we have no idea how many views was on the sponsor site.

The defendants have alleged this whole entire time these videos were just on the platform for a couple months. That's turned out to be demonstratively false by this metadata that we have.  We know there's only two mechanisms by which they make money.  That's ad revenue and view counts.  So we are entitled to this information to see, one, how much revenue our videos -- or plaintiffs' videos, excuse me, as well as just this type of content in general.  Maybe it was allowed because it was making them a lot of money.  Once again these RFPs are very narrowly tailored.  There's no reason not to answer them or at least provide supplemental responses now that we know that the answers that we received are demonstratively false.

And then I'm going to turn to the third category of information which is content moderation manipulation and about the procedures and policies that moderators relied on.  As Mr. Goddard indicated earlier, we have all of the policies and procedures, the employee handbooks for MindGeek from 2019.  We have none of that from Hammy.  We have one reviewer's guide

from 2021 because they say the 2019 reviewer's guide is gone. And we asked in RFP number 11 about the preliminary conversion process and thumbnail generation process. RFP 12 asks about the operation of the tagging system, whether they are neutral tools or moderators are going in themselves and changing and uploading tags, or altering them, supplementing, removing them if they're not correct, et cetera, based off trend to topics at that time. So we know that the defendants did that.

And during the meet-and-confer that we had with Mr. Fray-Witzer, it was discussed that they used the same software platform now that they did in 2019. So we suggested, okay, send us some screen shots. We just want to see the back end, what the moderators drop down, you know, available fields for the drop-downs are, any documentation pertaining to the tagging system, how that operates, thumbnail generation. And the defendants refuse to comply or supplement that. So, that's at issue.

RFP 13 speaks to documents, internal communications related to Hammy's process for changing and assigning tags.

RFP 14 speaks to the documents that the moderators relied on when verifying whether content was illegal or nonconsensual.

Every single answer for those three was the 2021 reviewer's guide. They said this is the closest document that we have in our custody, control, possession. So you're

telling me you hired 30 moderators. We have the contracts of the moderators. Gave them no materials and just gave them the computer and said, sit down, moderate these videos. I find that just completely ridiculous, to be honest.

RFP 16 speaks to specific internal guidelines relied on by the moderator team. We used that specific language because they alluded to specific internal guidelines that moderators relied on in their answers to our first set of interrogatories.

RFP 17 talks about content reevaluation process that once again they alluded to in their responses to our first set of rogs.

And 19 talks about internal communications that report, discussed, or comment on the training of moderators. And all of these are being lumped together for argument's sake and efficiency purposes. But we need information regarding the moderation efforts employed from 2017 to 2019. All of these requests were narrowly tailored, and it's troubling that they're saying they don't have any responsive documents.

And based on the metadata production, the videos in question were uploaded, stored, and modified by content moderators within defendant's system as recently as September 2024. If you turn to tab 10, Your Honor, on the last page, you'll see video updated 2024, September 2024.

THE COURT: Okay.

MS. FOUT: So I'll just, I reiterate again, Your Honor, we took your advice, fully embraced it, asked specifically narrowed RFPs, and we got completely evasive responses. And the only information that we got was that 2021 reviewer's guide and then the metadata that shows we've been lied to basically this whole entire time about the ad revenue, about the views, about how long the videos were on the platforms.

So to sum it up, Your Honor, there's a lot of holes within the production. We're trying to fill those gaps so we can move forward with this case. And the plaintiffs respectfully request that you compel production of these documents.

THE COURT: All right. Let me hear from them about that. Well, let's go ahead and talk about the request for production -- excuse me, the request to admit. Deal with all of it at one time.

MS. FOUT: Yes, sir. So as you'll know in their answers to our requests for admissions they provided a boiler plate answer to every single request for admission.

THE COURT: Yeah. I think what I gather from their answer is that when I said you could reformulate your questions, your discovery requests, that that didn't include admissions. So I think that's the gist of their argument.

MS. FOUT: That's exactly. That's a substance over

form.  We asked these RFAs because we couldn't get anything from RFPs.  So we need information from them.  I'm happy to go over every single request for admission.  But they pertain to the same type of information that we're seeking in the request for production, the identification of nonconsensual content, the existence of policies to detect such content, whether the defendants took steps to flag or remove this type of content once they were aware of it, the training provided or lack thereof to the moderators, the policies are prohibiting or verifying consent and videos tagged us by, whether defendants within their internal system engaged in creating thumbnails, modifying tags, titles, key words, or other elements of the videos.  We asked about ad revenue.  Admit that you made money off of the videos depicting plaintiff.  Admit that you make money off of non-voyeur -- or voyeuristic nonconsensual conduct.  I mean, it's very cut and dry.  We're not asking for anything that's super over broad, that's not relevant and that's not proportional to the need of this case.  And now -- and so like I said, the different categories, policies and procedures, content moderation manipulation, the ad revenue or the programs because Hammy alleges that they had no program in existence in 2019 where an up-loader of a video could then share the ad revenue.

However, if you turn to tab 11, Your Honor, you'll see that we found on an online forum that in 2019 users were

talking about making tokens, which then could be traded for cash based off of uploading videos on Hammy Media -- or XHamster.com. That's also been -- you know, that's a general dispute of material fact. We don't know. Was there a program? Was there not? We're being told there's not, and we're doing research on the back end on good old Google, and we see this forum and we're like, okay, so which one is it. That's why we're asking these questions. Which one is it.

Once again, the primary purpose of this is to narrow down these issues for trial. We don't want to have a month long trial. If they're not going to admit --

THE COURT: Speaking of narrowing down issues now that the dispositive motions have been filed, and I'll be honest with you, although I think sometimes you-all aren't totally aware of this, this is not the only case I have on my docket. But in light of the fact that dispositive motions have been filed, has any of this been narrowed down within the context of any motion that's been filed?

MS. FOUT: Has any -- have any of our requests been narrowed down?

THE COURT: Yeah. The information that you're trying to get through these requests based on representations made by the defendant in any motion or briefing they may have filed, has any of that been addressed or narrowed down?

MS. FOUT: It's still -- were still getting the,

hey, conflicting answers because in their brief Hammy says, we didn't have an ad program.  These videos were viewed less than 3,000 times.  The same song and dance, Your Honor, that we're dealing with now.

THE COURT:  All right.  Mr. Fray-Witzer.

MR. FRAY-WITZER:  Morning, Your Honor.  So when last we left our heros, Your Honor, you issued a minute order that allowed the plaintiffs to propound to Wisebits 30(b)(6) witness a total 12 questions as deposition-ed by written question in accordance with Rule 31.  And your minute order said that they could propound certain followup interrogatories designed to narrow the scope of over broad questions that they had asked before.  They didn't do either of those things. Instead, they served interrogatories that purported to be directed individually at Wisebits' 30(b)(6) witness Constantinos Christoforou.  They served an additional set of document requests that were directed at specifically and only to Hammy Media.  And they served requests for admissions on the Hammy defendants collectively despite the fact they had never done that before.  There were no requests for admissions that were the subject of the last motion hearing. Nevertheless, Your Honor, we tried to be reasonable with our responses.

We did the Rule 31 procedure that Your Honor had told us to do.  We gave their interrogatories as if they had

propounded them for a deposition by written question.  The witness sat for the deposition by written question, provided answers.  Despite the fact that the minute order didn't speak to additional document requests we said, you know, the feel of the hearing is that that's appropriate if they're narrowed down.  And so we provided responses and additional documents.  And yes, with respect to the admissions we said, hey, look, come on, this is past the original deadline.  The Court didn't order it.  If Your Honor tells us that we're wrong about that, I'll live with that.  But our position has been that was not part of what the Court ordered.

So if you turn to the requests for production, Your Honor, they fall into a number of categories.  The first is what I call, "We can't produce what we don't have part one."  So they've asked for documents concerning the creation of thumbnails in 2019, for example.  And we went back and we said, look, the software that created the thumbnails was an internally created software.  It was created in 2012 back when the website was first founded, literally internally created by the people who founded the website.  There isn't documentation for that.  We don't have documentation for that.  To the extent that there might have at one point in time, and we pressed the clients because we said, you know, did you have conversations back and forth as you're creating this software saying things like, hey, we should add this functionality,

hey, we should add that functionality.  And the client came back and said, we don't really remember that we did.  But if we did we don't have -- we don't have it.  It doesn't exist. We haven't had it since the software was created.

And we went back and we simply said, we don't have these things.  And the response to that, and counsel has said it today, the response to that was, oh, well, you don't have that; we want something else instead.  Why don't you go and look at the software as it currently exists and give us screen shots of the software as it currently exists.  Well, that's not the way that discovery works.  You asked for the documents you want.  If we have the documents that you want and they're responsive and relevant, we give them to you.  You don't get to say, well, we asked for one thing, you don't have it, so let's play bait and switch and see if you can give us something else that we might want.  That's what has happened here.  And that's before you even get to the sort of Meta versus -- MP versus Meta questions about whether or not any of this is really relevant or not.  The simple answer is, hey, we don't have them.

We can't produce what we don't have part 2 is, and I don't know why, but after the last hearing they sent document requests to Hammy Media.  Some of the documents Hammy Media hadn't produced.  Some of the documents they said we would have never had these to begin with.  TrafficStars might have

had them, but we don't have them.  And in particular they talk about, well, you haven't produced financial information, for example, about how much income did you receive from videos that had the tag "voyeur."  Well, Hammy's answer is, we don't have any documents that show that.  We don't know.  TrafficStars might have that.  And what we've provided you, even though it really is beyond what should have to be provided, is TrafficStars has come in and said, look, we don't know why they didn't ask us for the information.  They know that we're the advertising people.  They served us with document requests before.  We've responded to document requests before.  But even if they had, if they had asked us for these type of things, one, they don't exist as they've asked, and we don't think we need to create them, but, two, even if we want to we can't.

And one of the declarations that we've given you from TrafficStars says, hey, look, here's an example.  And there's an exhibit to that declaration that says, here's an example of one of the videos.  It has 79 different tags on it, one of which is amateur and one of which is...  And I said, how do we tell you what revenue is associated with a particular tag when a video has 79 tags.  We don't know.  We don't know if the revenue was generated because of the first tag or the 30th tag.  We just know that that particular video generated a certain amount of revenue.  We could tell you

that.  But we can't tell you what they are asking for.

When they talk about the metadata and, again, Your Honor, in the reply brief there is yet another shocking bait and switch.  They basically say, well, you know what, we can resolve the metadata questions.  Just give us another 30(b)(6) deposition.  Not part of their motion.  Brand new. And the truth of it is, these are self inflicted wounds.  They noticed Hammy's 30(b)(6) deposition in October of 2023, and it took place on October 17th, 2023, and they served us with document requests a month later in November.  They then come before you now and they say, oh, well, we should be able to ask them questions about metadata because we didn't have these documents before we took the 30(b)(6) deposition.  That's true, you didn't, because you didn't ask for them before the 30(b)(6) deposition.  That's not our fault.  You know, that is a strategic choice that you made.  We didn't understand it at the time, but you made it.

The summary judgment oppositions that have already been filed, Your Honor, they're interesting because they drop one footnote at the beginning that says, hey, by the way, we have motions to compel outstanding.  There's no 56 demotion along with this.  There's no 56 de-opposition.  They don't come to you and say, look, we can't respond to this argument here because we haven't been given document A, B, and C. There's certainly no declarations 56(d) requires to tell you

these are the specific documents we're entitled to and these are the specific reasons we can't respond to the summary judgment because we haven't been given them. The things that they're looking for, quite honestly, even more so after the recent Fourth Circuit case, but even before, don't really go to the legal issues that are before the Court on the summary judgment motions.

I'll respond really quickly to a few of the issues that they've brought up with respect to overproduction, and then I imagine Your Honor has some questions.

I'm really glad that they brought up at the end this issue about every one of our depositions and every one of our affidavits and every one of the declarations, sworn declarations that the Court has from the Hammy Media defendants say, we didn't have any payment plan, any reimbursement, any kind of plan that paid up-loaders in 2019. We just didn't have it. So we could not possibly have paid the up-loader in this case because we weren't paying any up-loader whatsoever. And in their opposition to the summary judgment motion and what counsel has just brought up, is they found anonymous comments posted on a website that is GFY.com which, Your Honor, if you'll excuse me stands for "go F yourself dot com. That's the evidence that they are coming to the Court with on summary judgment. It's inadmissible. It's 18 different levels of hearsay. And quite honestly it's just

wrong.  When counsel said that the postings to this GFY bulletin board talk about a payment system for XHamster.com, I'll assume that she's misspeaking because it's XHamster premium that even these postings talk about.  And that site was not owned, or run, or operated by any of the defendants who are here.  None of the videos from the plaintiffs appeared on that website so it's irrelevant anyway.

They had, as a lot of websites did at that time, they were approached by another company that said, hey, we'd like to offer full length for sale videos that we produce and use your name as an incentive to get people to look at the site.  They did so.  It had nothing to do with the user generated content that is the subject of this case.  It had nothing to do with the videos that are the subject of this case.  And the fact that that's the kind of evidence that is being brought before this Court to say, hey, there are material issues, genuine issues of material fact, is astonishing to me.

They talk about how we've pushed videos to our sponsor sites.  We don't have sponsor sites.  We haven't pushed the videos.  In any event, none of the videos from the plaintiffs were moved by the Hammy people to any other site.  They weren't XHamster.com, excuse me.

When they talk about the metadata, the shortest answer is, they're just wrong.  They're reading the metadata

wrong. And no one who has been before the Court and no evidence put before the Court is qualified to say what the metadata actually represents. There are -- it's true, and, again, we went back to the client because there are points in the metadata that look like there are updates post 2020 when the videos were removed. We said to the client, what's that about. The response was, well, look, even after videos are deleted, we maintain metadata for a certain amount of time. And when the site gets updated with some kind of functionality that we push out to every single video that is on the website, it gets recorded in the metadata even of deleted videos just because that metadata is still there. So at some point, for example, they added some functionality that automatically translates the title of video into the language that the visitor to the website might normally use. So, if it's being accessed from France, the title gets automatically translated into French. That shows up in the metadata of everything in the database, even videos that were deleted. And so it's simply not accurate to say, hey, they must be there. The videos must still exist because there are these indications in the metadata.

There is one issue, one last issue that I'll address, Your Honor, about the view count. When we initially asked the client for the view count on the plaintiff's videos, they went back to the request that they had received from the

Gaffney Police Department. There were six videos. They got the view counts on those six videos. That was the 3,000 number that we provided to the Court. Subsequent to that and in part when we were having our meet-and-confers in discussions about supplementing production, the plaintiff said to us, hey, go look at these responses that we gave to Limestone in their interrogatories because they identify a number of URLs that we say our clients videos appeared at. And a few of them are additional XHamster URLs, URLs that had never been identified to us before. And quite honestly we have no idea what appeared in any of those URLs. Plaintiffs say that they were their videos. I'm not staying that they aren't. But we don't know that they were. We asked for copies of the videos that were associated with those URLs, and we were told that they would be produced but they have not been produced.

But in any event, we went back to the client and said, hey, look, they've identified this URL. We needed additional view counts. Tell us what the additional view counts are, and we produced those. It's not that we were trying to hide anything from anyone. They gave us new URLs. We looked at new URLs. Videos aren't there. Videos have been deleted. But they did know what the view counts were, and so we supplemented and said, here are the additional numbers. It's not nefarious. It's just that these particular URLs

hadn't been identified until now.  And with that, Your Honor, I imagine you have some questions.

THE COURT:  Actually, I don't think I have any.

MR. FRAY-WITZER:  Even better.

THE COURT:  Let me hear from Ms. Fout in reply.  I think I know where we're going with this.

MS. FOUT:  I have a couple of things to address, Your Honor.  So I don't know if you remember, but I did send a note to the Court regarding these outstanding motions to compel and the summary judgment briefing.  And I was told I think by Ms. Angela, who I'm very close with now, that if supplemental briefing needs to be done then, you know, that will be done, and go ahead, file your motions.  You're not getting extensions.  So that's what happened with that instance.

In terms of the TrafficStars document we argue in our motion as well as our summary judgment motion that Hammy and TrafficStars are the same entity.  They're -- you know, South Carolina law recognizes the single business entity.  We briefed that.  We put it in our motion.  But the only information that TrafficStars would have goes to SCO.  They don't have moderation policies.  They don't have the thumbnail generation.  That's two of the 25 things that we're asking for that TrafficStars may have.  Ad revenue, you don't share your ad revenue with your client, (air quotes) "client."  We

believe there's internal communications.  There's emails. They watch out for trending tags, categories.  They know how much money these types of videos are making.  And there's internal communications between the two parties.  Whether they're a single business entity or not, obviously our position is I think it's quite clear that they are the same entity.  So, I think that that argument is just frivolous.

And in terms of the RFAs, Mr. Fray-Witzer forgot to mention the other part of the text order that says the order provided that completion of the discovery asked the parties to be set out by the Court on the record.  And that's where I went through all of the topics that you said were relevant and proportional and that we should focus on for this segment of discovery.  As Mr. Fray-Witzer alluded to, translating videos to different languages, that's creating new illegal content. That's directly relevant to our Section 230 arguments.

And in terms of the XHamster premium ad revenue, that just goes to show, it's a genuine dispute of material fact.  We find this document online.  They're saying it's different.  That's genuine dispute of material fact.  That's going to be ironed out in the summary judgment phase.  And if the documents don't exist, we are entitled to a formal supplemented answer.  They did not supplement their answers regarding the ad revenue and the view counts formally.  They produced us the metadata, so then we made a chart and added up

all of the view counts that we had.  We have no formal supplemental responses.

And in terms of the reviewer's guide and the moderation policies and guidelines, if the documents don't exist, once again, we're entitled to a formal supplementation response so we can bring it up at the spoliation issue at trial.  Thank you.  That's all I have.

THE COURT:  All right.  Here's what we're going to do.  These cases have been going on in some iteration, some case number for upward of five years now.  There have been -- there has been more than sufficient time to complete discovery.  The request for production that the plaintiffs seek from Hammy Media given the information in the briefing and information I've received this morning, I do think it's appropriate that the defendants supplement those responses or have the opportunity to.

Now, Mr. Fray-Witzer, my understanding is for a number of those the response that you've already given is those documents don't exist, they never existed, or to the extent they ever existed, we don't have them, which is a pretty easy answer to give.  And if that's the answer, that's the answer.  To the extent that you need to elaborate on that, understanding that that answer may be used by the plaintiffs if appropriate, I'm going to give you the opportunity to do that.  To the extent that there's some information that needs

to be clarified with regard to these views and where that information comes from and whether or not these videos were somehow updated after the date that it's been represented that they were taken down, I'll give you the opportunity to respond to that.

For the same reason I'm going to -- even though I understand the defense's position on the request for admission because the context in which I entered that order last summer was basically that the requests the plaintiffs had made were overly broad and seemed to be seeking a lot of information that wasn't particularly relevant, and I was giving them an opportunity to narrow that down, I understand why the defense would take that as, okay, question, interrogatories, document requests, but that doesn't include admissions -- requests for admissions. I think that is a reasonable position to take. I understand plaintiffs' position that, you know, typically Rule 36 is right in there with all the other discovery rules and so they interpreted that as an appropriate device. So, I'm going to deny the motion as to the admissions as it is.

However, my understanding from Ms. Fout's argument is that the primary purpose of the admissions was related to the sufficiency or lack thereof of the other responses. And so I'm going to give you-all the opportunity to confer. And if it's a situation where it is less burdensome to the defendant to respond to the request for admission than to the

request for production and it will get the plaintiffs essentially the same information as what they're looking for, then I'll be happy for you-all to substitute in and out, however you want to do that.  You need to get that done within two weeks.  Again, since apparently the responses to a lot of those requests for production is going to be, "we don't have any," shouldn't be too difficult to do that.

Now, that's going to take care of discovery.

To the extent anyone has any question, I'm going to say this as unambiguously for the record as I can.  We are done.  To the extent that anyone obtains information on either side from this supplementation that I've directed this morning that you believe is material and crucial to your briefing on summary judgment, whether it's in favor or in opposition, you can file a response indicating that along with a motion to be allowed to file that out of time, a motion for an extension.  And to the extent you can show me that this is information that you only got through this supplementation and you didn't have access to it before, I'll be pretty liberal in giving you that opportunity.  And I'm going to give you 30 days to get that in.

So basically I'm telling everybody to supplement both ways within two weeks, and you're going to have about two weeks after that to determine if you need to supplement anything because it shouldn't be much if at all.  I do not

need to hear the same thing eight different times just because you got some more paper in your hand.

Likewise, with respect to MP versus Meta, et al., to the extent that you believe that there is a legal impact of that that needs to be brought to the Court's attention vis-a-vis the summary judgment arguments, I'm going to likewise give you that same 30-day period to submit any supplemental briefing regarding that decision and how it plays into your arguments only. This is not another bite at the apple to go off writing another brief. But because this came out I believe on February 4th, which was either right at or maybe even after the summary judgment deadline and in the midst of the response, I want to make sure everybody has a fair opportunity. I think the only thing we have outstanding is there may be a reply or two that hasn't come in. And so I want to make sure everybody has an opportunity to address that case because I think it does have some bearing on the scope of the 230 immunity as viewed by the Fourth Circuit.

Now, with that, let's shift into status conference mode and talk about scheduling.

First, for counsel who have sat quietly back here on the 3576 case, this is the Jane Does represented by Mr. Few and Mr. Ellenburg and does not -- well, let me ask this. Mr. Few (sic), with respect to your case, we have -- we've consolidated all these cases for purposes of discovery but not

for trial.  And I'm sorry, who's here on 3576?

MR. HUBERT:  Your Honor, John Hubert for Limestone. So we settled that case a while back.  And they indicated it was their understanding there has been a Rubin dismissal so they didn't need to do anything to close.

THE COURT:  Let me take a look.

I'm going to need to go back and check on that because I don't see any entry of a Rubin order.

MR. HUBERT:  I'll tell you, I sent them dismissal and asked them to go ahead and file it.  So I may be able to get that filed this week or next week.  The case should be going away, Your Honor.

THE COURT:  All right.  So 3576 is settled?

MR. HUBERT:  Yes, sir.

THE COURT:  Okay.  That takes care of that.  I'm sorry.  Can you restate your name?

MR. HUBERT:  John Hubert.

THE COURT:  All right.  Thank you, sir.

That brings me back to my other cast of characters here.  With respect to the 947 and 3193 cases, I assume that you-all are -- although I think they were only formally consolidated for purposes of discovery, is there any reason that you know of why those cases can't all be tried together? And let me hear from plaintiff first.

MS. SULPIZIO:  No, Your Honor.  There's no reason

that they should not be tried together.

THE COURT:  Defense?

MR. FRAY-WITZER:  No reason, Your Honor.

MR. GODDARD:  No reason, Your Honor.

THE COURT:  I didn't think so, but I just didn't want to assume anything.

All right.  So, here's where we are on that.  You've got your dispositive motions filed.  I've given you some additional briefing and supplementation deadlines.  What I would like for you-all to do within the next two weeks while you're going to be getting to know each other even better than you already do as a result of my prior directives, I want you-all to talk about an updated scheduling order for these combined cases.  I want you to look at a trial date that is no later than early to mid September.  Of course you'll need to check with witnesses and all of that good stuff, make sure everybody is available.  Hopefully that will get us past summer vacation dates.  If you have a date in August that everybody is available, I'm up for that.  But I want something by September unless there's a real good reason that we can't get that done.  Of course any remaining deadlines in the scheduling order, just work backward from whatever trial date that you-all come up with.  Once I get that information, I'll take a look at it and we'll let you know about a specific jury selection date and we'll let you know about specific deadlines

by entry of a trial order.

I will tell you that based upon my knowledge of this case depending on the Court's ruling on the dispositive motions, it is highly likely, close to a dead sure certainty, that I'm going to send you back to mediation before we try this case. I think you-all had used Mr. Wills.

**MS. SULPIZIO:** Yes, Your Honor.

**THE COURT:** And Tom does a real good job. So I would expect that you would go back and take another shot at it with him with whoever that may involve at that point in time. Now, given the scope of the issues involved in this case, I think you're probably astute enough to know that if your final supplemental information is not coming in for 30 days, I'm not likely to have an order issued in 31. It's going to take a little while to go through this stuff. To the extent that you-all want to have any discussions or you want to talk with Mr. Wills before the Court makes a ruling, I would encourage you to do that. My understanding from Tom, last time you-all met with him was that you made some progress. That it wasn't a complete bust. Obviously I didn't ask him to give me any confidential information about what was going on, but it seemed like that there was at least some effort as it should be given the facts in this case. I mean, you know, regardless of where technical legal liability lies, this is a pretty awful set of facts here in terms of these

young ladies.  So, I will encourage you to do that.  And certainly you-all can weigh with your clients the relative risks and benefits.

To state the obvious for both sides, all parties, the benefit of going forward now is the price will likely go up for the defense and down for the plaintiff if one or more parties get out on summary judgment or if they don't.  So, you know, if you want to try to see if you can get something done now as opposed to taking your chances on if you're the plaintiff not having all of the parties who are present now present, or if you're the defendant, not being the one left without a seat when the music stops, you-all can make that determination.  But whoever is left, I can tell you you're going to go back before we try the case.  I think -- and so I'll expect you to submit a proposed scheduling order within two weeks.  If you run into any big issues on that, let me know and we can talk about whether you need a little bit more time if there's a good reason for it.  I think that's everything I had on my agenda this morning.  Anything else from the plaintiffs while we're all here?

MS. SULPIZIO:  Judge, I'd just like to ask a clarifying question for the scheduling order?

THE COURT:  Sure.

MS. SULPIZIO:  I don't know if you would like us to push out the Daubert deadline which is coming up.  I don't

think we need to.  I think we can work from the deadlines after Daubert.  But I just didn't know what the Court was thinking on that deadline as well, if we just do mediation and move forward in pretrial.

THE COURT:  I don't have a strong preference.  I think that's something you-all know who your experts are at this point.  I presume since discovery is closed, you've all deposed your relative various experts, so you pretty much know what they're going to say whether you've made a formal filing or not.  By you know, that's up to you-all.  I don't have a strong feeling on that.  Mr. Goddard?

MR. GODDARD:  I would like to talk to my co-counsel about that before I do that.  But certainly can talk during the next two weeks in the meet-and-confer.

THE COURT:  While you-all are conferring about scheduling order, you-all can look at that and see what you want to do.  I would encourage you to work at an agreement as long as it fits in the long view of where you're going to trial and working back, and it gives you adequate time.  You know, you're not going to get any pushback from me on, well, why did you change that deadline.  I don't think you need to change.  I'm going to let you do what you feel like you need to.  It's your case.  You've got to try it.  I'll let you-all figure that out.

MS. SULPIZIO:  Yes, sir.  Thank you.

MR. FRAY-WITZER: Very minor scheduling ask, I guess, given the supplementation order today.

The MindGeek folks had requested and received from plaintiffs an extra week to file their reply brief. We didn't ask for it. I think I would ask for an extra week if no one objects to that?

THE COURT: I assume if plaintiff gave it to one defendant they would give it the other. Any objection?

MS. SULPIZIO: I'm happy to give it to you.

THE COURT: All right. On the record and it's granted --

MR. FRAY-WITZER: Thank you.

THE COURT: -- by consent.

All right. Nothing else, Mr. Hubert?

MR. HUBERT: Would that deadline move specific to the client or all defendants, one week?

MS. SULPIZIO: You need it, John? That's fine.

MR. HUBERT: I don't need it, but I'll take it.

THE COURT: I was going to say, if you're settled, why do you need a deadline?

MR. HUBERT: Not with this one, Your Honor. I'm still in with the two cases here.

THE COURT: I'm sorry. That's correct.

Yeah. You just got out of one. You still have got two more. You're still with us.

MR. HUBERT:  That's why he hasn't been dismissed, Your Honor.  I should have been more diligent making sure it was --

THE COURT:  I understand.  That's fine.  I think what's good for one is good for all, so you-all got an extra week.

MR. HUBERT:  Thank you, Your Honor.  Appreciate that.

THE COURT:  All right.  If there's nothing further, that will conclude this morning.  I appreciate everybody coming in.  I know it's been another long hearing, but I think we've gotten a lot done.  Hopefully this is the last one of these we'll need to have for a while.  And at least if we're having another one, it's going to be of a more substantive nature.  Give me just one second.

(Pause.)

THE COURT:  All right.  My clerk who makes sure that I don't screw up any worse than I usually do pointed out an omission I had here.  On the first motion, Mr. Goddard, where I gave the plaintiff -- we crunched it down to one inquiry about due diligence related to 2019 information and I gave the plaintiff the opportunity to propound a new request within ten days, I neglected to put any deadline on the response.

Let me ask you this:  If the plaintiff gets that to you within ten days, could you respond to it in about three

weeks, in other words, could you respond to it in 30 days from today?

MR. GODDARD: Your Honor, I certainly will -- depending -- the only difficulty is the volume of what may be involved in the due diligence. But I certainly will take it to my client today as to what we may expect to get and start that process, and I should know more as we do the meet-and-confer.

THE COURT: The maximum you would get would be 30 days anyway.

MR. GODDARD: Right.

THE COURT: And what I'm trying to do is just tie all this up to essentially a 30-day from today end point.

MR. GODDARD: Understood.

THE COURT: What I'm going to do is, I'm going to indicate in the minute entry that plaintiff is required to do it within ten days, and you're required to respond within 30 days. Understanding that if you need the full 30 days from the date the plaintiff sent it to you --

MR. GODDARD: Right.

THE COURT: -- if you'll ask for an extension, I'll be glad to give it to you if you need it.

MR. GODDARD: Thank you, Your Honor.

THE COURT: All right. Anything else? All right. Hearing nothing further, court is adjourned. Thank you, very

much.

(Court adjourned at 12:36 p.m.)

CERTIFICATE

I, Michele E. Becker, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Michele E. Becker                Date:  February 25, 2025