**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | |
|---|---|
| JANE DOES 1-9,<br><br>            Plaintiffs,<br><br>    v.<br><br>COLLINS MURPHY, et al.,<br><br>            Defendants. | CASE NO. 7:20-CV-00947-DCC |
| JANE DOE,<br><br>            Plaintiff,<br><br>    v.<br><br>LIMESTONE UNIVERSITY, et al.,<br><br>            Defendants. | CASE NO. 7:21-CV-03193-DCC |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS MG
FREESITES LTD AND MINDGEEK S.À R.L. FOR SUMMARY JUDGMENT**

**INTRODUCTION**[1]

After five years of litigation, five amended complaints, and nearly a dozen shifting legal theories and claims, Plaintiffs' Opposition now confirms that Plaintiffs have ***no viable claims*** against Defendants MG Freesites Ltd and MindGeek S.à r.l. (together, "MindGeek"). All of Plaintiffs' claims fall squarely within the immunity of Section 230 and also independently fail on the merits for the reasons set forth in MindGeek's Motion. Since this lawsuit's inception, the developing caselaw—including a recent Fourth Circuit case—has confirmed that Plaintiffs' claims fail as a matter of law. *See, e.g.*, *M.P. v. Meta Platforms, Inc.*, 127 F.4th 516, 521 (4th Cir. Feb. 4, 2025) (dismissing all of plaintiff's claims as barred by Section 230 where Facebook allegedly used a "content-sorting algorithm" to "promote[]" "extremist and racist content" in order "to maximize viewer engagement"); *Doe v. Fenix Int'l, Ltd., et al.*, 2025 WL 336741, at **1, 9 (S.D. Fla. Jan. 30, 2025) (same, where OnlyFans allegedly "actively reviewed [the user-uploaded] video of [p]laintiff's rape, yet still allowed it to be published, and promoted" on its website and "engage[d] in profit-sharing with [the uploader]"), *appeal filed* No. 25-10669 (11th Cir. Mar. 3, 2025); *Doe v. Grindr Inc., et al.*, 128 F.4th 1148, 1152-53 (9th Cir. Feb. 18, 2025) (same, where Grindr allegedly "facilitat[ed] communication[s] among users for illegal activity, including the exchange of [CSAM]"); *Doe v. WebGroup Czech Republic, A.S.,* Case No. 2:21-CV-02428-SPG-SK, Dkt. No. 205 at 6-7 (C.D. Cal. Feb. 21, 2025) [2] (same, where XVideos allegedly "promot[ed]

---

[1] All capitalized terms not defined herein shall have the same meaning as in MindGeek's Motion for Summary Judgment (Dkt. No. 475-1) ("**Motion**" or "**Mot.**"). In addition, "**Ignatiou Mot. Decl.**" refers to the Declaration of Andreas Ignatiou dated January 9, 2025 (Dkt. No. 475-4); "**Andreou Decl.**" refers to the Declaration of Andreas Andreou dated January 10, 2025 (Dkt. No. 475-3); **"Opposition"** or **"Opp."** refers to Plaintiffs' Opposition to the Motion (Dkt. No. 488); and "**Pls. Ex. 1**," etc. refers to Plaintiffs' Exhibits in Opposition to the Motion.

[2] Pursuant to Local Rule 7.06(C), a copy of the recent decision in *WebGroup* is attached hereto as Exhibit A.

and encourag[ed] CSAM, host[ed] voluminous CSAM on their websites, fail[ed] to moderate and cull out illegal content, profit[ed] from CSAM, and [shared revenue] with uploaders of CSAM").

Unable to muster the evidence required to raise a genuine issue of material fact, Plaintiffs' Opposition attempts to re-write their complaints for a ***sixth time***, now claiming, for example, that third parties who uploaded the Videos—not Murphy, who allegedly created the Videos—"sex trafficked" Plaintiffs; that a single claim for "false light" encompasses three other privacy claims that were dismissed years ago; that the "civil conspiracy" is not among the "Defendants" (as plainly alleged) but is between MindGeek and third parties; and, for the very first time, that various other states' laws (not South Carolina law) governs the state law claims. Plaintiffs also abandon their RICO claim and jurisdictional arguments,[3] after forcing MindGeek to litigate these claims and issues for years and brief them on summary judgment. Further Plaintiffs play fast-and-loose with the record, mischaracterizing evidence and, on occasion, espousing outright falsehoods such as that MindGeek posted the Videos despite "warnings" they looked "illegal" or that MindGeek "reposted" the Videos in 2021. But the fundamental facts are undisputed: MindGeek did not participate in any manner in the creation of the Videos. Nor did it materially contribute to their alleged illegality. Rather, like any other video-sharing or social media website, MindGeek merely offered a platform that enabled third parties to upload content, and made such content accessible using standard, content-neutral tools—exactly the type of activities that Section 230 protects.

The Court should reject Plaintiffs' eleventh-hour attempts to save their failing claims and

---

[3] Plaintiffs do not address, and thus concede, that Plaintiffs' RICO claim fails as a matter of law (Mot. at 28-31) and that MindGeek S.à r.l. is not subject to personal jurisdiction (*id.* at 33-34). *See Herbert v. McCall*, 2024 WL 4276995, at *3 (D.S.C. Aug. 9, 2024) ("As numerous courts in the Fourth Circuit repeatedly have held, a litigant's failure to address arguments in responding to dispositive motions amounts to a concession of such arguments.") (collecting cases), *report and recommendation adopted*, 2024 WL 4556896 (D.S.C. Oct. 23, 2024)

grant MindGeek's Motion for Summary Judgment in its entirety.

## I.  PLAINTIFFS' PURPORTED "STATEMENT OF FACTS" RELIES ON ASSERTIONS THAT ARE DEMONSTRABLY FALSE OR UNSUPPORTED

Apparently realizing the undisputed facts do not support their position, Plaintiffs rely on demonstrably false "facts" and either mischaracterize or simply ignore the evidence.  For example:

- **MindGeek Did *Not* Re-Post Any of the Videos.**  Citing an Excel spreadsheet produced by MindGeek (Pls. Ex. 3) (the "Metadata Spreadsheet"), Plaintiffs falsely claim that the Videos "were reposted to the site as recently as 2021."  Opp. at 3-4; *contra* Declaration of Andreas Ignatiou dated March 17, 2025 ("Ignatiou Reply Decl.") ¶¶ 10-14.  Plaintiffs misconstrue the Metadata Spreadsheet, which actually reflects that the Videos were ***removed from the Pornhub Website in October 2019 and never re-posted***.  *Id.* ¶ 11.  The January 2021 "Actions" in the spreadsheet merely reflect back-end changes that were made to indicate in MindGeek's internal database the reasons why the Videos had been removed—*i.e.*, due to "Violation of Terms and Conditions" and "User: Content Removal Request."  *Id.* ¶ 13.

- **The Videos Were *Not* "Flagged" Before They Went Live.**  Plaintiffs falsely suggest, citing the Metadata Spreadsheet (Pls. Ex. 3), that "[m]ultiple times, Pornhub employees flagged the videos with warnings" and, "[n]otwithstanding these designations," the Videos "were published and made accessible on Defendants' websites within three minutes or less."  Opp. at 8.  In fact, the Metadata Spreadsheet reflects that ***two*** of the Videos were flagged by ***users*** of the Pornhub Website ***after*** the Videos were published.  *See* Ignatiou Reply Decl. ¶¶ 15-18.  Moreover, nearly all of these "flags" were made shortly before the Videos were removed.  Thus, the evidence reflects ***not*** that MindGeek ignored flags, but that its system worked as intended.

- **MindGeek Did *Not* Select or Change the Videos' Tags or Titles.**  Plaintiffs claim that MindGeek "created and provided" tags and titles to the Uploaders.  Opp. at 5, 9.  That is false.

*See* Ignatiou Reply Decl. ¶¶ 19-20.  Plaintiffs cite the same Metadata Spreadsheet (Pls. Ex. 3), which actually shows MindGeek made **no** changes to **any** of the Videos' tags or titles.  *Id.* ¶ 20.  Nor is there any evidence that MindGeek selected or even suggested these tags or titles.  While MindGeek did modify the **categories** for two of the Videos, this did not impact the content of the Videos, and the other Videos were not altered in any way.  *Id.* ¶¶ 21-24.

- **MindGeek Did *Not* Provide "Guidelines" to the Uploaders.**  In an effort to misleadingly suggest that MindGeek encouraged the posting of nonconsensual content, Plaintiffs mischaracterize the MPP and conflate it with the separate "Content Partner" program.  *See* Opp. at 4-5.  Unlike the MPP, through which individuals may monetize their uploaded content (Ignatiou Mot. Decl. ¶ 9), the "Content Partner" program allows professional studios to create dedicated "channels" for their content on the Pornhub Website (Ignatiou Reply Decl. ¶ 32).  The "Pornhub Playbook" (Pls. Ex. 6) that Plaintiffs cite was for "Content Partners," not MPP participants.  Ignatiou Reply Decl. ¶¶ 32-33.  Indeed, the words "Content Partner Program" appear on **every other page.**  Plaintiffs admit "[n]one of the [U]ploaders … were [content] partners."  Opp. at 15.

- **"Hidden Camera" Content Has *Never* Been A "Significant" Part of the Pornhub Website.**  Plaintiffs grossly overstate the quantity and significance of "hidden camera" or "voyeur" content on the Pornhub Website.  *See* Opp. at 6-7.  The only purported evidence that Plaintiffs cite is an Excel spreadsheet (Pls. Ex. 12) reflecting the number of searches performed for thousands of terms as of a particular date.  The terms Plaintiffs identify—*i.e.*, "voyeur," "real hidden camara [*sic*]," and "hidden camera"—are not even in the top 750 searched terms and collectively make up only **0.06%** of the searches.  Plaintiffs also ignore that the number of **searches** does not equate to the quantity of **content** on the Pornhub Website.  They also do not claim that content tagged as "hidden camera" or "voyeur" is nonconsensual.  Nor could they, because these

genres are common to professional pornographic content.  *See* Ignatiou Mot. Decl. ¶ 24.

- **"Axiom21" Did Not Upload Any Videos Of Plaintiffs.**  The Videos at issue were uploaded by "CWDistribution" and "LordFauger18."  Ignatiou Mot. Decl. ¶ 36.  Relying on a 2019 email (Pls. Ex. 13), Plaintiffs claim that a third individual, "Axiom21," "was confirmed to have uploaded videos of the Plaintiffs to Pornhub.com."  Opp. at 7.  This is false.  *See* Ignatiou Reply Decl. ¶¶ 30-31.  These videos do ***not*** depict Plaintiffs and thus are not at issue in this case.

- **There Is No Evidence That MindGeek Contributed To Any Proliferation of the Videos On Other Websites.**  Based on an unauthenticated list of URLs (Pls. Ex. 16), Plaintiffs boldly assert that, "[a]s a result of the Defendants' actions, the [Videos] have been found on at least seventy-three different pornographic websites."  Opp. at 10.  This is baseless.  Other than Pornhub.com, MindGeek ***does not own or operate any of these websites***.  *See* Andreou Decl. ¶ 6.  Moreover, there is no evidence of when, if ever, these third-party websites purportedly displayed the Videos, let alone evidence that they obtained the Videos from the Pornhub Website and not some other source.  Indeed, the Videos were available online for years before they were posted to the Pornhub Website.  *See* Dkt. No. 482-16 (showing Videos on third-party site "4chan" in 2016).

## II.  PLAINTIFFS' UNSPECIFIC CITATIONS TO UNAUTHENTICATED EVIDENCE CANNOT DEFEAT A MOTION FOR SUMMARY JUDGMENT

Plaintiffs' Opposition not only is rooted in demonstrably false "facts," but also is rife with evidentiary issues.  To defeat summary judgment, Plaintiffs must "go beyond the pleadings and by [their] own affidavits [or other evidence] on file, designate specific facts showing that there is a genuine issue for trial."  *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024); *see also Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (nonmoving party must "offer[] sufficient proof" of "a genuine issue of material fact") (cleaned up).  Plaintiffs have failed to meet their burden.

A.    **Plaintiffs Rely On Unauthenticated, Inadmissible, Unreliable "Evidence."**

Plaintiffs repeatedly cite inadmissible and unreliable evidence, including, for example, online articles (Opp. at 3, 6), a never-produced, third-party PowerPoint presentation (Pls. Ex. 10), an unexplained list of URLs (Pls. Ex. 16), undated screenshots (Pls. Exs. 17, 23), and a purported summary of Plaintiffs' expert's opinions (Pls. Ex. 29).  Plaintiffs even cite their own pleadings (*see, e.g.*, Opp. at 2-3, 11), which "of course, [is] not evidence."  *Cirrani v. Wal-Mart Stores, Inc.*, 2019 WL 859285, at *3 (D.S.C. Feb. 22, 2019).  The Court should disregard all of this "evidence."

*First*, Plaintiffs' exhibits are not attached to or referenced in any declaration.  This includes Plaintiffs' experts' reports, which also are unsworn.  *See* Pls. Exs. 5(a)-(b), 9.  "[I]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."  *Radford v. Hosp. Housekeeping Sys. LLC*, 2022 WL 4180450, at *6 n.4 (D.S.C. July 8, 2022) (cleaned up); *see also, e.g.*, *Durham v. Union Cnty.*, 2021 WL 4295886, at *8, n.5 (D.S.C. Aug. 31 2021) (on summary judgment, declining to consider a document that was "not part of an affidavit or declaration and [had] not been made an exhibit to a declaration").

*Second*, much of Plaintiffs' "evidence" constitutes inadmissible hearsay.  For example:

- **Articles.**  Plaintiffs cite links to online articles for several purported "facts," such as: (1) MindGeek owns "interconnected websites" that form the "Pornhub Network," "worth more than $740 million" (citing a *National Post* article); (2) "[i]t is well-known that the Pornhub Network hosts non-consensual pornography" (citing a *New York Times* op-ed); (3) "Pornhub's guidelines were remarkably lenient" and its "moderators were severely overworked, underpaid, and incentivized to review and post a significant volume of videos per shift" (citing a *Daily Mail* article); and (4) "[i]n 2019, Pornhub.com devoted a significant portion of its platform to hidden camera and voyeur content" (citing a *Jezebel* article).  *See* Opp. at 3, 6.  These articles are not

admissible. *See Greene v. Scott*, 2015 WL 2095214, at \*3 (D.S.C. May 6, 2015) ("Fourth Circuit has consistently found that newspaper articles are inadmissible hearsay to the extent that they are introduced to prove the factual matters asserted therein"), *aff'd*, 637 F. App'x 749 (4th Cir. 2016).

- **PowerPoint Presentation.** Plaintiffs cite an unexplained PowerPoint presentation by a third-party advocacy group, the "Justice Defense Fund" (Pls. Ex. 10), for the purported "fact" that MindGeek "required [its] employees to add tags and even modify the tags and categories chosen by the uploader, to ensure the content reached the appropriate audience and to maximize views and profitability for each video." Opp. at 6. The presentation is comprised of out-of-context website snippets, is wholly unreliable, and constitutes inadmissible hearsay. *See Farrar & Farrar Farms v. Miller-St. Nazianz, Inc.,* 477 F. App'x 981, 986 (4th Cir. 2012) (PowerPoint presentation was inadmissible because the offering party "did not identify or depose the author of the presentation, and no one … was questioned concerning its contents"). Moreover, nothing in the PowerPoint presentation supports the factual contention for which it is cited.

### B.     Plaintiffs Broadly Cite to Lengthy Documents.

Plaintiffs' Opposition is littered with unspecific citations to lengthy documents. *See, e.g.*, Opp. at 28-29 (citing without pin cites to "Pls. Ex. 25," which contains all ten Plaintiffs' entire deposition transcripts, totaling 917 pages); *id.* at 10, 17, 19 (citing without pin cites to "Pls. Ex. 5," which contains the Expert Report and Supplemental Reports of W. Scott Brandon, totaling 161 pages). This "flies squarely in the face of Rule 56(c), which requires a party to cite to ***particular parts*** of materials in the record."[4] *Paschal v. Lott*, 2016 WL 11409585, at \*3 n.3 (D.S.C. July 12, 2016) (declining to read entire lengthy transcript cited in opposition to summary judgment), *report and recommendation adopted*, 2016 WL 5402861 (D.S.C. Sept. 28, 2016), *aff'd*, 688 F. App'x

---

[4] All emphases herein have been added by MindGeek.

226 (4th Cir. 2017); *see also T-Zone Health Inc. v. SouthStar Cap. LLC*, 2023 WL 5108500, at \*3 (D.S.C. Aug. 9, 2023) ("Litigants may not thrust upon the Court the burden of combing through the record to make a case on their behalf."). The Court should disregard these broad citations.

## III.   ALL OF PLAINTIFFS' CLAIMS ARE BARRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT.

Nothing in Plaintiffs' Opposition undermines MindGeek's Section 230 immunity, which bars all of Plaintiffs' claims. *See* Mot. at 10-22. Plaintiffs do not dispute that: (1) the Pornhub Website is an "interactive computer service;" (2) third-party Uploaders provided the Videos to MindGeek; and (3) Plaintiffs' negligent monitoring and false light claims treat MindGeek as a "publisher" of the Videos. As discussed below, Plaintiffs' attempts to show MindGeek nevertheless engaged in conduct beyond its role as publisher or "materially contributed" to the illegality of the Videos are unsupported by the factual record and contrary to well-established law.

### A.     Plaintiffs' Claims Seek to Treat MindGeek as a "Publisher."

All of Plaintiffs' claims fundamentally seek to hold MindGeek liable for their role as a "publisher" of third-party content. *See* Mot. at 19-21. Plaintiffs concede as much with respect to their negligent monitoring and false light claims, but wrongly insist their TVPRA and civil conspiracy claims "do not treat [the MindGeek] Defendants as a publisher." Opp. at 23.

Plaintiffs' TVPRA and civil conspiracy claims plainly derive from MindGeek's exercise of "a publisher's traditional editorial functions," including decisions regarding the distribution and monetization of the Videos. *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). This is confirmed by Plaintiffs' own allegations and discovery responses. *See, e.g.*, 5AC ¶ 106 (alleging MindGeek violated TVPRA by "monetiz[ing] content on their platforms through user-focused products and services"); *id.* ¶ 196 (alleging MindGeek engaged in conspiracy resulting in "the publication … and dissemination of the [ ] videos"); Dkt. No. 437-2 at No. 20 (claiming MindGeek

violated TVPRA by "providing a platform … that allowed the non-consensual videos to be distributed"); *id.* at No. 22 (claiming MindGeek engaged in conspiracy by creating "a marketplace and platform for non-consensual content to be downloaded, re-uploaded, and distributed").[5]

In their Opposition, Plaintiffs take a "formalistic approach, looking abstractly to the [legal] elements" and ignoring the factual bases of their claims—an approach that the Fourth Circuit recently expressly rejected. *Meta*, 127 F.4th at 524-25. For example, Plaintiffs now argue their TVPRA claim seeks to hold MindGeek liable for "knowingly benefiting from a trafficking venture and not for the publishing of third-party content" (Opp. at 23), but Plaintiffs' entire theory of liability is based on MindGeek's hosting and monetization of the purportedly illegal Videos. *See* Opp. at 42-46; Dkt. No. 437-2 at No. 16 (claiming MindGeek "knowingly benefited" by providing "financial incentive[s]" that induce "uploaders to capture and publish videos to their websites"). Similarly, Plaintiffs argue their civil conspiracy claim focuses on MindGeek's "agreement to share revenue with a party who uploaded illegal content" (Opp. at 24), but this claim also arises entirely from the publication of third-party content on the Pornhub Website. *See* Opp. at 32-33. Courts "repeatedly have rejected [similar] attempts to recharacterize claims fundamentally based on the posting of online information in order to avoid [Section] 230's prohibition on 'treat[ing] [the defendant] as a 'publisher' of information.'" *Goddard v. Google, Inc.*, 2008 WL 5245490, at *4 (N.D. Cal. Dec. 17, 2008); *see also, e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20 (1st Cir. 2016) (rejecting attempt to "[c]haracterize [TVPRA] allegations as describing 'an

---

[5] Plaintiffs' arguments on the merits of their TVPRA and civil conspiracy claims also make clear that such claims derive from MindGeek's role as a "publisher." *See, e.g.*, Opp. at 43 (arguing MindGeek violated the TVPRA by "knowingly allow[ing] secretly recorded videos of Plaintiffs … to be uploaded"); *id.* at 32 (arguing MindGeek engaged in a conspiracy by "enter[ing] into an agreement … to procure videos for uploading").

affirmative course of conduct' by [defendant] distinct from the exercise of the 'traditional publishing or editorial functions' protected under the CDA").[6]

Moreover, contrary to Plaintiffs' assertions, "revenue-sharing claims" are not categorically excluded from Section 230 immunity. Opp. at 24-25. Like all MPP participants, LordFauger18 was eligible to receive a percentage of the revenue generated *from the content he uploaded* to the Pornhub Website. *See* Ignatiou Mot. Decl. ¶¶ 11, 39.[7] When, as here, the revenue-sharing "cannot be divorced from the users' own conduct of … disseminating the [ ] content," Section 230 bars liability. *See, e.g.*, *WebGroup*, Dkt. No. 205 at 10-11 (granting Section 230 immunity and rejecting argument that the "shar[ing] of revenue with sex-traffickers goes beyond a publishing role").[8]

### B.    MindGeek Did Not Materially Contribute to the Illegality of the Videos.

Plaintiffs concede that the Videos were uploaded to the Pornhub Website by third parties, that MindGeek did not participate in the creation of the Videos, and that MindGeek's only relationship to the Videos is that it hosted them and made them accessible to others in the same manner it makes all uploaded videos available. In an effort to create some basis for a "material contribution," Plaintiffs point to various content-neutral activities that occur after content is

---

[6] Contrary to Plaintiffs' suggestion (Opp. at 24), *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110 (4th Cir. 2022), does not support their position. *Henderson* recognized that a claim treats the defendant as a publisher, when as here, it seeks to impose liability "for disseminating 'improper content' on its website." *Meta*, 127 F.4th at 525 (quoting *Henderson*, 53 F.4th at 120-121).

[7] LordFauger18 never received any payment from MindGeek (Ignatiou Mot. Decl. ¶ 39), and CWDistribution did not participate in any monetization program (Ignatiou Reply Decl. ¶ 33).

[8] Plaintiffs' reliance on *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), is misplaced. *See* Opp. at 24-25. *Gonzalez* is factually distinguishable and has no impact on Section 230 immunity where, as here, the alleged revenue-sharing relates to third-party content and does not independently violate another statute. *Gonzalez*, 2 F.4th at 898 (no Section 230 immunity for defendant's "unlawful payments of money to ISIS," because, unlike here, the "revenue-sharing allegations [were] not directed to any third-party content" and violated the Anti-Terrorism Act); *see also WebGroup*, Dkt. No. 205 at 10-11 (distinguishing *Gonzalez* on this basis).

uploaded to the Pornhub Website, such as creating thumbnail images, categorizing the videos so the website content can be searched, and placing advertisements next to content. *See* Opp. at 15-22. These are actions common to every video-sharing or social media website, and they are not sufficient to transform MindGeek into an "information content provider."

**First**, MindGeek did nothing to contribute **to the illegality** of the Videos. In applying the "material contribution" test, courts "consistently draw[] the line at the 'crucial distinction between, on the one hand, taking actions … that are necessary to the display of unwelcome and actionable content and, on the other hand, ***responsibility for what makes the displayed content illegal or actionable***.'" *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 n.4 (9th Cir. 2016). Here, what makes the Videos "illegal" is how they were recorded, *i.e.*, by placing a hidden camera in a locker room without Plaintiffs' knowledge or consent. Plaintiffs concede MindGeek had **no role** in that. *See* Mot. at 12-13. Nothing MindGeek did here—such as allowing the Videos to be posted with tags such as "hidden" and "voyeur"—enhanced the illegality of any piece of content. In fact, MindGeek explicitly **prohibited** the posting of illegal content (Ignatiou Mot. Decl., Ex. A), which distinguishes this case from *Roommates.com* (*see* Opp. at 15), where the website "***encouraged***" or "**required**" illegal content. *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174-75 (9th Cir. 2008) ("immunity will be lost" only "[w]here it is very clear that the website directly participates in developing the alleged illegality").

**Second**, MindGeek's use of thumbnails, categories, tags, and advertisements is **not** unique to the Videos or any particular type of content. Rather, Plaintiffs concede—and the evidence establishes—that these are ***standard, content-neutral tools*** utilized in connection with ***every single video*** on the Pornhub Website. *See, e.g.*, Opp. at 5, 15; Ignatiou Mot. Decl. ¶¶ 13-18. The law is

clear that websites—including adult websites featuring pornographic content[9]—do not lose Section 230 immunity by acting in a content-neutral manner. *See WebGroup*, Dkt. No. 205 at 9 (finding no "material contribution" and granting Section 230 immunity where website created "advertisement[s]," "thumbnails, titles, tags, keywords, search terms, and categories indicative of CSAM," because these are "***standard, content-neutral tools***" "'necessary to the display' of ***all*** online content"); *Doe v. Reddit, Inc.*, 2021 WL 5860904, at **4-5 (C.D. Cal. Oct. 7, 2021) (same, where website "elevated" and "award[ed]" CSAM, because it "relate[d] to '***neutral tools***'").

> ***Third***, all of Plaintiffs' specific attempts to establish a "material contribution" fail.

- **Thumbnails.** MindGeek did *not* "create" thumbnails for the Videos. Opp. at 15. The Uploaders chose the thumbnails and MindGeek did not change them. *See* Ignatiou Reply Decl. ¶¶ 28-29.[10] Regardless, Plaintiffs concede ***all*** "users" must "choose a thumbnail" when "upload[ing] content." Opp. at 15. Also, South Carolina law does not criminalize the after-the-fact creation of thumbnails from voyeur videos. *Id.* at 16 (citing S.C. Code Ann. § 16-17-470, which criminalizes acts done "***while*** the person is in a place where [] she would have a reasonable expectation of privacy"). It is well-established that "the creation of thumbnails" does not preclude Section 230 immunity where, as here, it is "a standard function of [the defendant's] websites," *Doe v. WebGroup Czech Republic, A.S., et al.*, 2024 WL 3533426, at *8 (C.D. Cal. July 24, 2024), and

---

[9] Contrary to Plaintiffs' assertions (Opp. at 14), adult pornography websites are equally entitled to Section 230 immunity. *See, e.g.*, *WebGroup*, Dkt. No. 205 (granting Section 230 immunity to "adult website"). Moreover, the "dissemination of pornography" is ***not*** "unlawful in and of itself." Opp. at 14 (misquoting *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828 (C.D. Cal. 2021), *adhered to on denial of reconsideration*, 574 F. Supp. 3d 760 (C.D. Cal. 2021), which says "the dissemination of ***child*** pornography … is unlawful in and of itself"). This case does not involve child pornography or any other content for which possession or distribution would be a crime.

[10] Contrary to Plaintiffs' unsupported assertions, all uploaders—not "[o]nly channel partners" (Opp. at 15)—could create their own thumbnails for their content. *See* Ignatiou Reply Decl. ¶ 28.

"unrelated to the illegality" of the third-party content, *Roomates.com*, 521 F.3d at 1169.[11]

- **Categories and Tags.** MindGeek did *not* "actively create[] [the] tags" for the Videos. Opp. at 17. The Uploaders provided the tags for the Videos and MindGeek did not change them. *See* Ignatiou Reply Decl. ¶ 20. While MindGeek did provide a list of *categories* for the Uploaders to select from, that list did *not* include "voyeur," "spy cam," or any other term arguably associated with nonconsensual content (*id.* ¶ 38)—further distinguishing this case from *Doe v. MG Freesites*. *See* Mot. at 15-16. Plaintiffs make much of the fact that MindGeek "added categories." Opp. at 18. In reality, MindGeek added categories—*i.e.*, "Amateur," "Fetish," and/or "Lesbian," none of which are suggestive of illegal content—to only *two* Videos, and did so in furtherance of their overarching goal of ensuring *all* content on the Pornhub Website is properly categorized. *See* Ignatiou Reply Decl. ¶¶ 21-24. This does not disqualify MindGeek from Section 230 immunity. *See, e.g.*, *WebGroup*, 2024 WL 3533426, at *8 (use of "titles, tags, keywords, search terms, and categories" is "a standard publishing function or a neutral tool made available to all third parties seeking to upload material onto [defendants'] websites").

- **Search Functionality.** The Pornhub Website's search functionality also is "an essential part of traditional *publishing*" and "does not amount to 'developing' [the Videos] within the meaning of Section 230." *Force v. Facebook, Inc.*, 934 F.3d 53, 70 (2d Cir. 2019). Plaintiffs argue that MindGeek's goal was to "increase traffic and allow these [V]ideos to be more widely distributed to end-users" (Opp. at 4), but the Fourth Circuit has confirmed that a website "does not cease to be a publisher" by "us[ing] an algorithm" to "increase[] consumer engagement." *Meta*, 127 F.4th at 526; *see also, e.g.*, *Force,* 934 F.3d at 69-70 (no "material contribution" and granting

---

[11] Plaintiffs' cite the Northern District of Alabama's decision regarding the use of thumbnails in *Doe et al. v. MG Freesites, Ltd. et al.*, No. 7:21-cv-00220-LSC, Dkt. No. 261 (N.D. Ala. Dec. 19, 2024), but as previously explained (Mot. at 15), this decision is inapposite.

Section 230 immunity where "algorithms ma[d]e content more 'visible[]' [and] 'available'").

- **Advertisements and Other Content.** Plaintiffs argue MindGeek "materially contributed" by "matching" the Videos with advertisements and other content based on categories and tags. Opp. at 17-18. This argument consistently has been rejected, and is especially unpersuasive here since MindGeek's "advertising [and content-pairing] operation neutrally applies to **all** online content." *WebGroup*, Dkt. No. 205 at 9-10 (no "material contribution" and granting Section 230 immunity where defendants "creat[ed] [] advertisement[s] based on data" related to content). There also is no evidence that MindGeek "created entire landing pages" for "'spy cam,' 'hidden cam,' and 'voyeur' content." Opp. at 21; *contra* Ignatiou Reply Decl. ¶¶ 36-37.

- **Purported "Collaboration" and "Solicitation" of Content.** Plaintiffs argue that MindGeek "actively collaborated with uploaders and solicited illegal content." Opp. at 20. But there is no evidence MindGeek ever explicitly communicated with anyone—let alone Murphy or the Uploaders—to recommend that they provide nonconsensual content. *Cf. Meta*, 127 F.4th at 525, n.6. Plaintiffs rely solely on the so-called "Content Partner Guide" (also called the "Pornhub Playbook"). Pls. Ex. 6. That document is irrelevant; it never even mentions nonconsensual content and "[n]one of the [U]ploaders … were [content] partners." Opp. at 15; Ignatiou Reply Decl. ¶¶ 32-33. Plaintiffs' claim that "hidden camera" was not a "banned word" in 2019 (Opp. at 21) also is irrelevant, especially as fake "voyeur" content was a popular genre. Ignatiou Reply Decl. ¶ 39.

## C. The FOSTA Exception to Section 230 Immunity Does Not Apply Here.

The limited FOSTA exception does not destroy Section 230 immunity here. Plaintiffs argue they need only show "constructive knowledge" (Opp. at 22-23),[12] but the statute is clear that

---

[12] The cases Plaintiffs cite in support of this argument do not involve Section 230, let alone apply the FOSTA exception where the defendant merely "should have known" of the alleged trafficking.

FOSTA does not apply to a "claim [ ] under [§] 1595 ... *[unless] the conduct underlying the claim constitutes a violation of [§] 1591*," 47 U.S.C. § 230(e)(5)(A), which requires "*knowing* participation in a sex trafficking venture." *Does 1-6 v. Reddit, Inc.,* 51 F.4th 1137, 1145 (9th Cir. 2022) (rejecting FOSTA exception where plaintiffs "suggest[ed] only that Reddit 'turned a blind eye,'" not that it had "actual knowledge"). Either way, as discussed *infra* (§ IV.B), there is no evidence that MindGeek had knowledge, actual or constructive, of any purported sex trafficking.

## IV.     PLAINTIFF'S TVPRA CLAIM FAILS ON THE MERITS AS A MATTER OF LAW

Plaintiffs acknowledge that, in order to establish liability under the "beneficiary" prong of the TVPRA (18 U.S.C. § 1595(a)), they must prove that Defendants "knowingly benefit[ted]... from *participation in a venture* which that person knew or should have known has engaged *in an act in violation of this chapter*"—namely, recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting Plaintiffs to engage in a "commercial sex act" as a result of force, threats of force, fraud or coercion. Apparently realizing that MindGeek had no relationship with Murphy, Plaintiffs now argue (1) that the *Uploaders* (who are not defendants in this case) are sex traffickers—even though none had any interaction with Plaintiffs or involvement in creating the Videos—and (2) that the posting of the Videos is a "commercial sex act." *See* Opp. at 39-40. Plaintiffs' arguments are without merit.

### A.     Neither Murphy Nor The Uploaders Engaged In "Sex Trafficking."

In support of their claim that the Videos reflect a "commercial sex act," Plaintiffs make a series of disjointed arguments that mix-and-match elements of the TVPRA and conflate the distinct and separate activities of Murphy, the Uploaders, and MindGeek.

*First*, Plaintiffs argue that showering and changing clothes in a locker room is a "sex act" because someone *viewing* the Videos might, hypothetically, receive "sexual gratification." Opp.

at 39-40. This argument is not supported by the law and defies common sense. The statute is clear—and Plaintiffs' own authority confirms—that a "*sex act*" must be performed by the *victim*, not some unrelated third party. *See* 18 U.S.C. § 1591(a)(2) (prohibiting certain acts "used to cause the *person* to engage in a commercial sex act"); *United States v. Taylor*, 44 F.4th 779, 789 (8th Cir. 2022) (upholding sex trafficking conviction where "women were directed and encouraged by Taylor to digitally stimulate client's genitalia in exchange for money"). No court ever has held that the normal, everyday activity shown in the Videos is a "sex act" under the statute.

*Second,* Plaintiffs fail to explain how any alleged "sex act" was "*commercial*" in nature. Plaintiffs concede no "commercial sex act occurred" "when Murphy filmed [them] in the locker room." Opp. at 39. Plaintiffs therefore now argue that the Videos became "commercial sex acts" when, years later, the Uploaders "uploaded [the Videos] to pornographic sites for the sexual gratification of others and for profit." *Id.*. This argument fails because none of the Uploaders "engaged in" any act prohibited by the statute—namely, using "means of force, threats of force, fraud, coercion, … or any combination of such means … to cause the [victim] to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2). Plaintiffs offer no support for the proposition, and nothing in the statute even arguably suggests, that the mere uploading or publication of a *video* years after it was created is itself an act of sex trafficking—especially where there is no relationship between the uploader and the victim. Whether the Uploaders (or MindGeek) received some "value" from the *publication* of the Videos in 2019 is irrelevant.[13] The commercial "value" must

---

[13] Plaintiffs' reliance on *United States v. Raniere,* 55 F.4th 354 (2d Cir. 2022), is misplaced and, if anything, demonstrates the logical fallacy in Plaintiffs' argument. In *Raniere,* the defendant was accused of operating a "secret society" in which new recruits were designated as "slaves" and forced to engage in a variety of nonconsensual sex acts (such as posing for nude photographs and having sex with the defendant). The court held that because the sex acts were solicited and coerced for the purpose of obtaining "special privileges" in the organization, they were "commercial" in nature. Here, there is no link at all between Plaintiffs and the Uploaders.

be directly related to the use of force, fraud, or coercion to cause the victim to engage in a sex act.

**Third**, Plaintiffs incorrectly claim that "they can advance a sex-trafficking claim" simply by "arguing that fraud **occurred**." Opp. at 41. That is not the law. "[F]or any fraud to be relevant [under the TVPRA], it must have been fraud that 'would be used to cause that person to engage in a commercial sex act.'" *United States v. Maynes*, 880 F.3d 110, 113-14 (4th Cir. 2018). In other words, as Plaintiffs concede, there must be a relationship between the fraud and the sex act—for example, the "deception" or "act of trickery or deceit" must "induce another" to engage in the sex act. Opp. at 41. The only potential "fraud or trickery" was Murphy's alleged initial recording of Plaintiffs using a hidden camera, which Plaintiffs admit did not cause any "sex act," and in which neither MindGeek nor the Uploaders participated. Whether the Uploaders "materially misrepresented" to the public that the Videos were consensual years later (*e.g.*, by uploading them to the Pornhub Website and using titles and tags to solicit viewers) is irrelevant because the Uploaders did nothing to induce Plaintiffs to engage in a commercial sex act.[14]

## B.     <u>MindGeek Did Not Knowingly "Participate" In A "Trafficking Venture."</u>

As Plaintiffs concede, for MindGeek to be liable under the "beneficiary" prong of the TVPRA, Plaintiffs must establish MindGeek "**knowingly** assist[ed], support[ed] or faciliat[ed] a violation of subsection (a)(1)." Opp. at 43. As the Ninth Circuit recently explained, "[a] defendant's own conduct violates 18 U.S.C. § 1591 when the defendant 'actually engaged in some aspect of the sex trafficking.' ... Not only must the defendant have **actual knowledge** of the sex trafficking, but there must be 'a **causal relationship** between affirmative conduct furthering the

---

[14] In fact, Plaintiffs' claim that the Uploaders simultaneously (1) misrepresented that "Plaintiffs consented to being filmed" **and** (2) "used titles and tags to solicit viewers who have a fetish for non-consensual type content" is contradictory. Opp. at 41. And if, as Plaintiffs claim, the Uploaders materially misrepresented the consensual nature of the Videos, this undermines any argument that MindGeek had knowledge that the Videos were actually nonconsensual.

sex-trafficking venture and receipt of a benefit.'" *Grindr,* 128 F.4th at 1155.

Plaintiffs cannot establish *any* relationship—much less a "causal relationship"—between MindGeek and any alleged sex trafficking.  In an attempt to save this claim, Plaintiffs now cast the *Uploaders* (rather than Murphy) as the sex traffickers.  But that argument fails because the TVPRA imposes liability on those who *traffic people,* not those who *publish videos*.  *See, e.g., Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 915 (N.D. Cal. 2021) ("Section 1591(a)(1) contains a series of verbs, all of which relate to a '*person*[]'…"), *aff'd in part, rev'd in part*, 2023 WL 3220912 (9th Cir. May 3, 2023) (affirming dismissal of TVPRA claim because "Twitter's alleged conduct relates only to CSAM depicting Plaintiffs, not to their persons") (cleaned up).  Thus, whether MindGeek "facilitated" access to the Videos or "creat[ed] an environment that made it easier for people to upload non-consensual videos" (Opp. at 44) is irrelevant.

Likewise, any "benefit" MindGeek received from the Videos (*e.g.*, advertising revenue) was not causally connected to any purported sex trafficking.  *See, e.g.*, *Reddit*, 51 F.4th at 1145-46 (dismissing beneficiary claim where plaintiffs did "not allege[] a connection between the child pornography posted on Reddit and the revenue Reddit generates, other than the fact that Reddit makes money from advertising on all popular subreddits"); *WebGroup*, Dkt. No. 205 at 15-16 (same, where defendants allegedly gained revenue from "all content posted by third-party users").  Because MindGeek did not engage in "active participation" or "affirmative conduct furthering the sex-trafficking venture," they are not liable under the TVPRA.  *Grindr*, 128 F.4th at 1155.[15]

Finally, Plaintiffs offer no evidence that MindGeek had actual *or* constructive knowledge

---

[15]  As set forth in MindGeek' Motion (at 27 n.20), *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544 (7th Cir. 2023), is entirely distinguishable because in that case Salesforce had a direct relationship with Backpage.com—which was itself engaged in sex trafficking, including by advertising the plaintiff and other trafficking victims for sex or prostitution.

of any purported sex trafficking. Plaintiffs concede that MindGeek had no reason to know when or how the Videos were created. MindGeek did not communicate with the Uploaders, and thus did not know how they acquired the Videos or whether they were involved in creating them. To the contrary, when the Uploaders created their accounts, they warranted and represented to MindGeek that all uploaded content was fully consensual and lawful. *See* Ignatiou Mot. Decl. ¶ 38. At best for Plaintiffs, the evidence shows MindGeek should not have allowed the Videos to go live on the platform or should have removed them sooner. Opp. at 42. Even if true, this establishes, at most, that MindGeek "turn[ed] a blind eye" to potential nonconsensual nature of the Videos—not that it knew or should have known that the Videos were connected to sex trafficking. *Reddit,* 51 F.4th at 1145-46 (allegations that defendant "provides a platform where it is easy to share child pornography, highlights subreddits that feature child pornography to sell advertising on those pages, allows users who share child pornography to serve as subreddit moderators, and fails to remove child pornography even when users report it, as the plaintiff did in this case," even considered together, did not "amount[] to knowing participation in a sex trafficking venture").

## V. ALL OF PLAINTIFFS' STATE LAW CLAIMS INDEPENDENTLY FAIL ON THE MERITS, REGARDLESS OF WHICH STATE'S LAWS ARE APPLIED.

Plaintiffs concede all of their state law claims fail under South Carolina law. They argue for the first time that the Court should not apply South Carolina law,[16] but instead should apply "the law of the states where each Plaintiff suffered emotional distress"—*i.e.*, Kentucky (Does 2-8), Indiana (Doe 1), Texas (Doe 9), and Nevada (Doe 10). Opp. at 26. Under "*lex loci delicti* principles as they have been applied by South Carolina courts, this Court must apply the substantive law of the state in which 'in which the [alleged] injury occurred, ***not where the results***

---

[16] In their oppositions to MindGeek's motions to dismiss, Plaintiffs applied South Carolina law to their state law claims. *See, e.g.*, Dkt. Nos. 51, 69, 114.

*of the injury were felt* or where the damages manifested ….'" *Advanced Com. Credit Int'l (ACI) Ltd. v. CitiSculpt, LLC*, 2018 WL 2149296, at *4 (D.S.C. May 10, 2018) (applying South Carolina law despite "[plaintiff's] domiciliary [in Virginia] and where it might have felt the … harm").

Even if Plaintiffs' choice-of-law were correct (it is not), these claims—*i.e.*, negligent monitoring, false light, and civil conspiracy—still fail for the additional reasons discussed below.

### A.     Plaintiffs' "Negligent Monitoring" Claim Fails as a Matter of Law.

Plaintiffs concede that the negligent monitoring claim fails under Indiana and Nevada law, and thus, that Doe 1 and Doe 10's claims should be dismissed. *Cf.* Opp. at 33-38 (not addressing negligent monitoring claim under Indiana or Nevada law). The other Plaintiffs' (Does 2-9) negligent monitoring claim also should be dismissed. The "threshold inquiry" in any negligence action—including those governed by Kentucky and Texas law—"is whether the defendant owed the plaintiff a duty of care." *Mack v. RPC, Inc.*, 439 F. Supp. 3d 897, 901 (E.D. Tex. 2020); *accord Nationwide Mut. Fire Ins. Co. v. Nelson*, 2011 WL 6726917, at *3 (E.D. Ky. Dec. 21, 2011) ("the most fundamental element of a negligence claim" is whether "[defendant] owes [plaintiff] a duty"). MindGeek had no duty to Plaintiffs to monitor and filter out potentially harmful third-party content under any state's laws. *Cf.* Mot. at 31-32. As discussed below, the Court should reject Plaintiffs' attempts to concoct a duty where none exists under Kentucky and Texas law.

### 1.     There Is No Basis to Find a Duty of Care Under Kentucky Law.

Plaintiffs offer three bases for finding a duty of care under Kentucky law. All of them fail. ***First***, Plaintiffs argue a duty arose from Plaintiffs' status as "intended third party beneficiaries" of the TOS. Opp. at 34. However, Plaintiffs have never alleged—and thus cannot now assert—that the TOS was made for Plaintiffs' benefit. *See Jenkins v. Best*, 250 S.W.3d 680, 695 (Ky. Ct. App. 2007) (rejecting plaintiff's "third party beneficiary" argument on summary judgment where

"complaint [did] not allege a third-party beneficiary claim"). Moreover, Plaintiffs have not offered anything to overcome the "presumption [under Kentucky law] that the contracting parties did ***not*** intend to benefit a third party." *Bariteau v. PNC Fin. Servs. Grp., Inc.*, 285 F. App'x 218, 220-21 (6th Cir. 2008). In fact, the TOS does not mention Plaintiffs or "offer[] any indication that it was designed to benefit [them]." *Id.* at 221. Because Plaintiffs "at best [are] incidental beneficiar[ies]" of the TOS, they cannot maintain a negligence claim based thereon. *Id.* at 220-21.

***Second***, Plaintiffs argue a duty arose from MindGeek's "voluntary undertaking … to prevent nonconsensual posting." Opp. at 36. MindGeek's prohibition of nonconsensual content does "not create a new duty or constitute an assumption of a duty that [they] otherwise did not have." *Murphy v. Second St. Corp.*, 48 S.W.3d 571, 575 n.16 (Ky. Ct. App. 2001); *see also Morgan v. Scott*, 291 S.W.3d 622, 632-33 (Ky. 2009) ("we reject any argument that a person or business entity's adoption of an internal guideline or policy and subsequent failure to follow that internal guideline automatically leads to liability" for negligence).

***Third***, "despite its value as a 'catch phrase,' … the [so-called] 'universal duty of care' has no meaning in Kentucky jurisprudence beyond the most general expression of negligence theory." *Jenkins*, 250 S.W.3d at 691; *see also Cordes v. United Specialty Ins. Co.*, 2022 WL 949935, *10 (W.D. Ky. Mar. 29, 2022) (so-called "universal duty of care" "doesn't displace the usual analysis of whether a defendant owed a plaintiff a duty").[17] Because no duty of care otherwise exists here under Kentucky law, Doe 2-8's negligent monitoring claims must be dismissed.

---

[17] Both cases that Plaintiffs cite (Opp. at 34-35) recognize that the "universal duty of care" is "not boundless," and only found that a duty of care existed based on highly distinguishable facts. *See Hodge v. Spalding Univ., Inc.*, 2024 WL 4713578, at *4 (W.D. Ky. Nov. 7, 2024) (volleyball coach had duty to her team players); *T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 531 (Ky. 2006) (sporting goods store had duty to not sell firearms to people under the age of 21).

### 2.      There Also Is No Basis to Find a Duty of Care Under Texas Law.

Plaintiffs' "duty of care" arguments fare no better under Texas law.  ***First***, Plaintiffs argue a duty arose from Texas Penal Code § 21.16, which criminalizes the "unlawful disclosure or promotion of [ ] visual material" depicting a person with "intimate parts exposed or engaged in sexual conduct."  *See* Opp. at 36-37.  Plaintiffs do not cite a single case adopting this statute as a standard for negligence,[18] and it would be inappropriate do so here as the depiction of Doe 9 does not fall within the scope of the statute (*see* Pls. Ex. 25 (Doe 9 Tr.) at 176:7-177:6) and, regardless, MindGeek has a complete defense to liability.  *See* Texas Penal Code § 21.16(f)(3) (providing "affirmative defense" to "interactive computer service" if "promotion consists of visual material provided by another person"); *cf. Holder v. Brannan*, 2022 WL 4001973, at *2 (W.D. Tex. Aug. 31, 2022) ("[T]he adoption of criminal statutes into tort law is a matter of judicial discretion.").

***Second***, Plaintiffs argue MindGeek had a duty to stop others from "posting [] illegal videos [of] nonconsenting persons" due to the "foreseeability of the risk" and "interrelated factors."  Opp. at 37-38.  Tellingly, Plaintiffs ignore *Ethridge v. Samsung SDI Co.*, 604 F. Supp. 3d 556 (S.D. Tex. 2022), which held a website owes no duty to the public to monitor third-party content.  *See* Mot. at 32.  Because Plaintiffs "[did] not point to any case where a court has recognized a negligence duty under [similar] circumstances," the Court should not "recognize such a novel duty here."  *THPD, Inc. v. Cont'l Imps., Inc.*, 260 S.W.3d 593, 617-18 (Tex. App. 2008).[19]

---

[18] Plaintiffs only cite *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 279 (Tex. 1979), involving the "Motor Carrier Act," which the court refused to adopt it as a standard for negligence.

[19] The one case that Plaintiffs cite (Opp. at 37-38) recognized that, "[g]enerally, there is no duty to control the conduct of third persons."  *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525, 527 (Tex. 1990) ("cab company had no duty to warn its cab drivers not to carry guns").

B.     **Plaintiffs' False Light Claim Fails as a Matter of Law.**

As an initial matter, Plaintiffs' false light claim is the *only* privacy claim that remains against MindGeek.  Plaintiffs *previously* asserted other privacy claims against MindGeek (Dkt. No. 99 ¶¶ 60-86), but the Court dismissed them (Dkt. No. 133 at 7).  Plaintiffs' attempt to shoehorn these claims into their false light claim (Opp. at 26) is barred by the "law of the case."  *Columbus–America Discovery Group v. Atl. Mut. Ins. Co.*, 203 F.3d 291, 304 (4th Cir. 2000) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case").  Additionally, Plaintiffs' false light claim fails.

Plaintiffs concede that Doe 9's false light claim should be dismissed.  *Cf.* Opp. at 26-28.  Indeed, like South Carolina, "Texas law *does not recognize* claims for false-light invasion of privacy."  *Sinclair v. Krassenstein*, 2024 WL 4329137, at *5 (S.D. Tex. Aug. 20, 2024).

Under Nevada law, Doe 10's false light claim is time-barred.  A "two-year limitations period [ ] applies to false light claims," *Jackson v. Las Vegas Rev. J.*, 2018 WL 4173192, at *2 (Nev. App. Aug. 10, 2018), and when, as here, the claim arises from "publication of information on the Internet," it "runs from the point at which the *original dissemination* occurred."  *Sears v. Russell Rd. Food & Beverage, LLC*, 460 F. Supp. 3d 1065, 1071 (D. Nev. 2020).  Doe 10's Videos were posted on or before September 4, 2019.  *See* Pls. Ex. 3 ("Video Info" tab).  Because Doe 10 waited more than two years, until September 30, 2021, to file this lawsuit, her claims are untimely.

The remaining Plaintiffs' (Does 1-8) "false light" claim also fail on the merits as a matter of law.  Plaintiffs claim "what truly placed [them] in a false light" was the "placement of the videos on the 'amateur,' 'fetish,' and 'lesbian' category pages" on the Pornhub Website—*i.e.*, portraying them as willing participants in pornography.  Opp. at 21.  But these "categories" do not purport to describe *Plaintiffs*; they merely categorize the Videos for organizational purposes.   More

critically, Plaintiffs claim that MindGeek knew or should have known the Videos were nonconsensual. Indeed, Plaintiffs' own expert opined that MindGeek "advertised that the content of these videos was secretly recorded" (Pls. Ex. 9 ¶ 13) and that the Videos "did not appear to be staged or professionally produced" (*id.* ¶ 15).[20] Plaintiffs cannot have it both ways. If, as Plaintiffs claim, a view could reasonably conclude that the Videos were ***consensual*** (*i.e.*, that Plaintiffs voluntarily "engaged in porn" and "lesbian conduct" (Opp. at 28)), then Plaintiffs cannot fairly claim that MindGeek was negligent in allowing them to go live. On the other hand, if, as Plaintiffs also claim, the Videos obviously were ***nonconsensual***, then they cannot fairly claim they were portrayed in a false light as willing participants in pornography. *See, e.g.*, *Faloona by Fredrickson v. Hustler Mag., Inc.*, 799 F.2d 1000, 1007 (5th Cir. 1986) (affirming dismissal of false light claim on summary judgment because "[r]eviewing the context in which plaintiffs' photographs appeared in *Hustler*, … no reasonable person could consider the photographs as indicating plaintiffs' approval of *Hustler*, or that they were willing to pose nude for *Hustler*").

### C.     <u>Plaintiffs' "Civil Conspiracy" Claim Fails as a Matter of Law.</u>

Civil conspiracy is not an independent claim in any of the four states. Because all of the underlying claims fail as a matter of law, Plaintiffs' derivative civil conspiracy claim cannot stand. *See Christian Cnty. Clerk ex rel. Kem v. Mortgage Elec. Reg. Sys., Inc.*, 515 Fd. App'x 451, 458-59 (6th Cir. 2013) (dismissing civil conspiracy claim because "underlying [ ] claim" was "no[t] actionable"); *Reiner v. Dandurand*, 33 F. Supp. 3d 1018, 1033 (N.D. Ind. 2014) (similar); *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) (similar); *Vested Hous. Grp., LLC v. Principal Real Est. Invs.*, LLC, 648 F. App'x 646, 649 (9th Cir. 2016) (similar).

---

[20] Notably, the public would not have known that Plaintiffs were depicted in the Videos unless they actually watched them. Indeed, Plaintiffs were not identified in the Videos' titles or metadata.

Even if this were not the case, Plaintiffs' civil conspiracy claim still fails. Initially, Plaintiffs' new theory that MindGeek conspired with LordFauger18 (Opp. at 31) does not align with their pleadings, which alleges a conspiracy among **Defendants**. *See* 5AC ¶¶ 195-196; *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. Appx. 556, 563 (4th Cir. 2008) ("plaintiff may not amend her complaint through argument in a brief opposing summary judgment"). Regardless, Plaintiffs cite no evidence that MindGeek and LordFauger18 agreed or intended to accomplish any unlawful objective—which is fatal to their claim in all four states. *See Ellington v. Fed. Home Loan Mortg. Corp.*, 13 F. Supp. 3d 723, 730 (W.D. Ky. 2014) ("civil conspiracy requires" an agreement "for the **purpose of accomplishing an unlawful goal**"); *Mid Cent. Operating Eng'rs Health & Welfare Fund v. HoosierVac LLC*, 2024 WL 4494414, at *2 (S.D. Ind. Oct. 15, 2024) (similar); *Conceal City, L.L.C. v. Looper L. Enf't*, LLC, 917 F. Supp. 2d 611, 617 (N.D. Tex. 2013) (similar); *Wisdom v. Nev.*, 2011 WL 677332, at *4 (D. Nev. Feb. 16, 2011) (similar).

## CONCLUSION

For the foregoing reasons and those set forth in their opening brief, MindGeek respectfully request that the Court grant summary judgment in its favor on all of Plaintiffs' claims.

Respectfully submitted,

DATED: March 17, 2025                 TURNER, PADGET, GRAHAM AND LANEY, P.A.

Greenville, South Carolina            By: /s/ Mark Goddard
                                      Mark Goddard | Attorney ID: 09194
                                      email | mgoddard@turnerpadget.com
                                      direct | 803-227-4334

Los Angeles, California               MITCHELL SILBERBERG & KNUPP LLP

                                      Marc E. Mayer | admitted *pro hac vice*
                                      email | mem@msk.com
                                      direct | 310-312-3154

                                      *Attorneys for Defendants MG Freesites Ltd and MindGeek S.à r.l.*